1  Robert A. Sacks (SBN 150146)
   sacksr@sullcrom.com
2  Brian R. England (SBN 211335)
   englandb@sullcrom.com
3  Edward E. Johnson (SBN 241065)
   johnsonee@sullcrom.com
4  SULLIVAN & CROMWELL LLP
   1888 Century Park East, Suite 2100
5  Los Angeles, California 90067-1725
   Tel.:   (310) 712-6600
6  Fax:   (310) 712-8800

7  Frank L. Bernstein (SBN 189504)
   fbernstein@kenyon.com
8  KENYON & KENYON LLP
   333 West San Carlos Street, Suite 600
9  San Jose, California 95110
   Tel.:   (408) 975-7500
10 Fax:   (408) 975-7501

11 *Attorneys for Plaintiff and Counterclaim*
   *Defendant Catch Curve, Inc. and*
12 *Third Party Defendant j2 Global*
   *Communications, Inc.*

13

14

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17
   CATCH CURVE, INC.,                    )   Case No. CV 05-4820 DDP (AJWx)
18                                        )
                         Plaintiff        )   **CATCH CURVE, INC. AND J2**
19                                        )   **GLOBAL COMMUNICATIONS,**
                 v.                       )   **INC.'S NOTICE OF MOTION**
20                                        )   **AND MOTION TO STRIKE**
   VENALI, INC.                           )   **AND/OR EXCLUDE**
21                                        )   **TESTIMONY FROM DR.**
                         Defendant.       )   **RICHARD SMITH**
22                                        )
                                          )
23 ──────────────────────────────         )   Judge:    Hon. Dean D. Pregerson
                                          )   Date:     October 6, 2008
24 AND RELATED CROSS-ACTION              )   Time:     10:00 a.m.
                                          )   Courtroom: 3
25 AND THIRD PARTY COMPLAINT             )
                                          )
26 ──────────────────────────────         )

27

28

1  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2      PLEASE TAKE NOTICE that on October 6, 2008, at 10:00 a.m., or

3  as soon thereafter as the matter may be heard in the United States District Court,

4  Central District of California, located at 312 N. Spring Street, Los Angeles,

5  California, 90012, Counterclaim Defendant Catch Curve, Inc. and Third Party

6  Defendant j2 Global Communications, Inc. will, and hereby do, move to strike Dr.

7  Richard Smith's expert report or testimony and/or to preclude Venali, Inc. from

8  offering Dr. Smith's expert report or testimony in opposition to j2 and Catch

9  Curve's Motion for Summary Judgment or at trial.

10      This Motion will be based upon this Notice of Motion and Motion, the

11  accompanying Memorandum of Points and Authorities, the Declaration of Edward

12  E. Johnson submitted herewith, the complete files and records in this action, and

13  such additional material as may be considered at the hearing.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SULLIVAN & CROMWELL LLP

1         This Motion is made following the conference of counsel pursuant to

2   L.R. 7-3 which took place on August 18, 2008.

3

    Dated:  September 15, 2008               Respectfully submitted,

4

5                                         Robert A. Sacks /EEJ

6                                       Robert A. Sacks (SBN 150146)
                                    Brian R. England (SBN 211335)

7                                       Edward E. Johnson (SBN 241065)
    Of Counsel:                     SULLIVAN & CROMWELL LLP

8       Jeffrey S. Gerchick             1888 Century Park East
    KENYON & KENYON LLP      Los Angeles, California 90067-1725

9       1500 K Street, N.W.            (310) 712-6600
    Suite 700                    (310) 712-8800 facsimile

10      Washington, D.C.  20005-1257
    (202) 220-4200              Frank L. Bernstein (SBN 189504)

11      (202) 220-4201 facsimile      KENYON & KENYON LLP
                                      333 West San Carlos Street, Suite 600

12                                    San Jose, California 95110
                                  (408) 975-7500

13                                    (408) 975-7501 facsimile

14                       *Attorneys for Plaintiff and Counterclaim*
                     *Defendant Catch Curve, Inc. and*

15                       *Third Party Defendant j2 Global*
                     *Communications, Inc.*

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................1

ARGUMENT ....................................................................................2

    I.     Legal Standard .......................................................................2

    II.    Dr. Smith's Analysis and Conclusions Should Be Excluded Because They Do Not Address the Wrongful Conduct Alleged In This Case. .........................................................................4

    III.   Dr. Smith's Analysis and Conclusions Should Be Excluded Because They Are Dependant Upon Proof of Facts of Which There Is No Evidence in the Record. ........................................6

    IV.   Dr. Smith's Opinions Regarding j2's Market Power Should Be Excluded Because They Are Unreliable. .................................8

    V.    Dr. Smith Offers No Relevant Analysis Regarding j2's Alleged Anticompetitive Conduct or Any Alleged Injury To Competition. ...........................................................................16

    VI.   Dr. Smith's Conclusion About Venali's Damages Should Be Excluded Because He Does No Analysis. ..............................17

    VII.  Dr. Smith's Discussion of Internet Facsimile Services Should Be Excluded Because He Has No Expertise in Internet Faxing. ........17

CONCLUSION ................................................................................18

-i-

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Prof'l Testing Serv.* v. *Jiarcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*,
    108 F.3d 1147 (9th Cir. 1997) ...................................................................11

*Cabrera* v. *Cordis Corp.*,
    134 F.3d 1418 (9th Cir. 1998) ...................................................................2

*Claar* v. *Burlington N.R.R. Co.*,
    29 F.3d 499 (9th Cir. 1994) .......................................................................2

*Comer* v. *American Elec. Power*,
    63 F. Supp. 2d 927 (N.D. Ind. 1999) .........................................................6

*Daubert* v. *Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) .....................................................................3

*Daubert* v. *Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).........................................................................passim

*Democratic Party Wash. State* v. *Reed*,
    No. C00-5419, 2002 WL 32925223 (W.D. Wash. March 27, 2002) ................10

