# EXHIBIT 1

1

1                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
2

3

4                          CASE NO. CV 05-4820 DDP(AJWx)

5    CATCH CURVE, INC.,            )
                                   )
6                   Plaintiff,     )
                                   )
7            v.                    )
                                   )
8    VENALI, INC.,                 )
                    Defendant.     )
9    _____)
                                   )
10   AND RELATED CROSS-ACTION      )
     AND THIRD PARTY COMPLAINT     )
11                                 )
     _____)
12

13

14
                    Carey Rodriguez Greenberg Paul
15                    1395 Brickell Avenue
                         Suite 700
16                     Miami, Florida
                    Tuesday, September 19, 2007
17                       9:35 a.m.

18

19       V I D E O T A P E D   D E P O S I T I O N

20                         O F

21       D O U G L A S   L. O ' K E E F E

22

23

24            Taken pursuant to Notice,
              on behalf of the Plaintiff.
25

     OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT ___1___ PAGE __3__

2

1                    APPEARANCES:

2

                     SULLIVAN & CROMWELL, by
3                ROBERT A. SACKS, ESQUIRE
                 on behalf of the Plaintiff
4

5          CAREY RODRIGUEZ GREENBERG PAUL, by
                   JOHN CAREY, ESQUIRE
6              on behalf of the Defendant

7

8                    ALSO PRESENT:

9            THOMAS CHARRON, Videographer

10               - - - - - - -

11                 I N D E X

12   Witness          Direct        Cross

13   DOUGLAS L. O'KEEFE
       By Mr. Sacks         3            --
14

15                 E X H I B I T S

16
       Plaintiff's                        Page
17
         No. 15 ............................   8
18       No. 16 ............................   9
         No. 17 ............................  61
19       No  18 ............................ 106
         No. 19 ............................ 172
20

21               - - - - - - -

22

23

24

25

     OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT   1   PAGE   4

31

1    which Venali targets and sells its solution to that

2    group of customers?

3         A    Yes.

4         Q    Okay, and the -- at the bigger level,

5    again, that's separated out because Venali uses a

6    different method to sell its solution to those

7    customers; right?

8         A    Yeah, and there's a reason that it uses a

9    different method, it's not just because -- I mean,

10   it's not just because they use a different method.

11   The reason that they use a different method is that

12   the enterprise customers tend to need different bells

13   and whistles.

14        They don't want to take a -- a fixed

15   product that says, here's what we have and there's

16   going to be no modification.  There's often --

17   there's often development where it goes through and

18   try to integrate APIs or there's special

19   characteristics and -- and many of the -- the large

20   corporate customers need a lot of customization.

21        Q    But -- but at its core, the product being

22   offered or service being offered to each of these

23   three categories or classes is Venali's solution?

24        A    Well, it's all fax -- it's all -- it's all

25   internet fax services.  It's all fax to e-mail or

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT____1____PAGE 5

1   e-mail to fax at the core.  There's different -- you

2   know, you might have a -- an integration with an SAP

3   system or an integration with, you know, lots of

4   different functionality.  It could be used for a

5   specific purpose for reporting.  It could be --

6   there's lots of different features that could be

7   necessary, but the core functionality is -- is the

8   same messaging product or service.

9       Q    Okay.  Now -- and it's being offered to all

10  these classes of customers?

11      A    Yes.

12      Q    Okay.  Now ---

13      A    Same -- I mean, yeah.  It's a messaging

14  service being offered to all.

15      Q    Okay.  Now, you mentioned the web before.

16  Am I correct that Venali's web-based sales efforts

17  are not limited to SOHO customers?

18      A    I believe that only -- well, let me back

19  up.  Venali does marketing that includes things like

20  using ad words on Google, things like that.  They --

21  and they certainly could attract potential customers

22  in the SOHO market or in larger customers, leads.

23  But on the web, the only people that can sign up for

24  the service via the web would be a SOHO user.

25      Q    Isn't there -- was Mr. Poncy in error when

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT____1____ PAGE ___6___

58

1   larger customers --

2       A    Uh-huh.

3       Q    -- or outside of the -- to customers

4   outside of the United States, what are the barriers

5   to prevent them from offering that service to

6   customers in the United States in the SOHO market as

7   you've defined it?

8       A    Okay.  I think that those barriers would

9   include the -- probably the threat of the -- of

10  litigation in the United States, as well as the

11  ability to obtain sufficient local number coverage,

12  also limitations regarding portability of numbers

13  because once people have already signed up with one

14  fax service provider, they may not be able to freely

15  port their numbers away and that's -- that's an

16  issue.

17          Also, they probably -- I guess if they --

18  if they have a sufficient network, hardware and

19  software with reliability, they -- they would --

20  that's one area that they would have already gotten

21  over presumably.

22          Let me think if there's anything else.

23  Those are the ones that come to mind.

24      Q    Okay.  Can you identify any potential

25  entrant who has not entered because of a threat of

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT     1     PAGE     7

59

1   litigation?

2      A    I -- I don't know of any that have decided

3   that -- not to enter because of the threat of

4   litigation.

5      Q    Okay.  So my -- in saying that -- in

6   identifying a threat of litigation as a barrier to

7   entry, what's the factual basis for that?

8      A    That I think it's well known in the

9   industry that if you enter into this -- into this

10  market, into the U.S. market, you're going to get

11  sued by Catch Curve over the Audio Fax patents.

12     Q    What's the factual basis for that?

13     A    A, I think it's discussed in the Davidson

14  report; B, I think that there's lots of information

15  that's out on the internet that talks about the fact

16  that Catch Curve tries to sue everybody in the

17  industry over the fax to e-mail -- in the fax to

18  e-mail industry.

19     Q    What's your -- the factual basis for the

20  allegation that it's a barrier to entry?

21     A    That it certainly is a consideration

22  that -- that any company that is informed and looks

23  at the market would -- would -- would reasonably

24  consider.

25     Q    Okay, and has Venali done any analysis of

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT ___1___ PAGE _8_

1           The 2003 Davidson report is a report that

2     Venali believed was inaccurate in various respects;

3     isn't that right?

4           A     There were inaccuracies in the report, at

5     least one.

6           Q     Okay.  Now, what about the more recent

7     Davidson report?

8           A     What about it?

9           Q     Did you look at that?

10          A     Prior to filing the complaint?

11          Q     Since the filing.  Well, prior to filing, I

12    guess it wasn't around prior to filing, was it?

13          A     Right.

14          Q     Okay.  So you looked at a report from 2003

15    from Davidson that was several years out of date at

16    the time you filed the cross-complaint?

17          A     It was -- it was drafted several years --

18    published several years prior to the -- to the

19    counterclaim and cross-complaint, yeah.

20          Q     Okay, and did you look at the list of

21    competitors that -- strike that.

22          Did you look at the list in that 2003

23    Davidson report of the companies offering services,

24    offering fax to e-mail/e-mail to fax services in what

25    you describe as SOHO?

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT____1____PAGE____9

113

1       A       It's a handgards sham litigation and -- and

2    I think they're -- they're both -- they all derive

3    from the -- the sham litigation.

4       Q       Okay.  That -- I'm just trying to find out

5    if those -- that's the extent.  So these -- these

6    allegations that are in here on Paragraphs 108

7    through 111, those are not allegations that are

8    operative with respect to these claims?

9       A       Hold on just a moment.  I believe that's

10   correct.

11      Q       Thank you.

12              Okay.  Now, let me -- by the way, if you'll

13   look at Paragraph 83, please.  The last sentence

14   after you indicate what j2's alleged market share is,

15   you then say, "Therefore, historically SOHO users

16   have had little choice when selecting an internet

17   facsimile service provider."

18      A       Uh-huh.

19      Q       What is the factual basis for that

20   sentence?

21      A       I think that historically j2 -- it's been

22   j2's dominance in the market and for long periods of

23   time they -- there were not many companies that --

24   that were able to offer the service in a broad

25   geographic area in the United States.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT____1____PAGE__10

116

1    actually don't think was offering broad geographic

2    coverage at that time in the United States.

3         Q    Well, what -- what companies were?

4         A    Well, Venali was, and j2 was, and I don't

5    know how many -- I don't know which other ones

6    were -- were offering broad coverage.

7         Q    Okay.  So in terms of the composition of

8    competitors in the market offering broad geographic

9    coverage and services, since 2005 the market has

10   become more competitive in terms of the number of

11   customer -- number of suppliers offering those

12   services?

13        A    I wouldn't say that the -- that the market

14   has become more competitive.  I would say that there

15   are more players in the market.

16        Q    Okay.  All right, and so during the period

17   of time that j2 has allegedly acted to exclude

18   competitors, the number of competitors has actually

19   increased?

20        A    Well, j2, it's not just that they've ---

21        Q    It's just a yes or no question.

22        A    Well, I'm not -- I'm not going to answer it

23   with a yes or no.  I'm going to tell you that it's

24   not just j2 excluding competitors, it's also j2

25   maintaining its -- its monopoly position and by doing

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT____ PAGE____

126

1    anti-competitive acts that are -- on which the

2    antitrust claims in this case are based, is Venali

3    alleging that any of the conduct of Audio Fax prior

4    to j2's acquisition of the -- of the patents, forms a

5    basis for the claims against j2 and Catch Curve?

6            MR. CAREY:  I'm going to object to the

7    form of the question.  It calls for a legal

8    conclusion.

9            THE WITNESS:  Excuse me.  I'm not sure

10   if j2 can have liability for -- for that or not.

11   BY MR. SACKS:

12       Q    Well, let me ask it a different way,

13   Mr. O'Keefe.  I'll get rid of that answer and

14   Mr. Carey's objection.

15            The Topic Number 9 that you're here to

16   testify about, the factual bases for Venali's

17   contention that j2 has attempted to monopolize the

18   SOHO internet facsimile service market as alleged in

19   Paragraph 130, which is an operative liability

20   paragraph.

