# EXHIBIT 3

LAW OFFICE OF STEVEN M. GOLDSOBEL
STEVEN M. GOLDSOBEL (SBN 166405)
1900 Avenue of the Stars, Suite 1800
Los Angeles, CA 90067
Telephone: 310-552-4848
Facsimile: 310-552-9291

CAREY RODRIGUEZ GREENBERG & PAUL, LLP
JOHN C. CAREY (Admitted *Pro Hac Vice*)
Email: jcarey@crgplaw.com
DOUGLAS L. O'KEEFE (Admitted *Pro Hac Vice*)
Email: dokeefe@crgplaw.com
1395 Brickell Avenue, Suite 700
Miami, FL 33131
Telephone: 305-372-7474
Facsimile: 305-372-7475

Attorneys for Defendant and Counterclaim Plaintiff
VENALI, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATCH CURVE, INC., | Civil Action No. CV 05-4820 DDP (AJWx) |
| Plaintiff, | |
| vs. | **EXPERT REPORT OF RICHARD L. SMITH, PH.D.** |
| VENALI, INC., | |
| Defendant. | |
| AND RELATED COUNTERCLAIMS AND THIRD PARTY COMPLAINT | |

EXHIBIT 3  PAGE 48

# TABLE OF CONTENTS

I.     Introduction and Qualifications ...................................................................1

       A.     Assignment ..................................................................................2

       B.     Summary of Conclusions ...............................................................3

II.    Background on Internet Faxing ...................................................................6

III.   Market Power ...........................................................................................7

       A.     The Economics of Market Power ..................................................7

       B.     Assessing Market Power ...............................................................9

              i.     Direct Evidence of Market Power ......................................10

              ii.    Indirect Analysis of Market Power ....................................16

                     1.     Relevant Market ......................................................17

                     2.     Product Market .......................................................17

                     3.     Geographic Market .................................................18

       C.     Indirect Evidence of Market Power ..............................................19

IV.    Anticompetitive Conduct ..........................................................................23

V.     Injury to Competition ..............................................................................24

VI.    Damage to Venali .....................................................................................26

VII.   Conclusion ..............................................................................................26

EXHIBIT 3 PAGE 49

## I.      INTRODUCTION AND QUALIFICATIONS

1.      In this report, I refer to j2 Global Communications, Inc. and its related entities as "j2," Catch Curve, Inc. as "Catch Curve" and Venali, Inc. as "Venali." I have been retained by counsel for Venali to conduct an analysis of the antitrust economics relevant to Venali's antitrust claims against j2 and Catch Curve and to assess the harm to competition arising from j2 and Catch Curve's allegedly anticompetitive conduct in the relevant market.

2.      Currently, I hold academic appointments at Claremont Graduate University and the University of California, Riverside. At Claremont Graduate University I am a Professor of Financial Management in the Peter F. Drucker Graduate School of Management. At Claremont, I teach courses on corporate finance, entrepreneurial finance, strategic risk management, and financial policy. Through the summer of 2009, I am on extended leave from Claremont. During the 2007-2008 academic year, I taught at Chapman University. At Chapman, I held the Ralph W. Leatherby Chair in Entrepreneurship and Private Equity and taught courses on entrepreneurial finance and strategic risk management. Since July 2008 I have been employed by the University of California, Riverside, in the Gary A. Anderson Graduate School of Management. At Riverside, I hold the Philip L. Boyd Chair in Finance and am Chair of the Department of Finance and Management Science. My academic appointment at Chapman began in August 2007 and my academic appointment at Claremont began in 1995. During my tenure at Claremont, I have served at various times as Associate Dean of the Drucker School, Director of the Financial Engineering Program, member of the Investment Committee of the Board of Trustees, Faculty Chair, and others.

3.      Before joining the faculty of the Drucker School, I was Professor of Finance at Arizona State University. I also have taught economics and finance courses at the University of California, Los Angeles, the University of California, Irvine, the University of Oregon, and Case Western Reserve University. My teaching responsibilities at Claremont, ASU, Case Western Reserve, and elsewhere have included courses with subject matter

1

EXHIBIT 3   PAGE 50

relevant to industrial organization, industry structure, antitrust economics, and econometrics.

4.     I received a Ph.D. in Business Economics from UCLA in 1979, an MA in Economics from UCLA in 1978, an MBA in Finance from Washington University in 1973, and a BBA in Finance from Southern Methodist University in 1971.

5.     I am author of over thirty-five journal articles and other research papers on an array of economics and finance topics.  These include articles on strategic behavior in an antitrust context, industrial organization and industry structure, econometrics, venture capital and entrepreneurial finance, and valuation.  Also, I am co-author of *Entrepreneurial Finance* (Wiley: 2004), a text on venture capital, private equity, and valuation of non-public companies.  A complete listing of my publications is contained in my curriculum vitae, attached as Appendix 1.  Appendix 2 lists my deposition and trial testimony in the past four years. My billing rate for this engagement is $500 per hour.

**A.     Assignment**

6.     I have been requested by counsel for Venali to form an opinion regarding whether j2 possesses substantial market power; whether there exists a dangerous probability that j2 will obtain substantial market power; and whether j2 and Catch Curve have engaged in predatory or anticompetitive conduct.  As part of this assignment I have also been asked to opine on the relevant market for the analysis of the allegations in this case.  I have also been asked to address the impact of the claimed illegal conduct including harm to consumers as well as the damages incurred by Venali to defend the litigation that Venali alleges is sham litigation.

7.     In connection with this assignment, I met with and interviewed various members of the Venali management team who are familiar with aspects of the market and with industry practices relevant to the antitrust claims.  I also reviewed reports on the industry prepared by industry experts and financial analysts, and reviewed reports filed by j2 with the SEC and other documents produced by j2 in response to Venali's document production request in this matter.  I reviewed studies of the Fax Service Markets prepared

EXHIBIT 3 PAGE 51

1  by Davidson Consulting and I interviewed Peter Davidson, President of Davidson

2  Consulting. In addition, I visited the Venali and j2 websites, along with other websites that

3  could contain information relevant to my analysis. I also reviewed some of the deposition

4  testimony taken in this litigation. Exhibit 3 is a composite exhibit of the documents I have

5  reviewed and/or relied upon.

6  **B.    Summary of Conclusions**

7      8.    Direct and indirect evidence both establish that j2 possesses substantial

8  market power in the market for Internet Fax Services for individual and small office

9  customers in the United States. Assuming Venali's allegation that j2 and Catch Curve

10 engaged in sham litigations to be correct, and considering other aspects of j2's conduct, I

11 conclude that j2 and Catch Curve have engaged in anticompetitive conduct that has aided

12 j2's ability to establish and/or maintain substantial market power (a/k/a monopoly power) in

13 the relevant market.

14     9.    Market power is the ability of a firm "to control prices or exclude

15 competition."[1]  Often, the analysis of market power is focused on a firm's ability to

16 profitably raise the price at which it sells, by a nontrivial amount, for a sustained period of

17 time.

18     10.   j2's market power is evident through direct evidence of its ability to control

19 prices as set forth below. In addition to direct evidence of the ability to control prices or

20 exclude competition, market power can also be inferred from indirect evidence of a

21 substantial market share in a relevant economic market.

22     11.   Direct evidence of j2's market power includes that fact that between 2000 and

23 2007, j2 has increased the price of its basic service three times by substantial amounts, a

24 cumulative increase since 2000 of 242%. According to j2's executive management, these

25 percentage price increases resulted in higher profits and were associated with relatively

26 minor percentage losses in the numbers of accounts. Based on my analysis of j2's prices

27 and those of its competitors in the individual and small business Internet fax market, I find

28 that j2's prices are substantially higher than those of its competitors. As addressed in more

---

[1] *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

EXHIBIT 3 PAGE 52

1   detail below, j2's ability to profitably maintain prices above competitive levels for a

2   significant period of time is direct evidence of j2's substantial market power.   A

3   performance-based indicator of j2's market power is the increase in profitability the

4   company has realized over the period of its price increases.  In 2000, the annual average of

5   j2's quarterly gross margins was 48% and the annual average of its quarterly operating

6   profit margins was -186%.  After the price increases, j2's average gross margin for the first

7   three quarters of 2007 increased to 80% and its operating profit margin increased to 40%.

8   These margins in 2007 are extremely high relative to those of other public companies in the

9   relevant market, have been consistently high since 2002, and have been associated with a

10  dramatic increase in the price of j2 common stock. While these margin calculations are for

11  j2 overall, and are not limited to individual and small business Internet fax services or to the

12  US, the company financial reports indicate that this economic market continues to represent

13  the bulk of j2's revenues and profits.

14       12.    Because the direct evidence of j2's market power is compelling, principles of

15  antitrust economics do not require indirect evidence of market power inferred from

16  substantial market share in a relevant market.  Nonetheless, I have conducted the relevant

17  market analysis.  I refer to the relevant economic market as the market for Internet-based

18  fax services to individuals and small businesses.[2]  The essential characteristic is that the

19  customers in this market have limited volumes of fax traffic and generally are too small to

20  negotiate individual terms with Internet-based fax service providers.   The relevant

21  geographic market is the United States.  A firm's share of the relevant market is indirect

22  evidence of the likelihood of that the firm has market power, and specific conduct is

23  examined to address the questions of whether a firm is acting anticompetitively to achieve

24  or maintain a monopoly position.

25

26

27  [2] Industry participants and consultants refer to essentially this market by different terms.  Davidson Consulting
distinguishes between "Individual Internet Fax Services" and an "Enterprise Internet Fax Market."  Davidson describes

28  the Individual Internet Fax Services as "services that are offered from web pages and essentially take on a single
subscriber at a time." (Fax Service Markets, 2006-2010, Davidson Consulting, p. 7).  Venali refers to this market as the
SOHO (Small-Office Home-Office) segment.

EXHIBIT   3   PAGE   53

13.     There is substantial indirect economic evidence of j2's market power in the relevant market.  j2 is by far the largest supplier to the relevant market.  In terms of accounts, j2's share of the relevant market in 2006 is estimated to be 87%, including 10 million "free" accounts and 500,000 "paid" accounts.  In terms of revenue, j2's share is estimated to be at least 44.2%, and potentially as high as 83.9%, depending on how j2's licensing and litigation activities are classified.[3]

14.     As a test of j2's market power, I examined the relationship between j2's price increases, its financial performance, and the price of j2 common stock.  The price increases translate directly into higher gross margins, higher operating income percentages, and increases in the price of j2 stock.  Consistent with its possession of market power, j2 has been able to profitably increase prices in the relevant market and to sustain these price increases.  The price increases have resulted in profitability far in excess of industry norms.

15.     j2's strategy for capitalizing on, maintaining, and increasing its market power involves a combination of enticing new customers through offers of "free" inbound faxing as a first step to converting the customer to a paying, full-service client, locking in the customer via assignment of a customer specific account number that is a non-portable direct inward dialing (DID) phone number, and aggressively targeting rivals with intellectual property litigation, discouraging the rivals from competing aggressively and causing them to expend resources and executive time defending the attacks.  In some cases, I understand from counsel for Venali that j2 used the litigation or threat of litigation as a device to influence the terms for acquiring a rival.

16.     Venali alleges that j2 and Catch Curve used a sham litigation strategy in an effort to obtain or strengthen j2's market power and to restrict competition.  The pattern of j2 and Catch Curve's litigation practices is consistent with an attempt to use threats of litigation to obtain or maintain j2's monopoly pricing ability and to restrict competition in the individual and small business Internet-based fax market.

---

[3] These market share estimates are based on data compiled by Davidson Consulting, the leading industry analyst for the fax services market sector.

5

EXHIBIT 3  PAGE 54

1    17.   I also examined the impact of j2 and Catch Curve's anti-competitive practices

2    on consumers in the relevant market.  I estimate that a representative j2 customer would

3    have paid average monthly service prices that are more than $9.00 above the price that is

4    likely to have existed in a competitive market.

5    **II.    BACKGROUND ON INTERNET FAXING**

6    18.   Conventional fax messaging involves the transmission of a facsimile image

7    from one fax machine to another over a telephone line, using a traditional fax protocol for

8    communicating between the machines.  Conventional faxing requires that both parties have

9    access to a fax machine.   The time required for the fax transmission is essentially a

10   telephone call and is subject to normal local and possibly long-distance telephone charges.

11   In addition, a user who does not want to share a voice line and a fax line must contract for

12   an additional local phone line at the local telephone company's normal service price.  A

13   conventional fax line is prone to capacity bottlenecks, as only one call can be conducted at

14   a time. [4]

15   19.   Internet faxing is different in that it makes use of different communications

16   protocols, uses the Internet rather than telephone lines for much of the information transfer,

17   and reduces or eliminates the capacity bottleneck problems that a user would face.   A

18   facsimile sent from a fax machine to an Internet-based fax service is converted by the

19   service provider from fax to Internet protocol, and is transmitted to the recipient, normally

20   as an attachment to an email message.  The attachment can be opened on a computer, stored

21   as an electronic file, and printed on a conventional printer.  An email message sent from a

22   computer to a traditional fax machine is transmitted to the service provider as an image

23   using standard Internet protocol, where it is converted and sent to the recipient's fax

24   machine.[5]

25   20.   Internet fax service providers generally offer their clients dedicated local or

26   toll-free phone numbers for inbound faxing (referred to as Direct Inward Dialing or DID).

27   ─────────────────────

28   [4] For additional information on fax technology, including the evolution of fax protocols one can refer to
http://en.wikipedia.org/wiki/Fax.  As the background on conventional faxing is ancillary to my report, this reference is
offered as a convenience.  The description in the report is based on discussions with counsel and client representatives,
and review of various websites of fax service providers and personal experience with conventional faxing.
[5] Supra, note 4.

6

EXHIBIT 3 PAGE 55

1  The service providers acquire these numbers from local telephone service providers and
2  assign the numbers to their clients.  From the perspective of the telephone company, the
3  Internet fax service provider is the party who owns the phone number.  The Internet fax
4  service provider is able to assign the numbers to its clients.  When a client of the Internet
5  fax service provider terminates the account, the service provider can retain ownership of the
6  number and can reassign it to another client.[6]  Increasingly, some Internet fax providers
7  permit inward porting of a client's phone number.[7]

8  ### III.   MARKET POWER

9       21.    Market power is the ability of a firm to raise price, restrict output or exclude
10 competition.  Often, the analysis of market power is focused on a firm's ability to profitably
11 raise the price at which it sells, by a nontrivial amount, for a sustained period of time.[8]

12     **A.     The Economics of Market Power**

13      22.    In the neoclassical economics model of perfect competition, firms are price
14 takers.  The price is determined in competition by the profit-seeking behavior of each firm,
15 and each achieves maximum economic profit by setting price equal to the marginal cost of
16 its last unit produced and sold.  In this extreme model, any firm that attempted to charge a
17 price higher than the competitive price would sell nothing, as all customers would
18 immediately shift to competitors who were selling for less.  Real world markets are less
19 exacting.   No firm knows exactly what its marginal cost is, there are continuous
20 disturbances to the equilibrium such as due to changing input costs, new entry of efficient
21 producers, and shifts in demand, and the products of different producers are not perfect
22 substitutes for one another.  In real-world competitive markets, firms engage in price
23 searching, and in other ways continuously try to find the price and product features that
24 yield maximum economic profits.   In this kind of realistically competitive market, the
25 disciplining effects of competition are still intense.  A firm that attempted to significantly
26 raise price would find that the attempted increase was not sustainable.  Customers would

27
28

---

[6] Numbers may also be reassigned for other reasons, such as when a local area code is split by a telephone company, or when a client changes from one service program to another.
[7] For example, http://findarticles.com/p/articles/mi_m0EIN/is_2007_Sept_24/ai_n20512415  is a press release that indicates J2 announced the availability of inward porting on September 24, 2007.
[8] U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines, (rev. ed. 1997), § 0.1.