*Diviero* v. *Uniroyal Goodrich Tire Co.*,
    114 F.3d 851 (9th Cir. 1997) .....................................................................3

*Domingo* v. *T.K.*,
    289 F.3d 600 (9th Cir. 2002) .....................................................................14

*Eastern Auto Distr., Inc.* v. *Peugeot Motors of America*,
    795 F.2d 329 (4th Cir. 1986) .....................................................................6

*Eastman Kodak Co.* v. *Image Technical Servs., Inc.*,
    504 U.S. 451 (1992).................................................................................13

*Eymard* v. *Pan American World Airways*,
    795 F.2d 1230 (5th Cir. 1986) ...................................................................17

*Forsyth* v. *Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) ...................................................................13

-ii-

*Gen. Elec. Co.* v. *Joiner*,
  522 U.S. 136 (1997) ........................................................................3, 9

*In re Canvas Specialty, Inc.*,
  261 B.R. 12 (Bankr. C.D. Cal. 2001) ...................................................7

*In re Worldcom, Inc.*,
  371 B.R. 33 (Bankr. S.D.N.Y. 2007) ...................................................6

*Kumho Tire Co.* v. *Carmichael*,
  526 U.S. 137 (1999) ...................................................................2, 3, 9

*Lantec* v. *Novell, Inc.*,
  146 F. Supp. 2d 1140 (D. Utah 2001) ...................................................8

*Lust* v. *Merrell Dow Pharms., Inc.*,
  89 F.3d 594 (9th Cir. 1996) ...............................................................2

*McGlinchy* v. *Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988) ...............................................................3

*McLean* v. *Piper Aircraft Corp.*,
  224 F.3d 797 (6th Cir. 2000) ...............................................................6

*Metabyte, Inc.* v. *Canal+ Techs., S.A.*,
  No. C-02-05509, 2005 WL 6032845 (N.D. Cal. June 17, 2005) ......................16

*Nationwide Transp. Fin.* v. *Cass Info. Sys.*,
  523 F.3d 1051 (9th Cir. 2008) ...........................................................12

*R.J. Reynolds Tobacco Co.* v. *Philip Morris Inc.*,
  199 F. Supp. 2d 362 (M.D.N.C. 2002) .................................................13

*Rebel Oil Co.* v. *Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) .....................................................8, 9, 11

*Sanderson* v. *Int'l Flavors & Fragrances*,
  950 F. Supp. 981 (C.D. Cal. 1996) .....................................................17

*Smith Wholesale Co., Inc.* v. *Philip Morris USA, Inc.*,
  219 Fed. Appx. 398 (6th Cir. 2007) ....................................................13

*U.S.* v. *Various Slot Machines on Guam*,
  658 F.2d 697 (9th Cir. 1981) ...............................................................6

-iii-

*Van Der Valk* v. *Shell Oil Co.*,
    2004 WL 5486643 (C.D. Cal. Nov. 15, 2004) ...................................................5

*Virginia Vermiculite Ltd.* v. *W.R. Grace & Co.*,
    98 F. Supp. 2d 729 (W.D. Va. 2000).................................................................13

*YKK Corp.* v. *Jungwoo Zipper Co.*,
    213 F. Supp. 2d 1195 (C.D. Cal. 2002) ...........................................................18

*Zenith Elec. Corp.* v. *WH-TV Broadcasting Corp.*,
    395 F.3d 416 (7th Cir. 2005) ..............................................................................6

**STATUTES AND RULES**

Fed. R. Civ. P. 703 ....................................................................................................7

Fed. R. Evid. 104.................................................................................................2, 4

Fed. R. Evid. 402........................................................................................................3

Fed. R. Evid. 702.............................................................................................. 2, 3, 4, 6

**OTHER AUTHORITIES**

3A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (2d ed. 2002).... 15, 16

AMERICAN BAR ASSOCIATION SECTION OF ANTITRUST LAW, ECONOMETRICS:
    LEGAL, PRACTICAL, AND TECHNICAL ISSUES (2005) ..........................................15

RUTTER GROUP, FEDERAL CIVIL TRIAL AND EVIDENCE § 8:1526 ...........................17

SULLIVAN & CROMWELL LLP

MOTION TO STRIKE AND/OR EXCLUDE TESTIMONY FROM DR. RICHARD SMITH

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff and Counterclaim Defendant Catch Curve, Inc. ("Catch Curve") and Third Party Defendant j2 Global Communications, Inc. ("j2") respectfully submit this Memorandum in support of their motion to strike and/or preclude Defendant Venali, Inc. ("Venali") from offering testimony from Dr. Richard L. Smith ("Dr. Smith"), its purported economic expert.

## INTRODUCTION

The expert report submitted by Dr. Smith on behalf of Venali suffers from a myriad of flaws so fundamental as to render it totally unreliable and thus inadmissible.

First, Dr. Smith admits that he made *no effort whatsoever* to connect the alleged anticompetitive conduct (which is limited to sham litigation filed after j2 acquired the AudioFax Patents in 2005) to any competitive harm to the alleged market.  Absent any such connection, Dr. Smith's conclusions regarding j2's alleged market power and Venali's alleged damages are wholly irrelevant and must be excluded.

Second, even passing that fatal defect, Dr. Smith's analysis and conclusions with respect to j2's market share and power and the composition of the alleged market are inadmissible because they are entirely dependant on facts for which there is no admissible evidence in the record.  Venali did not take any discovery concerning the sales and revenue of participants in the alleged market and Dr. Smith has no source of such information.  Instead, Dr. Smith relied on estimates proposed by an industry analyst, who is not a witness in this case and has never been identified by Venali as having knowledge of facts relevant to this case, that are (i) admittedly not accurate, (ii) based largely on the analyst's own judgment rather than empirical data and in some individual cases, supposedly on conversations with some competitors, and (iii) not verifiable by reference to public sources because most of the companies in the alleged market are private.  Thus,

-1-

1  because the "facts" are hearsay and inadmissible, Dr. Smith's analysis must be
2  stricken because it is not based on any facts that could be considered in this case.