21            My question to you now is the following:

22   Is j2 -- is Venali's contention that j2 has attempted

23   to monopolize the SOHO internet facsimile service

24   market based factually in any way upon the conduct of

25   Audio Fax in licensing or threatening to sue people

EXHIBIT __1__ PAGE __12__

127

1    based upon its patents before the time that j2 bought

2    those patents in 2005?

3        A    I don't think that -- no, I don't -- Venali

4    is not alleging ---

5            MR. CAREY:  I'm going to object to the

6    form of the question.

7            THE WITNESS:  Venali is not alleging

8    that the misuse of the patents by Audio Fax was

9    part of j2's attempt to monopolize.

10   BY MR. SACKS:

11       Q    Okay.  It's not -- it's -- okay, fine.

12           Now, so we've now got threat of litigation,

13   the cost of litigation, the cost of the license --

14   again, the threat of litigation based on the Catch

15   Curve patents, the cost of litigation relating to

16   defending a claim based upon those patents, the cost

17   of a license under those patents, no reasonable good

18   faith basis for the assertion of those patents

19   against fax to e-mail or e-mail to fax service

20   against either Venali or other companies whose

21   service offerings are limited to a fax to e-mail or

22   e-mail to fax service.

23           Are there any other bases, factual bases

24   for the allegation in the complaint that j2 has

25   attempted to monopolize the SOHO internet facsimile

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT ___l___ PAGE __13__

128

1    service market?

2         A    On some occasions I -- I believe that j2

3    has gone out to customers and tried to use the fact

4    that it had this litigation pending against Venali as

5    a competitive tool to -- to gain business.  Let me

6    just think about whether or not that has ---

7         Q    Oh, you dropped that from this case.

8         A    And I'm not sure that that applied to the

9    SOHO market anyway.

10        Q    I thought you told me a little while ago,

11   one, that it related to VARs and to -- and to others;

12   and, two, that you dropped those allegations from

13   this complaint.

14             MR. CAREY:  Object to form.

15             THE WITNESS:  I think I might need to

16   take a break to -- to discuss with counsel any

17   claims.

18             MR. SACKS:  Go ahead.

19             (Thereupon, a brief recess was taken, after

20        which the following proceedings were had:)

21             THE WITNESS:  Yes, the interference,

22   the tortious interference claim has been dropped

23   and we're not alleging a tortious inter --

24   tortious interference as a basis of the attempted

25   monopolization in the SOHO market.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT___1___PAGE_14

129

1    BY MR. SACKS:

2        Q    Okay.  So the facts that I've just

3    identified, are those the -- are those the factual

4    bases for the remaining antitrust counterclaims?

5    Again --

6        A    Yeah.

7        Q    -- threat -- I'll just run through them.

8        A    No, no, I know them.  Yeah.

9        Q    Is that correct, have I covered them all?

10       A    Yes.

11       Q    Okay.  Now, I want to run through some

12   specific licenses that have been entered into by --

13   by Catch Curve since -- since acquiring the patents

14   and I want to know whether you're contending -- what

15   your contentions are with respect to them.

16            First, is Hostopia.com.  Is Hostopia.com a

17   competitor?

18       A    I don't know.

19       Q    Okay.  Has it -- is Venali contending that

20   it -- it has been inhibited or affected from

21   competition in the SOHO internet facsimile service

22   market by virtue of either being threatened with

23   infringement or taking a license under the Catch

24   Curve patents?

25       A    I don't know.  When -- it wasn't -- when

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT__1__ PAGE 15

1      A      Sure.

2      Q      I think we've touched upon this already.   I

3   just want to make sure I've covered it fully.

4           What you told me as it relates to this is

5   that the cost of defending the lawsuits and the cost

6   of a license are the impacts that have existed as a

7   result of this; is that correct?

8      A      Yes.

9      Q      Anything else?

10      A      I think it's just that it's helped main --

11   j2 maintain its -- its market power in the SOHO

12   internet fax service market.

13      Q      And on what basis -- what are the facts

14   that support that contention?

15      A      The same -- I guess it's the -- the same

16   facts that we've -- that you've mentioned.

17      Q      Okay.  Let me ask you a question.   j2 paid

18   for a license under these same patents, did it not?

19      A      It did pay for a license, yes.

20      Q      Okay, and it paid a seven figure number for

21   a license?

22      A      It paid a million dollars, yeah.

23      Q      Right.  And so -- going to Number 25.

24      A      Uh-huh.

25      Q      I'm correct that you're not aware of any

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT ___1___ PAGE 16

156

```
 1    companies that have been prevented from competing in

 2    this market by virtue of the Catch Curve licensing

 3    practices?

 4         A    Correct.

 5         Q    Okay, and as to Number 26, am I correct

 6    that you cannot identify any companies that have

 7    increased their prices in the alleged SOHO internet

 8    facsimile market as a result of the Catch Curve

 9    licensing practices?

10         A    It may have impacted Venali's, you know,

11    pricing decisions, but, no.

12         Q    It may have or it did?

13         A    Well, certainly when Venali's pricing

14    decisions are based, in part, in looking at its

15    overall costs, so I would say it did.

16         Q    Okay.  Well, tell me what -- are there any

17    documents that -- that show the impact that the

18    litigation has had on Venali's pricing decisions?

19         A    No.

20         Q    Okay.  Were you present at any discussions

21    with anybody where there was discussion as to how

22    Venali's -- whether Venali's pricing decision should

23    be influenced in any way by the cost that it incurred

24    in connection with this litigation?

25         A    Only to the extent that Venali has been
```

EXHIBIT ___1___ PAGE __17__

1   this year?

2      A      Ultimately that decision would have been

3   made by Mr. Poncy.

4      Q      Okay, and was he provided with this cost

5   breakdown for this litigation prior to the time he

6   made that decision?

7      A      He was not provided with that particular

8   document, but he was provided with -- every month

9   he's provided with legal fees for this particular

10  litigation.

11     Q      Uh-huh.  So -- just so I'm clear, the --

12  okay.

13          Are there any written documents that

14  reflect the consideration -- well, are there any

15  written documents that reflect what was taken into

16  account by Mr. Poncy ultimately or by Venali in

17  deciding to change their price structure?

18     A      I don't believe so.

19     Q      Okay, and so, I take it then there are no

20  written documents that would reflect his -- would --

21  would reflect the consideration of the legal costs of

22  this litigation as an element of the change in

23  prices?

24     A      Not that I'm aware of.

25     Q      Okay.  Is Venali aware of any companies

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT____1____ PAGE 18

1    that have -- looking at Number 27, changed or limited

2    their services or product offerings in the alleged

3    SOHO internet facsimile service market as a result of

4    Catch Curve's pursuit of infringement claims or

5    litigation?

6        A    I can't remember whether Go Daddy had

7    agreed to drop that service or not as part of its

8    agreement with Catch Curve.  I -- it's possible that

9    they did, but I'm -- I'm not certain.

10       Q    Other than that, and I'll tell you your

11   recollection is incorrect on that, but other than

12   that, is there anything else you are aware of?

13       A    No..

14       Q    Okay.  Let's look at -- I want to go to

15   Paragraphs 103 to 105 of the complaint, Category 28.

16       A    Uh-huh.

17       Q    Now, Paragraphs 103 to 105 refer to

18   settlement communications that took place after this

19   lawsuit had been filed; isn't that right?

20       A    Yeah, these -- these relate to the tying

21   claim.

22       Q    Okay.  So these are now out of the case?

23       A    Yes.

24       Q    Okay.  That's easy.  Okay.  Let's go on

25   then to -- actually, let me just give them an X

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT ___1___ PAGE ___19___

194

```
1                           CERTIFICATE
2        STATE OF FLORIDA )
3        COUNTY OF DADE    )
4
5                I,  Margaret Franzen,  Notary  Public
6        for the State of Florida at Large, do hereby certify
7        that  I  reported  in  shorthand  the  deposition of
8        DOUGLAS L. O'KEEFE,  the  witness  herein;  that  the
9        said  witness was first duly sworn  by me;  and that
10       the  foregoing  pages,  numbered   from  1  to  193,
11       inclusive, constitute a true record thereof.
12                I  further  certify  that I am not of
13       counsel, I  am  not  related  to nor employed by any
14       attorney in this case, nor financially interested in
15       the outcome thereof.
16                Dated at Miami, Dade County, Florida,
17       this 1st day of October, 2007.
18
19
20
21       My Commission Expires:
         April 14, 2010        _____
22                             Margaret Franzen
                               Notary Public
23                             STATE OF FLORIDA
24
25
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875



EXHIBIT____|____PAGE 20

# EXHIBIT 2

CERTIFIED COPY



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CATCH CURVE, INC.,                          )
                                            )
                        PLAINTIFF,          )
                                            )
VS.                                         )          CASE NO. CV 05-4820 DDP (AJWX)
                                            )
VENALI, INC.,                               )
                                            )
                        DEFENDANT.          )
                                            )
_____         )
                                            )
AND RELATED CROSS-ACTION                    )
AND THIRD-PARTY COMPLAINT.                   )
                                            )

## DEPOSITION OF RICHARD SMITH, PH.D.

AUGUST 12, 2008

KELLI C. NORDEN
CSR 7200
20099



Kelli Norden and Associates
Court Reporters
310.820.7733 phone 310.820.7933 fax
11726 San Vicente Boulevard  Suite 205
Los Angeles, California  90049
kna@kellinorden.com  www.kellinorden.com

**EXHIBIT 2 - PAGE 21**

DEPOSITION OF RICHARD SMITH

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5
     CATCH CURVE, INC.,            )
 6                                 )
                     PLAINTIFF,    )
 7                                 )
       VS.                         )   CASE NO. CV 05-4820
 8                                 )   DDP (AJWX)
     VENALI, INC.,                 )
 9                                 )
                     DEFENDANT.    )
10   _____)
                                   )
11   AND RELATED CROSS-ACTION      )
     AND THIRD-PARTY COMPLAINT.    )
12   _____)

13

14

15

16

17           DEPOSITION OF RICHARD SMITH, PH.D.,

18           TAKEN ON BEHALF OF THE PLAINTIFF

19           AND COUNTERCLAIM DEFENDANT, AT

20           1888 CENTURY PARK EAST, SUITE 2100,

21           LOS ANGELES, CALIFORNIA, COMMENCING

22           AT 10:00 A.M., TUESDAY, AUGUST 12,

23           2008, BEFORE KELLI C. NORDEN, CSR

24           NUMBER 7200.

25
```