7

EXHIBIT 3 PAGE 56

1    substitute away to the point that the firm would find itself worse off than by charging a

2    lower (competitive) price.  Thus, in competitive markets, an effort to set prices above the

3    competitive level is that the benefits of higher prices on remaining customers are

4    outweighed by the loss associated with customer defections.  Therefore, in a competitive

5    market an effort to force higher prices on customers reduces the firm's profits.

6        23.    The term "market power" is used in economics to describe the extent to

7    which the real world demand for a firm's products differs from perfect competition.  If a

8    firm's market power is slight, any material attempt to raise price above a competitive level

9    will cause a rapid and substantial erosion of sales, such that the firm would find the increase

10   not to be profitable.  If the market power of a firm is substantial, the firm would be able to

11   profitably increase price by a substantial amount.  The increase is profitable because the

12   higher profit on remaining customers more than offsets the loss of profits on those who

13   leave the market or shift to other suppliers.  Firms can acquire market power in a variety of

14   ways.   Those generally considered to be pro-competitive include producing superior a

15   superior product or achieving a competitive cost advantage.  Actions that directly impede

16   the ability of rivals to compete for customers such as actions that raise their costs, or that

17   limit the ability of existing customers to switch away have greater potential to be anti-

18   competitive.   The essence of market power is the ability to profitably raise prices for a

19   sustained period.  This means that the loss of customers due to a price increase is small

20   enough so that profitability is increased.

21       24.    An economist views market power as a continuum ranging from its complete

22   absence (perfect competition) to a sole seller monopolist.  I understand that the phrase

23   "market power" as used in antitrust law reflects a level of power over pricing that is

24   substantial. In the past, the U.S. Department of Justice has operationalized this threshold as

25   the ability to raise prices profitably, in a non-transitory fashion, more than five percent

26   above the level that would otherwise exist.[9]

27

28

---

[9] U.S. department of Justice and Federal Trade Commission, Horizontal Merger Guidelines, (rev. ed 1997), § 1.11.

EXHIBIT  3  PAGE  57

**B.   Assessing Market Power**

25.   Market power can be established in either of two ways: (i) it can be established through direct evidence of the exercise of market power; or (ii) it can be inferred through relevant market analysis including showing that a firm has a dominant share in a defined relevant market and that there are significant barriers to entry in that market.

26.   To determine whether direct evidence of market power exists, economists look first to actual market performance. Below, I have conducted an analysis of j2's price increases and their impact on customer retention. Customer reactions to j2's history of substantial price increases constitute direct evidence of j2's market power. Another element of direct evidence of market power is finding prices that exceed marginal costs. In a perfectly competitive market, prices reflect the marginal cost associated with producing and selling the marginal unit of output. Marginal cost is an economic concept (the change in total cost associated with a one-unit change in output) that is not directly observable in the financial accounting statements of a firm. Among other things, marginal cost includes the opportunity cost of equity capital, something that is not measured in standard financial accounting. In lieu of marginal cost, economists generally focus on "incremental cost." The two measures are similar and are intended to address similar issues. Particularly when incremental cost is measured relative to a one-unit change in output and when an allowance is made for return on capital, the measure is an attempt to approximate the economic concept of marginal cost.

27.   Economists often employ the Lerner Index to assess market power. The index is calculated as ((Price – Marginal Cost)/Price) and has a scale from 0 to 1. If price is equal to marginal cost, then the index has a value of zero and implies that the seller has no market power. If price is positive and marginal cost is zero, the index has a value of one. The greater the excess of price over marginal cost, the closer to one the index will be. While marginal cost is not observable, other measures of cost such as variable cost and incremental cost often are used as reasonable approximations. While a value of one is the

9

EXHIBIT  3  PAGE 58

1   theoretical maximum of the index, values well below one still can imply substantial market

2   power.  For illustration, the Lerner index is an estimate of the elasticity of demand for a

3   firm's product (measured as 1/elasticity).  An index value of 0.5 corresponds to an elasticity

4   of 1.  With an elasticity of 1, a 5% price increase would result in a 5% reduction of the

5   quantity of sales but no change in total revenue.  Since reducing sales would reduce

6   variable cost, such a firm would benefit by charging a price higher than marginal cost.

7   Depending on variable cost, exercise of market power can be profitable even at Lerner

8   index values well below 0.5.

9   ### i.    Direct Evidence of Market Power

10   28.    The most compelling direct evidence of j2's market power is j2's

11   demonstrated ability to profitably and sustainably raise the price of its service relative to

12   prices offered generally in the market.  Since 2000, j2 has increased the price of its basic

13   service three times by substantial amounts.  First, beginning in February 2001, j2 increased

14   its basic service price from a range of $2.95 to $4.95 per month to $9.95 per month, an

15   increase of more than 100%.[10]  Second, beginning in mid-June 2003, j2 again increased its

16   basic service price, this time from $9.95 to $12.95, an increase of 30% and a cumulative

17   increase since 2000 of 162% relative to the top of the range before the increase in 2001.[11]

18   Third, beginning in August 2006, j2 again increased its basic service price, this time from

19   $12.95 to $16.95, an increase of 31% and a cumulative increase of 242% from the top of

20   the range prior to the first increase.[12]  According to the company, these revisions resulted in

21   higher profits and were not associated with significant losses in the numbers of accounts.

22

23   [10] In its 2001 10K/A filed 4/29/2002, J2 indicates that the price increase was affected in February 2001.  In its March

24   12, 2007 Investor Presentation, J2 indicates that the 2001 increase was phased.  I assume that the impact of the price increase was mainly in the first two quarters of 2001.

25   [11] During its Q3 2003 Conference Call with Investors, J2 indicated that the price increase was announced for new customers on June 18, 2003 and that the same increase was announced to existing customers on September 15, 2003.

26   In that call, J2 indicated that the phasing in of existing customers would mainly impact existing customers in Q4 2003 and Q1 2004.  In its Q4 2003 Conference Call to Investors, J2 reported that the by the end of Q4 2003, price changes had been effected for 80% of existing customers.  I assume that the price increase mainly impacted Q3 and Q4 of 2003.

27   [12] During its Q2 2006 Conference Call with Investors, J2 indicated that it would start a new round of price increases after August 2006.  At that time J2 indicated that the increase would be for new customers in the US and that the

28   possibility of increasing prices to existing customers and international customers was still under evaluation.  In its March 12, 2007 Investor Presentation J2 indicates that approximately 40% of existing customers had migrated to the new price by the end of Q4, 2006, approximately 60% by the end of Q1, 2007, and approximately 90% by the end of Q2, 2007.  I assume that the price increase mainly impacted the Q4 of 2006 through Q2 of 2007.

EXHIBIT___3___PAGE _59_

29.   j2's own analysis of customer reaction to its two most recent price increases demonstrates j2's market power in the relevant market.  Regarding the 2003 increase, the company stated:

> Our gross profit margin, aided by the price change, increased 82.6 percent versus 81.5 percent in Q3 2003.
>
> The ARCU, or the average revenue per user, for the channel, was positively impacted by the price change and the cancellation rate, while up for the quarter, due to the price change did not rise to the level we had expected.
>
> On that note, let me touch on the outcome of the price change. As we stated on the third quarter earnings conference call, we have affected [sic] the price change on approximately 150,000 DIDs during the fourth quarter. As a result of the positive success, which we experienced during this initial push, including fewer cancellations than expected, and a more efficient management of customer reaction, we accelerated the pace of the price change beyond what was originally planned. As a result, we ended the year with approximately 80 percent of our Web channel DID having gone through the price change process. For the most part, the price change has been substantially implemented, with the exception of annual subscriptions, and a few anomalous accounts which are being worked on individually. [15]

30.   Even more explicitly, regarding the 2006-07 increase, during the Q2 2006 Conference Call, Scott Turicchi described the price elasticity study the company made prior to deciding on the magnitude of the increase.

> SCOTT TURICCHI: Sure; we did a test from mid-April to mid-May I believe it was, and we tested 2 alternative price points. For the quarterly fax service $12.95 is the current price point as of today. We tested $15.95 and $16.95. The reason we tested those price points is our philosophical view on pricing is that it's something that we look at every 2 to 3 years. You'll notice that the Company is not that old, but it's been about every 3 years that we've gone through this process and exercise, and the last 2 times we've done it, we have of course, actually raised the prices.
>
> Part of the reason for doing that is that this process of raising prices is not a *de minimis* exercise. So you also know that as you raise prices, you will have a lower number of sign-ups, at least initially at the higher price point. We know people come, they investigate, they see $12.95 today, and then suddenly they're asked to pay $16.95. So you want to make sure that if you're going to do a raise in prices, there's enough percentage delta pick-up of 25% to 30% such that you can absorb a decline on the spot basis in your sign-ups, and if you're looking to do it on the exiting base, you can afford to have attrition from the existing base and still have a positive delta from an economic revenue standpoint.

---

[15] Q4, 2003 Conference Call, Scott Turicchi.

EXHIBIT 3 PAGE 60

To give you some comparative statistics, the last time we did this, which was in 2003 through the end of the first quarter roughly of 2004, prices went from $9.95 to $12.95, and from $12.50 to $15 for the jConnect products. So you are looking at 25% plus price increases. *As it relates to the existing base when the dust settled after about 6 months, we had about an 85% retention of that base. So there was a very nice positive delta between a 25% price raise and an 85% retention rate.*

So those are things we're looking for; we look at philosophical reasons as to why we think it is warranted; we look at product evolution; we look at competitive landscape; and then we actually test, and the test is what we did during this past fiscal quarter, and the test is where we actually had customers come to our website, and they were presented either $12.95, $15.95, or $16.95; the data that we garnered did not show actually a material difference between $15.95 and $16.95; hence the decision to go with the higher price.

Thus, the j2 study of the 2003 price increase, with its finding that a price increase of 25% results in 85% retention of the base (i.e., a 15% reduction), indicates that demand from existing customers of j2 is price inelastic. Inelastic demand is direct evidence of market power as (regardless of its cost of production) a firm that finds itself in the inelastic region of its demand curve can expect to increase profit by raising its price. Relating these figures from j2 to standard economic measures of elasticity and the Lerner index, the implied elasticity for j2 is 0.6 (highly inelastic). This implied elasticity yields an implied Lerner index (without measuring costs directly) of 1.67, which is greater than the theoretical bounds for a profit maximizing firm. The proper economic interpretation of this result is that j2 is still charging a price below its profit maximizing price. It could be doing so because it is still searching for the profit maximizing price as some of the above explanations suggest, and/or because it is seeking to maintain its high market share for strategic reasons.

31.    At j2's Q2, 2007 Conference Call, the company was asked by an analyst about the impact of the 2006 price increase:

DANIEL IVES: Okay, and just finally and then I'll hand it off. Price increase. Based on net sub-adds, it looks like going ahead of expectations. Can you just talk about the price increase and maybe what's surprising you on the upside? At least that's how it looks with regards to the numbers.

EXHIBIT 3 PAGE 61

SCOTT TURICCHI: I'll let Hemi comment as to the change itself, but one highlight I want to point out is that you'll notice the cancel rate for the quarter, the average monthly cancel rate over Q1 was 3%, up from 2.9%. The last time we went through the price change in late '03 and into '04, we had a top tick cancel rate of 3.3% per month, and we had stated on the last call to expect the cancel rate to go up in Q1 relative to Q4 and that it could even touch those previously-recorded levels. It did not. That is a positive sign in terms of how the price change is being accepted. I'll let Hemi comment in terms of how much of the base we've gone through and the overall view on the recent activity of it.

HEMI ZUCKER: Hi, Daniel. How are you today?

DANIEL IVES: Good, good.

HEMI ZUCKER: As you know, by the end of the quarter, we have changed the price to two-thirds of our base. During April -- I'll give you more information -- we added another 5%. The focus is really on quality rather than quantity, so we are trying to do everything we can to keep -- and if you've seen the numbers, we are able to maintain relatively higher portion of our base without churning them. We give up, on the other hand, speed and we try to do it in a way that we keep most of our customers. We still believe that by the end of this quarter we'll be up to 85% conversion, maybe closer even to the 90%. But our focus is in maintaining large proportion of our base and I'm very happy to tell you that so far we are exceeding the expectation.

BILL BENTON: Okay. So if I got an incremental 20% of, let's all it 60% of your total base transitioning, that's about 12% of your total base and a $4 incremental revenue number, which I would have thought the fixed ARPU would have gone up maybe an -- almost double of what it went up. Am I missing something there or is there some other moving part? Obviously there's some other moving parts in there that I'm over simplifying, but I just wanted to get your thoughts on that and whether you still expect to be at 90% by end of the second quarter?

SCOTT TURICCHI: Well, let's deal with the last one. I think Hemi just said we think we'll be at between 85% and 90% by the end of the quarter -- by the end of Q2, and that depends on how -- the speed with which we do some of the elements of the bases that are left. We've talked previously that not all customers and not all types of customers are of equal types. For some of them, we have to have specially designed programs or certain care in terms of how we deal with the, and we're starting to get into some of those customers as we speak. I'd have to go offline with you in terms of your first question to walk through the math and check it with you to see if you've got your assumption correct. I would tell you that the $4 is a little biased up because that is for the month-to-month customers who are the predominant mix of that base. The annuals aren't going up by $4 on an equivalent basis, so I think that the average is like $3.60.

32.    Moreover, the fact that j2 is more cautious about increasing prices to corporate and international customers indicates a perception that the company's market

13

EXHIBIT   3   PAGE  62

1  power is greatest in the relevant market at issue.  As discussed in the Q2, 2007 Conference
2  Call:

> HEMI ZUCKER: Also, I'd like to add -- I'm sure that you remember, but for some of the listeners -- we are increasing the price for 600,000 customers only, which is the eFax domestic. 20% of that is 120,000, which is roughly 12% of j2 as a company. So we move only 12% of the needle, not the entire 20%.
>
> YOUSSEF SQUALI: Then on that, there's still no decision as to whether you would consider a price hike on the corporate one and international second?
>
> HEMI ZUCKER: No, no. We are following very closely. As you know, our largest market outside of the US is in the UK, and the British pound is doing wonders for us. So we are not touching it now.
>
> As far as the corporate, we are always looking to it selectively. With the strengthening of our telesales part of our midrange of the corporate, we are seeing ARPU increases -- by the mix, not by the pricing.
>
> YOUSSEF SQUALI: Right. Well, I guess the currency is giving you your own price increase there, without doing anything.
>
> HEMI ZUCKER: Right.

15      33.    For the 2003 and 2006 price increases, Exhibit 3 shows the impact on the rate
16  of growth of paying telephone numbers.  Both episodes show that the growth rates are
17  negatively impacted by substantial price increases.  However, even during these episodes,
18  j2 continues to add paying numbers.  Thus, while the impacts of the price increases are
19  negative, they do not result in absolute declines in numbers of paying phone numbers.
20  Moreover, the impact is short-lived.  Within a few months after each price increase, the rate
21  of increase in paying numbers returns to historical levels.

22      34.    Exhibit 4 shows quarter-to-quarter changes in revenue, with the three price
23  increase episodes highlighted.  In later quarters, when subscriber revenue is available, it is
24  used instead of total revenue, as it excludes royalties and advertising, which streams are not
25  affected by price changes.  The exhibit shows that the price increases generally are
26  associated with high rates of revenue growth.  Thus, while growth in numbers of

14

EXHIBIT 3 PAGE 63

1  subscribers is lower during the price increase episodes, revenue (*i.e.*, price x quantity)

2  continues to grow and may grow faster than at other times.[14]

3      35.    Over the six years from February 2001 through February 2007, the compound

4  annual growth rate in j2's price was 23%.  Over the same period, the compound annual

5  average rate of increase in the US CPI was less than 2%.  Also, over the same period, the

6  split-adjusted price of j2 common stock increased at a compound annual growth rate of

7  78%.  The higher rate of share price growth corresponds generally to the company's rapid

8  rate of revenue growth.  Subscriber revenues increased at a compound annual growth rate

9  of approximately 42% over the same period.  Consistent with earlier discussion and

10  conference call excerpts of the effects of the price increases, the confluence of substantial

11  increases in share prices and rapid revenue growth indicates that in gross terms, j2

12  customers are not responding to the rapid price increases by discontinuing service or

13  switching to other suppliers.  The evidence is consistent with j2 possessing substantial

14  market power in the relevant market.