3         Third, Dr. Smith's purported conclusions are in many respects
4  contradicted by the undisputed facts.

5         Fourth, Dr. Smith's methodology in certain central aspects fails to
6  conform to accepted economic standards and/or to consider relevant elements that
7  the applicable law and accepted economic teaching requires to be considered.

8         Because Dr. Smith's analysis and conclusions fail to satisfy the
9  requirements of Fed. R. Evid. 702 and the standards enunciated in *Daubert* v.
10 *Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), his report and testimony must be
11 excluded.

12                **<u>ARGUMENT</u>**

13 **I.**    **Legal Standard**

14        The Supreme Court has emphasized the "gatekeeping" role of trial
15 courts, under Fed. R. Evid. 104 and 702, "to ensure the reliability and relevancy of
16 expert testimony." *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 152 (1999)
17 (citing *Daubert*, 509 U.S. at 597). Consistent with this rule, the Ninth Circuit has
18 made clear that a district court has the ability to exclude expert testimony that fails
19 to meet the *Daubert* standard of reliability. *See, e.g., Cabrera* v. *Cordis Corp.*, 134
20 F.3d 1418, 1421-23 (9th Cir. 1998) (affirming exclusion of testimony from four
21 experts); *Lust* v. *Merrell Dow Pharms., Inc.*, 89 F.3d 594, 596-97 (9th Cir. 1996)
22 (affirming exclusion of proposed expert testimony where expert "merely
23 interpreted the work of others"); *Claar* v. *Burlington N.R.R. Co.*, 29 F.3d 499, 502
24 (9th Cir. 1994) (affirming exclusion of expert testimony where there was no
25 evidence that the experts' conclusions "[were] based on anything more than
26 subjective belief and unsupported speculation").

27        Expert testimony is admissible only if: "(1) the testimony is based
28 upon sufficient facts or data, (2) the testimony is the product of reliable principles

-2-

1    and methods, and (3) the witness has applied the principles and methods reliably to

2    the facts of the case." Fed. R. Evid. 702. In short, expert opinions must be based

3    on sound methodology and facts in the record, not on speculation and conjecture.

4    *See, e.g., Daubert*, 509 U.S. at 589-90 ("The subject of an expert's testimony must

5    be 'scientific knowledge.' . . . [T]he word 'knowledge' connotes more than

6    subjective belief or unsupported speculation."); *Kumho Tire Co.*, 526 U.S. at 152

7    (expert must employ "the same level of intellectual rigor that characterizes the

8    practice of an expert in the relevant field"); *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136,

9    146 (1997) (expert testimony is properly excluded when "there is simply too great

10   an analytical gap between the data and the opinion proffered"); *Diviero* v. *Uniroyal*

11   *Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) (holding that district court

12   properly excluded expert testimony where it was speculative and would not have

13   assisted the trier of fact); *McGlinchy* v. *Shell Chem. Co.*, 845 F.2d 802, 807 (9th

14   Cir. 1988) (excluding expert testimony where expert's study rested on

15   "unsupported assumptions and unsound extrapolation").

16           In addition, the proffered testimony must be relevant. *See* Fed. R.

17   Evid. 402; *Daubert* v. *Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir.

18   1995) ("we must ensure that the proposed expert testimony is relevant to the task at

19   hand") (quotation marks omitted); *Kumho Tire Co.*, 526 U.S. at 152 (Rule 702

20   "requires a valid . . . connection to the pertinent inquiry as a precondition to

21   admissibility") (quotation marks omitted). In other words, the expert's proposed

22   testimony must be "sufficiently tied to the facts of the case [so] that it will aid the

23   jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (citation omitted).

24           The proponent of the expert testimony "has the burden of establishing

25   that the pertinent admissibility requirements [of Rule 702] are met by a

26   preponderance of the evidence." Fed. R. Evid. 702, Advisory Committee's Note

27   (2000 amendments) (citing *Bourjaily* v. *United States*, 483 U.S. 171 (1987)); *see*

28   *also* Fed. R. Evid. 104.

## II. Dr. Smith's Analysis and Conclusions Should Be Excluded Because They Do Not Address the Wrongful Conduct Alleged In This Case.

Dr. Smith's analysis and conclusions are irrelevant, because even if they were correct, he has failed to connect — or even *try* to connect — j2's claimed acquisition or maintenance of market power to the alleged misconduct in this case. As Venali has repeatedly made clear, the *only* alleged misconduct at issue in this case is the assertion by j2, through Catch Curve, of allegedly sham patent infringement claims against competitors. (Johnson Decl. Ex. 1 ("O'Keefe Dep.") at 113 ("all [of the antitrust claims] derive from the – the sham litigation"); *id.* at 127-29 ("Q: Now, so we've got threat of litigation, the cost of litigation, the cost of the license . . . Is that correct, have I covered them all?  A: Yes."); Second Amended Counterclaims ¶¶ 118 - 127 (alleging no misconduct other than sham litigation).)  j2 did not even acquire the AudioFax Patents until 2005, and so the conduct at issue only began in 2005.  Venali has confirmed that its claims are not based on any conduct prior to j2's acquisition of the AudioFax Patents. (O'Keefe Dep. at 126-27.)