2

DEPOSITION OF RICHARD SMITH

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF AND COUNTERCLAIM DEFENDANT
     CATCH CURVE, INC.:
 4
             SULLIVAN & CROMWELL, L.L.P.
 5           BY:  ROBERT SACKS, ESQ.
                 AND
 6               EDDEY JOHNSON, ESQ. (AT PAGE 94)
             1888 CENTURY PARK EAST
 7           SUITE 2100
             LOS ANGELES, CALIFORNIA  90067-1725
 8           310.712.6600
             SACKSR@SULLCROM.COM
 9           JOHNSONEE@SULLCROM.COM

10

11   FOR THE DEFENDANT:

12           CAREY, RODRIGUEZ, GREENBERG & PAUL, L.L.P.
             BY:  DOUGLAS L. O'KEEFE, ESQ.
13           1395 BRICKELL AVENUE
             SUITE 700
14           MIAMI, FLORIDA  33131
             305.372.7474
15           DOKEEFE@CRGPLAW.COM

16

17   ALSO PRESENT:

18           TINA GROEN, CORNERSTONE RESEARCH

19           VANDY HOWELL, CORNERSTONE RESEARCH

20           DUDLEY FETZER, LEGAL VIDEO SERVICES

21

22

23

24

25
                                                      3
```

EXHIBIT 2 - PAGE 23

## DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 09:50:17 | 1 | OBJECT- -- WAS THE OBJECTIVE OF YOUR REPORT TO |
| 09:50:19 | 2 | ANALYZE AND EVALUATE THE IMPACT OF THE LIABILITY |
| 09:50:26 | 3 | EVALUATION -- LIABILITY ALLEGATIONS VENALI WAS |
| 09:50:28 | 4 | MAKING IN THIS CASE? |
| 09:50:29 | 5 | MR. O'KEEFE:  OBJECT TO THE FORM. |
| 09:50:32 | 6 | THE DEPONENT:  I DON'T KNOW |
| 09:50:34 | 7 | SPECIFICALLY THE ANSWER TO THAT QUESTION.  I |
| 09:50:39 | 8 | INTERPRETED MY ASSIGNMENT AS A BROAD ASSIGNMENT TO |
| 09:50:43 | 9 | ASSESS THE ANTICOMPETITIVE EFFECTS OF ANY CONDUCT |
| 09:50:47 | 10 | OF J2 AND TO ALSO EVALUATE THE MARKET STRUCTURE IN |
| 09:50:53 | 11 | THE RELEVANT MARKET. |
| | 12 | BY MR. SACKS: |
| 09:50:55 | 13 | Q.   OKAY.  SO AM I CORRECT THAT THE |
| 09:50:56 | 14 | CONCLUSIONS YOU REACH IN YOUR REPORT REGARDING THE |
| 09:50:59 | 15 | EFFECT OF J2'S CONDUCT INCLUDE THE CUMULATIVE |
| 09:51:03 | 16 | EFFECTS OF CONDUCT BEYOND LITIGATION BEHAVIOR? |
| 09:51:11 | 17 | A.   YES. |
| 09:51:11 | 18 | Q.   OKAY.  AND AM I CORRECT THAT YOU |
| 09:51:13 | 19 | DON'T SEPARATE OUT IN YOUR REPORT THE EFFECT OF |
| 09:51:17 | 20 | LITIGATION BEHAVIOR, IF ANY? |
| 09:51:26 | 21 | A.   I BELIEVE THAT'S ACCURATE. |
| 09:51:29 | 22 | Q.   OKAY.  I SHOULD -- YOU'VE BEEN |
| 09:51:31 | 23 | DEPOSED NUMEROUS TIMES, HAVE YOU NOT, PROFESSOR |
| 09:51:35 | 24 | SMITH? |
| 09:51:35 | 25 | A.   I HAVE BEEN, YES. |

10

EXHIBIT 2 - PAGE 24

DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 10:43:13 | 1 | DIFFERENCE, WHETHER THERE'S A QUALITY DIFFERENCE |
| 10:43:15 | 2 | OR NOT RELATIVE TO ALL THE OTHER SUBSTITUTES THAT |
| 10:43:19 | 3 | ARE AVAILABLE, THAT COULD -- THAT COULD GIVE RISE |
| 10:43:23 | 4 | TO THE ABILITY TO CHARGE ABOVE MARGINAL COST, |
| 10:43:26 | 5 | SURE.  I THINK WE UNDERSTAND EACH OTHER. |
| 10:43:27 | 6 | Q.   OKAY.  NOW, LET ME GO BACK AGAIN |
| 10:43:32 | 7 | TO -- IN YOUR REPORT, YOU HAVEN'T DONE ANY |
| 10:43:46 | 8 | ANALYSIS TO DETERMINE THAT ANY MARKET POWER THAT |
| 10:43:51 | 9 | J2 MAY OR MAY NOT HAVE WAS OBTAINED AS A RESULT OF |
| 10:43:56 | 10 | ITS PATENT LICENSING POLICIES, HAVE YOU? |
| 10:44:07 | 11 | A.   AS DISTINCT FROM OTHER ASPECTS OF |
| 10:44:09 | 12 | J2'S CONDUCT, I HAVEN'T TRIED TO PARSE OUT |
| 10:44:12 | 13 | INDIVIDUAL COMPONENTS THAT GIVE RISE TO MARKET |
| 10:44:15 | 14 | POWER. |
| 10:44:15 | 15 | Q.   LET ME ASK YOU A QUESTION.  ARE YOU |
| 10:44:17 | 16 | FAMILIAR WITH THE HISTORY OF THE INTERNET FAX |
| 10:44:20 | 17 | BUSINESS? |
| 10:44:20 | 18 | A.   TO SOME EXTENT. |
| 10:44:22 | 19 | Q.   OKAY.  AND IN TERMS OF THE HISTORY |
| 10:44:25 | 20 | OF COMPANIES ENTERING INTO THAT BUSINESS, ISN'T IT |
| 10:44:28 | 21 | TRUE THAT J2 WAS ONE OF THE FIRST COMPANIES TO |
| 10:44:31 | 22 | ENTER THAT BUSINESS? |
| 10:44:35 | 23 | A.   J2 AND EFAX. |
| 10:44:38 | 24 | Q.   CORRECT. |
| 10:44:39 | 25 | A.   OR JFAX AND EFAX. |

53

KELLI NORDEN AND ASSOCIATES     310.820.7733     FAX: 310.820.7933

EXHIBIT 2 - PAGE 25

DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 10:50:17 | 1 | A HANDLE ON WHAT I THINK IS THE ANSWER, WHICH IS |
| 10:50:20 | 2 | THAT YOUR ANALYSIS IN THIS CASE DOESN'T ATTRIBUTE |
| 10:50:24 | 3 | ANY CONSEQUENCES TO -- SPECIFICALLY TO J2'S |
| 10:50:41 | 4 | ENFORCEMENT OF THE AUDIOFAX PATENTS. |
| 10:50:44 | 5 | MR. O'KEEFE:  OBJECT TO THE FORM. |
| 10:50:57 | 6 | THE DEPONENT:  ANY CONSEQUENCES? |
| 10:50:58 | 7 | LIKE WHETHER A COMPANY WAS ACQUIRED BY J2? |
| | 8 | BY MR. SACKS: |
| 10:51:03 | 9 | Q.  NO.  NO, LET ME REPHRASE.  THAT'S |
| 10:51:04 | 10 | FAIR.  THAT'S FAIR.  YOU INTERPRETED MY QUESTION |
| 10:51:07 | 11 | LITERALLY.  I DIDN'T MEAN IT THAT WAY. |
| 10:51:09 | 12 | YOUR -- YOUR ANALYSIS DOES NOT |
| 10:51:17 | 13 | ATTRIBUTE ANY SPECIFIC ANTITRUST -- STRIKE THAT. |
| 10:51:32 | 14 | YOUR ANALYSIS DID NOT STRIKE -- |
| 10:51:35 | 15 | DOES NOT ATTRIBUTE ANY SPECIFIC ANTICOMPETITIVE |
| 10:51:39 | 16 | CONSEQUENCES AND DAMAGE TO J2'S ENFORCEMENT OF THE |
| 10:51:42 | 17 | AUDIOFAX PATENTS SPECIFICALLY? |
| 10:51:48 | 18 | MR. O'KEEFE:  OBJECT TO THE FORM. |
| 10:51:49 | 19 | THE DEPONENT:  I MEAN, I'LL TRY TO |
| 10:51:51 | 20 | ANSWER IT. |
| 10:51:51 | 21 | I DON'T DO ANYTHING TO TRY TO |
| 10:51:54 | 22 | ISOLATE A SEPARATE IMPACT OF J2'S EFFORTS TO |
| 10:51:58 | 23 | ENFORCE THE AUDIOFAX PATENTS, ALTHOUGH THERE MAY |
| 10:52:03 | 24 | BE A FEW THINGS THAT ARE IN MY REPORT THAT WOULD |
| 10:52:05 | 25 | BE RELATED TO THAT, SUCH AS MAYBE AN ACQUISITION |

59

EXHIBIT 2 - PAGE 26

DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 10:52:08 | 1 | OR TWO OR SOMETHING LIKE THAT, OF SPECIFIC |
| 10:52:11 | 2 | COMPETITORS IN THE MARKET. |
| | 3 | BY MR. SACKS: |
| 10:52:19 | 4 | Q. OKAY. AND, AGAIN, LOOKING AT THE |
| 10:52:22 | 5 | THING -- JUST TEMPORALLY LOOKING AT SOME OF THE |
| 10:52:26 | 6 | MATTERS THAT YOU LOOK AT IN YOUR REPORT, WHICH IS |
| 10:52:29 | 7 | GOING BACK TO 2000, 2001, 2002, 2003, 2004, TO |
| 10:52:38 | 8 | PRICING BEHAVIOR BY J2, I'M CORRECT THAT NONE OF |
| 10:52:43 | 9 | THAT IS, AS A FACTUAL MATTER, RELATED TO THE |
| 10:52:51 | 10 | PATENT INFRINGEMENT -- STRIKE THAT -- THE PATENT |
| 10:52:54 | 11 | ENFORCEMENT ALLEGATIONS RELATED TO THE AUDIOFAX |
| 10:52:57 | 12 | PATENTS THAT ARE AT ISSUE IN THE COUNTERCLAIM IN |
| 10:53:03 | 13 | THIS CASE? |
| 10:53:03 | 14 | A. MY PROBLEM WITH THAT QUESTION IS |
| 10:53:06 | 15 | THE PHRASE "RELATED TO." |
| 10:53:11 | 16 | Q. OKAY. |
| 10:53:12 | 17 | A. IT'S -- |
| 10:53:13 | 18 | Q. CAUSED BY? |
| 10:53:14 | 19 | A. OKAY. I AGREE WITH THAT. |
| 10:53:15 | 20 | Q. OKAY. SO TO THE EXTENT THAT J2 HAD |
| 10:53:18 | 21 | THE ABILITY TO RAISE PRICES IN 2001 BY SOME |
| 10:53:22 | 22 | MEASURE, THAT WAS NOT AS A CONSEQUENCE OF ITS |
| 10:53:27 | 23 | ENFORCEMENT OF THE AUDIOFAX PATENTS; CORRECT? |
| 10:53:29 | 24 | A. CORRECT. |
| 10:53:29 | 25 | Q. AND TO THE EXTENT IN 2003, I |

60