15      36.    A performance-based indicator of j2's market power is the increase in

16  profitability the company has realized over the period of its price increases.  In Q1 2000,

17  j2's gross margin was 52% and its operating profit margin was negative 213%.  After the

18  first round of price increases, in Q3, 2001, j2's gross margin increased to 61% and its

19  operating margin increased to negative 20%.  After the second round of price increases, j2's

20  gross margin increased to 84% and its operating profit margin increased to 44%.  After the

21  second round of price increases and through the third round, j2's gross margin has remained

22  fairly steady at around 80% and its operating profit margin remained fairly steady at around

23  40%.  These results are shown in Exhibits 5 and 6.

24      37.    These margins are extremely high relative to those of other public companies

25  in the relevant market and have been associated with a dramatic increase in the price of j2

26  common stock.  Exhibits 7, 8, and 9 show three-year averages of j2's gross profit margin,

27  operating profit margin, and operating profit to assets ratio compared to those of other

28

---

[14] The lack of more specific data on price increases and their phasing in, as well as other events such as acquisitions, precludes a more precise statistical analysis of the impacts on subscriber revenue.

EXHIBIT 3 PAGE 64

1    public companies that that j2 has identified as peers in the outsourced messaging and

2    communications industry or that are on the list of industry participants identified by

3    Davidson Consulting.  The three years included in the averages are the three most recently

4    completed and reported fiscal years as of December 2007.

5         38.    Exhibit 7 shows that j2 had the highest average gross profit margin compared

6    to the all ten of the "peer" firms.  The j2 average of 81.2% is significantly higher than the

7    overall average of 52.8% at the 9.7% level in a one-tail test of significance (t-value =

8    1.402).  Exhibit 8 shows a similar comparison for operating profit margins.  The j2 average

9    of 40.8% is significantly higher than the overall average of -17.9% at the 13.8% level in a

10   one-tail test of significance (t-value = 1.162).     Finally, Exhibit 9 shows a similar

11   comparison of the ratio of operating profit to total assets.   The j2 average of 26.9% is

12   significantly higher than the overall average of -12.4% at the 9.3% level in a one-tail test of

13   significance (t-value =  1.434).  j2's ability to generate consistently higher profit margins

14   and rates of return than other industry participants, despite its substantial price increases is

15   further direct evidence of its substantial market power.

16        39.    The Learner index can be estimated by comparing quarterly changes in

17   revenue to quarterly changes in expenses.  I calculated this for j2 over the period from

18   March 31, 1999 to March 31, 2007, a total of 33 consecutive quarters.  If I approximate

19   marginal cost as the change in cost of sales, the quarterly average implied Lerner index is

20   0.8.  If I approximate it as change in operating expenses, the implied index is 0.31.  Even

21   the lower of these implies that demand for j2 services has been fairly inelastic over the time

22   period.

23                        ii.    **Indirect Analysis of Market Power**

24        40.    The primary focus of indirect analysis of market power is on market share of

25   a relevant market.  The underlying reasoning is that in a properly defined economic market,

26   high market share is likely to be related to market power.  Thus, the analysis of indirect

27   evidence of market power begins with identification of a relevant economic market.

28

EXHIBIT 3 PAGE 65

### 1.     Relevant Market

41.     In the context of antitrust law and public policy, the economic notion of market power is made operational by focusing on the concept of a "relevant market" and the ability of a business to control price or exclude competition within the relevant market. A firm's share of the relevant market is an indirect indicator of the likelihood of that the firm has market power, and specific conduct is examined to address the questions of whether a firm is acting anticompetitively to achieve or maintain a monopoly position.

42.     The analysis of a relevant economic market has two dimensions: product market and geographic market.  The product market is based on demand-side functionality to meet the needs of customers.  For assessing the relevant product market, customary practice is to begin with the specific product at issue (such as Internet faxing services for individuals and small businesses) and to assess whether good substitutes are sufficiently limited that a hypothetical monopolist in the product market would have market power.  If there are good substitutes available, both in the sense of functionality and pricing, then the product market definition is too narrow and must be expanded.  The other dimension, geographic market, seeks to address the question of whether a customer who was faced with a price increase could easily shift to purchasing from another supplier in a different geographic location.

### 2.     Product Market

43.     The relevant product market at issue is the market for Internet-based fax services to individuals and small businesses that have limited volumes of fax traffic.[15] Internet-based fax services are distinguishable from traditional fax-to-fax communications on price and other dimensions that limit demand-side substitutability for many potential customers.  Compared to traditional faxing, Internet faxing has several advantages that limit demand-side substitutability.  Most importantly, a client of an Internet fax service does not

---

[15] Industry participants and consultants refer to essentially this market by different terms.  Davidson Consulting distinguishes between "Individual Internet Fax Services" and an "Enterprise Internet Fax Market."  Davidson describes the Individual Internet Fax Services as "services that are offered from web pages and essentially take on a single subscriber at a time." (Fax Service Markets, 2006-2010, Davidson Consulting, p. 7).  Venali refers to this market as the SOHO (Small-Office Home-Office) segment.

17

EXHIBIT 3 PAGE 66

1   need to purchase or have access to a fax machine, does not need to incur long-distance or
2   international telephone charges for sending fax messages, does not need to impose such
3   charges on others who send faxes to the client, is not faced with telephone line congestion
4   problems associated with traditional faxing, does not need to acquire a separate fax line to
5   help manage fax traffic, and can receive messages that originated as facsimile messages as
6   an email attachment.  Internet-based and traditional faxing also differ in other ways that
7   affect their substitutability.

8       44.    Internet-based faxing also is distinguishable from other document delivery
9   communications services such as email, mail, and courier services based on differences in
10  functionality, timeliness, and cost. Mail can be much slower and is sometimes unreliable,
11  especially in international exchanges. Email, while as fast as faxing, is less secure, easier to
12  alter, and more difficult to confirm successful receipt.  Courier services are substantially
13  more expensive and are not as fast.  While there is, no doubt, some substitution on the
14  margin, such as by using mail when timeliness is less of a concern, there appear to be many
15  applications where Internet faxing is clearly preferable to non-fax-based approaches to
16  document delivery and communication.

17      45.    The individual and small business market is distinguishable from the market
18  for Internet fax services to large enterprises in that large enterprises with high demand for
19  fax services generally can negotiate prices and service features bilaterally with service
20  providers, whereas small users are limited to service bundles that are offered generically to
21  the market on set terms.  A user, such as an individual or small business, with limited need
22  for fax services is not able to substitute into a bilaterally negotiated arrangement with a
23  service provider.  Rather, such users are constrained by the availability of packages and
24  pricing terms that are offered in the market.

### 3.    Geographic Market

26      46.    Although the relevant product is a service where market size is not restricted
27  by distribution cost, there are, nonetheless, geographic impediments to serving remote
28  customers.  In the current telephone service environment, Internet fax customers tend to

EXHIBIT __3__ PAGE __67__

1   prefer local phone numbers and toll-free numbers.   Thus, a service provider generally

2   needs to contract with a local telephone company for DID numbers or otherwise offer non-

3   local numbers or toll-free numbers.   Further, there are geo-political impediments to serving

4   different countries due to language differences, currency differences, and regulatory regime

5   difference.   Because it is possible for Internet fax service providers to establish different

6   pricing schedules for customers in different countries, it is appropriate to focus the

7   geographic market analysis in a single country.   The geographic market relevant to this case

8   is the US.

9       47.   Although the relevant geographic market is the US, suppliers in the market

10   include non-US entities who market their services to customers in the US.   Further, some

11   providers of Internet fax services to clients outside the US may be potential competitors in

12   the US market.   Beyond existing service providers, it is possible that some Internet faxing

13   services could be offered by voice-over-IP (VoIP) service providers or by local telephone

14   service providers, and by others who have technologies for transmitting images over cable

15   or wireless networks.   While these others are potential entrants, in most cases, it appears

16   that their incentives to enter the market and their interest in the market are low and that

17   historical price increases have not induced them to enter with comprehensive service

18   packages.

19   **C.   Indirect Evidence of Market Power**

20       48.   j2's market share is an indirect indication of its market power in the US

21   individual and small business Internet fax services market.   j2 is by far the largest supplier

22   to the relevant market.   In terms of accounts, based on 2006 information, Exhibit 1 shows

23   that j2's share of the global market is estimated to be 80%, including approximately 10

24   million "non-paid" accounts and 500 thousand "paid" accounts.   These estimates are based

25   on information reported in "Fax Service Markets, 2006-2010" by Davidson Consulting,[16] as

26   well j2's own documents.   Davidson does not provide information on j2's share of

27   accounts in the US.   However, given that the market developed first in the US and given

28

---

[16] "Fax Service Markets, 2006-2010" Davidson Consulting, Sturgis, MI, 2007.  See Exhibit 1.

19

EXHIBIT___3___PAGE _68

j2's prominence in the US market, its share of accounts is certainly larger than in the global market.

49.     For understanding j2's market power, the distinction between non-paid accounts and paid accounts is important.  j2 has had a long-standing practice of offering inbound-only fax service to customers at no charge.  "Free" inbound faxing is similar to free broadcast TV or radio, and other such services, where, in exchange for receiving the service, a user is required to receive unsolicited advertising and promotional fax messages.[17]  A customer who wants both inbound and outbound fax capabilities or who wishes to avoid unwanted advertising faxes, must instead sign up for a paid account that is subject to monthly and other fees and usage charges.

50.     While j2 seeks to generate revenues from the non-paid-service business by selling advertising access, this component of j2's revenue is small and does not explain the company's substantial commitment to providing Internet-based fax service at no charge. Rather, j2's strategy is to use its non-paid service as a prospecting approach for identifying customers who are willing to pay for fax service that includes out-bound faxing and the ability filter in-bound faxes.[18]

---

[17] In its stated terms and conditions for using j2's free service, a subscriber must agree not to block inbound fax messages from unsolicited sources.  j2 reserves the right to monitor the subscriber's adherence to this requirement and to terminate a subscriber for non-compliance.

[18] j2 indicates that approximately 10% of its paid subscriber accounts come from converting free accounts to paid (see In j2's Investor Presentation dated March 12, 2007, slide 7).  j2 also indicates that it follows a systematic program of conversion.  New free subscribers are not immediate candidates for switching to paid.  j2 indicates that free subscribers need to go through a seasoning period before they are likely to be interested in switching to paid service.

As we've said before, we believe that our lifecycle management process, which gets to the heart of your question, is something that is proprietary, so we've never released conversion rates from the free base to the paid. However, let me give you a little bit of an insight in terms of how we look at it on a big picture basis. If you look at the base of customers and you take the incremental 700,000 that came to us in Q1, those customers need about a ninety day seasoning period before they become ripe for upgrade, before they either on their own initiative or through an offer we give them or through violation of the fair use policy.

Beginning in the month three of their life and for about the next 12 months, from month three to 15, that is the right target phase, if you will, for their conversion. And you can imagine that you had greater success in the earlier months and then it begins to tail off as you hit month 15. We do get conversions beyond month 15, but at that point you have obviously had the service for quite a while, you have seen many offers from us, so our expectation of your conversion goes down substantially. So that how we look at it internally. In our case, with internal numbers, obviously we put real numbers to it in terms of how that will roll forward in terms of gross adds, but it's not a number we have publicly discussed nor do we intend to.

51.     This strategy is effective partly because non-paid service customers can become somewhat locked into a subscriber relationship with j2. When a customer signs up for a non-paid account, j2 assigns a phone number for in-bound faxing. The number, which is non-portable, is the property of j2 and can be reassigned if the subscriber discontinues the service. To the extent that the subscriber becomes associated with the number such as by adding the number to business cards or letterhead, switching away from j2 to a different service provider is more costly.

52.     A similar switching cost can arise when a customer signs up for one of j2's paid services. j2 assigns a phone number, which, at the subscriber's option, may be local or toll-free. Again, the fax number is the property of j2 and is not portable to competing service providers. Thus, switching costs in the Internet fax service market are similar to the switching costs that used to exist among providers of mobile telephone service, where, until the practice was prohibited by the FCC, assigned phone numbers were not portable.

53.     Because switching away from j2 is costly for subscribers to its free service, j2's share of the non-paid-service customer base is an important indicator of its market power. According to Davidson Consulting, j2's share of free accounts worldwide is 87%. Again, in the US market, its share of non-paid-service accounts is likely to be higher.

54.     Another indirect indicator of j2's market power is its share of Internet-based fax service revenue.[19] In the global market, Davidson Consulting estimates that as of 2005, j2's share was 29.6%. While this share estimate is low compared to share of accounts, it is still three times as large as that of the next largest competitor. Moreover, j2's revenue share of the US market is certain to be significantly greater than its global share. To estimate the US market revenue share reported in Exhibit 1, in Exhibit 2, I classify the list of service providers in the Davidson Consulting report as those that serve the US market as opposed to those that do not appear to do so. The classifications are based on information provided by Davidson Consulting or on the various company websites. With just this adjustment j2's

---

See Q1 2004 j2 Global Communications Earnings Conference Call, responses to questions by Scott Turicchi.
[19] By focusing on Internet-based fax revenue, Davidson Consulting seeks to exclude large users who are capable of negotiating custom service packages and pricing.

21

EXHIBIT 3   PAGE 70

1   apparent share increases to 44.2%, which, again, appears to understate the true revenue

2   share.

3       55.    One part of the understatement that I am unable to correct is that the

4   calculation on which the 44.2% estimate is based classifies all of the revenues of any

5   company that appears to serve the US market as being US revenues.  Because j2 started in

6   the US and focused heavily on the US for much of its growth, the inability to distinguish

7   between US revenues and foreign revenues at the company level is likely to impart a

8   downward bias to j2's estimated share.

9       56.    Finally, the revenue share estimate up to this point does not take account of

10  companies that have recently been acquired by j2 or companies that have entered into

11  licensing arrangements with j2 or Catch Curve.  Because acquired companies and licensees

12  are limited in their abilities to compete against j2, useful indications of market share include

13  the shares of acquired companies and licensees.  Based on a search of public information

14  and on the deposition of Michael McLaughlin, I have tried to identify industry participants

15  who have been acquired or are licensees as of the end of 2007.  Incorporating the acquired

16  companies into the estimate increases j2's controlled share to a range of 49.4% to 51.1%.

17  The bottom of the range is determined by assuming that none of the "Other" participants in

18  the Davidson Consulting report is acquired by j2.  The top of the range is determined by

19  assuming that all of the "Other" participants are acquired by j2.  Incorporating licensees in

20  addition to acquired companies raises the estimate of j2's controlled revenue market share

21  to a range of 60.6% to 62.8%.

22      57.    These market share indicators based on individual customer accounts and

23  revenue are at levels that commonly are regarded as indicative of the potential for a firm to

24  possess market power.  Moreover, according to Catch Curve's CEO, Michael McLaughlin,

25  j2 and/or Catch Curve is in active negotiation or litigation with other companies, including

26  Venali, Max Email (IGC), Protus, and many others.[20]  To the extent that these litigation

27  efforts result in the targeted competitors entering into licensing agreements, j2's controlled

28  revenue market share will be even larger.

---

[20] McLaughlin deposition.

EXHIBIT 3 PAGE 71

## IV.   ANTICOMPETITIVE CONDUCT

58.   Venali alleges that j2 and Catch Curve used a sham litigation strategy in an effort to strengthen and sustain j2's market power and to restrict competition.  With regard to j2's litigation strategy, Venali alleges that in an effort to strengthen the threat, j2 was joined by Catch Curve.  According to the Complaint, Catch Curve owns certain patents it acquired from AudioFax.[21]   j2 has described itself as having a "relationship" to Catch Curve.   For example, in the Q4 2005 Conference Call with investors, Scott Turicchi discussed the relationship with Catch Curve:

> STEVE FREITAS: In some of these suits, it seems like you've come to it jointly with a company called Catch Curve. Can you just describe how those patents are spread among you and that entity?