Dr. Smith admits, however, that he did not "do anything to try to isolate a separate impact of j2's efforts to enforce the AudioFax Patents." (Johnson Decl. Ex. 2 ("Smith Dep.") at 59; *see also id.* at 10 ("Am I correct that you don't separate out in your report the effect of litigation behavior, if any?  A: I believe that's accurate."); *id.* at 53, 61.)  Nor was he able to identify any competitive harm caused by Catch Curve's litigation, such as a competitor being forced to exit the market or curtail its service offerings. (*Id.* at 94 ("Q: Okay.  So in terms of this, you're expressing no opinion that these lawsuits have caused any competitive — any material competitive harm to any of the other competitors in the market?  . . . A: You're correct.").)[1]

---

[1] This is not surprising since Venali has admitted that: (i) there are *more* competitors in the alleged market today than there were when j2 acquired the AudioFax Patents, (ii) it cannot identify any competitors who have been prevented from entry into the allged market because of j2's actual or

1    In fact, most of the conduct and events relied upon by Dr. Smith in

2    concluding that j2 has market power *predate* j2's purchase of the patents-in-suit in

3    2005. (*E.g.*, Johnson Decl. Ex. 3 ("Rep.") at ¶ 29, describing 2003 price increase.)

4    As Dr. Smith admits, if j2 had market power at that time, it could not have been

5    due to enforcement of the patents-in-suit. (Smith Dep. at 60 ("Q: To the extent in

6    2003 that j2 had the ability to raise the price of its services, that was not as a result

7    of its enforcement of the AudioFax patents; is that right?  A. Correct.").)  It is

8    therefore clear that Dr. Smith's testimony and analysis do not relate to the issues in

9    this case and must be excluded.

10    Instead of analyzing the effects of j2's alleged anticompetitive

11    conduct in threatening or bringing allegedly sham litigation beginning in 2005, Dr.

12    Smith focuses on j2 offering its service for free to new customers — conduct that

13    is not claimed by Venali in this action to be anticompetitive, is not even mentioned

14    in Venali's counterclaims, was not the subject of discovery, and is not now and has

15    never been a part of this case.  (*E.g.*, Rep. at ¶¶ 49-53, 59.)  Because Venali's

16    claims are not based on j2's free service, Dr. Smith's analysis of that service, and

17    his conclusions based on it, are irrelevant and inadmissible.  *See Van Der Valk* v.

18    *Shell Oil Co.*, 2004 WL 5486643, at *2 (C.D. Cal. Nov. 15, 2004) (striking from

19    expert reports all the references to the difference in the price charged to a

20    subsidiary and an independent retailer, because the court had previously ruled that

21    those differences could not support liability and therefore were irrelevant).

22    In short, Dr. Smith concludes that j2 has market power, but fails to tie

23    that conclusion to the alleged anticompetitive conduct at issue in this case.  Thus,

24    even if Dr. Smith's conclusions were correct, and they are not, his testimony does

25    not "fit" the facts of this case, and should be excluded.  *Daubert*, 509 U.S. at 591.

26

27    threatened assertion of patent claims, and (iii) it cannot identify any
competitor who has left the market or been unable to compete because of

28    j2's assertion of patent claims. (O'Keefe Dep. at 58-59, 116, 155-56, 160-61; Johnson Decl. Ex. 4 ("Musgrove Dep.") at 138.)

-5-

**III.   Dr. Smith's Analysis and Conclusions Should Be Excluded Because They Are Dependant Upon Proof of Facts of Which There Is No Evidence in the Record.**

Dr. Smith's entire expert report and conclusions are founded upon and flow from computations he performs of j2's share of the supposed U.S. market for internet facsimile services for SOHO (small office/home office) customers. Putting aside the impropriety and implausibility of that market definition in the first place,[2] Dr. Smith's opinions must be excluded because there is no evidence in the record of the "facts" on which his market share "analysis" depends.

Rule 702 expressly requires proposed expert testimony to be based upon "sufficient facts or data." Fed. R. Evid. 702; *see also, e.g., Daubert*, 509 U.S. at 590, *Zenith Elec. Corp.* v. *WH-TV Broadcasting Corp.*, 395 F.3d 416, 418 (7th Cir. 2005); *Comer* v. *American Elec. Power*, 63 F. Supp. 2d 927, 939 (N.D. Ind. 1999) ("Opinions without factual support are nothing more than subjective belief and unsupported speculation — the *ipse dixit* — of the witness, and therefore Dr. Nine's testimony does not meet the reliability test of *Daubert* and Rule 702."); *McLean* v. *Piper Aircraft Corp.*, 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record."); *U.S.* v. *Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981) ("in the context of a motion for summary judgment, an expert must back up his opinion with specific facts").

Where the assumptions underlying an expert's opinion are unsupported and speculative, the expert's testimony is properly excluded. *Eastern Auto Distr., Inc.* v. *Peugeot Motors of America*, 795 F.2d 329, 338 (4th Cir. 1986); *In re Worldcom, Inc.*, 371 B.R. 33, 41 (Bankr. S.D.N.Y. 2007). Further, "even where an expert has sufficient data, the testimony may be inadmissible if the expert

---

[2]   *See* Catch Curve, Inc. and j2 Global Communications, Inc.'s Motion for Partial Summary Judgment, at 18-23.

-6-

1  has a gross misunderstanding of the relevant facts." *In re Canvas Specialty, Inc.*,

2  261 B.R. 12, 16 (Bankr. C.D. Cal. 2001).

3  Under these well-settled standards, Dr. Smith's testimony here must

4  be excluded. There is no admissible or reliable evidence of the size of the market

5  or the size of any of j2's competitors, and, as such, there is no factual basis in the

6  record to support Dr. Smith's analysis and conclusions regarding j2's alleged

7  market share.

8  The only "facts" Dr. Smith uses to support his conclusions come from

9  a report authored by Peter Davidson (the "Davidson Report"). The Davidson

10  Report, however, is unreliable hearsay. To compile market share figures,

11  Davidson (according to Dr. Smith) calls some Internet fax providers and asks them

12  their revenue, and simply guesses at the rest. (Smith Dep. at 130-31.) Not

13  surprisingly, everyone agrees that the Davidson Report is unreliable. (*E.g.*,

14  Musgrove Dep. at 89-90; Johnson Decl. Ex. 5 ("El Gazzar Dep.") at 147; O'Keefe

15  Dep. at 80.)

16  In addition, the Davidson Report is inadmissible hearsay. Although

17  Fed. R. Civ. P. 703 allows an expert to rely on data relied upon by experts in the

18  field, there is no evidence that any expert in the field relies on the Davidson

19  Report. Dr. Smith testified that Mr. Davidson told him many people in the

20  industry purchase the report, but admitted that he does not know what the

21  purchasers use the report for. (Smith Dep. at 135.) Thus, there is no basis for a

22  finding that experts in the field rely on the Davidson Report, and Dr. Smith's

23  reliance on it was improper for that reason as well.