**EXHIBIT 2 - PAGE 27**

DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 10:53:32 | 1 | BELIEVE, IS ANOTHER PRICE INCREASE THAT YOU LOOKED |
| 10:53:34 | 2 | AT; IS THAT RIGHT? |
| 10:53:36 | 3 | A.   YES. |
| 10:53:36 | 4 | Q.   TO THE EXTENT IN 2003 THAT J2 HAD |
| 10:53:41 | 5 | THE ABILITY TO RAISE THE PRICE OF ITS SERVICES, |
| 10:53:43 | 6 | THAT WAS NOT AS A RESULT OF ITS ENFORCEMENT OF THE |
| 10:53:46 | 7 | AUDIOFAX PATENTS; IS THAT RIGHT? |
| 10:53:48 | 8 | A.   CORRECT. |
| 10:53:49 | 9 | Q.   OKAY.  AND WITH RESPECT TO THE MORE |
| 10:53:52 | 10 | RECENT PRICE INCREASE THAT YOU LOOKED AT, AM I |
| 10:53:56 | 11 | CORRECT THAT YOU DID NOT ANALYZE SPECIFICALLY |
| 10:53:59 | 12 | WHETHER THAT PRICE INCREASE WAS A RESULT OF THE |
| 10:54:07 | 13 | PATENT ENFORCEMENT ACTION IN -- J2'S ENFORCEMENT |
| 10:54:12 | 14 | OF THE AUDIOFAX PATENTS? |
| 10:54:21 | 15 | A.   YOU'RE CORRECT THAT I DIDN'T TRY TO |
| 10:54:24 | 16 | ANALYZE THE ROLE OF THAT ENFORCEMENT IN THAT PRICE |
| 10:54:26 | 17 | INCREASE. |
| 10:54:27 | 18 | Q.   OKAY.  NOW, LOOKING AT THE ISSUE |
| 10:54:29 | 19 | OF -- GOING BACK, AGAIN, TO THE ISSUE OF MARKET |
| 10:54:36 | 20 | POWER IN THE SENSE OF LOOKING AT IT IN THE REAL |
| 10:54:42 | 21 | WORLD, ARE THERE ATTRIBUTES OF MARKETS THAT HAVE A |
| 10:54:45 | 22 | BEARING ON WHETHER A COMPANY IS LIKELY TO HAVE OR |
| 10:54:49 | 23 | NOT HAVE MARKET POWER? |
| 10:54:58 | 24 | A.   I'M NOT SURE I UNDERSTAND THAT |
| 10:54:59 | 25 | QUESTION. |

61

DEPOSITION OF RICHARD SMITH

11:33:03 1          A.   NO.

11:33:10 2          Q.   OKAY.  SO IN TERMS OF THIS, YOU'RE

11:33:12 3  EXPRESSING NO OPINION THAT THESE LAWSUITS HAVE

11:33:15 4  CAUSED ANY COMPETITIVE -- ANY MATERIAL COMPETITIVE

11:33:16 5  HARM TO ANY OF THE OTHER COMPETITORS IN THE

11:33:18 6  MARKET?

11:33:18 7                MR. O'KEEFE:  OBJECT TO THE FORM.

11:33:20 8                THE DEPONENT:  FOR THE 50 THAT WE

11:33:22 9  ARE TALKING ABOUT OR 50 PLUS WHO ARE CURRENTLY IN

11:33:25 10  THE MARKET?

11  BY MR. SACKS:

11:33:26 12          Q.   YES.

11:33:27 13          A.   YES.

11:33:27 14          Q.   I'M CORRECT?

11:33:28 15          A.   YOU'RE CORRECT.

11:33:29 16                MR. SACKS:  OKAY.  WANT TO TAKE A

11:33:31 17  SHORT BREAK?  WE'VE BEEN GOING A WHILE.  SORRY

11:33:35 18  ABOUT THAT.

11:33:35 19                THE VIDEOGRAPHER:  TIME IS 11:33.

11:33:37 20  THIS IS THE END OF TAPE NUMBER ONE.  WE'RE OFF THE

11:33:45 21  RECORD.

11:33:46 22                (WHEREUPON, A RECESS WAS HELD

11:33:46 23                FROM 11:33 A.M. TO 11:46 A.M.)

24                (WHEREUPON, MR. JOHNSON ENTERED THE

11:46:38 25                DEPOSITION PROCEEDINGS.)

94

EXHIBIT 2 - PAGE 29

DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 12:06:11 | 1 | A.   OH. |
| 12:06:11 | 2 | Q.   LET ME START OVER AGAIN BECAUSE |
| 12:06:13 | 3 | THAT'S NOT WHAT I -- THAT WASN'T THE QUESTION.  I |
| 12:06:16 | 4 | ASK A LOT OF STUPID QUESTIONS.  THAT WASN'T ONE I |
| 12:06:19 | 5 | WAS ASKING. |
| 12:06:19 | 6 | LOOKING AT YOUR CHART, EXHIBIT 5, |
| 12:06:22 | 7 | I'M CORRECT THAT BY AND LARGE, J2'S GROSS MARGIN |
| 12:06:26 | 8 | HAS GONE DOWN FROM THE FOURTH QUARTER OF 2004, |
| 12:06:31 | 9 | SINCE THAT TIME?  IT'S LOWER IN ALL QUARTERS SINCE |
| 12:06:36 | 10 | THE FOURTH QUARTER OF 2004 THAN IT WAS IN THAT |
| 12:06:40 | 11 | QUARTER AND THE SEVERAL IMMEDIATELY PRECEDING |
| 12:06:43 | 12 | QUARTERS? |
| 12:06:43 | 13 | A.   THAT'S TRUE. |
| 12:06:45 | 14 | Q.   OKAY.  SO SINCE THE TIME IT HAS |
| 12:06:48 | 15 | ACQUIRED AND BEGUN ITS PATENT ENFORCEMENT |
| 12:06:51 | 16 | STRATEGY, ITS MARGINS HAVE GONE DOWN -- ITS GROSS |
| 12:06:54 | 17 | MARGIN HAS GONE DOWN. |
| 12:06:56 | 18 | MR. O'KEEFE:  OBJECT TO THE FORM. |
| 12:07:00 | 19 | THAT'S NOT WHEN -- IT DIDN'T |
| 12:07:01 | 20 | ACQUIRE THESE PATENTS IN THE FOURTH QUARTER OF |
| 12:07:04 | 21 | '04. |
| 12:07:04 | 22 | MR. SACKS:  FIRST QUARTER OF '05. |
| 12:07:06 | 23 | MR. O'KEEFE:  RIGHT.  SO THEN LOOK |
| 12:07:08 | 24 | AT THE FIRST QUARTER OF '05. |
| 12:07:10 | 25 | MR. SACKS:  MY POINT. |

110

**EXHIBIT 2 - PAGE 30**

## DEPOSITION OF RICHARD SMITH

12:21:06  1        Q.   WHAT DID YOU -- WHAT DID YOU

12:21:07  2   UNDERSTAND -- OR DO YOU HAVE ANY UNDERSTANDING AS

12:21:11  3   TO WHAT MIGHT BE INVOLVED FOR A COMPANY TO --

12:21:19  4   THAT, FOR EXAMPLE, IS OPERATING IN CANADA TO BEGIN

12:21:24  5   OFFERING ITS SERVICES IN THE UNITED STATES?

12:21:26  6        A.   YOU KNOW, I DON'T THINK IT WOULD BE

12:21:35  7   PARTICULARLY DIFFICULT IN MOST CASES FOR A COMPANY

12:21:38  8   OPERATING IN CANADA TO COMPETE IN THE UNITED

12:21:41  9   STATES, AND I THINK A NUMBER OF THEM DO BECAUSE

12:21:42  10  THEY'RE LOCATED ALONG THE BORDER.

12:21:44  11       AND SO I THINK PROBABLY IN A NUMBER

12:21:47  12  OF CASES I'VE ALREADY INCLUDED CANADIAN FIRMS IN

12:21:51  13  THE CALCULATIONS OF MARKET SHARE.

12:21:53  14       Q.   UH-HUH.

12:21:54  15       A.   CANADA, I THINK, IS A LITTLE BIT

12:21:57  16  UNUSUAL RELATIVE TO OTHER COUNTRIES.

12:21:59  17       Q.   WELL, ENGLAND.  HAVE YOU CONSIDERED

12:22:01  18  WHAT MIGHT BE INVOLVED THERE?

12:22:04  19       A.   THAT'S A BIGGER DEAL, AS FAR AS I'M

12:22:07  20  CONCERNED.

12:22:07  21       Q.   WELL, LET ME ASK THIS:  YOU'RE

12:22:10  22  AWARE, FOR EXAMPLE, THAT J2 HAS BEGUN TO EXPAND

12:22:13  23  ITS SERVICE INTERNATIONALLY; ISN'T THAT RIGHT?

12:22:17  24       A.   YES.

12:22:17  25       Q.   OKAY.  WHY IS IT THAT YOU DON'T

123

**EXHIBIT 2 - PAGE 31**

DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 12:22:21 | 1 | BELIEVE THAT PEOPLE WHO ARE PRESENTLY IN |
| 12:22:25 | 2 | INTERNATIONAL LOCATIONS MIGHT NOT HAVE THE SAME |
| 12:22:29 | 3 | ABILITY TO EXPAND THEIR SERVICES TO THE |
| 12:22:32 | 4 | UNITED STATES? |
| 12:22:39 | 5 | MR. O'KEEFE:  OBJECT TO THE FORM. |
| 12:22:44 | 6 | THE DEPONENT:  I THINK THE QUESTION |
| 12:22:45 | 7 | IS WHETHER IT WOULD MAKE ECONOMIC SENSE FOR THEM |
| 12:22:47 | 8 | TO DO SO. |
| 12:22:49 | 9 | AND, YOU KNOW, IF WE WERE TO TAKE A |
| 12:22:54 | 10 | COMPANY THAT'S OPERATING IN CHINA, SAY, OR THE |
| 12:22:57 | 11 | U.K. OR WHEREVER, YOU KNOW, THEY WOULD HAVE TO BE |
| 12:23:05 | 12 | ABLE TO PERCEIVE THAT WHATEVER THE FRONT-END COSTS |
| 12:23:08 | 13 | OF STARTING BUSINESS IN THE UNITED STATES WERE |
| 12:23:10 | 14 | SUFFICIENT TO WARRANT DOING THAT. |
| 12:23:12 | 15 | NOW, ON THE MARGIN, I DON'T SEE IT |
| 12:23:15 | 16 | RELATIVE TO THE OTHERS WHO ARE ALREADY HERE. |
| 12:23:19 | 17 | BY MR. SACKS: |
| 12:23:19 | 18 | Q.   ON WHAT BASIS DO YOU MAKE THAT |
| 12:23:20 | 19 | STATEMENT?  ON WHAT ANALYTICAL BASIS DO YOU MAKE |
| 12:23:23 | 20 | THAT STATEMENT? |
| 12:23:24 | 21 | A.   WELL, IT WAS -- I MEAN, YOU HAVE TO |
| 12:23:28 | 22 | HAVE, AT LEAST FOR A LARGE NUMBER OF THE |
| 12:23:32 | 23 | CUSTOMERS, U.S. BASED PHONE NUMBERS, SO THAT'S, |
| 12:23:35 | 24 | YOU KNOW, SOMETHING THAT HAS TO BE DONE. |
| 12:23:40 | 25 | YOU KNOW, IF YOUR EXISTING PLATFORM |

124

EXHIBIT 2 - PAGE 32

## DEPOSITION OF RICHARD SMITH