> SCOTT TURICCHI: Well Catch Curve, we have a small -- we have an interest in the Catch Curve entity. They have their own team that goes out and either search the patents through litigation or attempts to generate royalty revenue through settlement. So, we have our set of patents; they have their set of patents. There are instances, where we run into each other. There's maybe two or three of the litigations, where it's a combination of the patents.

Venali has alleged, and Michael McLauglin confirmed in his deposition, that j2 owns Catch Curve.[22] Venali alleges, further, that j2 and Catch Curve knew that the patents held by Catch Curve were not infringed by Venali or other providers of Fax to Email Services.[23] For purposes of this report, I have assumed that these allegations are correct.

59.   j2's strategy for capitalizing on, maintaining, and increasing its market power involves a combination of enticing new customers through offers of "free" inbound faxing as a first step to converting the customer to a paying full-service customer, locking in these, as well as paid-service customers, via assignment of a customer specific account number that is a non-portable direct inward dialing (DID) phone number, and aggressively targeting rivals with intellectual property litigation.   The strategy can discourage rivals from competing aggressively and causing them to expend resources and executive time

---

[21] See D.E. 70 ¶¶ 5, 7, 9, 11 and 13.
[22] See McLauglin Deposition, P. 28; and D.E. 64, ¶¶ 90.
[23] See D.E. ¶ 95.

23

EXHIBIT  3   PAGE 72

1    defending the attack.  Venali alleges that j2 has used the litigation or threat of litigation as a

2    device to influence the terms for acquiring a rival.[24]

3         60.    I have reviewed j2 and Catch Curve's practices with regard to use of the

4    patents held by Catch Curve in the context of their settlements, acquisitions of rivals by j2,

5    and the pricing of j2's services.  The pattern of j2 and catch Curve's litigation practices is

6    consistent with an attempt to use threats of litigation to maintain j2's market power pricing

7    ability and to restrict competition in the individual and small business Internet-based fax

8    market.

9         61.    Exhibit 10, which is constructed primarily from public sources, is my most

10   recent effort to identify the lawsuits filed by j2 or Catch Curve, licensing agreements

11   entered with either one, and acquisitions of competitor companies by j2.  In Exhibit 1,

12   where I present evidence on j2's market share, I use the Davidson Consulting market share

13   estimates (in Exhibit 2) together with information from Exhibit 10 to estimate j2's U.S.

14   market share that is controlled through acquisitions and licensing agreements.  I also use the

15   information from Exhibit 10 to estimate the market share that would be controlled if it is

16   successful in securing licensing agreements with the companies against which j2 or Catch

17   Curve has initiated patent infringement litigation.  It appears that, as of the time of my latest

18   effort, j2 and Catch Curve had litigation pending against competitors accounting for over

19   20% of the U.S. market.  If these lawsuits result in licensing agreements, j2's controlled

20   market share is estimated to be in the range of 81.0% to 83.9%, as shown in Exhibit 1.

21   **V.    INJURY TO COMPETITION**

22        62.    I also have examined the impact of j2 and Catch Curve's anti-competitive

23   practices on consumers in the relevant market.  Based on prices quoted on j2's website and

24   other industry participants' websites, I estimate that a representative j2 customer would

25   have paid average monthly service prices that are more than $9.00 above the price that is

26   likely to have existed in a competitive market.   This average is calculated based on

27   information collected from supplier websites in December 2007, and summarized in Exhibit

28   11.

---

[24] D.E. 64 ¶¶ 91-92.

EXHIBIT 3  PAGE 73

63.    To estimate the price differential for j2 in the relevant market, I began with the list of suppliers identified in the Davidson Consulting report and supplemented with other supplier information that I could locate by searching the Internet.  For each potential supplier, I used website information in an effort to determine (1) whether the supplier appeared to offer service in the U.S. (prices in U.S. dollars, availability of U.S. DIDs, etc. were used to assess this.) (2) whether it appeared that the supplier offered an unbundled Internet fax service (rather than a broad service such as might be offered by a local telephone company).  I excluded suppliers that did not appear to offer unbundled Internet fax service in the U.S.  For the remaining firms, I sought to identify key attributes of the various service plans offered at set prices over the Internet.  I collected data on monthly service fee, set-up fee, free pages, prices per additional pages, and phone number availability.  I then excluded service plans that were for in-bound faxing only, out-bound faxing only, and plans that combined in- and out-bound service but with no limit on out-bound pages or with higher than the suppliers' typical base levels of free pages (up to about 500 pages in- or out-bound).  Through these screens, I identified 44 service plans with sufficient data.  These included 3 j2 plans and 4 Venali plans.  The data are summarized in Exhibit 11.

64.    Exhibit 12 shows the results of four regression models.  The service attributes that are most important for explaining monthly service price are numbers of free pages (in, out, and combined).  Toll-free service has a positive effect that is weakly significant.  In the first model, I include binary variables for the service plans of j2 and Venali.  The j2 plan coefficient indicates that, controlling for the included variables, the j2 plans are, on average, $9.36 per month more expensive.  The coefficient for Venali is also positive, but only marginally significant.  Compared to the Venali average, the j2 average price controlling for service attributes is more than $6.00 higher.  The second and third models demonstrate that the estimates for j2 and Venali are not significantly affected by exclusion of a binary flag variable for plans of the other company.  That is, for example, the estimated price differential for j2 is about the same if I separate out Venali in the regression (i.e., $9.36) as

EXHIBIT 3 PAGE 74

if I combine Venali with the other firms ($9.44) The fourth model shows that the general structural estimates of the monthly prices are robust to exclusion of the j2 and Venali binary variables.  While it can be argued that the models are incomplete because other differences in service are not included, the estimates are based on the information that can readily be found on company websites, and would be available to prospective customers without extensive research on other features that are likely to be of limited value or value only to certain customers.

65.   In its 2006 Form 10K, j2 indicates that the average monthly revenue per paying phone number was $16.45, and DID revenue for the year was $167,882,000, based on 907,000 paying telephone numbers as of year-end.  As shown in Exhibit 1, Davidson Consulting estimates that j2 had 500,000 U.S. individual subscribers.  Given Davidson Consulting's estimate of j2's installed customer base, I estimate that $56 million or one-third of j2's DID revenues in 2006 were a result of DID service price premiums resulting from its anticompetitive practices.  The estimate for 2007 would be somewhat larger due to the company's 22% growth in overall revenue year-to-year.[25]  In addition, j2's licensing revenues received through Catch Curve derive from the licensing practices that Venali alleges are anticompetitive.

## VI.   DAMAGE TO VENALI

66.   In July 2005 Catch Curve sued Venali alleging infringement of five patents.  I understand that in November 2007, Catch Curve narrowed its allegations of infringement to only one of the five patents in suit.  Through my discussions with Venali, I was informed that Venali was forced to incur approximately $955,000 in attorneys' fees and costs to defend Catch Curve's infringement allegations in this litigation, which is alleged to be part of j2 and Catch Curve's strategy of engaging in sham litigation.[26]

## VII.   CONCLUSION

67.   It is my opinion that the direct evidence and indirect evidence both establish that j2 possesses substantial market power in the market for Internet Fax Services for

---

[25] j2 Global Reports 2007 Year End Results, 19 February 2008, Business Wire

[26] See D.E. 64 ¶¶ 107 and 120-123.

26

EXHIBIT  3  PAGE  75

1   individual and small office customers in the United States.  Taking Venali's allegation that

2   j2 and Catch Curve engaged in sham litigations as correct, it is my conclusion that j2 and

3   Catch Curve have engaged in anticompetitive conduct that has aided j2's ability to maintain

4   this substantial market power.  In the event that a court determined that j2 does not posses

5   substantial market power in the relevant market, it would be my opinion that, through the

6   anticompetitive conduct addressed above, there exists a dangerous probability that j2 will

7   achieve a monopoly.

8

9

10

11

12

13                                   _____
                                          Dr. Richard Smith, II

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27                    EXHIBIT 3  PAGE 76

Appendix 1

EXHIBIT 3 PAGE 77

November 2007

# RICHARD LESTER SMITH

Peter F. Drucker and Masatoshi Ito Graduate School of Management
Claremont Graduate University
1021 North Dartmouth Avenue
Claremont, California 91711
(909) 607-3310
(909) 621-8543 (fax)
E-mail: richard.smith@cgu.edu

## Personal

Born 1949, United States citizen; married, two children.

## Education

Ph.D., Business Economics, University of California, Los Angeles, 1979 (Award for Outstanding Graduate in Management).

M.A., Economics, University of California, Los Angeles, 1978.

M.B.A., Finance, Washington University, St. Louis, 1973.

B.B.A., Finance, Southern Methodist University, Dallas, 1971.

## Professional Employment

Professor and Ralph Leatherby Chair of Entrepreneurship and Private Equity, Argyros School of Business and Economics, Chapman University, 2007 – present.

Professor of Financial Management, Peter F. Drucker Graduate School of Management, Claremont Graduate University, Claremont, California, 1995-present (on leave, 2007 – present) (Associate Dean for Academic Programs, 2004-2006) (Director, Financial Engineering Management Program, 1998-2007) (Director, Venture Finance Institute, 1997-2007).

Professor of Finance, Arizona State University, Tempe, Arizona, College of Business, 1989-95 (Associate Professor of Finance, 1985-88) (Assistant Professor of Finance, 1981-84) (on leave 1995).

Chair, Department of Finance, Arizona State University, Tempe, Arizona, College of Business, 1986-91.

Visiting Associate Professor of Business Economics, University of California, Los Angeles, Graduate School of Management, 1985-86.

Visiting Assistant Professor of Finance and Business Economics, University of Oregon, Eugene, 1982.

EXHIBIT 3 PAGE 78

Visiting Assistant Professor of Business Economics, University of California, Los Angeles, Graduate School of Management, 1980-81.

Visiting Assistant Professor of Finance and Business Economics, University of California, Irvine, Graduate School of Management, 1981.

Assistant Professor of Economics, Case Western Reserve University, Cleveland, Ohio, 1979-80.

Research Assistant, Research Program in Competition and Business Policy, Los Angeles, Professor J. Fred Weston, Director, 1976-79.

Manager of Marketing Research, United Bank of Arizona, Phoenix, Arizona, 1973-76.

Financial Analyst, Edward D. Jones & Company, St. Louis, Missouri, 1972-73.

## Directorship and Advisory Committee Positions

Investment Committee of the Board of Trustees, Claremont Graduate University, 1997-00, 2004-2006 (directs investment of the CGU endowment).

Chairman, Arizona State Retirement System, Investment Advisory Council, 1995-96 (the IAC directs investment of the Arizona State Retirement Fund - $14 billion during my tenure there).

Budget Committee of the Board, 1995-96.

Arizona State Retirement System, Investment Advisory Council, 1991-96.

Arizona State University, Investment Committee, 1986-88 (directs investment of the ASU Endowment).

## Fields of Concentration

Entrepreneurial Finance, Financial Economics, Financial Management, Industrial Organization, Economics of Contracts

## Honors and Awards

Dean's Council of 100, Research Grant, Arizona State University, 1995, "Heterogeneity of Beliefs and Asset Value."
1994 Governor's Spirit of Excellence Award, Business Partners Task Force, member.
Smith Breeden Prize for 1993 (nominee), for best paper published in the *Journal of Finance*, "Market Discounts and Shareholder Gains for Placing Equity Privately."
Dean's Council of 100, Research Grant, Arizona State University, 1992, "Ownership Structure, Monitoring and Corporate Headquarters Relocation."
State of Arizona Department of Insurance Sponsored Project, 1990, "Financial Analysis of Axa's Proposed Acquisition of Farmers Insurance," principal investigator.

EXHIBIT 3 PAGE 79

Arizona State Legislature Sponsored Project, 1989, "An Investigation of the Funding Status, Investment Practices and Actuarial Assumptions of the Arizona State Retirement Plan," principal investigator.

California Department of Real Estate Sponsored Project, 1986, "Real Estate Specializations: Assessment of the Need for Special Licensing and/or Educational Requirements," principal investigator.

Emory Law and Economics Center, Legal Institute for Economists, at Dartmouth University, 1983.

Faculty Grant-In-Aid, Research Grant, Arizona State University, 1983.

University Research Fund Research Grant, Arizona State University, 1982, "The Impact of the Community Reinvestment Act on Branching Activity of Financial Institutions," co-recipient.

Civitas Foundation Summer Grants, 1981 and 1982, "Efficiency Gains from Strategic Investment."

Foundation for Research in Economics Education Research Grant, 1980-81, "Franchise Regulation: An Economic Analysis of State Restrictions on Automobile Distribution."

Institute for Humane Studies Research Grant, 1980, "State and Local Fiscal Policy: Implications for Property Values and Economic Growth," co-recipient.

P.W.S. Andrews Prize for Essays on Theory of the Firm, 1980, awarded for "Efficiency Gains from Strategic Investment."

UCLA Anderson Graduate School of Management Alumni Association Award for Outstanding Graduate in Management, 1979.

**Teaching:**  **Finance**
Asset Management Practicum – MBA
Corporate Finance - MBA
Financial Entrepreneurship – MBA, Executive MBA
Financial Policy and Strategy – MBA, Executive MBA
Mergers, Acquisitions, and Corporate Control Executive MBA
Risk Management and Derivatives - MBA
Strategic Risk Management – MBA and EMBA
Theory of Finance - Ph.D.

**Economics**
Industrial Organization
Microeconomics
Managerial Economics

**Editorial:**  *Journal of Financial Research*, Executive Editor, 1986-93
*Journal of Financial Research*, Associate Editor, 1981-86
*Journal of Banking and Finance,* Referee
*Journal of Finance,* Referee
*Journal of Financial and Quantitative Analysis*, Referee
*Journal of Industrial Economics*, Referee
*Journal of Law and Economics*, Referee
*Journal of Money, Credit and Banking*, Referee
*Economic Inquiry*, Referee
*Quarterly Journal of Business and Economics*, Referee
*Financial Review*, Referee
*Financial Management*, Referee

EXHIBIT___3___ PAGE___80___

**Professional Affiliations**

American Economics Association
American Finance Association
Financial Management Association
Western Finance Association

## Publications

### *Books and Articles in Books*

Entrepreneurial *Finance,* 2d ed. (2004), Wiley: New York, NY, with J. Kiholm Smith.

Japanese (Kanji) translation (2004)
Chinese (simplified) translation (2006)

"Misperceptions About Private Placement Discounts:  Why Market Reaction to Rule 144A Has Been Lukewarm," with V. Armstrong, in *Modernizing US Securities Regulation: Economic and Legal Perspectives*, K. Lehn and R. Kamphuis, eds., 1993: 175-191.

"New Issue Underwriting," invited essay for *The New Palgrave Dictionary of Money and Finance*, P. Newman, M. Milgate and J. Eatwell, eds., London:  MacMillan Press, 1992: 722-724.

"Product Quality, Nonsalvageable Capital Investment and the Cost of Financial Leverage," with K. Chung, in *Essays in Honor of J. F. Weston*, T. E. Copeland, ed., 1986: 148-167.

### *Research Papers*

"Public Information, IPO Price Formation, and Long-run Returns: Japanese Evidence," with K. Kutsuna and R. Smith, *The Journal of Finance*, forthcoming.

"Why Are IPOs Underpriced?  Evidence from Japan's Hybrid Auction-Method Offerings," with K. Kutsuna and F. Kerins, *Journal of Financial Economics* 85, September 2007, 637-666.

"What's in Your 403(b)? Academic Retirement Plans and the Costs of Underdiversification," with J. Angus, W. Brown, and J. Smith, *Financial Management* 36, Summer 2007, 87-124.

"Banking Relationships and Access to Equity Capital Markets: Evidence from Japan's Main Bank System," with K. Kutsuna and J. Smith *Journal of Banking and Finance* 31, 2007: 335-360.