24  Dr. Smith admits that he would be unable to analyze market share

25  without relying upon the Davidson Report. (Smith Dep. at 127-29.) Accordingly,

26  his market share analysis and conclusions should be stricken.

27

28

**IV.   Dr. Smith's Opinions Regarding j2's Market Power Should Be Excluded Because They Are Unreliable.**

    **A.   Dr. Smith's Conclusion That There Is Indirect Evidence That j2 Has Market Power Is Unreliable.**

In addition to the fundamental lack of any evidentiary basis, Dr. Smith's opinion that there is indirect evidence that j2 has market power should be excluded for three reasons: (i) Dr. Smith fails to properly analyze the relevant market; (ii) Dr. Smith's market share analysis is unsound; and (iii) Dr. Smith's conclusions with respect to barriers to entry are not supported by any evidence or citation.

    **1.   *Dr. Smith Fails To Properly Analyze the Relevant Market.***

Dr. Smith opines that the relevant market is Internet facsimile services sold to individual or small business customers (*i.e.*, customers who buy from the website and do not negotiate unique pricing) in the United States. (Rep. at ¶¶ 43-47.) But he does not support any aspect of his definition with meaningful analysis.

*First*, whether two products are part of the same market for antitrust purposes depends on whether "consumers view the products as substitutes." *Rebel Oil Co.* v. *Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995). Dr. Smith acknowledges that several products, including fax machines, are substitutes. (Rep. ¶ 44; Smith Dep. at 184.) He nevertheless concludes that Internet facsimile services constitute a separate market because "price and other dimensions [] limit demand-side substitutability." (Rep. at ¶ 43.) But he did not conduct a cross-elasticity analysis, nor any quantitative analysis whatsoever. *See Lantec* v. *Novell, Inc.*, 146 F. Supp. 2d 1140 (D. Utah 2001) (faulting expert testimony for failing to perform a cross-elasticity study to determine the relevant market). And while Dr. Smith points out differences between internet faxing and traditional faxing, email, mail and courier services (*id.* at ¶¶ 43, 44), he does not take the necessary next step: analyzing whether these differences are enough to create separate product

-8-

1    markets.  Nor does he conclude that, or even analyze whether, these substitutes are

2    so limited as to give a hypothetical monopolist market power.

3         This superficial analysis does not meet the necessary "level of

4    intellectual rigor" to support Dr. Smith's market definition.  *Kumho Tire Co.*, 526

5    U.S. at 152 (1999).  Any two products will have *some* differences in price or other

6    features; if that were enough to establish separate markets, then every product

7    would be in its own market.  The unexplained jump from the fact that there are

8    differences in the products to the conclusion that the products are not reasonable

9    substitutes is exactly the type of "analytical gap" which warrants the exclusion of

10   expert evidence.  *Joiner*, 522 U.S. at 146.

11        *Second*, Dr. Smith limits the market to services sold to individual or

12   small business customers, even though j2's competitors sell essentially the same

13   product to each segment.  (O'Keefe Dep. at 31-32; Musgrove Dep. at 94-95.)

14   Thus, if j2 were charging a supracompetitive price, there would be nothing to stop

15   its competitors who sell to enterprise customers from shifting capacity into the

16   individual segment.  "If producers of product X can readily shift their production

17   facilities to produce product Y, then the sales of both should be included in the

18   relevant market."  *Rebel Oil Co.*, 51 F.3d at 1436

19        *Third*, Dr. Smith's analysis of the geographic market is also deficient.

20   He limits the market to providers who currently sell services in the United States,

21   based on a few modest impediments to a company outside the U.S. entering the

22   U.S. market, such as language or currency barriers.  (Rep. at ¶¶ 46-47.)  He admits,

23   however, that various U.S. providers, including both j2 and Venali, have begun

24   offering services outside the U.S.  (Smith Dep. at 123-26.)  He cannot explain why,

25   if prices were to rise to a supracompetitive level, providers outside the U.S. would

26   not similarly be able to begin providing services in the U.S.  (*Id.*)

27

28

-9-

### 2.    *Dr. Smith's Market Share Analysis Is Unsound.*

Dr. Smith's conclusions about j2's market share would not meet the *Daubert* standard even if they were based on a properly defined market. Dr. Smith provides several alternate market share figures, each of which is faulty. First, he asserts that j2's market share is 80%, by including free accounts. (Rep. at ¶ 48.) Free accounts cannot be used to show market power, even indirectly, because they represent customers who are unwilling to pay anything for Internet fax services. That is the antithesis of market power.

Next, Dr. Smith estimates j2's share of U.S. Internet fax revenues to be at least 44.2%, by taking the market share numbers in the unreliable Davidson Report and removing any company that does not offer services in the U.S. (Rep. at ¶ 54.) Among companies offering services in the U.S., however, Dr. Smith makes no attempt to distinguish their U.S. revenue from their non-U.S. revenue. He guesses that this error understates j2's market share, but a guess cannot substitute for evidence.[3] *See, e.g., Democratic Party Wash. State* v. *Reed*, No. C00-5419, 2002 WL 32925223 (W.D. Wash. March 27, 2002) (excluding evidence where expert relied on "data from the February 2000 presidential preference primary to make estimates of 'non-party members' voting in the September 2000 state primary election").