```
12:23:42  1   IS GERMAN, THEN THERE'S A LANGUAGE ISSUE.  THERE'S
12:23:48  2   A -- POTENTIALLY, A TECHNICAL SUPPORT ISSUE.
12:23:52  3   THERE ARE CURRENCY DIFFERENCES.
12:23:55  4           SO BASICALLY, I MEAN, IF IT WERE
12:23:58  5   THE CASE THAT EVERYBODY WORKED IN DOLLARS AND
12:24:00  6   EVERYBODY READ ENGLISH AND USED U.S., YOU KNOW,
12:24:05  7   CURRENCY -- WELL, I ALREADY SAID THAT -- THEN, YOU
12:24:09  8   KNOW, IT MIGHT BE RELATIVELY LESS COSTLY TO DO IT.
12:24:12  9           BUT THOSE OTHER THINGS DO IMPEDE
12:24:15 10   THE FLOW ACROSS AND I'M PRETTY SURE THAT A
12:24:17 11   CUSTOMER IN THE U.S. WHO IS LOOKING TO SEND OR
12:24:25 12   RECEIVE FAXES TO OTHER PARTIES IN THE U.S. IS NOT
12:24:28 13   GOING TO SHOP FOR SERVICE PROVIDERS OUTSIDE THE
12:24:33 14   U.S.
12:24:33 15           Q.  WELL, I GUESS I'M CONFUSED BECAUSE
12:24:35 16   YOU'RE AWARE THAT J2 HAS BEEN -- AND NOT ALONE
12:24:39 17   AMONG U.S. COMPANIES, BEEN TRYING TO EXPAND ITS
12:24:43 18   SERVICES INTERNATIONALLY.
12:24:45 19           WHY IS IT THAT YOU THINK THAT
12:24:46 20   INTERNATIONAL COMPANIES ARE NOT ABLE TO EXPAND
12:24:50 21   INTO -- WHY IS IT THAT THE UNITED STATES IS
12:24:52 22   DIFFERENT, THAT AMERICAN COMPANIES CAN EXPAND
12:24:55 23   ABROAD, BUT COMPANIES FROM ABROAD IN THIS BUSINESS
12:24:58 24   CAN'T EXPAND INTO THE UNITED STATES?
12:25:00 25           MR. O'KEEFE:  OBJECT TO THE FORM.
```

125

## DEPOSITION OF RICHARD SMITH

| | |
|---|---|
| 12:25:01 1 | THE DEPONENT:  LOOK, THOSE |
| 12:25:04 2 | COMPANIES OUTSIDE THE U.S. YOU CAN INCLUDE AS |
| 12:25:09 3 | POTENTIAL COMPETITORS IN THE U.S. MARKET, BUT |
| 12:25:16 4 | THEY'RE NOT IN THE U.S. MARKET AND THEY'RE NOT |
| 12:25:18 5 | GOING TO BE MARKETING WITH THEIR EXISTING PRODUCTS |
| 12:25:22 6 | AND SERVICES IN THE U.S. EXCEPT IN SOME PRETTY |
| 12:25:28 7 | ISOLATED, MAYBE IDIOSYNCRATIC CASES DEALING WITH |
| 12:25:34 8 | INDIVIDUAL CUSTOMERS WHO HAVE INTERNATIONAL NEEDS. |
| 12:25:37 9 | BY MR. SACKS: |
| 12:25:37 10 | Q.   NOW, THE DAVIDSON DATA YOU RELIED |
| 12:25:40 11 | UPON IN YOUR ANALYSIS, THAT'S DATA THAT'S |
| 12:25:43 12 | WORLDWIDE, ISN'T IT?  THEY DON'T -- THEY DON'T |
| 12:25:46 13 | BREAK DOWN U.S. AND -- U.S. ONLY, DO THEY? |
| 12:25:53 14 | MR. O'KEEFE:  OBJECT TO THE FORM. |
| 12:25:55 15 | THE DEPONENT:  I DON'T -- |
| 16 | BY MR. SACKS: |
| 12:25:56 17 | Q.   ISN'T IT CORRECT THAT THE DAVIDSON |
| 12:25:58 18 | DATA THAT YOU UTILIZED FOR PURPOSES OF YOUR |
| 12:26:00 19 | ANALYSIS WAS WORLDWIDE DATA? |
| 12:26:03 20 | A.   WELL, I THINK THAT MOST OF THE |
| 12:26:05 21 | DETAILED DATA WAS WORLDWIDE, BUT I DON'T RECALL |
| 12:26:08 22 | BEYOND THAT WHETHER THERE WERE DISCUSSIONS OF U.S. |
| 12:26:11 23 | VERSUS NON-U.S. IN THE DAVIDSON REPORTS. |
| 12:26:15 24 | Q.   WELL, DO YOU -- DO YOU KNOW HOW YOU |
| 12:26:18 25 | DERIVED U.S. NUMBERS FOR PURPOSES OF YOUR REPORT? |

126

EXHIBIT 2 - PAGE 34

## DEPOSITION OF RICHARD SMITH

12:28:11  1    JUST ISN'T RIGHT?  I MEAN, WHETHER IT'S

12:28:13  2    CONSERVATIVE OR OTHERWISE, IT'S NOT ACCURATE?

12:28:16  3            MR. O'KEEFE:  OBJECT TO THE FORM.

12:28:17  4            THE DEPONENT:  I THINK IT IS --

12:28:27  5    WELL, IT'S MY ATTEMPT TO MAKE A CONSERVATIVE

12:28:32  6    ESTIMATE OF J2'S U.S. MARKET SHARE.

12:28:35  7            SO I WOULD AGREE WITH YOU THAT IT'S

12:28:37  8    NOT AN UNBIASED ESTIMATE OF J2'S MARKET SHARE;

12:28:42  9    IT'S A CONSERVATIVE ESTIMATE OF J2'S MARKET SHARE.

           10    BY MR. SACKS:

12:28:46 11            Q.  WELL, LET'S TALK ABOUT THAT FOR

12:28:49 12    A -- I HADN'T INTENDED TO, BUT LET ME ASK A

12:28:52 13    QUESTION OR TWO ABOUT THAT.

12:28:52 14            THAT ESTIMATE IS FOUNDED

12:28:56 15    FUNDAMENTALLY ON RELIABILITY OF DAVIDSON DATA,

12:28:59 16    ISN'T IT?

12:29:01 17            MR. O'KEEFE:  OBJECT TO THE FORM.

12:29:10 18            THE DEPONENT:  FOR THE MOST PART,

12:29:12 19    YES, AND IN CONJUNCTION WITH WHATEVER I COULD GET

12:29:15 20    FOR PUBLIC COMPANIES FROM THEIR OWN INFORMATION.

           21    BY MR. SACKS:

12:29:19 22            Q.  THAT WAS A VERY SMALL SUBSET OF THE

12:29:21 23    NUMBERS, THAT YOU COULDN'T DO A MARKET SHARE

12:29:23 24    ANALYSIS, BASED ON THE PUBLIC COMPANY INFORMATION

12:29:25 25    YOU HAD, COULD YOU?

128

**EXHIBIT 2 - PAGE 35**

DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 12:29:26 | 1 | A.   NO, BUT A LARGE FRACTION OF THE |
| 12:29:28 | 2 | MARKET IS J2, WHICH IS PUBLIC.  A LARGE -- |
| 12:29:31 | 3 | Q.   YOU COULD NOT HAVE DONE A MARKET |
| 12:29:33 | 4 | SHARE ANALYSIS, BASED ON THE PUBLIC INFORMATION |
| 12:29:35 | 5 | YOU HAVE, COULD YOU? |
| 12:29:44 | 6 | A.   I DON'T -- I DON'T THINK SO, BUT |
| 12:29:45 | 7 | I'M NOT SURE.  I'D HAVE TO GO BACK AND LOOK AT |
| 12:29:48 | 8 | WHAT INFORMATION WAS IN J2'S PUBLIC INFORMATION |
| 12:29:51 | 9 | RELEASES AND WHAT ELSE WAS AVAILABLE IN THE |
| 12:29:54 | 10 | MARKET. |
| 12:29:54 | 11 | Q.   I CAN ASSURE YOU THEY DON'T DO |
| 12:29:57 | 12 | MARKET SHARE INFORMATION IN THEIR PUBLIC RELEASES. |
| 12:30:00 | 13 | A.   YOU ASKED ME IF I COULD DO IT. |
| 12:30:02 | 14 | Q.   RIGHT.  AND THE ANSWER IS YOU DON'T |
| 12:30:04 | 15 | THINK YOU COULD; IS THAT RIGHT? |
| 12:30:07 | 16 | A.   I DON'T THINK, AS I SIT HERE, THAT |
| 12:30:08 | 17 | I COULD, ALTHOUGH I POSSIBLY COULD. |
| 12:30:10 | 18 | Q.   AND IN YOUR COMMENT ABOUT J2 BEING |
| 12:30:13 | 19 | A LARGE SHARE OF THE MARKET, THAT'S BASED UPON |
| 12:30:16 | 20 | ANECDOTAL INFORMATION AND DAVIDSON NUMBERS, ISN'T |
| 12:30:19 | 21 | IT? |
| 12:30:19 | 22 | MR. O'KEEFE:  OBJECT TO THE FORM. |
| 12:30:21 | 23 | THE DEPONENT:  AND J2 INFORMATION. |
| | 24 | BY MR. SACKS: |
| 12:30:25 | 25 | Q.   OKAY.  YOU KNOW WHAT J2'S SALES ARE |

129

KELLI NORDEN AND ASSOCIATES    310.820.7733    FAX: 310.820.7933

**EXHIBIT 2 - PAGE 36**

## DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 12:30:28 | 1 | FROM J2 INFORMATION, BUT IN TERMS OF THE SIZE OF |
| 12:30:30 | 2 | THE MARKET AS YOU'VE DEFINED IT, THAT REQUIRES YOU |
| 12:30:34 | 3 | TO ACCEPT THE RELIABILITY OF INFORMATION THAT |
| 12:30:38 | 4 | COMES FROM DAVIDSON, DOESN'T IT? |
| 12:30:46 | 5 | A.   YES -- |
| 12:30:46 | 6 | Q.   OKAY. |
| 12:30:47 | 7 | A.   -- AT SOME LEVEL. |
| 12:30:48 | 8 | Q.   RIGHT. |
| 12:30:48 | 9 | A.   I MEAN, CERTAINLY, DAVIDSON |
| 12:30:51 | 10 | INFORMATION IN MANY CASES IS ESTIMATES. |
| 12:30:53 | 11 | Q.   OKAY.  IT IS ESTIMATES, ISN'T IT? |
| 12:30:59 | 12 | AND I UNDERSTAND FROM READING YOUR REPORT THAT YOU |
| 12:31:04 | 13 | SPOKE TO MR. DAVIDSON? |
| 12:31:05 | 14 | A.   THAT'S CORRECT. |
| 12:31:06 | 15 | Q.   WHEN DID YOU SPEAK TO MR. DAVIDSON? |
| 12:31:08 | 16 | A.   I THINK PROBABLY IN JUNE OF THIS |
| 12:31:15 | 17 | YEAR.  YES. |