"Why Does Book Building Drive Out Auction Methods of IPO Issuance? Evidence from Japan," with K. Kutsuna, *Review of Financial Studies* 17, 2004: 1129-1166.

"Opportunity Cost of Capital for Venture Capital Investors and Entrepreneurs," with F. Kerins and J. Smith, *Journal of Financial and Quantitative Analysis* 39, 2004: 385-405.

EXHIBIT___3___ PAGE__81__

"The SEC's 'Fair Value' Standard for Mutual Fund Investment in Restricted Shares and Other Illiquid Securities," with J. Smith and K. Williams, *Fordham Journal of Corporate and Financial Law* 6, 2001: 421-474.

"Strategic Restructuring: Evidence from the Telecommunications Industry," with

M. Hertzel and J. Smith, *Industrial and Corporate Change* 10, 2001: 207-246.

"Market Reactions to Failed Acquisition Attempts," with S. Chang and D. Suk, *International Journal of Finance* 12, 2000: 1586-1603.

"The Choice of Payment Terms in Trade Credit Financing," with J. Smith and C. Ng, *Journal of Finance* 54 1999: 1109-1129.

Abstracted in *CFO Europe*, July 1999.

"The Unwinding of Venture Capital Investments:  Insider Selling During Equity IPOs," with T. Lin, *Journal of Corporate Finance* 4, 1998: 241-263.

"Determinants of Contract Choice:  The Use of Warrants to Compensate Underwriters of Seasoned Equity Issues," with C. Ng, *Journal of Finance* 50, 1996: 363-380.

"Wall Street Journal Reporting Decisions and the Use of Prediction Errors in Cross-sectional Analysis:  Evidence on Seasoned Equity Announcements," with F. Griggs and D. M. Kim, *Financial Review* 30, 1995: 139-174.

"The Combined Effects of Free Cash Flow and Financial Slack on Bidder and Target Stock Returns," with J. Kim, *Journal of Business* 67, 1994: 281-310.

"Market Discounts and Shareholder Gains for Placing Equity Privately," with M. Hertzel, *Journal of Finance*, 48, 1993: 459-485.

"Contract Law, Mutual Mistake, and the Incentives to Produce and Disclose Information," with J. Smith, *Journal of Legal Studies* 19, 1990: 467-488.

"Licensing Requirements, Enforcement Effort and Complaints Against Real Estate Agents," with K. Guntermann, *Journal of Real Estate Research* 3, 1988: 11-20.

"The Choice of Issuance Procedure and the Cost of Competitive and Negotiated Underwriting:  An Examination of the Impact of Rule 50," *Journal of Finance* 42, 1987: 703-720.

"Examination of the Small Firm Effect on the Basis of Skewness Preference," with J. R. Booth, *Journal of Financial Research* 10, 1987: 77-86.

"Efficiency of the Market for Residential Real Estate," with K. L. Guntermann, *Land Economics* 63, 1987: 34-45.

"Derivation of Cost of Capital and Equity Rates from Market Data," with K. Guntermann, *Journal of Real Estate Economics (former name AREUEA Journal)* 15, 1987: 98-109.

EXHIBIT 3 PAGE 82

"Announcement Effects of Withdrawn Security Offerings: Evidence on the Wealth Redistribution Hypothesis," with D. Officer, *Journal of Financial Research*, 9 1986: 229-238.

"Capital Raising, Underwriting and the Certification Hypothesis," with J. Booth, *Journal of Financial Economics* 15, 1986: 261-281.

"The Certification Role of the Investment Banker in New Issue Pricing," with J. Booth *Midland Corporate Finance Journal*, Spring 1986: 56-63.

"The Application of Errors-In-Variables Methodology to Capital Market Research: Evidence on the Small Firm Effect," with J. Booth, *Journal of Financial and Quantitative Analysis* 20 1985: 501-515.

"The Risk Structure of Interest Rates and Interdependent Borrowing Costs: Evidence of the New York Fiscal Crisis," with J. Booth, *Journal of Financial Research* 8, 1985: 83-94.

"A Theory of *Ex Post* Versus *Ex Ante* Price Determination," with J. Smith, *Economic Inquiry* 23, 1985: 57-67.

"Direct Equity Financing--Resolution of a Paradox: A Comment," with M. Dhatt, *Journal of Finance* 39, 1984: 1615-1618.

"On Strategic Behavior as a Basis for Antitrust Action," *The Antitrust Bulletin*, Fall 1984.

"The Impact of the Community Reinvestment Act on Branching Activity of Financial Institutions," with J. Booth, *Journal of Bank Research* 15, 1984: 123-128.

"State and Local Fiscal Policy: Implications for Property Values and Economic Growth," with J. Smith, *Public Finance Quarterly*, 12 1984: 51-76.

"Use of Interest Rate Futures by Financial Institutions," with J. Booth and R. Stolz, *Journal of Bank Research*, 1984.

"Theory Z: A Critical Analysis," *Arizona Business*, Summer 1983: 19-24.

"Franchise Regulation: An Economic Analysis of State Restrictions on Automobile Distribution," *Journal of Law and Economics* 25, 1982: 125-157.

"Efficiency Gains from Strategic Investment," *Journal of Industrial Economics*, P.W.S. Andrews Prize for 1980 30, 1981: 1-23.

"The 1958 Automobile Information Disclosure Act: A Study of the Impact of Regulation," *Journal of Industrial Economics* 28, 1980: 387-403.

"The Appropriateness and Applicability of Image Research to Banking," with S. Brown and G. Zurowski. *Journal of Bank Research* 8, 1977: 94-100.

"Surveying the Image Research Practices of Banks," with S. Brown and G. Zurowski *Bank Marketing*, January 1977: 16-19.

**Work in Progress**

EXHIBIT 3 PAGE 83

"A Comprehensive Evaluation of the Comparative Cost of Negotiated and Competitive Methods of Municipal Bond Issuance" with James Booth, Eric Fruits, Randall Pozdena, under review.

**Dissertation Committees**

Luann Bangsund, 2006, Drucker School, Claremont Graduate School, Chair, "From Textbook to Pitchbook: An Examination of the IPO Price Formation Process"

John Kinsey, in progress, Drucker Center, Claremont Graduate School, Chair, "The Increasing Significance of Public Capital Sources In Financing Development Stage Enterprises"

Jim Hornbuckle, 1999, Drucker School, Claremont Graduate School, Chair, "Competition and Restructuring in the Electrical Utilities Industry"

Frank Kerins, 1997, Arizona State University, Chair
Calling Nonrefundable Debt

Marcia Selz, 1997, Drucker School, Claremont Graduate School, Member
Toward a Model of a Gap Analysis Between Investors, Leaders and Intermediaries in the Mutual Fund Industry

Paul Williams, 1997, Drucker School, Claremont Graduate School, Member
Firms' Reluctance to Issue New Equity

Steve Rundles, 1996, School for Politics and Economics, Claremont Graduate School, Member, Strategic Alliances

Michael Smith, 1994, Arizona State University, Chair
Shareholder Activism by Institutional Investors: Evidence from CalPERS

Vaughn Armstrong, 1995, Arizona State University, Member
Insiders, Information Purchasers and the Bid/Ask Spread

Patrick Trachial, 1994, Arizona State University, Member
Compensation Contracting in the Presence of External Monitors

Timothy Lin, 1993, Arizona State University, Chair
The Selling Choice of Insiders in an Initial Public Offering: The Case of Venture Capital

Chee Keong Ng, 1992, Arizona State University, Chair
The Use of Warrants in Seasoned Equity Underwritings: An Optimal Contract Choice Explanation

Ibrahim Helou, 1992, Arizona State University, Member
Underwriter Reputation and the Wealth Effects of Seasoned Equity

Lena Chua, 1991, Arizona State University, Member
The Cost of Going Public: An Analysis of Firm Commitment and Best Efforts Contracts

Stanley Eakins, 1990, Arizona State University, Chair
The Role of Institutional Ownership in Reducing Agency Costs

EXHIBIT 3 PAGE 84

Frank Griggs, 1990, Arizona State University, Member
Survival Time Model of Coalition Theory of Financial Distress

Dong Man Kim, 1990, Arizona State University, Chair
Stock Splits and Composition of Shareholders: An Examination of Clientele Effects and Clientele Shifts

Gary Moore, 1989, Arizona State University, Member
The Role of Resource Utilization in the Stock Market/Inflation Relationship

Joo-Hyun Kim, 1989, Arizona State University, Chair
Free Cash Flow and Stockholder Returns in Corporate Takeovers

Hsing Fang, 1986, Arizona State University, Member
International Arbitrage Pricing Model with Market Imperfections: Theory and Empirical Evidence

Kevin Green, 1986, University of California Los Angeles, Member
An Economic Analysis of Investment Banking Contracts

EXHIBIT 3 PAGE 85

Appendix 2

EXHIBIT 3 PAGE 86

**Recent Litigation Testimony**

In Re: Biovail Corporation Securities Litigation United States District Court, Southern District of New York.  Expert Reports July 2006, Deposition August 2006, Supplemental Report January 2007.

Securities and Exchange Commission v. Henry C. Yuen, et al., United States District Court, Central District of California, Western Division. Expert Report December 2004, Deposition November 2005, Trial December 2006.

Titan International, Inc. et al. v. George Becker et al. United States District Court for the Central District of Illinois.   Initial Report June 2005, Deposition September 2005, Supplemental Report November 2005.

In Re: Enron Corporation, et al., No. 01-16034 (AJG); Enron North America Corporation v. Arizona Public Service Company, No. 04-02366 (AJG), United States Bankruptcy Court, Southern District of New York. Preliminary Report October 2004.

In Re: Flat Glass Antitrust Litigation, United States District Court, Western District of Pennsylvania Master Docket Misc. No. 97-550 MDL No. 1200, Docket 2:99-875. Expert Report May 2004. Reply Expert Report August 2004. Deposition October 2004.

Hagemeyer North America, Inc. n/k/a Hagemeyer (N.A.) Holdings Inc. v. Gateway Data Sciences Corporation, n/k/a Brownshire Holdings, Inc., United States District Court, Eastern District of Wisconsin, Case No. 97-C-635. Expert Report October 2003. Deposition testimony July 2004. Supplemental Declaration November 2004.

Western States Wholesale, et. al. v. Synthetic Industries, Inc: and Insteel Industries v. SI Corporation. United States District Court, Central District of California, Expert Report and Deposition testimony.

Universal Avionics Systems Corporation v. Rockwell International Corporation, et al., United States District Court, District of Arizona, No. CV 97-28 TUC ACM. Expert Report September 1998. Supplemental Report July 1999. Declaration January 2000. Deposition testimony.

In Re: MTC Electronic Technologies Shareholder Litigation, Master File No. CV-93-0876 (JG); Kayne, et al., No. CV-95-2499 (JG), MDL No. 1059, United States District Court, Eastern District of New York. Deposition testimony June and July 2000.

In the Matter of Carroll A. Wallace, United States Securities and Exchange Commission, Administrative Proceeding. Expert Report August 1999. Testimony September 1999.

Comsat Corporation v. News Corporation, Ltd., et al., United States District Court, Central District of California. Deposition testimony July and August 1998.

EXHIBIT 3 PAGE 87

<u>Coram Healthcare Corporation, et al. v. Caremark, Inc., et al.</u>, San Francisco Superior Court, California. Deposition testimony May 1997.

<u>In Re: Circuit Breaker Litigation</u>, United States District Court, Central District of California, No. CV88-03012 RG(GX). Deposition testimony February 1997.

<u>William E. Ray v. Jennings, Strouss & Salmon, et al.</u>, Superior Court for the County of Maricopa, Arizona, No. CV 88-12065. Deposition testimony December 1994.

<u>Forest City Properties Corporation and F.C. Irvine, Inc. v. The Prudential Insurance Company of America</u>, Superior Court for the County of Los Angeles, California, No. BC 036284. Deposition testimony December 1994. Trial testimony June 1995.

<u>Pappas Telecasting Inc., et al. v. Columbia Pictures Television</u>, U.S. District Court, Eastern District of California, No. CV-F93-58190WW-DBL. Declaration December 1994. Expert Report April 1995, Supplemental Expert Report May 1995. Declaration and Supplemental Declaration June 1995.

<u>Devon Industries, Inc. v. American Medical Manufacturing, Inc., et al.</u>, United States District Court, Central District of California, No. CV 92-3730 ER(Bx). Deposition testimony July 1993 and August 1993.

<u>Forestry Corporation of New Zealand Limited v. Tasman Pulp and Paper Co.</u>, in the Court of Appeal of New Zealand. Testimony May 1993 and November 1993.

<u>Karsten Manufacturing Corp., et al. v. PGA Tour, Inc.</u>, United States District Court, District of Arizona, No. CIV 89-1980 PHX-PGR. Preliminary injunction hearing testimony December 1989, deposition testimony, March 1990, August 1991, August 1992 and February 1993.

<u>In Re: Circuit Breaker Litigation</u>, United States District Court, Central District of California, No. CV88-03012 RG(GX). Deposition testimony July 1992 and September 1992. Trial testimony September 1993.

EXHIBIT____3____PAGE____88____

Appendix 3

Documents Reviewed or Relied Upon

EXHIBIT 3  PAGE 89

Preliminary
Privileged Confidential
Subject to Revision

Exhibit 1

## Measures of Market Share for Individual Internet Fax Services

| | Unpaid Subscribers (M) | Paid Subscribers (M) | Total Subscribers (M) | International Market Revenue ($M) | J2 U.S. Market Revenue ($M) | Acquisition- Adjusted U.S. Market Revenue ($M) | Licensing- Adjusted U.S. Market Revenue ($M) | Litigation- Adjusted U.S. Market Revenue ($M) |
|---|---|---|---|---|---|---|---|---|
| | [A] | [B] | [F] | [C] | [D] | [E] | | |
| J2 | 10 | 0.5 | 10.5 | 102 | 102 | 114 | 140 | 187 |
| Total | 11.5 | 1.6 | 13.1 | 345 | 231 | 231 | 231 | 231 |
| J2 Share of Total Market (%) | 87.0% | 31.3% | 80.2% | 29.6% | 44.2% | 49.4% | 60.6% | 81.0% |
| | | | | | | | | |
| J2 Identified Total [G] | | | | | | 114 | 140 | 187 |
| Total | | | | | | 223 | 223 | 223 |
| J2 Share of Identified Market (%) | | | | | | 51.1% | 62.8% | 83.9% |

[A] Peter J. Davidson, "Fax Service Markets," Davidson Consulting, Sturgis, MI, 2007 at page 9 (according to Davidson Report J2 has over 10 million unpaid subscribers), market share is calculated by dividing J2's unpaid subscribers by total unpaid subscribers.
[B] J2 Market Share is set equal to J2 Market Share in [C]; Total Subscriber is as reported on page 9 of Davidson Report; J2 paid subscribers is estimated using Total* J2 Market Share
[C] Exhibit 2, Column [D]
[D] Exhibit 2, Column [D]
[E] Exhibit 2, Column [E]
[F] [A] + [B]
[G] = Total Market less "Other"