Finally, Dr. Smith calculates that j2's "controlled market share" is between 60% and 62% by including the revenues of all licensees of the AudioFax Patents. (Rep. at ¶ 56.) That is nonsense. j2 must still compete with the licensees: it does not own them, it has no power over their pricing, and with few exceptions, the licenses were fully paid up so Catch Curve does not receive ongoing royalty

---

[3]    Venali had ample opportunity during discovery to determine what percentage of j2's revenue comes from the U.S., but never sent the simple interrogatory or asked a single deposition question to obtain that information. Nor did Venali make any attempt to conduct third party discovery to determine the portion of other companies' revenue that comes from the U.S.

-10-

1  payments from them.  There is no basis to attribute the revenue of a direct

2  competitor to j2 simply because the competitor made a payment to j2 sometime in

3  the past.[4]

4          **3.**    ***Dr. Smith's Conclusions With Respect to Barriers To Entry Are Unsupported By Any Evidence Or Citation.***

5        "[N]either monopoly power nor a dangerous probability of achieving

6  monopoly power can exist absent evidence of barriers to new entry or expansion."

7  *Am. Prof'l Testing Serv.* v. *Jiarcourt Brace Jovanovich Legal & Prof'l Publ'ns,*

8  *Inc.,* 108 F.3d 1147, 1154 (9th Cir. 1997); *see also Rebel Oil Co.*, 51 F.3d at 1439.

9        In his testimony, Dr. Smith asserted that lack of portability of fax

10  numbers (*i.e.*, the ability to take your fax number with you when you switch

11  providers) is a barrier to entry.  (Smith Dep. at 142.)  But Dr. Smith made no

12  attempt to analyze whether this is true.  He performed no analysis, conducted no

13  surveys, and has not even attempted to calculate what the switching costs are for j2

14  subscribers.  His assertion that portability is a material consideration to customers

15  is pure speculation.  (Smith Dep. at 142-45 ("Q: First of all, you've done no

16  analysis of the extent to which lack of flexibility and portability of numbers

17  impacts the willingness of people to switch services, have you? … A: So, you

18  know, depending on what you call 'analysis,' I've done some things, but I haven't

19  done a great deal.").  Dr. Smith's opinion must be excluded because it is not based

20  on any analysis or subject regarding which he has expertise.

21        In fact, putting aside his unfounded speculation, the undisputed

22  evidence that Dr. Smith ignores indicates that portability is not a significant

23  concern.  As an initial matter, while lack of portability theoretically could deter

24  current j2 customers from switching away from j2, it cannot have any effect on

25  competitors' ability to compete for new customers — which is significant in a

26

27

---

28  [4]     In several cases, Dr. Smith even attributes to j2 revenue from companies that licensed the patents-in-suit before j2 even owned them.

-11-

1   rapidly growing market.  Moreover, the evidence indicates that it is not a

2   significant deterrent.  In the first half of 2008, of j2's free subscribers who

3   switched to the paid service, 70% of them opted for a new phone number.

4   (Johnson Decl. Ex. 6.)  Thus, for more than two thirds of the supposedly "locked

5   in" customers, portability could not have been a factor in them choosing to stay

6   with j2 rather than switching to a competing service because they changed fax

7   numbers anyway.  (*Id.*)

### B.   Dr. Smith's Conclusion That There Is Direct Evidence That j2 Has Market Power Is Unreliable.

9           Dr. Smith concludes that there is direct evidence that j2 has market

10  power, based on (i) the results of j2's three price increases over the past eight

11  years, and (ii) j2's margins.  Dr. Smith's conclusion is speculative and based on

12  unsound analysis, and should be excluded.

### 1.   *Dr. Smith's Conclusions Regarding j2's Price Increases are Based on Unsound Methodology and Assumptions.*

15          Dr. Smith contends that the primary "direct evidence" of j2's market

16  power is the results of its price increases.  (Report at ¶¶ 28-35.)  Dr. Smith

17  concludes, in essence, that j2 has market power simply because it was able to raise

18  prices without losing revenue.[5]

19          The only basis for Dr. Smith's methodology is the Federal Trade

20  Commission's Horizontal Merger Guidelines, which defines market power as the

21  ability to profitably raise price a nontrivial amount for a sustained period of time.

22  (Rep. at ¶ 21.)  By adopting that definition of market power and basing his

23  conclusion on it, however, Dr. Smith effectively proposes to instruct the jury on

24  what "market power" or "monopoly power" means.  That is the Court's function.

25  *See, e.g.*, *Nationwide Transp. Fin.* v. *Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir.

26

27  ───────────────
[5]     For instance, Dr. Smith points to evidence that j2 lost 15% of its customers
28  as a result of its 2003 price increase, but because the price increase was
        25%, j2 still increased its revenue.  (Rep. at ¶ 30.)

-12-

1  2008) (affirming exclusion of expert's legal conclusions because they "invaded the

2  province of the trial judge"); *Virginia Vermiculite Ltd.* v. *W.R. Grace & Co.*, 98 F.

3  Supp. 2d 729, 739 (W.D. Va. 2000) (criticizing expert for relying solely on the

4  Merger Guidelines in analyzing market definition).

5        Moreover, the definition of market power Dr. Smith adopts is

6  incorrect.  Market power requires the court to consider the ability of a single seller

7  to unilaterally raise prices *and* restrict output.  *See Eastman Kodak Co.* v. *Image*

8  *Technical Servs., Inc.*, 504 U.S. 451, 464 (1992) (defining market power as "the

9  ability of a single seller to raise price and restrict output"); *Forsyth* v. *Humana,*

10 *Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) ("The plaintiffs submitted evidence that

11 Sunrise Hospital routinely charged higher prices than other hospitals while reaping

12 high profits. With no accompanying showing of restricted output, however, the

13 plaintiffs have failed to present direct evidence of market power."); *Smith*

14 *Wholesale Co., Inc.* v. *Philip Morris USA, Inc.*, 219 Fed. Appx. 398, 410 (6th Cir.