| 12:31:15 | 18 | Q.   DO YOU HAVE ANY NOTES OF YOUR |
| 12:31:17 | 19 | CONVERSATIONS WITH MR. DAVIDSON? |
| 12:31:20 | 20 | A.   I DON'T BELIEVE SO. |
| 12:31:20 | 21 | Q.   HOW LONG DID YOU SPEAK TO |
| 12:31:22 | 22 | MR. DAVIDSON? |
| 12:31:22 | 23 | A.   NOT A LONG CONVERSATION, LIKE |
| 12:31:24 | 24 | CERTAINLY LESS THAN HALF HOUR. |
| 12:31:25 | 25 | Q.   HOW DID YOU GET IN TOUCH WITH |

130

**EXHIBIT 2 - PAGE 37**

DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 12:31:26 | 1 | MR. DAVIDSON? |
| 12:31:27 | 2 | A.   IT WAS ARRANGED THROUGH COUNSEL. |
| 12:31:29 | 3 | Q.   AND WHAT DID MR. DAVIDSON TELL YOU? |
| 12:31:33 | 4 | WHAT DID YOU AND MR. DAVIDSON TALK ABOUT? |
| 12:31:35 | 5 | A.   I ASKED HIM ABOUT WHAT -- THIS IS |
| 12:31:44 | 6 | GOING FROM RECOLLECTION, BUT WHAT HE DID TO |
| 12:31:51 | 7 | VALIDATE INFORMATION THAT WAS PROVIDED IN HIS |
| 12:31:55 | 8 | REPORTS; GENERALLY, HOW HE WENT ABOUT COMPILING |
| 12:32:00 | 9 | THE INFORMATION IN THE REPORTS; WHAT INDUSTRY |
| 12:32:07 | 10 | PRACTICE WAS WITH RESPECT TO USE OF HIS DATA OR |
| 12:32:10 | 11 | SUBSCRIPTION TO HIS SERVICE. |
| 12:32:12 | 12 | THOSE, I THINK, ARE THE MAIN AREAS. |
| 12:32:14 | 13 | Q.   DO YOU RECALL WHAT HE TOLD YOU? |
| 12:32:18 | 14 | A.   I THINK HE TOLD ME THAT IN SOME |
| 12:32:20 | 15 | CASES, AND CERTAINLY FOR PRIVATE COMPANIES, HE HAS |
| 12:32:23 | 16 | TO RELY FAIRLY SIGNIFICANTLY ON WHAT HE'S TOLD BY |
| 12:32:26 | 17 | THE PARTICIPANTS FOR WHOM HE'S TRYING TO ESTIMATE |
| 12:32:36 | 18 | MARKET VOLUMES -- |
| | 19 | Q.   UH-HUH. |
| 12:32:37 | 20 | A.   -- BUT THAT IN CASES OF PUBLIC |
| 12:32:38 | 21 | COMPANIES, HE DOES TRY TO CROSS-VALIDATE WITH |
| 12:32:41 | 22 | THEIR PUBLIC FILINGS -- |
| 12:32:42 | 23 | Q.   UH-HUH. |
| 12:32:43 | 24 | A.   -- AND THAT A NUMBER OF THE |
| 12:32:47 | 25 | INDUSTRY PARTICIPANTS DO USE HIS SERVICE, BUT I |

131

KELLI NORDEN AND ASSOCIATES      310.820.7733      FAX: 310.820.7933

EXHIBIT 2 - PAGE 38

## DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 12:32:50 | 1 | THINK HE MIGHT HAVE TOLD ME THAT HE'S NOT SURE FOR |
| 12:32:52 | 2 | WHAT PURPOSES THEY USE HIS SERVICES. |
| 12:32:55 | 3 | Q.  OKAY.  AND IN TERMS OF RELYING ON |
| 12:32:59 | 4 | WHAT HE -- FOR PRIVATE COMPANIES, HE RELIES ON |
| 12:33:02 | 5 | WHAT HE'S TOLD BY PEOPLE, HE DIDN'T TELL YOU THAT |
| 12:33:04 | 6 | HE ACTUALLY SPOKE TO PEOPLE AT EACH OF THE |
| 12:33:07 | 7 | COMPANIES THAT'S CONTAINED IN HIS REPORT, DID HE? |
| 12:33:11 | 8 | A.  NOT AT EACH OF THEM.  I THINK HE -- |
| 12:33:14 | 9 | I THINK HE INDICATED -- I DIDN'T ASK HIM THAT |
| 12:33:17 | 10 | SPECIFIC QUESTION THAT I CAN RECALL, BUT I THINK |
| 12:33:22 | 11 | MY INFERENCE FROM THE CONVERSATION WAS THAT HE |
| 12:33:24 | 12 | SPOKE WITH A NUMBER OF INDUSTRY PARTICIPANTS WHO |
| 12:33:27 | 13 | WERE NONPUBLIC IN ATTEMPTS TO DERIVE THE ESTIMATES |
| 12:33:29 | 14 | THAT HE HAS. |
| 12:33:30 | 15 | Q.  DID YOU TELL -- ASK HIM WHICH |
| 12:33:32 | 16 | COMPANIES HE SPOKE TO OR DID NOT SPEAK TO? |
| 12:33:34 | 17 | A.  I DON'T RECALL HAVING DONE THAT. |
| 12:33:36 | 18 | Q.  OKAY.  SO AS YOU SIT HERE TODAY, |
| 12:33:38 | 19 | YOU DON'T KNOW WHICH, IF ANY, COMPANIES HE |
| 12:33:40 | 20 | ACTUALLY SPOKE TO? |
| 12:33:41 | 21 | MR. O'KEEFE:  OBJECT TO THE FORM; |
| 12:33:43 | 22 | MISCHARACTERIZES HIS TESTIMONY. |
| 12:33:45 | 23 | MR. SACKS:  I STAND ON THE |
| 12:33:47 | 24 | QUESTION. |
| 12:33:53 | 25 | THE DEPONENT:  I DON'T KNOW WHICH |

132

## DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 12:35:52 | 1 | SOME QUALITATIVE EVIDENCE THAT, YOU KNOW, SOME |
| 12:35:55 | 2 | COMPANIES ARE LARGER THAN OTHER COMPANIES, BUT NOT |
| 12:35:58 | 3 | IN THE SENSE THAT I WOULD BE ABLE TO PUT A NUMBER |
| 12:36:02 | 4 | ON IT. |
| 12:36:02 | 5 | Q.   RIGHT.  AND OTHER THAN THAT, DO YOU |
| 12:36:04 | 6 | HAVE ANY BASIS TO UNDERSTAND THE ACCURACY OF THE |
| 12:36:07 | 7 | DATA? |
| 12:36:13 | 8 | A.   THERE'S A LITTLE BIT OF A MARKET |
| 12:36:15 | 9 | TEST IN THE FACT THAT HE DOES HAVE SUBSCRIBERS TO |
| 12:36:17 | 10 | THE DATA WHO USE IT, AGAIN, AS I SAID, FOR |
| 12:36:20 | 11 | WHATEVER PURPOSES, I'M NOT SURE.  THEY MAY NOT BE |
| 12:36:23 | 12 | USING IT BECAUSE OF THE DATA AS MUCH AS THE |
| 12:36:27 | 13 | DESCRIPTIONS OF WHAT COMPANIES ARE INVOLVED IN. |
| 12:36:30 | 14 | Q.   BUT YOU DON'T KNOW THE ANSWER TO |
| 12:36:31 | 15 | THAT, DO YOU? |
| 12:36:32 | 16 | A.   BEYOND THAT, I DON'T KNOW. |
| 12:36:33 | 17 | Q.   OKAY.  AND YOU'RE AWARE FROM THE |
| 12:36:37 | 18 | TESTIMONY IN THIS -- ARE YOU AWARE OF WHAT HAS |
| 12:36:39 | 19 | BEEN TESTIFIED TO IN THIS CASE BY THE TWO |
| 12:36:42 | 20 | COMPANIES IN THIS LITIGATION ABOUT THEIR VIEW OF |
| 12:36:47 | 21 | THE ACCURACY OF THE DAVIDSON DATA? |
| 12:36:49 | 22 | A.   I BELIEVE THEY BOTH SUBSCRIBE TO IT |
| 12:36:51 | 23 | AND -- |
| 12:36:51 | 24 | Q.   AND WHAT ABOUT THE ACCURACY? |
| 12:36:53 | 25 | A.   WELL, AND THEY BOTH BELIEVE THAT |

135

**EXHIBIT 2 - PAGE 40**

## DEPOSITION OF RICHARD SMITH

13:43:13  1    SOMETHING TO EXCLUDE -- THAT HAS EXCLUDED

13:43:16  2    COMPETITORS?

13:43:21  3         A.   WELL, IN THE SENSE OF CUSTOMERS WHO

13:43:31  4    ARE, TO SOME DEGREE -- I MEAN, I DON'T WANT TO

13:43:36  5    OVERUSE THE TERM, BUT ARE TO SOME EXTENT LOCKED IN

13:43:40  6    TO J2, I THINK, YOU KNOW, THOSE -- THAT SAME KIND

13:43:44  7    OF THING EXISTS FOR VENALI; THAT IS, IF YOU'VE GOT

13:43:51  8    AN ACCOUNT NUMBER WITH J2 AND NO OUTWARD

13:43:55  9    PORTABILITY, THOSE CUSTOMERS ARE NOT EASILY

13:43:59  10   AVAILABLE TO OTHERS WHO WANT TO COMPETE ON PRICE.

13:44:03  11        AND IF IT'S A LARGE ENOUGH FRACTION

13:44:05  12   OF THE MARKET, THEN IT IMPEDES THE POTENTIAL FOR

13:44:09  13   SOMEBODY TO COME IN AND ENTER SIGNIFICANTLY OR TO

13:44:11  14   DISCIPLINE THE PRICING WITH RESPECT TO THOSE

13:44:14  15   CUSTOMERS.

13:44:14  16        SO IT'S, TO SOME EXTENT, ALONG THE

13:44:20  17   LINES OF, WELL, KIND OF THE KODAK STYLE LOCK-IN OF

13:44:27  18   EXISTING CUSTOMERS.

13:44:29  19        Q.   WELL, LET'S TALK FOR A MINUTE ABOUT

13:44:30  20   THAT.

13:44:30  21        FIRST OF ALL, YOU'VE DONE NO

13:44:37  22   ANALYSIS OF THE EXTENT TO WHICH LACK OF

13:44:40  23   FLEXIBILITY AND PORTABILITY OF NUMBERS IMPACTS THE

13:44:43  24   WILLINGNESS OF PEOPLE TO SWITCH SERVICES, HAVE

13:44:47  25   YOU?

142

EXHIBIT 2 - PAGE 41

## DEPOSITION OF RICHARD SMITH

13:44:47  1           MR. O'KEEFE:  OBJECT TO THE FORM.

13:44:48  2           THE DEPONENT:  I HAVEN'T DONE AN

13:44:49  3  ANALYSIS.  I THINK I SAW --

13:44:57  4           "TURICCHI"?

13:44:58  5  BY MR. SACKS:

13:44:58  6       Q.  "TURICCHI."

13:44:59  7       A.   -- TURICCHI'S TESTIMONY THAT -- I

13:45:02  8  THINK THAT THERE WAS SOMETHING LIKE AROUND -- I