EXHIBIT___3___PAGE __90__

Preliminary
Privileged Confidential
Subject to Revision

**Exhibit 2**

**Participants in Internet Fax Markets, J2 and CC Acquisitions, Licenses, and Litigation, and 2005 Revenues**

| Supplier | Country | Acquired by J2 | CC or J2 License | Suit Filed | 2005 Revenues ($M) | Acquisition-Adjusted J2 Revenues ($M) | Licensing-Adjusted J2 Revenues ($M) | Litigation-Adjusted J2 Revenues ($M) | Intl. Market Share (%) | U.S. Market Share (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| | [A] | [B] | [C] | [C] | [D] | | | | [F] | [G] |
| J2 | U.S. | | | | 102.0 | 102.0 | 102.0 | 102.0 | 29.6 | 44.2 |
| Protus | U.S. | | | 8/4/2005 | 34.0 | | | 34.0 | 9.9 | 14.7 |
| Digital Message Network | South Africa | | | | 10.0 | | | | 2.9 | - |
| Mbfax | Hong Kong | | | | 10.0 | | | | 2.9 | - |
| Teamphone | U.K. | | | | 10.0 | | | | 2.9 | - |
| China Telecom | China | | | | 9.0 | | | | 2.6 | - |
| Yac | U.K. | | | | 9.0 | | | | 2.6 | - |
| Digital Host | South Africa | | | | 9.0 | | | | 2.6 | - |
| Data Info Systems | India | | | | 8.0 | | | | 2.3 | - |
| Beijing Yuantel | China | | | | 8.0 | | | | 2.3 | - |
| Bezeq | Isreal | | | | 7.0 | | | | 2.0 | - |
| China VoIP & Digital Telecom | China | | | | 7.0 | | | | 2.0 | - |
| CallWave | U.S. | | 3/15/2007 | 7/12/2005 | 7.0 | | 7.0 | 7.0 | 2.0 | 3.0 |
| Global Virtual Office | U.S. | | | | 7.0 | | | | 2.0 | 3.0 |
| Cbeyond | U.S. | | | | 7.0 | | | | 2.0 | 3.0 |
| MaxEMail | U.S. | | | | 7.0 | | | | 2.0 | 3.0 |
| Fax Ltd. | U.K. | | | | 7.0 | | | | 2.0 | - |
| GnetX | Germany | | | | 7.0 | | | | 2.0 | - |
| Fax Online Australia | Australia | | | | 6.0 | | | | 1.7 | - |
| Communilink | Hong Kong | | | | 6.0 | | | | 1.7 | - |
| Faxaway | U.S. | | | | 6.0 | | | | 1.7 | 2.6 |
| GoDaddy | U.S. | | | 9/28/2006 | 6.0 | | | 6.0 | 1.7 | 2.6 |
| Accessline | U.S. | | 10/4/2004 | | 6.0 | | 6.0 | 6.0 | 1.7 | 2.6 |
| EasyLink (RapidFax business) | U.S. | 12/13/2007 | | | 4.0 | 4.0 | 4.0 | 4.0 | 1.2 | 1.7 |
| Tiscali | U.S. | | | | 4.0 | | | | 1.2 | - |
| Comodo | U.S. | | | 3/20/2007 | 4.0 | | | 4.0 | 1.2 | 1.7 |
| Eagle Telecommunications | U.S. | | | | 3.0 | | | | 0.9 | 1.3 |
| Intellicom | U.S. | | | | 3.0 | | | | 0.9 | 1.3 |
| Shanghai Telecom | China | | | | 3.0 | | | | 0.9 | - |
| uReach | U.S. | | 12/1/2005 | 10/6/2005 | 3.0 | | 3.0 | 3.0 | 0.9 | 1.3 |
| RingCentral | U.S. | | 1/17/2007 | | 3.0 | | 3.0 | 3.0 | 0.9 | 1.3 |
| Venali | U.S. | | | 7/1/2005 | 3.0 | | | 3.0 | 0.9 | 1.3 |
| Premiere | U.S. | | 11/20/2001 | | 2.0 | | 2.0 | 2.0 | 0.6 | 0.9 |
| EasyTel | U.S. | | 11/20/2001 | 8/4/2005 | 2.0 | | 2.0 | 2.0 | 0.6 | 0.9 |
| FreedomVOICE | U.S. | | 8/31/2007 | | 2.0 | | 2.0 | 2.0 | 0.6 | 0.9 |
| Meixler (GreenFax) | U.S. | | | | 1.0 | | | | 0.3 | 0.4 |
| Whaleback | U.S. | | | | 1.0 | | | | 0.3 | 0.4 |
| 8x8 | U.S. | | | | 1.0 | | | | 0.3 | 0.4 |
| Uniserve | U.S. | | | | 1.0 | | | | 0.3 | 0.4 |
| TalkFree | U.S. | | | | 1.0 | | | | 0.3 | 0.4 |
| Intelliverse | U.S. | | 4/3/2006 | | 1.0 | | 1.0 | 1.0 | 0.3 | 0.4 |
| BabyTel | U.S. | | | | 1.0 | | | | 0.3 | 0.4 |
| Popfax | U.S. | | | | 1.0 | | | | 0.3 | 0.4 |
| Metro High Speed | U.S. | | | | 1.0 | | | | 0.3 | 0.4 |
| Packetel | U.S. | | | | 1.0 | | | | 0.3 | 0.4 |
| PATlive | U.S. | | | | 1.0 | | | | 0.3 | 0.4 |
| Teleconnect (RightFax) | U.S. | | | | 1.0 | | | | 0.3 | 0.4 |
| Other* | U.S. | | | | 8.0 | 8.0 | 8.0 | 8.0 | 2.3 | 3.5 |
| **Davidson Reported Total\*\*** | | | | | 345.0 | | | | | |
| **International Market Total\*\*** | | | | | 351.0 | | | | | |
| **J2 Total** | | | | | 102.0 | 114.0 | 140.0 | 187.0 | | |
| **U.S. Market Total\*\*\*** | | | | | 231.0 | 231.0 | 231.0 | 231.0 | | |
| **J2 Estimated Share of Total Market** | | | | | 44.2% | 49.4% | 60.6% | 81.0% | | |
| **U.S. Market (less Other)** | | | | | 223.0 | 223.0 | 223.0 | 223.0 | | |
| **J2 Estimated Share of Identified Market** | | | | | | 51.1% | 62.8% | 83.9% | | |

[A]  Peter J. Davidson, "Fax Service Markets," Davidson Consulting, Sturgis, MI, 2007 at pages 10-12 (table 3-2).

[B]  Sources include Davidson Report and web-based research: coded "U.S." if reported by Davidson as U.S. firm and/or web research indicates strong ties

    to U.S. (including evidence of pricing information available for U.S. customers).

[C]  Source are news reports of acquisition or license deals where J2 or Catch Curve is the acquiring company or licensor.

    *\*\*\*\** it is unclear whether the following acquired companies have any connection to the firms listed in the Davidson report (column [A]):

      jump, cyberbox, imc jump, cyberbox, impor (SP??), call science/onebox, data on call/unifax, send-a-fax

    *\*\*\*\** it is unclear whether the following license companies have any connection to the firms listed in the Davidson report (column [A]):

      bigfoot, cyberbox, gi bigfoot, cyberbox, glenayre electronics, interactive intelligence, castelle, callware, ureach technologies,

      data fabrication (clic data fabrication (clickfax), send2fax, ss&networks, open text corp and intomi, voicecom telecommunicaitons, biscom,

      smith micro, villager smith micro, villageedocs, esker, gfi software, dicom (topcall), faxback, ringcentral, callwave, fenestrae inc, quadrant software,

      hostopia, 3cx ltd., in hostopia, 3cx ltd., intermedia inc., 3 com, mitel, intervoice, logicacmg, topcall

[D]  Peter J. Davidson, "Fax Service Markets," Davidson Consulting, Sturgis, MI, 2007 at pages 10-12 (table 3-2).

[E]  If [C] is "yes", [D] value is transferred to j2.

[F]  Peter J. Davidson, "Fax Service Markets," Davidson Consulting, Sturgis, MI, 2007 at pages 10-12 (table 3-2).

[G]  Value in [D] divided by [B].

[H]  Value in [E] divided by [B].

[1]  Peter J. Davidson, "Fax Service Markets," Davidson Consulting, Sturgis, MI, 2007 at pages 10-12 (table 3-2).

[2]  Sum of Column (differs from [1] due to rounding effects)

[3]  Sum of Column if [B] is "U.S."

EXHIBIT ___3___ PAGE ___91___


Preliminary Unproofed
Privileged Confidential
Subject to Revision



Exhibit 3

Quarter-to-Quarter Change in Paid Numbers

- 1Q 2003 through 3Q 2007 -

**Price Event 2:** Price increased from 9.95 to 12.95 (see J2 March 12, 2007 Investor Presentation at slide 10); assumed that price increase took effect over the third and fourth quarters of 2003 (see Third Quarter Conference Call 2003, Fourth Quarter Conference Call 2003, and J2 March 12, 2007 Investor Presentation, slide 10)

**Price Event 3:** Price increased from 12.95 to 16.95 (see J2 March 12, 2007 Investor Presentation at slide 10); assumed that price increase took effect starting in the fourth quarter of 2006 through the second quarter of 2007 (see J2 March 12, 2007 Investor Presentation at slides 11,12).

*Sources: J2 10Ks and 10Qs.*

EXHIBIT 3 PAGE 92



Exhibit 4

Quarter-to-Quarter Change in Revenue

- 1Q 1999 through 3Q 2007 -

Preliminary Unproofed
Privileged Confidential
Subject to Revision

EXHIBIT ___3___ PAGE ___93___



Exhibit 5

Gross Margin

- 1Q 1999 through 3Q 2007 -

Preliminary Unproofed
Privileged Confidential
Subject to Revision

**Price Event 1:** Price increased from 2.95d 4.95 to 9.95 (see J2 March 12, 2007 Investor Presentation at slide 10); assumed that price increase took effect over the first and second quarters of 2001 (see Amended 2001 10-K, filed April 29, 2002 and J2 March 12, 2007 Investor Presentation, at slide 10).

**Price Event 2:** Price increased from 9.95 to 12.95 (see J2 March 12, 2007 Investor Presentation at slide 10); assumed that price increase took effect over the third and fourth quarters of 2003 (see Third Quarter Conference Call 2003, Fourth Quarter Conference Call 2003, and J2 March 12, 2007 Investor Presentation, slide 10)

**Price Event 3:** Price increased from 12.95 to 16.95 (see J2 March 12, 2007 Investor Presentation at slide 10); assumed that price increase took effect starting in the fourth quarter of 2006 though the second quarter of 2007 (see J2 March 12, 2007 Investor Presentation at slides 11,12).

**Sources:** J2 10K and 10Qs.

EXHIBIT 3 PAGE 94



Exhibit 6

Operating Profit Margin
- 1Q 1999 through 3Q 2007 -

Preliminary Unproofed
Privileged Confidential
Subject to Revision

EXHIBIT 3 PAGE 95



Exhibit 7

3-Year Average Gross Margin for J2-Identified Peer Companies and Other Publicly Traded Companies Offering Individual Internet Fax Services - FY 2004 through FY 2006 -

(1) denotes J2-identified peer

(2) denotes a publicly traded company offering individual internet fax services

(3) denotes J2-identified peer that is also a publicly traded company offering individual Internet fax services

Notes: J2, in its 2006 10K, selected a group of peer companies for comparison. In addition to J2-identified peers, publicly traded companies offering individual internet fax services are included for comparison.

Fiscal Year End is December 31 for J2, Delta Three, C2 Global, iBasis, Premiere, Tumbleweed, Cbeyond, Xfone; fiscal year end is July 31 for EasyLink; fiscal year end is March 31 for 8x8; fiscal year end is June 30 for CallWave. Fiscal year is based on the calendar year of the first month of the fiscal year, for example FY 2006 includes any fiscal year starting in 2006.

Sources: J2 2006 10K; Yahoo Finance.

EXHIBIT 3 PAGE 96



Exhibit 8

3-Year Average Operating Margin for J2-Identified Peer Companies and Other Publically Traded Companies Offering Individual Internet Fax Services - FY 2004 through FY 2006 -

**(1)** denotes J2-identified peer

**(2)** denotes a public ally traded company offering individual internet fax services

**(3)** denotes J2-identified peer that is also a public ally traded company offering individual internet fax services

**Notes:** J2, in its 2006 10K, selected a group of peer companies for comparison. In addition to J2-identified peers, public ally traded companies offering individual internet fax services are included for comparison.

Fiscal Year End is December 31 for J2, Delta Three, C2 Global, iBasis, Premiere, Tumbleweed, Cbeyond, Xfone; fiscal year end is July 31 for EasyLink; fiscal year end is March 31 for 8x8; fiscal year end is June 30 for CallWave. Fiscal year is based on the calendar year of the first month of the fiscal year, for example FY 2006 includes any fiscal year starting in 2006.

**Sources:** J2 2006 10K; Yahoo Finance.

EXHIBIT 3 PAGE 97



Exhibit 9

3-Year Average Operating Income to Assets Ratio for J2-Identified Peer Companies and Other Publicly Traded Companies Offering Individual Internet Fax Services
- FY 2004 through FY 2006 -

**(1)** denotes J2-identified peer

**(2)** denotes a publicly traded company offering individual Internet fax services

**(3)** denotes J2-identified peer that is also a publicly traded company offering individual Internet fax services

**Notes:** J2, in its 2006 10K, selected a group of peer companies for comparison. In addition to J2-identified peers, publicly traded companies offering individual Internet fax services are included for comparison.

Fiscal Year End is December 31 for J2, Delta Three, C2 Global, iBasis, Premiere, Tumbleweed, Cheyond, Xfone; fiscal year end is July 31 for EasyLink; fiscal year end is March 31 for 8x8; fiscal year end is June 30 for CallWave. Fiscal year is based on the calendar year of the first month of the fiscal year, for example FY 2006 includes any fiscal year starting in 2006.

**Sources:**J2 2006 10K; Yahoo Finance.

EXHIBIT 3 PAGE 98

**Exhibit 10**

**J2 and Catch Curve Litigation, Licensing, and Acquisition History**

| Supplier | Catch Curve - Suit filed | J2 - Suit Filed | Catch Curve - Licensed | J2 - Licensed | Acquired by J2 |
|---|---|---|---|---|---|
| 3CX Ltd | | | 11/14/2007 | | |
| Bigfoot | | | | 3/13/2002 | |
| Biscom | | | 4/10/2006 | | |
| Call Science (OneBox) | | | | | 10/18/2004 |
| Callware | | | 12/1/2005 | | |
| CallWave | | 8/25/2004 | | | |
| CallWave | 7/12/2005 | | 3/15/2007 | | |
| Castelle | | | 10/25/2005 | | |
| Comodo Group | 3/20/2007 | | | | |
| Cyberbox.com | | | | 3/28/2002 | 2/21/2003 |
| Data Fabrication (ClickFax) | | | 1/19/2006 | | |
| Data On Call | | | | | 7/25/2005 |
| EasyTel (InfoUSA) | | 8/4/2005 | Licensed | | |
| Esker | 4/5/2006 | | 7/1/2006 | | |
| FaxBack | | | 1/17/2007 | | |
| FaxNet (now part of Critical Path) | | | 11/20/2001 | | |
| FaxSav (now part of EasyLink) | | | 11/20/2001 | | |
| Fenestrae Inc. | | | 3/20/2007 | | |
| FreedomVOICE Systems | | | 8/31/2007 | | |
| GFI | | | 9/28/2006 | | |
| Glenayre Electronics | | | 4/4/2005 | | |
| GoDaddy | 9/28/2006 | | | | |
| Hostopia.com | | | 7/1/2007 | 8/1/2007 | |
| Impor (sp) | | | | | 2/2/2004 |
| Integrated Global Concepts (IGC) | | | | | |
| Intelliverse - Voicecom (Now part of Premiere) | | | 4/3/2006 | | |
| Interactive Intelligence | | | 4/4/2005 | | |
| Intermedia Inc. | | | 11/14/2007 | | |
| Interstar Technologies | | | 5/10/2006 | | |
| Intervoice | | | 10/4/2004 | | |
| iNuntius Inc | | | 4/3/2006 | | |
| J2 | | | 11/20/2001 | | |
| Jump | | | | | 4/19/2004 |
| LogicaCMG | | | 10/4/2004 | | |
| Mijanda | | 8/4/2005 | 12/1/2005 | | |
| Mitel | | | 11/20/2001 | | |
| NetCentric | | | Licensed | | |
| Open Text Corp. and iNuntius | 12/15/2005 | | 4/3/2006 | | |
| Premiere Global Services | | | 11/20/2001 | | |
| Protus IP Solutions | | 8/4/2005 | | | |
| Quadrant Software Inc. | | | 3/20/2007 | | |
| RapidFax (EasyLink Services sub) | | | | | 12/13/2007 |
| RingCentral | | | 1/17/2007 | | |
| Send2Fax | | | 1/19/2006 | | |
| Smith Micro | 12/9/2005 | | 5/10/2006 | | |
| SS8 Networks | | | 1/19/2006 | | |
| TopCall (DICOM) | 9/28/2006 | | 1/17/2007 | | |
| uReach Technologies | 10/6/2005 | | 12/1/2005 | | |
| Venali | | 2/23/2004 | | 7/10/2006 | |
| Venali | 7/1/2005 | | | | |
| Venali | 2/1/2007 | | | | |
| Village EDOCS | | | 5/16/2006 | | |
| VoiceCom Telecommunications | | | 4/3/2006 | | |

Sources: J2 Conference Call transcripts, J2 and Catch Curve press releases, Catch Curve website, deposition of Michael McLaughlin.