15 2007); *R.J. Reynolds Tobacco Co.* v. *Philip Morris Inc.*, 199 F. Supp. 2d 362, 382

16 (M.D.N.C. 2002).  Nowhere in his report does Dr. Smith even mention output

17 restrictions or limits.  (*See generally* Rep.)

18        In *Virginia Vermiculite Ltd.* v. *W.R. Grace & Co.*, 98 F. Supp. 2d 729,

19 736-37 (W.D. Va. 2000), the Court rejected precisely the same simplistic analysis

20 as that employed by Dr. Smith:

21            To determine if Grace was a monopolist, Schwartz
             utilized the Merger Guidelines which require analysis of
22           whether a seller can raise prices profitably over
             competitive prices for a significant period of time.
23           Pointing to a series of considerable increases in Grace's
             price for mid-sized vermiculite, Schwartz declared that
24           Grace was, in fact, a monopolist . . . In this analysis,
             however, Schwartz failed to look at the alternative
25           hypotheses. For example, an observed price increase may
             result from a rightward shift of a demand curve, a
26           leftward shift of a supply curve, or a combination of
             these two movements.  Schwartz merely pointed to the
27           price increase as an indication that Grace possessed
             monopoly power without further investigation as to how
28           the price increase occurred. It is improper to conclude
             that a company such as Grace has market power by

-13-

pointing to its price increases without further testing of alternative hypotheses.

Likewise, Dr. Smith failed to consider any alternative hypothesis for j2's ability to raise prices, such as the fact that j2's price increases were accompanied by enhancements to the service, the fact that the alleged Internet facsimile market is growing rapidly, and j2's well-recognized brand name and investment in marketing. (Smith Dep. at 155-56, 173; *see generally* Johnson Decl. Ex. 7 ("Howell Report") at 31-32, 43-49.) Indeed, according to Dr. Smith's logic, Venali — which, like j2, was able to profitably raise its prices — is also a monopolist. (Johnson Decl. Ex. 8 ("Poncy Dep.") at 137-40.) Dr. Smith's cursory analysis is not sufficiently rigorous to meet the *Daubert* standard. *See Domingo* v. *T.K.*, 289 F.3d 600, 606-07 (9th Cir. 2002) (district court properly excluded expert testimony where "court could reasonably conclude that [expert's] conclusion simply did not follow from his analysis").

Nor does Dr. Smith's analysis of j2's price increases take into account the vast majority of j2's customers: users who pay nothing. Approximately 90% of j2's subscribers are free accounts. (Johnson Decl. Ex. 9 ("Turicchi Dep.") at 25-26.) Dr. Smith does not even attempt to explain why a company with the power to unilaterally raise prices would give away 90% of its services for free.

The cursory and sloppy nature of Dr. Smith's analysis is further illustrated by his Lerner Index calculation. (Rep. at ¶¶ 27, 30, 39.) The Lerner Index is a number between 0 and 1 that Dr. Smith claims is "often" used by economists to assess market power.[6] (*Id.* at ¶ 27.) Dr. Smith calculates no less than three widely disparate values for the Lerner Index — 0.31, 0.8, and 1.67 —

---

[6] Dr. Smith does not provide a citation to support his assertion that economists often use the Lerner Index, and the assertion is wrong. *See* Federal Trade Commission, How Do Courts and Agencies Evaluate Market Power?, available at http://www.ftc.gov/opp/jointvent/classic3.shtm (last visited Sept. 3, 2008) (noting the "theoretical and practical difficulties in using the Lerner Index to measure market power").

-14-

1   and fails to explain why the numbers differ or which measure might be best.[7] (*Id.*

2   at ¶¶ 30, 39.) And although, as Dr. Smith admits, 1.67 is "greater than the

3   theoretical bounds" of the Lerner Index, he fails to explain how he managed to

4   arrive at an impossible result. (*Id.* at ¶ 30.) It does not take a degree in economics

5   to know that if you obtain a result outside the "theoretical bounds," you are not

6   using a reliable method.

7           **2.    *Dr. Smith's Conclusions Regarding j2's Margins Are Directly
8                    Contrary to the Data on Which He Purports to Rely.***

9           Dr. Smith also asserts (again without citation) that j2's margins are

10   high relative to comparable companies, and that these high margins provide further

11   direct evidence of market power. (Rep. at ¶¶ 36-38.) Dr. Smith admits, however,

12   that *j2's margins have actually gone down since it purchased the patents-in-suit.*

13   (Smith Dep. at 110.) And in any event, high profits do not signal market power.

14   *See* 3A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (2d ed. 2002) at

15   323, ¶ 801c ("the use of accounting data to infer power from profit rates is so

16   problematic as to be unreliable in most circumstances"); (Howell Rep. at 48-49 &

17   n.236, 237 (citing academic sources).)

18           To conclude that high profits do imply market power, Dr. Smith must

19   ignore a host of alternative explanations for j2's high margins. Most glaringly, Dr.

20   Smith failed to consider the effect of economies of scale on j2's margins relative to

21   its competitors, even though he admits that there is evidence that economies of

22   scale helped j2 achieve its margins. (Smith Dep. at 107.)

23           Moreover, Dr. Smith concluded that j2's margins were relatively high

24   by comparing j2 to businesses "whose principal revenues are [not] derived from

25

26   _____

        [7]    Smith characterizes 0.31 as inelastic, but offers no support for that assertion.
27   In fact, Lerner Index values may be 0.4 or 0.5 in reasonably competitive
     industries. AMERICAN BAR ASSOCIATION SECTION OF ANTITRUST LAW,
28   ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL ISSUES at 323 (2005).
     In industries where marginal cost is low, such as software or internet
     services, the Lerner Index may be 0.9 or higher. *Id.*

Internet facsimile services." (*Id.* at 99-100.)  This apples to oranges comparison is not helpful in assessing j2's margins or market power.  *See Metabyte, Inc.* v. *Canal+ Techs., S.A.*, No. C-02-05509, 2005 WL 6032845 (N.D. Cal. June 17, 2005) (excluding expert opinion as unreliable in part because, in analyzing a company's value based on the value of a comparable company, the expert chose a comparable company with significant differences from the company being valued).