13:45:08  9  MEAN, I DON'T REMEMBER THE SPECIFICS, BUT

13:45:10  10 SOMETHING LIKE AROUND 50 PERCENT OF THE CUSTOMERS

13:45:12  11 WHO SWITCHED FROM -- I THINK THIS IS -- WHO

13:45:16  12 SWITCHED FROM FREE TO PAID ACCOUNTS, KEPT THEIR

13:45:21  13 FREE NUMBER, EVEN IF IT MIGHT NOT BE AS DESIRABLE

13:45:29  14 AS, SAY, A PAID NUMBER DE NOVO.

13:45:34  15           NOW, THAT LAST PART I ADDED ON.

13:45:44  16           I ALSO -- I THINK IN ONE OF THE

13:45:46  17 MORE RECENT CONFERENCE CALLS, LIKE IN THE LAST

13:45:49  18 COUPLE OF QUARTERS OR THREE QUARTERS, SAW SOME

13:45:53  19 DISCUSSION OF SOMEBODY FROM ONE OF THE -- ONE OF

13:45:57  20 THE SPEAKERS FOR J2, IN TERMS OF LOOKING AT THE

13:46:00  21 FREE CUSTOMERS AND MAKING CHOICES ABOUT,

13:46:06  22 ESSENTIALLY, CANCELING THE FREE SERVICE FOR THOSE

13:46:09  23 CUSTOMERS AND SORT OF FORCING THEM INTO THE

13:46:11  24 DECISION OF EITHER DROPPING THE SERVICE OR

13:46:13  25 CHANGING INTO A PAID SERVICE IF THEY WANTED TO

143

DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 13:46:16 | 1 | KEEP THEIR PHONE NUMBER. |
| 13:46:20 | 2 | SO, YOU KNOW, DEPENDING ON WHAT YOU |
| 13:46:22 | 3 | CALL "ANALYSIS," I'VE DONE SOME THINGS, BUT I |
| 13:46:25 | 4 | HAVEN'T DONE A GREAT DEAL. |
| 13:46:25 | 5 | Q.   HAVE YOU DONE ANY ANALYSIS -- I |
| 13:46:27 | 6 | MEAN, AN -- I MEAN, I UNDERSTAND YOU'VE OBSERVED |
| 13:46:29 | 7 | TWO THINGS WHICH HAVE INDICATED, IN FAIRNESS, THAT |
| 13:46:34 | 8 | ALL ELSE BEING EQUAL, PEOPLE WOULD RATHER KEEP |
| 13:46:37 | 9 | THEIR NUMBER THAN CHANGE THEIR NUMBER. |
| 13:46:39 | 10 | IS THAT ESSENTIALLY WHAT THAT SAYS |
| 13:46:41 | 11 | TO YOU? |
| 13:46:43 | 12 | A.   WELL -- |
| 13:46:44 | 13 | MR. O'KEEFE:  OBJECT TO FORM. |
| 13:46:45 | 14 | THE DEPONENT:  -- YOU KNOW, I GAVE |
| 13:46:45 | 15 | YOU TWO EXAMPLES. |
| | 16 | BY MR. SACKS: |
| 13:46:47 | 17 | Q.   OKAY. |
| 13:46:47 | 18 | A.   BUT YOU CAN ALSO JUST THINK ABOUT |
| 13:46:49 | 19 | IT.  IT'S LIKE IF YOU PRINT BUSINESS CARD OR YOU |
| 13:46:53 | 20 | HAVE LETTERHEAD OR YOU HAVE CUSTOMER RELATIONSHIPS |
| 13:46:56 | 21 | OR CLIENT RELATIONSHIPS THAT HAVE A PARTICULAR FAX |
| 13:46:58 | 22 | NUMBER ASSOCIATED WITH THEM, THOSE THINGS ALL |
| 13:47:00 | 23 | OBVIOUSLY RAISE THE COST OF SWITCHING TO SOMEBODY |
| 13:47:03 | 24 | ELSE. |
| 13:47:03 | 25 | AND WE'RE TALKING, FOR INDIVIDUAL |

144

EXHIBIT 2 - PAGE 43

## DEPOSITION OF RICHARD SMITH

13:47:05 1  ACCOUNTS, ABOUT A TOTAL ANNUAL SERVICE COST OF A

13:47:08 2  COUPLE HUNDRED DOLLARS OR SO, DEPENDING ON NOT

13:47:12 3  USING ANY EXTRA SERVICES.  AND SO AT WHAT POINT

13:47:16 4  DOES IT BECOME WORTHWHILE TO BEAR ALL THOSE

13:47:19 5  ADDITIONAL COSTS IN ORDER TO AVOID A PRICE

13:47:21 6  INCREASE?

13:47:22 7            I THINK YOU CAN REASON THROUGH THAT

13:47:23 8  FAIRLY WELL.

13:47:24 9       Q.   YOU COULD PROBABLY DO SOME TYPE OF

13:47:27 10 MORE QUANTITATIVE ANALYSIS OF IT TOO, COULDN'T

13:47:31 11 YOU?  YOU COULD SURVEY PEOPLE, COULDN'T YOU?

13:47:34 12      A.   IF I HAD THE CUSTOMERS' I.D.'S, I

13:47:37 13 COULD POTENTIALLY SURVEY PEOPLE.

13:47:41 14      Q.   BUT THERE ARE OTHER -- IF YOU HAD

13:47:42 15 CHURN NUMBERS, YOU MIGHT BE ABLE TO DO SOME TYPE

13:47:44 16 OF AN ANALYSIS TOO; RIGHT?  IF YOU UTILIZE CHURN

13:47:49 17 NUMBERS AND UNDERSTOOD WHERE PEOPLE -- WHAT PEOPLE

13:47:50 18 DID WHEN THEY DROPPED THE SERVICE?

13:47:52 19           STRIKE THAT.  LET ME GO BACK.

13:47:54 20           DO YOU KNOW -- YOU KNOW WHAT THE

13:47:55 21 CONCEPT OF "CHURN" IS?

13:47:57 22      A.   YES.

13:47:57 23      Q.   OKAY.  WHAT IS IT?

13:47:58 24      A.   IT'S THE EROSION -- WELL, IN MOST

13:48:01 25 OF THE CASES WHERE I'VE SEEN IT DISCUSSED, IT'S

145

EXHIBIT 2 - PAGE 44

DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 14:17:36 | 1 | Q.   I DON'T UNDERSTAND WHAT YOU'RE -- |
| 14:17:38 | 2 | HOW ABOUT NUMBER -- LET'S TALK ABOUT ONE YOU |
| 14:17:40 | 3 | DIDN'T TALK ABOUT, ITS BRAND.  OKAY?  DID YOU DO |
| 14:17:43 | 4 | ANY BRAND RECOGNITION SURVEY? |
| 14:17:51 | 5 | A.   NO, NOT IN A FORMAL SENSE, OTHER |
| 14:17:53 | 6 | THAN I JUST TOLD YOU I LISTEN TO THE RADIO.  BUT |
| 14:17:56 | 7 | NO. |
| 14:17:56 | 8 | Q.   YOU -- OKAY.  SO YOU LISTEN TO THE |
| 14:17:57 | 9 | RADIO.  I MEAN, YOU LISTEN TO PEOPLE ADVERTISING |
| 14:17:59 | 10 | J- -- EFAX, DON'T YOU?  YOU'VE HEARD |
| 14:18:02 | 11 | ADVERTISEMENTS FOR EFAX? |
| 14:18:05 | 12 | A.   SURE. |
| 14:18:05 | 13 | Q.   OKAY.  THAT BUILDS GOODWILL, |
| 14:18:07 | 14 | DOESN'T IT? |
| 14:18:07 | 15 | A.   IT BUILDS TRAFFIC TO THE WEBSITE. |
| 14:18:10 | 16 | Q.   OKAY.  NOW, YOU -- I JUST WANT TO |
| 14:18:11 | 17 | ASK YOU ABOUT YOUR ANALYSIS, BECAUSE YOU'RE VERY |
| 14:18:13 | 18 | QUICK TO ATTRIBUTE EVERYTHING TO BAD BEHAVIOR BY |
| 14:18:17 | 19 | J2. |
| 14:18:17 | 20 | BUT HOW ABOUT THE FACT THAT THE |
| 14:18:19 | 21 | POSSIBILITY EQUALLY AVAILABLE IS THAT CUSTOMERS |
| 14:18:21 | 22 | BELIEVE THAT J2 IS THE PREMIUM BRAND AND ATTRIBUTE |
| 14:18:24 | 23 | A 9-DOLLAR-A-MONTH BENEFIT TO BEING A SUBSCRIBER |
| 14:18:28 | 24 | TO THE PREMIUM BRAND? |
| 14:18:30 | 25 | THAT A -- THAT'S A CONCLUSION THAT |

173

**EXHIBIT 2 - PAGE 45**

DEPOSITION OF RICHARD SMITH

| | | |
|---|---|---|
| 14:28:52 | 1 | SOME RESPECTS, PRETTY CLOSE TO PERFECT SUBSTITUTES |
| 14:28:55 | 2 | IN A LOT OF WAYS, AREN'T THEY? |
| 14:28:57 | 3 | MR. O'KEEFE:  OBJECT TO THE FORM. |
| 14:28:58 | 4 | THE DEPONENT:  THIS IS, AGAIN, A |
| 14:29:00 | 5 | QUESTION OF ECONOMICS, WHICH IS FUNCTIONALITY.  IT |
| 14:29:02 | 6 | DEPENDS.  SOME CONSUMERS WOULD FIND THEM GOOD |
| 14:29:05 | 7 | SUBSTITUTES IN ECONOMIC TERMS BUT, FOR A VARIETY |
| 14:29:08 | 8 | OF REASONS, OTHERS WOULD NOT. |
| | 9 | BY MR. SACKS: |
| 14:29:10 | 10 | Q.   SOME DO AND SOME DON'T.  AND THAT'S |
| 14:29:12 | 11 | TRUE WITH RESPECT TO ALL OF THE DIFFERENT TYPES OF |
| 14:29:15 | 12 | MESSAGE DELIVERY SYSTEMS THAT ARE DESCRIBED THERE; |
| 14:29:19 | 13 | ISN'T THAT RIGHT?  SOME BETTER THAN OTHERS?  SOME |
| 14:29:22 | 14 | CLOSER THAN OTHERS? |
| 14:29:23 | 15 | A.   OF COURSE. |
| 14:29:24 | 16 | Q.   OKAY.  AND ISN'T ONE ASPECT OF |
| 14:29:27 | 17 | THE -- DO YOU UNDERSTAND THE POTENTIAL MARKET FOR |
| 14:29:29 | 18 | INTERNET FAX SERVICES TO BE THE NUMBER OF PEOPLE |
| 14:29:32 | 19 | THAT SUPPLIERS TO THAT MARKET CAN INDUCE TO |
| 14:29:39 | 20 | TRANSITION FROM TRADITIONAL FAX MACHINES? |
| 14:29:53 | 21 | A.   WELL, YES, BUT THAT IS A |
| 14:29:55 | 22 | TECHNOLOGICAL -- A TECHNOLOGICAL CHANGE TEST THAT |
| 14:29:58 | 23 | YOU'RE APPLYING RATHER THAN THE ABILITY TO |
| 14:30:01 | 24 | SUBSTITUTE IN EITHER DIRECTION IN RESPONSE TO |
| 14:30:06 | 25 | RELATIVELY SMALL, NONTRANSITORY PRICE CHANGES. |

184

DEPOSITION OF RICHARD SMITH