EXHIBIT ___3___ PAGE ___99___

Exhibit 11

December 2007 Pricing for Basic Internet Fax Services with In- and Out-bound and Limited Pages

| CoName | Product Name | Startup | Monthly | SendPerPage | Rec 800Per Page | RecLocalPerPage | FreeIn | FreeOut | FreeComb | UnlimitedFreeIn | Local | TollFree | Both |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8x8 | Freedom Fax | 29.990 | 9.990 | 0.035 | 0.000 | 0.000 | 0 | 300 | 0 | 1 | 1 | 0 | 0 |
| Accessline | SmartFax Plus | 10.000 | 7.950 | 0.070 | 0.070 | 0.070 | 0 | 0 | 100 | 0 | 0 | 0 | 1 |
| Accessline | SmartFax Pro | 10.000 | 9.950 | 0.070 | 0.070 | 0.070 | 0 | 0 | 300 | 0 | 0 | 0 | 1 |
| CallWave | | 10.000 | 9.950 | 0.100 | 0.100 | 0.100 | 150 | 100 | 0 | 0 | 1 | 0 | 0 |
| Comodo | TrustFax Prestige | 0.000 | 4.950 | 0.100 | 0.100 | 0.100 | 0 | 0 | 50 | 0 | 0 | 1 | 0 |
| Comodo | TrustFax Pro | 0.000 | 9.950 | 0.100 | 0.100 | 0.100 | 0 | 0 | 125 | 0 | 0 | 1 | 0 |
| Concord Fax | Concord Fax Premier | 0.000 | 10.950 | 0.070 | 0.080 | 0.080 | 50 | 50 | 0 | 0 | 0 | 1 | 0 |
| Data Fabrication | Clickfax Budget Send and Receive | 0.000 | 9.950 | 0.080 | 0.080 | 0.080 | 0 | 0 | 50 | 0 | 0 | 0 | 1 |
| EasyLink | Rapid Fax | 0.000 | 9.950 | 0.080 | 0.080 | 0.080 | 200 | 100 | 0 | 0 | 0 | 0 | 1 |
| EC Data Systems | FAXAGE Professional | 5.000 | 7.950 | 0.050 | 0.050 | 0.050 | 150 | 150 | 0 | 0 | 1 | 0 | 0 |
| Esker | FLYDOC | 0.000 | 9.990 | 0.100 | 0.100 | 0.100 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Faxaway | | 0.000 | 1.000 | 0.110 | 0.000 | 0.000 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Fax.com (J2) | | 0.000 | 9.990 | 0.120 | 0.120 | 0.120 | 0 | 0 | 300 | 0 | 0 | 0 | 1 |
| FaxDigits | | 0.000 | 7.950 | 0.030 | 0.000 | 0.000 | 0 | 50 | 0 | 1 | 0 | 0 | 1 |
| Fax1.com | | 0.000 | 9.000 | 0.120 | 0.050 | 0.050 | 200 | 0 | 0 | 0 | 1 | 0 | 0 |
| GreenFax | Signature Service + Sending | 0.000 | 12.950 | 0.070 | 0.030 | 0.030 | 250 | 0 | 0 | 0 | 1 | 0 | 0 |
| GreenFax | Toll Free + sending | 0.000 | 12.950 | 0.070 | 0.150 | 0.150 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Intellicom | Innoport Omni | 0.000 | 7.950 | 0.060 | 0.040 | 0.040 | 300 | 0 | 0 | 0 | 1 | 0 | 0 |
| Intellicom | Innoport Toll Free | 0.000 | 7.950 | 0.060 | 0.060 | 0.060 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Interfax | | 12.950 | 12.950 | 0.110 | 0.150 | 0.150 | 200 | 0 | 0 | 0 | 0 | 1 | 0 |
| Intermedia.NET | | 0.000 | 4.950 | 0.080 | 0.070 | 0.070 | 50 | 0 | 0 | 0 | 1 | 0 | 0 |
| j2 | JConnect Premier | 15.000 | 15.000 | 0.100 | 0.200 | 0.000 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| j2 | eFax Pro | 0.000 | 13.950 | 0.100 | 0.200 | 0.000 | 200 | 0 | 0 | 0 | 1 | 0 | 0 |
| j2 | eFax Plus | 10.000 | 16.950 | 0.100 | 0.200 | 0.150 | 130 | 30 | 0 | 0 | 1 | 0 | 0 |
| MaxEmail | MaxEmail Plus (local) | 10.000 | 9.950 | 0.100 | 0.050 | 0.050 | 250 | 0 | 0 | 0 | 0 | 0 | 1 |
| Metro High Speed | MetroFax | 9.950 | 12.950 | 0.030 | 0.030 | 0.030 | 0 | 0 | 1000 | 0 | 1 | 0 | 0 |
| PATLive | Virtual Fax | 4.950 | 9.950 | 0.049 | 0.049 | 0.049 | 0 | 0 | 50 | 0 | 0 | 1 | 0 |
| PopFax | Send & Receive | 0.000 | 8.497 | 0.070 | 0.000 | 0.000 | 7 | 0 | 0 | 0 | 1 | 0 | 0 |
| Premiere Global Services | Fax2Mail Basic Plan | 15.000 | 9.950 | 0.100 | 0.100 | 0.100 | 0 | 0 | 350 | 0 | 0 | 0 | 1 |
| Premiere Global Services | Fax2Mail Value Plan | 15.000 | 12.490 | 0.100 | 0.100 | 0.100 | 0 | 0 | 500 | 0 | 0 | 0 | 1 |
| Protus | Most Popular | 0.000 | 10.000 | 0.100 | 0.100 | 0.100 | 200 | 100 | 0 | 0 | 0 | 0 | 1 |
| Protus | Fax More | 0.000 | 20.000 | 0.100 | 0.100 | 0.100 | 400 | 200 | 0 | 0 | 0 | 0 | 1 |
| RapidFax (not in survey) | | 0.000 | 9.950 | 0.080 | 0.080 | 0.080 | 200 | 100 | 0 | 0 | 0 | 0 | 1 |
| Ring Central | | 0.059 | 0.059 | 0.059 | 9.990 | | 0 | 0 | 300 | 0 | 0 | 0 | 1 |
| Send2Fax (J2) | Individual/Small Business | 11.950 | 11.950 | 0.120 | 0.120 | 0.120 | 0 | 0 | 200 | 0 | 0 | 1 | 0 |
| Telecentrex | fax800-FaxFreedom | 0.000 | 9.950 | 0.069 | 0.069 | 0.069 | 0 | 0 | 100 | 0 | 0 | 1 | 0 |
| Uniserve | Freedom 40 | 0.000 | 8.950 | 0.120 | 0.120 | 0.120 | 0 | 0 | 40 | 0 | 1 | 0 | 0 |
| Uniserve | Freedom 150 | 0.000 | 13.950 | 0.120 | 0.120 | 0.120 | 0 | 0 | 150 | 0 | 1 | 0 | 0 |
| Uniserve | Freedom 200 | 0.000 | 18.950 | 0.120 | 0.120 | 0.120 | 0 | 0 | 200 | 0 | 1 | 0 | 0 |
| uReach | uFax | 0.000 | 5.990 | 0.100 | 0.100 | 0.100 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Venali | Fax Complete (toll free) | 0.000 | 14.950 | 0.080 | 0.080 | 0.080 | 175 | 175 | 0 | 0 | 0 | 1 | 0 |
| Venali | Fax Complete Pro (toll free) | 0.000 | 24.950 | 0.070 | 0.070 | 0.070 | 500 | 300 | 0 | 0 | 0 | 1 | 0 |
| Venali | Fax Complete (local) | 0.000 | 9.950 | 0.080 | 0.050 | 0.050 | 100 | 100 | 0 | 0 | 1 | 0 | 0 |
| Venali | Fax Complete Pro (local) | 0.000 | 19.950 | 0.070 | 0.040 | 0.040 | 300 | 200 | 0 | 0 | 1 | 0 | 0 |
| World Fax | | 10.000 | 9.950 | 0.100 | 0.050 | 0.050 | 250 | 0 | 0 | 0 | 0 | 0 | 1 |

Sources: Supplier websites - information collected in early December 2007.

EXHIBIT 3 PAGE 100

## Exhibit 12

## Regression Models of Monthly Service Price on Attributes

| | Number of obs | | 44 | Number of obs | | 44 | Number of obs | | 44 | Number of obs | | 44 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $F(11, 32)$ | | 9.92 | $F(10, 33)$ | | 12.35 | $F(10, 33)$ | | 6.11 | $F(9, 34)$ | | 5.04 |
| | Prob > F | | 0 | Prob > F | | 0 | Prob > F | | 0 | Prob > F | | 0.0002 |
| | R-squared | | 0.687 | R-squared | | 0.667 | R-squared | | 0.460 | R-squared | | 0.436 |
| | Root MSE | | 2.9134 | Root MSE | | 2.9572 | Root MSE | | 3.7674 | Root MSE | | 3.7927 |
| Variable | Coef. | t | P>\|t\| | Coef. | t | P>\|t\| | Coef. | t | P>\|t\| | Coef. | t | P>\|t\| |
| Start-up Fee | -0.0819 | -1.32 | 0.195 | -0.1113 | -1.93 | 0.062 | 0.0362 | 0.34 | 0.734 | 0.0049 | 0.05 | 0.961 |
| Price per Page Sent | 13.9053 | 0.46 | 0.649 | 17.4617 | 0.57 | 0.575 | 29.4544 | 0.69 | 0.494 | 33.5366 | 0.79 | 0.437 |
| Price per Page Received (Local) | 26.4146 | 1.38 | 0.177 | 21.9602 | 1.18 | 0.245 | 14.3551 | 0.45 | 0.658 | 9.3154 | 0.29 | 0.770 |
| Number of Free In-Bound Pages | 0.0163 | 3.59 | 0.001 | 0.0163 | 3.62 | 0.001 | 0.0173 | 2.42 | 0.021 | 0.0173 | 2.46 | 0.019 |
| Number of Free Out-Bound Pages | 0.0139 | 1.67 | 0.104 | 0.0223 | 3.16 | 0.003 | 0.0077 | 0.69 | 0.498 | 0.0169 | 1.72 | 0.095 |
| Number of Combined Free Pages | 0.0106 | 3.82 | 0.001 | 0.0113 | 3.86 | 0.001 | 0.0076 | 2.43 | 0.021 | 0.0084 | 2.67 | 0.011 |
| Unlimited Free In-bound Pages | 3.3506 | 1.58 | 0.125 | 2.2855 | 1.03 | 0.312 | 1.8725 | 0.59 | 0.557 | 0.6814 | 0.19 | 0.850 |
| Local or Non-toll-free Number | 0.1138 | 0.1 | 0.918 | 0.2647 | 0.24 | 0.815 | 0.6138 | 0.41 | 0.687 | 0.7855 | 0.51 | 0.610 |
| Toll-free Number | 1.3237 | 1.28 | 0.210 | 1.7806 | 1.68 | 0.103 | 1.0942 | 0.8 | 0.429 | 1.5967 | 1.24 | 0.223 |
| J2 Plan | 9.3603 | 4.69 | 0.000 | 9.4439 | 5.1 | 0.000 | | | | | | |
| Venali Plan | 3.1254 | 1.47 | 0.152 | | | | 3.4493 | 1.33 | 0.192 | | | |
| Constant | 3.9042 | 1.65 | 0.109 | 3.7502 | 1.53 | 0.134 | 3.9420 | 1.45 | 0.156 | 3.7722 | 1.36 | 0.181 |

EXHIBIT ___3___ PAGE _101_

# EXHIBIT 4

Page 1

1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
2

                    CASE NO.   CV 05-4820 DDP(AJWx)
3    In re:
     CATCH CURVE, INC.,
4

5          Plaintiff,

                                **CERTIFIED
6    vs.                         COPY**

7    VENALI, INC.,

8          Defendant.
     _____/
9    AND RELATED CROSS-ACTION
     AND THIRD-PARTY COMPLAINT
10   _____/
11
12
13
            CAREY, RODRIGUEZ, GREENBERG & PAUL, LLP
14             1395 Brickell Avenue, Suite 700
                   Miami, Florida  33131
15             Thursday, December 6, 2007
                  10:10 a.m. - 3:30 p.m.
16
17                    VOLUME II
18              VIDEOTAPED DEPOSITION
19                        OF
20                  RALPH MUSGROVE
21            Taken pursuant to Notice,
              On behalf of the Plaintiff.
22
23              -  -  -  -  -
24
25

EXHIBIT___4___ PAGE_102_

1              APPEARANCES:

2

3          SULLIVAN & CROMWELL, LLP, by
              BRIAN ENGLAND, ESQUIRE
           On behalf of the Plaintiff.

4

5      CAREY, RODRIGUEZ, GREENBERG & PAUL, LLP, by
              RICHARD MOCKLER, ESQUIRE

6           On behalf of the Defendant.

7              ALSO PRESENT:

8       CUSTOM VIDEO SERVICES, INC., by
           KENNETH STERN, VIDEOGRAPHER

9

10           -  -  -  -  -  -  - -

11

                    I N D E X

12

13    WITNESS                    DIRECT     CROSS

14    RALPH MUSGROVE
        By Mr. England                3
15      By Mr. Mockler                        --

16

17      EXHIBIT MARKED FOR IDENTIFICATIONPlaintiff's

18                   Page

19    No. 20, E-mail dated 12/16/02.....................   50
       No. 21, E-mail dated 11/24/04.....................   69

20

21

22

23

24

25

EXHIBIT 4   PAGE 103

Page 89

1   distinction that -- the distinction is one that you have made,

2   that below a thousand subscribers is not a meaningful

3   competitor?

4        A     That is my distinction, yes.

5        Q     But somebody who has less than a thousand subscribers

6   to an enhanced service, as we're referring to it, would still be

7   competing in the SOHO market; is that correct?

8        A     Yes.

9        Q     And I believe you testified that there's more than 30

10  companies that are offering some sort of enhanced fax services

11  in the SOHO market; is that correct?

12       A     Yes.

13       Q     Are you familiar with the Davidson Report?

14       A     Yes.

15       Q     And what do you know about the Davidson Report?

16       A     Well, Mr. Davidson, who I met for the first time, I

17  believe, in 1994, is the only analyst who covers the fax market

18  that I'm aware of.  The Davidson Report is the outcome of his

19  research.

20       Q     So the Davidson Report is an analysis of the

21  competitors in the enhanced fax services market?

22       A     Analysis might be a strong word, but it is his

23  opinion as to what the fax market is, yes.

24       Q     That's a -- that's a loaded answer.

25             You tell me what you mean by that.

EXHIBIT 4  PAGE 104

1       A    I'm aware of the Davidson Report frequently having

2    significant factual errors.

3       Q    So it -- would your opinion be that the Davidson

4    Report is not a reliable source of information on the companies

5    competing --

6       A    That would be my opinion, yes.

7       Q    -- let me finish the question.

8       A    Sorry.

9       Q    It would be your opinion that the Davidson Report is

10   not a reliable source of information regarding the companies

11   competing in the enhanced facsimile service SOHO market?

12      A    Yes.

13      Q    Sorry, I just wanted to make sure our transcript is

14   clear.