## V.   Dr. Smith Offers No Relevant Analysis Regarding j2's Alleged Anticompetitive Conduct or Any Alleged Injury To Competition.

Dr. Smith's "analysis" of j2's allegedly anticompetitive conduct is no such thing.  Rather, he merely repeats *verbatim* Venali's allegations from the counterclaim and discusses j2's strategy for "capitalizing on, maintaining its market power" based on activities that are not at issue in this case (*i.e.* offering a free service and refusing to allow customers to port fax numbers away from j2).  With respect to the only alleged anticompetitive conduct at issue, sham litigation, Dr. Smith "analysis" consists of *exactly two sentences*, one confirming that he has reviewed j2 and Catch Curve's practices with regard to the use of the patents (not limited to litigation, but also acquisitions, which are not at issue here) and one announcing his unsupported opinion that these litigation practices are "consistent" with an attempt to use threats of litigation to restrict competition and increase j2's market power.  (Rep. at 23-24.)  As shown above, Dr. Smith has not even attempted to connect his conclusions regarding j2's alleged market power to the alleged anticompetitive conduct at issue.  Further, Dr. Smith offers no support or citation whatsoever in support of his conclusion.  As such, his opinions are unreliable and must be excluded.

Dr. Smith also attempts to quantify the alleged harm to consumers from j2 and Catch Curve's allegedly anticompetitive conduct.  As before, however, Dr. Smith's unsupported "analysis" does not even attempt to link the alleged harm to the alleged conduct, makes no effort to relate the allegedly higher prices in 2007

-16-

1  to any conduct by j2 associated with enforcement of the AudioFax Patents in 2005

2  and 2006, and does not offer even a guess as to why j2's prices may be higher (if in

3  fact, they are, which is also not established in his report).  In fact, neither Venali

4  nor Dr. Smith have ever identified a cognizable theory as to how consumers have

5  been harmed by the alleged sham litigation.  In short, Dr. Smith's bare conclusions,

6  devoid of support and any connection to the anticompetitive conduct at issue, are

7  neither reliable nor relevant, and must be excluded.

8  **VI.   Dr. Smith's Conclusion About Venali's Damages Should Be Excluded Because He Does No Analysis.**

9

10          Dr. Smith includes in his report a section on the damages suffered by

11 Venali, in which he simply repeats a number told to him by Venali.  (Rep. at ¶ 66;

12 Smith Dep. at 266 (stating he is not expressing an opinion on the damages).)  If a

13 jury is capable of drawing its own inferences from the available evidence,

14 admission of expert opinion testimony unnecessarily risks unfair prejudice,

15 confusion of issues, and misleading of the jury.  RUTTER GROUP, FEDERAL CIVIL

16 TRIAL AND EVIDENCE § 8:1526; *see also Eymard* v. *Pan American World Airways*,

17 795 F.2d 1230, 1233 (5th Cir. 1986).  Accordingly, an expert may not introduce

18 evidence without adding any value through his expertise.  *See Sanderson* v. *Int'l*

19 *Flavors & Fragrances*, 950 F. Supp. 981, 987 (C.D. Cal. 1996) ("If Brautbar's

20 answer is interpreted as an attempt to adopt [the party's] opinion . . . , it's not

21 admissible expert opinion testimony.").

22 **VII.  Dr. Smith's Discussion of Internet Facsimile Services Should Be Excluded Because He Has No Expertise in Internet Faxing.**

23          Finally, in his report Dr. Smith purports to describe how Internet

24 facsimile services work, based on discussions with Venali and its counsel,

25 unnamed websites, his "personal experience with conventional faxing," and

26 Wikipedia.  (Report at 6-7 & n.4.)  Dr. Smith, however, claims to be an *economic*

27 expert.  (*Id*. at 1-2.)  He is not an expert on facsimile or Internet facsimile

28 technology.  Accordingly, those topics are not proper subjects for his opinion, and

-17-

1   his discussion of them should be excluded.  *See YKK Corp.* v. *Jungwoo Zipper Co.*,

2   213 F. Supp. 2d 1195, 1203 (C.D. Cal. 2002) ("Expert testimony is required to be

3   within the scope of the proffered expert's expertise.").

### CONCLUSION

5           For the foregoing reasons, j2 and Catch Curve respectfully request

6   that the Court rule that Dr. Smith's Report and testimony are inadmissible and may

7   not be offered at trial or in opposition to j2 and Catch Curve's Motion for

8   Summary Judgment.

9   Dated:  September 15, 2008                Respectfully submitted,

11                                           *Robert A. Sacks / EEJ*

12                                           Robert A. Sacks (SBN 150146)
                                             Brian R. England (SBN 211335)
                                             Edward E. Johnson (SBN 241065)
13                                           SULLIVAN & CROMWELL LLP
    Of Counsel:                              1888 Century Park East
14  Jeffrey S. Gerchick                      Los Angeles, California 90067-1725
    KENYON & KENYON LLP                      (310) 712-6600
15  1500 K Street, N.W.                      (310) 712-8800 facsimile
    Suite 700
16  Washington, D.C.  20005-1257             Frank L. Bernstein (SBN 189504)
    (202) 220-4200                           KENYON & KENYON LLP
17  (202) 220-4201 facsimile                 333 West San Carlos Street, Suite 600
                                             San Jose, California 95110
18                                           (408) 975-7500
                                             (408) 975-7501 facsimile
19
                                             *Attorneys for Plaintiff and Counterclaim*
20                                           *Defendant Catch Curve, Inc.. and*
                                             *Third Party Defendant j2 Global*
21                                           *Communications, Inc.*

-18-