```
 1   STATE OF CALIFORNIA   )
                           )SS
 2   COUNTY OF LOS ANGELES)

 3

 4         I, KELLI C. NORDEN, CERTIFIED SHORTHAND

 5   REPORTER, CERTIFICATE NUMBER 7200, FOR THE STATE

 6   OF CALIFORNIA, HEREBY CERTIFY:

 7         THE FOREGOING PROCEEDINGS WERE TAKEN

 8   BEFORE ME AT THE TIME AND PLACE THEREIN SET FORTH,

 9   AT WHICH TIME THE DEPONENT WAS PLACED UNDER OATH

10   BY ME;

11         THE TESTIMONY OF THE DEPONENT AND ALL

12   OBJECTIONS MADE AT THE TIME OF THE EXAMINATION

13   WERE RECORDED STENOGRAPHICALLY BY ME AND WERE

14   THEREAFTER TRANSCRIBED;

15         THE FOREGOING TRANSCRIPT IS A TRUE AND

16   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;

17         I FURTHER CERTIFY THAT I AM NEITHER

18   COUNSEL FOR NOR RELATED TO ANY PARTY TO SAID

19   ACTION, NOR IN ANY WAY INTERESTED IN THE OUTCOME

20   THEREOF.

21         IN WITNESS WHEREOF, I HAVE HEREUNTO

22   SUBSCRIBED MY NAME THIS 23RD DAY OF AUGUST, 2008.

23

24

25                       _____
                              Kelli C. Norden
```

284

**EXHIBIT 2 - PAGE 47**