15           Do you have some specific examples of inaccuracies in

16   mind?

17      A    Certainly the revenue numbers that were contributed

18   to Venali that I've seen in Davidson Reports were dramatically

19   higher than they actually were, but even going back to the old

20   Winfax days, where Winfax had 97 percent market share and,

21   subsequently, whatever my opinion was was regarded relatively

22   highly by analysts like Mr. Davidson, and very often I would

23   find that when I was asked about my opinion of whatever the

24   market might be doing in the future, nine month later I would

25   spend five, $6,000 to buy the report, and guess what, it would

EXHIBIT   4   PAGE  105

Page 94

1          Would that be a fair characterization?

2          MR. MOCKLER:  Object to the form.

3          THE WITNESS:  Can you repeat the question?

4     BY MR. ENGLAND:

5       Q    Well, when you -- my question is when you take the

6     definitions across companies, there can be -- the lines are

7     going to be very difficult to draw between these various

8     markets?

9          MR. MOCKLER:  Object to the form.

10         THE WITNESS:  Specifically when it comes to

11         enterprise and mid-size, I would say yes.  SOHO is much

12         more narrow.

13    BY MR. ENGLAND:

14      Q    Okay.  The Venali service, the enhanced fax service

15    that we've been discussing, they offer that in all three

16    markets?

17      A    Yes.

18      Q    Is it -- but it's the same service in all three

19    markets; is that correct?

20      A    The fax features are the same.  There are more

21    enterprise management or business-type management interfaces to

22    add and remove users to manage revenue and billing for an

23    enterprise environment, for a business environment, that are not

24    applicable and not available to the SOHO user.

25      Q    Okay.  So apart from some accounting features --

EXHIBIT  4  PAGE 106

Page 95

1          A     Accounting and account management features.

2          Q     Fair enough.

3                But the actual fax-to-e-mail and message storage

4    system is the same service?

5                MR. MOCKLER:  Object to the form.

6                THE WITNESS:  There is no message storage system for

7          those users, but yes.

8    BY MR. ENGLAND:

9          Q     Okay.  We talked about Easy Link.

10               Expedite, do they offer an enhanced fax service?

11         A     Yes.

12         Q     And to which market do they offer their service?

13         A     Largely, large enterprises.  They did, for awhile,

14   have a SOHO product which I believe does not exist anymore, but

15   today their audience would be large companies.

16         Q     Of the three markets, which one is Venali the most --

17   the Venali service the most focused on?

18         A     Mid-size and enterprise.

19         Q     Mid-size and enterprise?

20         A     Yes.

21         Q     Not SOHO?

22         A     Not SOHO.

23         Q     Okay.  I'm going to just go down a quick list of

24   other companies, and I want you to tell me if you recognize the

25   company and if they are offering an enhanced facsimile service

EXHIBIT  4   PAGE  107

 1      A    For example.

 2           MR. ENGLAND:  Why don't we take a break, and let me

 3      gather my thoughts.

 4           MR. STERN:  We are off the record.

 5           (Thereupon, a brief recess was taken.)

 6           MR. STERN:  The time is three o'clock p.m., and we're

 7      back on the record.

 8           MR. ENGLAND:  Thank you.

 9      BY MR. ENGLAND:

10      Q    Mr. Musgrove, a few follow-up questions about some

11      topics we've talked about previously.

12           One, I believe you had testified that there are more

13      companies competing in the enhanced facsimile market today than

14      there were in 2003; is that correct?

15      A    There are more now than there were in 2003, yes.

16      Q    There are more companies competing?

17      A    Yes.

18      Q    Using your definition of significant companies, by

19      that I mean more than a thousand subscribers, are there more

20      companies, are there more significant companies competing in the

21      market than there were in 2003?

22      A    If we limit the 1,000 users to users actually using

23      the fax services, then I think the number is roughly the same.

24      There are more significant companies now that have more than a

25      thousand users that may have fax features as part of their

EXHIBIT___4___PAGE___108

1                              CERTIFICATE

2       STATE OF FLORIDA:

        COUNTY OF MIAMI DADE:

3

4            I, Anna M. Meagher, Shorthand Reporter and Notary

5       Public for the State of Florida at Large, do hereby certify that

6       the foregoing Deposition of RALPH MUSGROVE was taken before me,

7       in the cause, at the time and place, and in the presence of

8       counsel as stated in the caption hereto; that the said witness

9       was first duly sworn by me; and that the foregoing pages,

10      numbered 1 through 162, constitute a true record thereof; and

11      that the reading and signing was not waived by said witness and

12      said witness was notified to read.

13

14           I further certify that I am not of counsel, I am not

15      related to nor employed by any attorney in this case.

16

17           Dated this 3rd day of January 2008.

18                                  _Anna M Meagher_____

19      My Commission Expires:          Anna M. Meagher, Notary Public

        December 7, 2008                State of Florida at Large

20      Commission #DD355554

21

22

23

24

25

EXHIBIT   4   PAGE 109

# EXHIBIT 5

12072007.txt

1

```
 1                    UNITED STATES BANKRUPTCY COURT
                      CENTRAL DISTRICT OF CALIFORNIA
 2

 3                        CASE NO. CV 05-4820 DDP(AJWX)
     CATCH CURVE, INC.,
 4
                 Plaintiff,
 5
     vs.
 6
     VENALI, INC.,
 7
                 Defendant.
 8    _____/

 9   AND RELATED CROSS-ACTION
     AND THIRD PARTY COMPLAINT
10    _____/

11

12                        Carey Rodriguez Greenberg & Paul
                          1395 Brickell Avenue
13                        Suite 700
                          Miami, Florida
14                        Friday, December 7, 2007
                          10:00 a.m. - 12:40 p.m.
15                        1:40 - 5:10 p.m.

16

17                VIDEOTAPED DEPOSITION

18                        OF

19                AMIN EL-GAZZAR

20

21             Taken pursuant to Notice,
             on behalf of the Plaintiff
22             _ _ _ _ _ _

23

24             Reported By:  Lissette A. Kelley

25
```

2

```
 1   APPEARANCES:

 2           SULLIVAN & CROMWELL, by
```

EXHIBIT 5 PAGE 110

12072007.txt

3       BRIAN ENGLAND, Esquire
        on behalf of the Plaintiff

4       CAREY RODRIGUEZ GREENBERG PAUL, by
        RICHARD MOCKLER, Esquire
5       on behalf of the Defendant

6           ALSO PRESENT:

7          Thomas Charron, Videographer

8              - - - - - - -

9

              I N D E X
10
Witness            Direct   Cross
11
AMIN EL-GAZZAR
12
By Mr. England       3
13 By Mr. Mockler            --

14

          E X H I B I T S
15

16    Plaintiff's                 Page

17      No. 22 ................................77
       No. 23 ................................86
       No. 24 ................................92
18      No. 25 ................................99
       No. 26 ................................113
19      No. 27 ................................182
       No. 28 ................................188

20

21

22

23

24

25


&#x26A5;                                           3

1       THE VIDEOGRAPHER:  Today is December 7, 2007.

2  The time is approximately 10:00 a.m.  We are at 1395

3  Brickell Avenue.  We're here to take the deposition of

4  Amin El-Gazzar in the case styled Catch Curve vs.

5  Venali, Case Number 05-4820.
              Page 2

EXHIBIT 5    PAGE 111

12072007.txt
25   Davidson in several locations.

1       Q     Okay.  Do you consider the Davidson report to

2   be an accurate source of information about this market?

3             MR. MOCKLER:  Object to the form.

4             THE WITNESS:  Maybe not 100 percent accurate

5   but a good indication of the market.

6   BY MR. ENGLAND:

7       Q     So if someone wanted to get an accurate

8   understanding of what the status of this market was,

9   they could use Davidson as some information but

10  couldn't rely on it wholly; is that a fair

11  characterization?

12      A     I would say that's a fair characterization.

13      Q     Do you know of inaccuracies in the Davidson

14  report?

15            MR. MOCKLER:  Object to the form.

16            THE WITNESS:  I know that on several cases

17  our revenue was reported as too high.

18  BY MR. ENGLAND:

19      Q     As over estimating Venali's revenue?

20            MR. MOCKLER:  Object to form.

21            THE WITNESS:  My understanding of the

22  Davidson report was that the way they report revenues

23  was estimated on end use of value after revenue

24  produced  rather than actual sales revenues.

25            MR. ENGLAND:  I'm sorry, could you repeat


Page 133

EXHIBIT 5   PAGE 112

12072007.txt

12   notes taken at said proceedings.

13          Dated this 14th day of December, 2007.

14

15

16                     _____

17                     LISSETTE KELLEY
                       Notary Public in and for the
18                     State of Florida at Large.

19

20

    My commission expires:
21   July 1, 2011
    Commission # DD664202
22

23

24

25


                                               216


 1    OUELLETTE & MAULDIN COURT REPORTERS, INC.
                28 West Flagler Street
 2                   Suite 808
                   Miami, FL 33130
 3     (305)358-8875   (305)577-9869 fax

 4

 5               December 14, 2007

 6   TO:  AMIN EL-GAZZAR
    C/o  RICHARD MOCKLER, ESQUIRE
 7   Carey, Rodriguez, Greenberg & Paul
    Suite 700
 8   1395 Brickell Avenue
    Miami, FL 33131

 9

10        IN RE:  CATCH CURVE vs. VENALI, INC.

11        Case No.  CV 05-4820

12          Please be advised that your deposition taken
    in the case and on the date described above has
13   been transcribed and is ready for your review.
               Please contact us for an appointment to read
14   and sign this deposition at your earliest convenience.
                     Page 195

EXHIBIT 5  PAGE 113

12072007.txt

          The transcript will be sent to counsel with or
15  without your signature in 30 days or at the time
of trial, whichever comes first.

16          Our office hours are 9:00 a.m. to 4:30 p.m.,
Monday through Friday.

17          If you have any questions regarding this matter,
please feel free to contact us at the above number.

18

19          Sincerely,

20

21    _____

     OUELLETTE & MAULDIN COURT REPORTERS, INC.

22

23

24

25

Page 196

EXHIBIT 5 PAGE 114

# EXHIBIT 6

| Prod 2 | Change | Data Sum of Q2 06 | Sum of Q3 06 | Sum of Q4 06 | Sum of Q1 07 | Sum of Q2 07 | Sum of Q3 07 | Sum of Q4 07 | Sum of Q1 08 | Sum of Q2 08 |
|---|---|---|---|---|---|---|---|---|---|---|
| eFax Paid Domestic | CONVERT | 4,776 | 4,541 | 2,922 | 2,536 | 2,617 | 1,854 | 1,702 | 2,064 | 2,395 |
|  | UPGRADE | 8,073 | 8,116 | 6,993 | 6,274 | 5,510 | 4,954 | 4,870 | 5,373 | 5,188 |
| eFax Paid Domestic Sum |  | 12,849 | 12,657 | 9,915 | 8,810 | 8,127 | 6,808 | 6,572 | 7,437 | 7,583 |
| eFax Paid International | CONVERT | 449 | 359 | 271 | 238 | 295 | 239 | 252 | 238 | 263 |
|  | UPGRADE | 703 | 901 | 1,028 | 1,073 | 939 | 816 | 1,007 | 986 | 1,136 |
| eFax Paid International Sum |  | 1,152 | 1,260 | 1,299 | 1,311 | 1,234 | 1,055 | 1,259 | 1,224 | 1,399 |
| eVoice Paid Domestic | CONVERT | 15 | 12 | 11 | 13 | 6 | 7 | 6 | 9 | 21 |
|  | UPGRADE | 388 | 334 | 259 | 263 | 226 | 246 | 203 | 240 | 217 |
| eVoice Paid Domestic Sum |  | 403 | 346 | 270 | 276 | 232 | 253 | 209 | 249 | 238 |
| eVoice Paid International | CONVERT | - | - | - | 1 | - | 2 | 1 | 2 | 2 |
|  | UPGRADE | 12 | 4 | 9 | 8 | 3 | 12 | 11 | 7 | 4 |
| eVoice Paid International Sum |  | 12 | 4 | 9 | 9 | 3 | 14 | 12 | 9 | 6 |
| jConnect Paid Domestic | CONVERT | 226 | 235 | 205 | 121 | 77 | 63 | 107 | 99 | 116 |
|  | UPGRADE | 447 | 408 | 431 | 365 | 310 | 274 | 242 | 238 | 247 |
| jConnect Paid Domestic Sum |  | 673 | 643 | 636 | 486 | 387 | 337 | 349 | 337 | 363 |
| jConnect Paid International | CONVERT | 30 | 28 | 25 | 16 | 12 | 14 | 13 | 16 | 9 |
|  | UPGRADE | 83 | 82 | 95 | 117 | 78 | 83 | 64 | 64 | 76 |
| jConnect Paid International Sum |  | 113 | 110 | 120 | 133 | 90 | 97 | 77 | 80 | 85 |
| Grand Total |  | 15,202 | 15,020 | 12,249 | 11,025 | 10,073 | 8,564 | 8,478 | 9,336 | 9,674 |
|  |  |  |  |  |  |  |  |  |  |  |
| Grand Total as % of Free Base |  | 0.14% | 0.14% | 0.12% | 0.11% | 0.09% | 0.08% | 0.08% | 0.09% | 0.10% |

| Prod 2 | Change | Data Sum of Q2 06 | Sum of Q3 06 | Sum of Q4 06 | Sum of Q1 07 | Sum of Q2 07 | Sum of Q3 07 | Sum of Q4 07 | Sum of Q1 08 | Sum of Q2 08 |
|---|---|---|---|---|---|---|---|---|---|---|
| eFax Paid Domestic | CONVERT | 37.2% | 35.9% | 29.5% | 28.8% | 32.2% | 27.2% | 25.9% | 27.8% | 31.6% |
|  | UPGRADE | 62.8% | 64.1% | 70.5% | 71.2% | 67.8% | 72.8% | 74.1% | 72.2% | 68.4% |
| eFax Paid Domestic Sum |  | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| eFax Paid International | CONVERT | 39.0% | 28.5% | 20.9% | 18.2% | 23.9% | 22.7% | 20.0% | 19.4% | 18.8% |
|  | UPGRADE | 61.0% | 71.5% | 79.1% | 81.8% | 76.1% | 77.3% | 80.0% | 80.6% | 81.2% |
| eFax Paid International Sum |  | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| eVoice Paid Domestic | CONVERT | 3.7% | 3.5% | 4.1% | 4.7% | 2.6% | 2.8% | 2.9% | 3.6% | 8.8% |
|  | UPGRADE | 96.3% | 96.5% | 95.9% | 95.3% | 97.4% | 97.2% | 97.1% | 96.4% | 91.2% |
| eVoice Paid Domestic Sum |  | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| eVoice Paid International | CONVERT | 0.0% | 0.0% | 0.0% | 11.1% | 0.0% | 14.3% | 8.3% | 22.2% | 33.3% |
|  | UPGRADE | 100.0% | 100.0% | 100.0% | 88.9% | 100.0% | 85.7% | 91.7% | 77.8% | 66.7% |
| eVoice Paid International Sum |  | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| jConnect Paid Domestic | CONVERT | 33.6% | 36.5% | 32.2% | 24.9% | 19.9% | 18.7% | 30.7% | 29.4% | 32.0% |
|  | UPGRADE | 66.4% | 63.5% | 67.8% | 75.1% | 80.1% | 81.3% | 69.3% | 70.6% | 68.0% |
| jConnect Paid Domestic Sum |  | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| jConnect Paid International | CONVERT | 26.5% | 25.5% | 20.8% | 12.0% | 13.3% | 14.4% | 16.9% | 20.0% | 10.6% |
|  | UPGRADE | 73.5% | 74.5% | 79.2% | 88.0% | 86.7% | 85.6% | 83.1% | 80.0% | 89.4% |
| jConnect Paid International Sum |  | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

HIGHLY CONFIDENTIAL

EXHIBIT 6 PAGE 115   CC/V 159243