# EXHIBIT 7

# An Economic Analysis of The Antitrust Issues:

## *Venali, Inc.*

### *v.*

## *Catch Curve, Inc., and j2 Global Communications, Inc.*

Expert Report of

Vandy M. Howell, Ph.D.

Vice President

Cornerstone Research

August 26, 2008

*Highly Confidential*

EXHIBIT __7__ PAGE 116

# Table of Contents

I.   Introduction .................................................................................................... 3

     A.   Qualifications ......................................................................................... 3

     B.   Assignment ............................................................................................ 3

II.  Case Background And Allegations ................................................................ 4

III. Summary ........................................................................................................ 5

IV.  Background on Internet Facsimile Services And Patents at Issue ................ 7

     A.   Description of Internet Facsimile Services ........................................... 7

     B.   Providers of Internet Facsimile Services .............................................. 8

          1.   j2 and Catch Curve ...................................................................... 8

          2.   Venali ........................................................................................... 8

          3.   Other Internet Facsimile Services Providers ............................... 9

     C.   Examples of Providers of Other Competing Products ........................ 12

     D.   Different Ways in Which Internet Facsimile Services Are Sold to Customers .... 12

     E.   History of AudioFAX Patents .............................................................. 14

V.   The Relevant Market And Monopoly Power ............................................... 15

VI.  Market Definition Must Reflect Interchangeable Products ........................ 17

     A.   Products That Allow Consumers to Send Faxes .................................. 17

     B.   Additional Competing Document Delivery Products .......................... 21

VII. Internet Facsimile Services to SOHO Customers in The U.S. Is Not A Properly Defined Market ............................................................................. 23

     A.   SOHO Customers Do Not Constitute A Distinct Market .................... 23

     B.   Geographic Market .............................................................................. 25

VIII. j2 Does Not Have Monopoly Power, Regardless of Whether The Product Market Is Narrowly Or Broadly Defined .................................................... 26

     A.   j2 Has A Very Small Share of Fax Products And Services .................. 26

     B.   j2 Does Not Have A Dominant Share of Overall Internet Facsimile Services Sold in The U.S. ................................................................................................ 27

     C.   j2 Does Not Have A Dominant Share of Internet Facsimile Services Sold to SOHO Customers in The U.S. ....................................................................... 28

     D.   j2's Successes Are Explained by Competition .................................... 31

IX.  j2 Cannot Have Monopoly Power Due to Lack of Barriers to Entry And Elastic Supply of Existing Firms That Offer Internet Facsimile Services .................................. 32

      A.     There Has Been Rapid Entry Since j2 Acquired The AudioFAX Patents............ 33

      B.     Limited Portability of Fax Numbers Is Not A Barrier to Entry ............................ 36

      C.     Existing Firms' Supply Is Capable of Constraining j2's Prices ........................... 39

X.     j2 Has Not Harmed Competition Or Consumers by Enforcing Its Patents ...................... 40

      1.     There Is No Evidence of Deterred Competition Or Entry ....................... 41

      2.     j2 And Others Were, And Are, Able to Compete While Paying The License Fee ....................................................................................................... 41

XI.    Summary Comments on Professor Smith's Analysis ........................................................ 43

      A.     Professor Smith's "Direct Analysis" Is Unreliable.............................................. 44

      1.     Professor Smith's "Merger Guidelines" Approach Implies That j2 Is in Its Own Product Market........................................................................................ 44

      2.     Professor Smith's Approach Implies That Whenever A Firm Profitably Increases Its Price over Time, It Has Market Power of Antitrust Concern .......... 45

      3.     Professor Smith's Approach Implies That Whenever A Firm Has A Higher Price Than Some of Its Competitors, It Has Market Power of Antitrust Concern 47

      4.     Professor Smith's Approach Implies That Profitable Firms Have Market Power of Antitrust Concern .......................................................................... 48

      B.     Professor Smith's "Direct Analysis" Is Empirically Unsound ............................ 49

      C.     Professor Smith's "Direct Analysis" Is Unrelated to The Question of Whether j2 Has Been Able to Harm Competition through The Alleged Sham Patent Litigation ....... 51

      D.     Professor Smith's "Damages" Estimate Is Unrelated to The Antitrust Claims in This Case................................................................................................................. 52

# I.  Introduction

## A.  Qualifications

I, Vandy M. Howell, submit this Expert Report in connection with the matter *Venali, Inc. v. Catch Curve, Inc., and j2 Global Communications, Inc.* I received my undergraduate degree in Economics in 1989 from the University of California at Berkeley, and my Ph.D. in Economics in 1997 from the Massachusetts Institute of Technology. I am currently a Vice President with Cornerstone Research, an economic consulting firm, where I focus on research regarding issues related to competition. Over the past decade, I have consulted on a wide range of antitrust matters including allegations of attempted monopolization, monopoly leveraging, tying, exclusive dealing and bundling, predatory pricing, and price fixing. I have also taught an upper division undergraduate course on Industrial Organization and Public Policy at the University of California at Berkeley. A copy of my curriculum vitae is attached as Appendix A.

Cornerstone Research is being compensated for its work on this matter at its normal and customary billing rates, and neither its or my compensation is contingent or dependent on the outcome of this matter. My work is billed at $490 per hour.

## B.  Assignment

I have been asked by counsel for Catch Curve, Inc. ("Catch Curve") and j2 Global Communications, Inc. ("j2") to assess the antitrust allegations made by Counter Plaintiff, Venali, Inc. ("Venali") against Catch Curve and j2. This includes assessing the expert report submitted by Professor Richard Smith as well as considering whether j2 has monopoly power and whether Catch Curve's pursuit of licensing and litigation regarding the AudioFAX patents has caused harm to competition.

In support of my analysis in this case I have reviewed a variety of materials including legal pleadings, depositions, Professor Smith's expert report, case data, documents produced in discovery, and other publically available information. Additionally, I conducted interviews with Mr. Scott Turicchi, j2's current President. See Appendix B: Documents Relied Upon.

## II.    Case Background And Allegations

This case involves a subset of patents commonly referred to in this litigation as the "AudioFAX patents."[1]  These patents relate to facsimile telecommunications systems and methods.[2]

j2 bought the AudioFAX patents in January 2005, and assigned them to its wholly owned subsidiary, Catch Curve.[3]  Prior to j2's ownership in 2005, AudioFAX had licensed the patents to several Internet facsimile service providers, including j2.  Internet facsimile services are services to which consumers can subscribe that enable them to send and receive faxes through their email.  Counter Plaintiff, Venali, also sells Internet facsimile services, as do many other companies.

On July 1, 2005, Catch Curve sued Venali for infringement of various of the AudioFAX patents.[4]  The present case involves an antitrust counterclaim subsequently filed by Venali against Catch Curve and j2.  While Catch Curve's infringement suit covers all Internet facsimile services that are sold by Venali, in this counterclaim, Venali alleges that this patent enforcement has been a sham attempt to monopolize a "market" that represents a subset of these sales: Internet facsimile services purchased by consumer/small office/home office ("SOHO") subscribers.[5]  Venali alleges that j2 has monopolized or attempted to monopolize this alleged market by pursuing allegedly baseless patent licenses and lawsuits.[6]  Venali alleges that these actions have harmed it by forcing it to defend the patent lawsuit.  Venali does not allege that the actions of AudioFAX in enforcing or licensing the AudioFAX patents before j2 purchased those patents in 2005 are attributable to j2.[7]

---

[1] "AudioFAX – Overview of Patented Technology," http://catchcurve.com/AudioFAX_Overview_Patented_Tech.asp, accessed on 6/18/2008.  This subset of patents consists of:  U.S. Patent Nos. 4,994,926 ('926 patent); 5,291,302 ('302 patent); 5,459,584 ('584 patent); 6,643,034 ('034 patent); and 6,785,021 ('021 patent).  Venali, Inc.'s Answer To Amended Complaint, Affirmative Defenses, Amended Counterclaim, and Third Party Complaint ("Counterclaim"), 8/08, ¶ 99.
[2] Counterclaim, 8/08, ¶ 99; see also "Asset Purchase Agreement," 1/18/05, Exhibit 4 to Deposition of Richard Ressler (Chairman of the Board, j2), CC/V 14376 – 416 at CC/V 14391.
[3] Deposition of Jeffrey Adelman (Vice President and General Counsel, j2), 1/8/08, p. 25; Counterclaim, 8/08, ¶ 99.
[4] Claim Construction Order, 5/11/07, p. 2.
[5] Counterclaim, 8/08, ¶¶ 87, 110, 124.
[6] Counterclaim, 8/08, ¶¶ 120, 121, 127.
[7] Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07, pp 126-7.

EXHIBIT 7   PAGE 120

### III.   Summary

The evidence in this case does not support a finding that Catch Curve's pursuit of licensing and litigation of the AudioFAX patents since 2005 has caused anticompetitive harm. Even if Catch Curve's patent enforcement efforts were intentionally misleading, and Catch Curve were found to have *illegally* pursued the licensing of the AudioFAX patents to the Internet facsimile service providers, these patent enforcement efforts did not cause anticompetitive harm to the market in which j2 competes.

In this report I show that the AudioFAX patents existed and were licensed to firms offering Internet facsimile services long before j2 owned the patents in 2005. In fact, j2 itself purchased a license in 2001 as it was building its business. Other of j2's Internet facsimile competitors also obtained licenses to these patents from AudioFAX in this time period. Over the time period from 2001 to 2005, and while being a licensee to the AudioFAX patents, j2 had success selling Internet facsimile services to both large and small customers. The last of these patents expire in 2011.

Since acquiring the AudioFAX patents in 2005, Catch Curve has freely licensed the patents generally for a fully paid up license fee at an amount similar to, and most often substantially less than, what j2 paid AudioFAX to obtain the license in 2001. j2 and others were able to build their business and compete while licensing the AudioFAX patents from AudioFAX, and thus any competitor licensing the patents after 2005 is simply on a level playing field to those earlier licensees. Because Catch Curve has been charging licensing fees as a modest one-time lump sum in the vast majority of cases, economic theory suggests that this type of fixed cost would not affect competitors' entry or pricing decisions.

This is born out by the facts. Since 2005 while Catch Curve has owned and licensed the patents, there has been rapid entry of new competitors offering Internet facsimile services. Thus there is no evidence that Catch Curve's licensing strategies have excluded competitors. Neither Venali nor their expert, Professor Smith, has offered any evidence or analysis that connects Catch Curve's licensing practice to any harm to the competitive process. Neither has identified a single competitor that has been excluded from the market, or disabled from competing with j2, since Catch Curve began licensing and litigating the AudioFAX patents. They also offer no evidence that existing competitors cannot compete on price with j2. To the contrary, Venali's

EXHIBIT ___7___ PAGE _121_

position is that most of j2's competitors offer comparable services at prices *lower* than j2,[8] and Professor Smith also offers an analysis in which he concludes that all of j2's competitors are currently able to participate in the market offering prices to customers that are lower than j2's prices.

The data on which Professor Smith relies[9] also show that if one focuses only on sales of Internet facsimile services, however one defines the bounds of these product sales (i.e., by customer group, worldwide or U.S. domestic only), j2 does not have a dominant share during the 2005 to 2007 time period. These data also show that j2's share of Internet facsimile services *declines* from 2005 to 2007.

Even if Internet facsimile services were, counter to fact, insulated from competition from other products, and j2's share were, counter to fact, very high, j2 still would not have monopoly power. Neither Venali, nor Professor Smith in his expert report, offers evidence of any material barriers to entry to providing Internet facsimile services. Professor Smith opines in his deposition that outbound portability could be a barrier to entry, but he conducted no analysis to assess this hypothesis. Investigation of customer's behavior shows that outbound portability is not a barrier to entry for competition for new or existing Internet facsimile customers. This lack of barriers to entry and the high elasticity of supply of existing firms that offer Internet facsimile services ensure that j2 does not and can not have monopoly power in an alleged "SOHO Internet facsimile services market."

Additionally, review of j2 and Venali documents and testimony show that they, and other Internet facsimile service providers, compete directly and actively with products other than Internet facsimile services. Most direct and important are other devices that include traditional fax capability (including traditional fax machines, multi-function printers, desktop fax software, and for larger customers, fax servers). Of the customers that communicate which product they purchase when leaving j2, almost 6 times as many say they are leaving to buy a fax machine than to go to another Internet service provider. j2 is a very small player in the broader market in which it competes and j2 has not excluded any of the products or companies that make those products from this market.

---

[8] Mr. O'Keefe agreed that it was "absolutely" Venali's understanding that "most of the other competitors charge less for their services on a comparable service basis than eFax charges." Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07, p. 149; deposing attorney's words in second quote.

[9] Professor Smith has relied upon data from the annual Davidson Report. I discuss in detail below the deficiencies and unreliability of these data. I have referred to the Davidson Report data in this report in order to respond to Professor Smith. I do not independently vouch for the reliability or accuracy of the data.

Venali and its expert, Professor Smith, have presented no analysis that implies that j2 has monopoly power.  Nor have they offered any analysis or evidence that j2 has increased its market power as a result of its pursuit of patent litigation.  They do not offer even a single example of a competitor that has been unable to enter or compete with j2 since 2005 because of Catch Curve's patent licensing and litigation strategy regarding the AudioFAX patents. Professor Smith has also offered a number of calculations and conclusions that show a fundamental misunderstanding of antitrust economics and are entirely unreliable.

## IV.    Background on Internet Facsimile Services And Patents at Issue

### A.    Description of Internet Facsimile Services

Internet facsimile services are a direct substitute for fax machines.  The services allow subscribers to communicate with fax machines (i.e., send electronic documents to a fax machine and receive documents from a fax machine) without owning a fax machine.  With a fax machine, the user is sending and/or receiving hard copy documents, but with Internet facsimile services, the user is sending and/or receiving electronic documents through email or from a web interface.

Internet facsimile services are frequently combined with other services, such as voice services, into a "unified communications" product.  j2's Onebox products, for example, allow subscribers to access voicemail messages and faxes via email or phone, and to send, receive, or reply to faxes or voicemail messages online or by telephone.[10]

Internet facsimile services allow subscribers to send documents that are electronic, and receive documents that are electronic.  In this manner they provide the same functionality as email.  The Internet facsimile service is used by people who want to send (and receive) electronic communications to (and from) fax machines or other fax devices.   Thus, a difference from email is that Internet facsimile services communicate with fax machines or other fax devices attached to phone numbers instead of email addresses.[11]   As with sending non-electronic documents via email, someone who wants to fax non-electronic documents using Internet facsimile services would need a scanner.  Someone who would like to have a hard copy of a received electronic file will need a printer.

---

[10] j2 Global Communications, Inc. SEC Form 10-K for the year ended 12/31/07, filed on 2/25/08, p. 5.
[11] Another difference is that at least some Internet facsimile services packages do not offer generous storage options for archiving sent and received documents, but many email providers do.

EXHIBIT ____7____ PAGE |23

**B.     Providers of Internet Facsimile Services**

**1.     j2 and Catch Curve**

j2 was founded on December 14, 1995 as JFAX Communications,[12] and began selling unified communications products in 1996.[13]  In November 2000, j2 merged with eFax, an Internet facsimile service provider.[14]  The eFax acquisition added about 2.7 million free accounts and 100,000 paid accounts to j2's business.[15]  Today, j2 still maintains a large number of free accounts; recently, j2 reported that across its multiple lines business, it has 10.1 million free service telephone numbers and 1.1 million paying telephone numbers.[16]  The free Internet facsimile services accounts have been a way for j2 to introduce customers to the Internet facsimile services.[17]  j2 also earns modest advertising revenue on the free accounts.[18]

In 2005, j2 acquired the AudioFAX patents.  These patents are currently held by Catch Curve, a patent holding and licensing company owned by j2 that was also formed in 2005.[19]

**2.     Venali**

Counter Plaintiff, Venali, is a privately held company that sells Internet facsimile services in the U.S. and seventy other countries.[20]  Venali was founded in January 2002 when it was spun off from Vision Lab Telecommunications, Inc. ("Vision Lab").[21]  It became operational in May 2002,[22] and signed contracts with several Fortune 100 companies that same year.[23]  Historically, Venali's focus has been on selling Internet facsimile services to very large companies such as

---

[12] At the time of its founding, j2 was called JFAX Communications, Inc.  It later became JFAX.COM, Inc., and finally j2 in December of 2000.  Bloomberg Corporate Action Calendar; JFAX.COM, Inc. SEC Form S-1, filed on 4/16/99, p. F-7 and p. 1 of Exhibit 3.1.

[13] Interview with Scott Turicchi, 7/2/08; see also JFAX.COM, Inc. SEC Form S-1, filed on 4/16/99, pp. 8, 22.

[14] j2 Global Communications, Inc. SEC Form 10-K/A for the year ended 12/31/00, filed on 4/30/01, p. 4.

[15] Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, p. 24.  After the eFax acquisition, as of December 31, 2000, j2's total number of paid and free subscriptions for all of its services was 4.3 million.  j2 Global Communications, Inc. SEC Form 10-K/A for the year ended 12/31/00, filed on 4/30/01, p. 33.

[16] j2 Global Communications, Inc. SEC Form 10-Q for the period ended 3/31/08, filed on 5/8/08, p. 18.

[17] Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, p. 79.

[18] Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, pp. 79-80.

[19] Deposition of Jeffrey Adelman (Vice President and General Counsel, j2), 1/8/08, pp. 25-7.

[20] http://www.venali.com/about/service/servicemap.php, accessed 8/15/08.  Most of Venali's revenue is from U.S. sales.  Based on preliminary results, in May 2007, Venali's U.S. business accounted for about 74 percent of its revenue.  "Venali Q1 and April Results, Board Meeting," 6/7/07, VEN280281-349 at VEN280297.

[21] Venali presentation, undated, VEN 133578-605 at VEN 133585.  Deposition of Douglas L. O'Keefe (General Counsel, Venali), 12/18/07, p. 15.

[22] Deposition of Douglas L. O'Keefe (General Counsel, Venali), 12/18/07, p. 17.

[23] Email to Doug O'Keefe et al. from Doug O'Keefe with attachment, "RE:  Business Plan Responsibilities," 7/15/03, VEN 107501-43 at VEN 107504.

EXHIBIT ___7___ PAGE __124__

Citibank, Geico, DuPont, and Wal-Mart.[24]  Beginning in late 2003, Venali began to offer Internet facsimile services to smaller customers through a relationship with Microsoft.[25]  In about three and a half years, its revenue from services sold to these small customers in the U.S. grew from zero to over $107,000 per month in March 2007.[26]

Venali's historical customer focus on large companies is evident through the share of its business dedicated to small customers versus large customers.  As of September 2007, approximately 9 percent of Venali's deployed DIDs were assigned to customers it characterized as SOHO customers.[27]  Venali does not currently maintain a free subscriber base among SOHO customers.  It does offer free trials for larger customers, but it discontinued free trials for SOHO customers and began expunging free SOHO subscribers from its services around June 2007.[28]

### 3.    Other Internet Facsimile Services Providers

#### a)    Davidson Report and The Lack of Availability of Detailed Information

Peter Davidson is a fax industry analyst, who periodically publishes a report focusing on Internet facsimile services.  Venali, and Venali's expert Professor Smith, rely heavily on Peter Davidson's reports.[29]  While it may be convenient for them to do so, the evidence reflects that Mr. Davidson's reports are neither reliable nor complete.

---

[24] Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, p. 86.  Venali presentation, undated, VEN 133578-605 at VEN 133585.  See also Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, p. 95.

[25] Email to Doug O'Keefe et al. from Doug O'Keefe with attachment, "RE:  Business Plan Responsibilities," 7/15/03, VEN 107501-43 at VEN 107504.  Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, p. 145.  Microsoft also integrated the Internet facsimile services of other providers, such as j2, with its Microsoft Office 2003 product.  Mr. Adelman explained the nature of the integration:  "I think that if a user went to send from within an Office—I don't know what Office application or all or whatever, but somewhere in there, if you went to send by fax, that it would take you to a Web page that had a link to our service.  Something like that."  Mr. Adelman said that "a number of brands" were offered on the Web page.  Deposition of Jeffrey Adelman (Vice President and General Counsel, j2), 1/8/08, pp. 81-2; see also Deposition of Amin El-Gazzar (founder, former CEO, and former CTO of Venali, Inc.), 12/7/07, pp. 35-6; http://office.microsoft.com/en-us/help/HP010377981033.aspx, accessed 7/29/08.

[26] Venali Financial Statements, Exhibit 8 to the Deposition of John Robert Poncy, VEN 187405-13 at VEN 187407.  Deposition of John Robert Poncy (CEO, Venali), 8/21/07, p. 170.  Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, p. 145.

[27] As of 9/5/07, Venali had 68,444 deployed DIDS in the U.S.  Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, p. 174, Exhibit 19.  Mr. O'Keefe testified that Venali had approximately 6,000 paid SOHO subscribers as of 9/19/07.  Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, pp. 136, 140-1.

[28] Deposition of John Robert Poncy (CEO, Venali), 8/21/07, pp. 141, 143-4.  Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, pp. 141, 176-7.

[29] For example, Mr. Davidson's report is the basis for all the different measures of market shares calculated by Professor Smith.  Venali also relies on Mr. Davidson's reports.  In its counterclaim, Venali alleges that j2 has 80% of the SOHO Internet fax market.  Counterclaim, 8/08, ¶ 88.  Mr. O'Keefe testified that one of the sources for this

EXHIBIT ___7___ PAGE 125

Witnesses from both Venali and j2 have testified to the lack of reliability of the figures reported by Mr. Davidson.[30] This is not surprising given Mr. Davidson's methodology to estimate worldwide Internet facsimile service revenues for Internet facsimile service providers. This methodology consists of talking with individuals from some Internet facsimile service firms, and in the case of public companies, trying to cross-validate the figures he collects with their SEC filings.[31] Because most Internet facsimile service providers are private companies, Mr. Davidson's reported figures are simply based on Mr. Davidson's judgment,[32] and he does not even talk with representatives from all the companies for which he reports data.[33]

Professor Smith suggested that Mr. Davidson's figures for public Internet facsimile service providers might be more accurate because they could be cross-validated with SEC filings for those companies.[34] However, many of the public Internet facsimile service companies (including j2, Premiere Global, and CallWave, among others) sell products in addition to Internet facsimile services. The SEC filings of these companies do not break out revenues or telephone numbers for their Internet facsimile services from their other lines of business, thus making it impossible to cross-validate details about Internet facsimile services. For example, in reports about fax services in 2007, 2006, and 2005, Mr. Davidson writes that j2 "has over 10 million free subscribers."[35] While it is true that j2's SEC filings report over 10 million free subscribers for its businesses in 2007, 2006, and 2005,[36] j2's number of free eFax subscribers is less than 9 million in 2006, 2007, and 2008.[37]

Even if Mr. Davidson had gathered reliable figures for the worldwide Internet facsimile service revenues by company, the data would still be insufficient for Professor Smith's purposes. Mr. Davidson does not have visibility into the breakdown of each company's revenues by customer segment or whether the sales are in the U.S. or international. Thus, it is not possible to use the Davidson data to reliably assess details of the U.S. SOHO "market" that Venali alleges.

---

estimate was a 2003 Davidson Consulting report. Deposition Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07, pp. 74-5.

[30] Deposition of Amin El-Gazzar (founder, former CEO, and former CTO of Venali, Inc.), 12/7/07, pp. 212-3. Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, pp. 89-91. Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, p. 126.

[31] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 124-5.

[32] Deposition of Richard Smith (rough transcript), 8/12/08, p. 127.

[33] Deposition of Richard Smith (rough transcript), 8/12/08, p. 125.

[34] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 125-6, 128-9.

[35] Davidson, Peter, J., "Fax Services Markets, 2005-2009," p. 11; Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p. 9; Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, p. 7;

[36] j2 Global Communications, Inc. SEC Form 10-K for the year ended 12/31/07, filed on 2/25/08, p. 25.

[37] j2 Table with column headings "Sum of Subscription Base" and "Marketing Region."

In addition to being unreliable, Mr. Davidson's report is also incomplete, and does not capture all companies that offer Internet facsimile services. For example, j2 has identified over 70 Internet facsimile service providers that did not make Mr. Davidson's 2007 list of providers.[38]

Thus while Venali and its expert, Professor Smith, rely heavily on Mr. Davidson's reports, they do not provide a source of data that can be used to identify and measure with meaningful precision the companies, sales or customers that are relevant to Venali's claim. In my analysis, when I refer to Mr. Davidson's reports, I do so with the understanding that it is not a reliable source for the relevant data, but that it is the source that Venali and Professor Smith have offered as the basis for their allegations and opinion.

### b)    Information on Other Internet Facsimile Providers

Mr. Davidson's reports' data on which Venali and its expert rely show that there are dozens of Internet facsimile service providers, and that the number of these firms has grown every year since j2 acquired the AudioFAX patents. The reports identified 24 Internet facsimile service providers in 2005 that currently offer services in the U.S., 38 Internet facsimile service providers in 2006 that currently offer services in the U.S., and 40 Internet facsimile service providers in 2007 that currently offer services in the U.S.[39] As stated above, these numbers understate the actual number of Internet facsimile service providers in the market.

Mr. Davidson has ranked Protus as the second largest individual Internet facsimile service provider in terms of revenue.[40] Protus, which sells Internet facsimile services under the MyFax brand, has grown very rapidly in the past several years.[41] "MyFax is the fastest growing Internet fax service used by individuals, small, medium, and large businesses….More than

---

[38] Exhibit 1A:  "Internet Facsimile Service Providers, 2005 – 2008."

[39] Exhibit 1B:  "Number of Internet Facsimile Service Providers Identified by Davidson Reports, 2005 – 2007." These counts are an underestimate because Mr. Davidson lumps an unknown number of companies into an "other" category rather than listing them by name; some of these "other" companies may offer services in the U.S. The number of companies, worldwide, that offer internet facsimile services is even larger. Mr. Musgrove testified that there are likely more than a hundred companies worldwide that sell Internet facsimile services. Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, p. 123.

[40] Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, p. 9.

[41] Mr. Davidson estimated Protus' individual Internet facsimile service revenues to be $14 million in 2005, $34 million in 2006, and $46 million in 2007. Davidson, Peter J., "Fax Service Markets, 2005-2009,", p. 13; Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p. 10. Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, pp. 8, 9.

EXHIBIT ___7___ PAGE 127

10,000 new customers subscribe to MyFax each month."[42]   It has achieved this success reported by Mr. Davidson while also being in litigation with Catch Curve over the AudioFAX patents.

## C.   Examples of Providers of Other Competing Products

Internet facsimile services offer functionality provided by many other products, including fax machines, multi-function printers, desktop fax software, and email.  Examples of such services and products are included in Exhibit 2: "Examples of Document Delivery Products." Mr. Davidson, who has written periodically on competition faced by Internet facsimile services, states in his July 2007 report: "The entrenched Internet fax suppliers, led by j2, face competition from, among others, fax-to-email providers, broadcast fax companies, traditional fax machine or MFP (multifunction peripheral) companies, unified messaging/communications providers, telephone companies, cable TV suppliers, voice-mail providers, Internet service providers, Internet domain providers and email providers."[43, 44]   Many suppliers of these alternative products are large, well-known companies—for example, Canon, HP, Xerox, Google, Yahoo, and Microsoft.

## D.   Different Ways in Which Internet Facsimile Services Are Sold to Customers

Internet facsimile services are sold via multiple sales channels to different types of customers.  For example, Mr. Turicchi, the co-President of j2, described j2's customers by four groupings according to the number of phone numbers for inbound faxing (referred to as Direct Inward Dialing, or DID) per account the entity is able to purchase:  individuals (generally one DID per account), small to medium size businesses (2 to 200 DIDs per account), small to medium size enterprises (200 to 799 DIDs per account), and enterprises (800+ DIDs per account).[45]

---

[42] "Contractor Builds More Efficient Communication with MyFax," 7/19/07, produced as part of Appendix 3 to Expert Report of Richard L. Smith, Ph.D. ("Smith Report").  See also Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, p. 8.

[43] Davidson, Peter J., "Fax Service Markets, 2006-2010" by Davidson Consulting, 7/07, p. 7.

[44] In Professor Smith's deposition, when asked if he would agree with this assessment by Mr. Davidson, he answered "...in a nontechnical sense, those are all things[,] for some potential customers in the Internet fax services market[,] that would...be substitutes."  Deposition of Richard Smith (rough transcript), 8/12/08, pp. 171, 178.

[45] Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, pp. 128-30.  Venali also categorizes its customers, but not in a way that is based on the size of the customer.  Instead Venali categorizes its customers according to the sales channel through which Venali targets the customer.  Venali refers to the customer segments / sales channels as SOHO/consumer, medium size (or channel), enterprise, and other.  Deposition of Amin El-Gazzar (founder, former

EXHIBIT ___7___ PAGE _128_

The manner in which j2 and Venali market and sell their services tends to vary for different types of customers. j2 and Venali both sell Internet facsimile services packages directly via the Web. The packages that j2 and Venali sell via the Web have set terms—i.e., a certain level of service for a nonnegotiable price.[46] Both j2 and Venali also employ direct sales forces to make sales to "corporate customers" or "enterprise customers" with larger faxing needs.[47] Sales to enterprises are generally governed by one- to three-year negotiated contracts.[48] Venali also sells its services through a third method that Venali calls the "channel" sales process and involves resellers and referral agents.[49] Regardless of the manner in which the product is sold, it is still the same basic service.[50] The key difference is that some customization is generally involved for the enterprise sales.[51]

---

CEO, and former CTO of Venali, Inc.), 12/7/07, pp. 111-3, 116-7.  Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, pp. 28-9.

[46] Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, pp. 20-2, 24, 28.  Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, pp. 39-40, 130.

[47] Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, p. 28.  Mr. Turicchi testified that j2's corporate sales handles sales to small to medium size businesses, small to medium size enterprises, and enterprises.  Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, p. 130.

[48] j2 has pricing plans available for customers that want to buy up to 200 DIDs per account (i.e., for individual and small to medium size businesses).  Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, pp. 74-5, 129-30.  Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, p. 34.  Interview with Scott Turicchi, 7/16/08.

[49] Mr. O'Keefe explained there are two parts to this third sales method: "A, under channel you have the reseller who purchases the product and is Venali's customer and they usually negotiate their own special pricing based on lots of characteristics of how they're going to purchase the—the—the service or resell the service, and then they go on and they can charge their—their customer, you know, whatever price they—they want to.  So that's kind of Part A of channel.  And part B of channel are—are other people that would come in and they're really kind of like referral agents that they come in and they—they might have a customer base and they would sell or refer customers to Venali, who would end up in contracts with them."  For this segment, "Venali has a minimum of $200--$195 per month usage fee."  Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, pp. 29-30.

[50] "It's all fax to e-mail or e-mal to fax at the core.  ...[T]here's lots of different features that could be necessary [for the corporate customer], but the core functionality is—is the same messaging product or service."  Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, pp. 31-2.  "[W]hat j2 does is it sells outsource messaging services to individuals and companies, and it has different—it's the same basic service."  Deposition of Richard Ressler (Chairman of the Board, j2), 12/19/07, p. 157.

[51] "[T]he enterprise customers tend to need different bells and whistles.  They don't want to take a –a fixed product that says, here's what we have and there's going to be no modification.  There's often...development where it goes through and try to integrate APIs are there's special characteristics and—and many of the—the large corporate customers need a lot of customization."  Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, p. 31.

EXHIBIT _____7_____ PAGE 129

### E.    History of AudioFAX Patents

The AudioFAX patent portfolio[52] was invented by Richard J. Gordon and James R.
Kennedy.  AudioFAX, Inc[53] began licensing the patents around the mid-1990s.[54]  AudioFAX
pursued litigation against companies that it believed were infringing on the patents, including j2
in 1999.[55]  By January 2005, AudioFAX had licensed the patents to 34 companies,[56] including six
companies identified by Mr. Davidson as offering Internet facsimile services.[57]  Most of these
licenses were fully paid up licenses.[58]  j2 was one of these six, having obtained a fully paid up
license for $1 million on 11/15/01.[59]  Twelve of the 34 license agreements executed by
AudioFAX involved prior litigation.[60]

j2 bought the patent portfolio in early 2005 for an initial payment of $4.9 million and an
"earn out" of up to $1.667 million.[61]  Prior to this time, AudioFAX had no relationship with j2

---

[52] The litigation in this case involved five U.S. patents in the complete AudioFAX patent portfolio, which currently
consists of two Canadian patents and six U.S. patents, the first of which, U.S. patent # 4,994,926, was filed on
9/22/88.  The complete AudioFAX patent portfolio consists of Canadian Patent No. 2,101,327; Canadian Patent No.
1,329,852; U.S. Patent No. 6,785,021; U.S. Patent No. 6,643,034; U.S. Patent No. 5,459,584; U.S. Patent No.
5,291,302; U.S. Patent No. 4,994,926; and U.S. Patent No. 7,202,978.  At the time that j2 acquired the AudioFAX
patents in January 2005, the last patent had not yet been issued, but was pending application number 10/927,630.
"Asset Purchase Agreement," 1/18/05, Exhibit 4 to Deposition of Richard Ressler, CC/V 14376 – 416 at CC/V 14391.
See also the Patent documents available at:  http://catchcurve.com/AudioFAX_Overview_Patented_Tech.asp,
accessed 6/18/08.
[53] AudioFAX, Inc. was the licensor of the patents until 5/24/96 when the patents were assigned to AudioFAX IP LLC.
From that point, the licensor of the patents was AudioFAX IP LLC, until j2 purchased the patents.  "Asset Purchase
Agreement," 1/18/05, Exhibit 4 to Deposition of Richard Ressler (Chairman of the Board, j2), CC/V 14376 – 416 at
CC/V 14394-9, CC/V 143406.  I will use "AudioFAX" to refer to the relevant AudioFAX entity that was the patent
licensor.
[54] "AudioFAX Patent Licensing Program," undated, CC/V 154617.
[55] Deposition of Richard Ressler (Chairman of the Board, j2), 12/19/07, p. 30.  See also "Asset Purchase Agreement,"
1/18/05, Exhibit 4 to Deposition of Richard Ressler (Chairman of the Board, j2), CC/V 14376 – 416 at CC/V 14400 –
01.  See also "AudioFAX Patent Licensing Program," undated, CC/V 154617.  See also "AudioFAX – Litigation
History," http://catchcurve.com/AudioFAX_Executed_Agreements_Litigation.asp, accessed 4/18/08.
[56] "AudioFAX Patent Licensing Program," undated, CC/V 154617.
[57] Besides these 6 companies, a few other AudioFAX licensees also provide Internet facsimile service today
according to j2.  Additionally, two other Internet facsimile service providers that no longer exist as a result of
merger/acquisition also licensed from AudioFAX.  Exhibit 5:  "Comparison of Revenues and License Fees for Internet
Facsimile Service Provider Licensees to AudioFAX Patents."
[58] "AudioFAX Patent Licensing Program," undated, CC/V 154617.  Exhibit 5:  "Comparison of Revenues and License
Fees for Internet Facsimile Service Provider Licensees to AudioFAX Patents."
[59] "AudioFAX Patent Licensing Program," undated, CC/V 154617.  j2 paid $600,000 for the licenses plus an additional
$400,000 that was contingent on sales thresholds.
[60] "AudioFAX Patent Licensing Program," undated, CC/V 154617.
[61] The "earn out" provision in the asset purchase agreement indicates that "After Purchaser, its Affiliates and
successors-in-interest have received Nine Million United States Dollars ($9,000,000) in Net Revenue, Purchaser shall
pay to Seller…fifty percent (50%) of any additional Net Revenue in excess of Nine Million United States Dollars
($9,000,000) until Seller has been paid the Earnout Amount" which is $1.667 million.  Mr. McLaughlin testified that
AudioFAX has not received any payment under the earn out provision.   Deposition of Michael W. McLaughlin
(President, Catch Curve), 12/5/07, pp. 160-1 and Exhibit 3, "Asset Purchase Agreement," 1/18/05, CC/V 14376–4416
at CC/V 14376 – 80.  Mr. Turicchi testified that j2 paid approximately $2 million for the AudioFAX patents.  Deposition
of Robert Scott Turicchi (Co-President, j2), 1/9/08, p. 22.  In my interview with Mr. Turicchi, he explained that at the
time of the purchase, there were some recent licensing agreements that AudioFAX had negotiated, but the "revenues
had not closed."  The purchase price was grossed up as a way to transfer revenues from the not-yet closed deals to

other than the fact that j2 was its licensee.  j2 transferred the patent portfolio to Catch Curve.[62] The last of the patents expire in 2011.[63]  Detail on various dates for the patents in litigation is chronicled in Exhibit 4: "Timeline for the AudioFAX Patents."

The vast majority of the license agreements that Catch Curve has negotiated with Internet facsimile service providers are fully paid up licenses.[64]  Since acquiring the patents in 2005, Catch Curve has licensed the AudioFAX patents to about 20 companies that provide Internet facsimile services[65] as well as several companies that sell other products and services.[66]  Catch Curve's license fees to Internet facsimile companies are generally lower than the amount that j2 paid to AudioFAX in 2001.[67]

## V.      The Relevant Market And Monopoly Power

To assess whether j2 has monopoly power,[68] or a "dangerous probability" of gaining it, one must first define the market in which j2 competes.  Defining an exact bright line boundary of a particular product market is often challenging,[69] especially when product technologies are changing rapidly.[70]  The key to market definition is to identify the economic factors that constrain the actions and pricing of participants who are in the defined market.  The task of defining a relevant market is useful only to the extent that it accurately reflects and portrays these

---

AudioFAX.  Mr. Turicchi said that the "net impact to j2" was around $2 million or $2.25 million.  Interview with Scott Turicchi, 7/2/08.

[62] Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, p. 84.

[63] The first of the patents to expire is set to expire this year.  Deposition of Michael W. McLaughlin (President, Catch Curve), 12/5/07, pp. 155-6.

[64] The agreements with a running royalty are for a larger portfolio of patents, of which the AudioFAX patents are only a subset.  Exhibit 5:  "Comparison of Revenues and License Fees for Internet Facsimile Service Provider Licensees to AudioFAX Patents."

[65] Exhibit 5:  "Comparison of Revenues and License Fees for Internet Facsimile Service Provider Licensees to AudioFAX Patents."

[66] For example, Mijanda, Inc.; Open Text Corporation; Smith Micro Software, Inc. are licensees to the patents, but are not identified as Internet facsimile service providers by Mr. Davidson.  "AudioFAX Patent Licensing Program" as of 8/4/08, undated; Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, pp. I - IV.

[67] Exhibit 5:  "Comparison of Revenues and License Fees for Internet Facsimile Service Provider Licensees to AudioFAX Patents."

[68] The terms "monopoly power," "market power of antitrust concern" and "market power" have an important distinction.  Technically, in economic theory, any firm that is not a *perfect* competitor has some degree of market power – for example, the corner grocer or any branded product would have "market power".  But in antitrust economics, this is not the market power that is relevant.  "Market power of antitrust concern" affords the seller the power to exclude competitors and harm competition.  Additionally, in the dictionary sense of the word, a monopolist is a sole seller of a good.  But in antitrust economics, "monopoly power" and "market power of antitrust concern" are often used interchangeably.  Thus a firm need not be the *only* seller in the relevant market to have monopoly power.

[69] White, Lawrence J. (February 1999), "Wanted:  A Market Definition Paradigm for Monopolization," New York University Center for Law and Business Working Paper # CLB-99-002.

[70] Pleatsikas, Christopher, and David Teece (2001), "The analysis of market definition and market power in the context of rapid innovation," *International Journal of Industrial Organization* 19:  665-693.

EXHIBIT ___7___ PAGE ___131___

economic forces.[71]  A properly defined market is a set or group of products and/or firms that compete with one another for the consumer's dollar.  That is, the market should include the products that consumers view as reasonably interchangeable.[72]

A firm with monopoly power in a properly defined market is not constrained by competition from reasonably interchangeable products and would possess the ability to exclude competitors.  Thus, a firm with monopoly power is able to control or influence market prices.  For a firm to have monopoly power, three conditions (each of which is necessary, but alone insufficient) must be met.  First, the firm must control a substantial share of the market, thereby constraining consumer choice.  Because a lack of consumer choice due to dominance by a single firm can be overcome by entry of new firms into the market, meaningful economic barriers to entry are a second necessary condition.  Additionally, any firms that can easily and quickly shift production resources to produce the product in the relevant market would be able to constrain another firm's influence over prices.  Thus, the third necessary condition is that existing firms in the market (i.e., those with relatively small market shares) cannot substantially expand output in the face of higher prices.

As applied to this case, these economic concepts imply that if j2 is to have monopoly power, then the following conditions *must* be true:  1) j2 must have a substantial market share in the relevant market, 2) entry by new firms must be limited by economic barriers to entry, and 3) the existing firms in the market must not be able to expand output in the face of a price increase by j2.  As I show below, *none* of these conditions hold.

---

[71] See Franklin M. Fisher, "Diagnosing Monopoly," in *Industrial Organization, Economics and the Law*. John Mons (ed.).  MIT Press, 1991, pp. 9-15.

[72] "In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal."  *U.S. v. DuPont & Co.*, 351 U.S. 377 (1956), p. 395.  To better illustrate the concept of reasonable interchangeability, consider the case of Special K and Cheerios.  These are two ready-to-eat cereals that compete against each other, as well as compete with other brands of cereal.  They are in the same market because they compete with each other.  Special K and Cheerios are "reasonably interchangeable" one for the other.  For many consumers, either product will still satisfy a desire to have cereal in the morning.  Some consumers might prefer more sugary cereals, such as Honey Smacks, and might not choose Special K or Cheerios for breakfast.  But for enough people, the products are "reasonably interchangeable" to put Special K and Cheerios in the same market with other more sugary cereal brands.  "Enough" simply has to be a large enough number of people so that the manufacturers of Special K and Cheerios will pay attention to the price and quality of other cereals when they set the price and quality of their cereals.  If that is the case, then the products belong in the same market.

## VI.   Market Definition Must Reflect Interchangeable Products

Venali defines the relevant product market as Internet facsimile services sold to SOHO customers.  This market definition ignores many products and services that are direct substitutes for Internet facsimile services (i.e., products that are reasonably interchangeable for the functionality provided by an Internet facsimile service).  Venali asserts that there are *no* products consumers could turn to that would meet the need currently fulfilled by Internet facsimile services.  Additionally, it assumes that companies that sell Internet facsimile services to large enterprise customers would not constrain companies that sell Internet facsimile services to individual and small business customers.  In the complaint, Venali states, "there are no adequate alternative products or services for the end users in the Relevant Market."[73]  And Professor Smith simply states, "Internet faxing has several advantages that limit demand-side substitutability," and then goes on to claim that Internet facsimile services constitute a stand alone market.[74] Professor Smith offers no analysis to support his claim.

To the contrary, Venali and j2 testimony and documents show that each company discusses and acknowledges that Internet facsimile services actively compete for the customer's dollar against a continuum of products in the marketplace.[75]  Professor Smith also admits in deposition that customers of Internet facsimile services have other substitute products available to them.[76]  I discuss these in the following sections.

### A.   Products That Allow Consumers to Send Faxes

The first and most obvious products that compete with Internet facsimile services are machines with traditional fax capabilities.  Internet facsimile services are a direct substitute for traditional fax machines.  Internet facsimile services also directly compete with any other device that includes a traditional fax capability (including multi-function printers, desktop fax software,

---

[73] Counterclaim, 8/08, ¶ 111.
[74] Smith Report, ¶¶ 43-5.
[75] For example, on August 17, 2005, Ntera Holdings Inc, a potential partner for Venali, requested more industry information, such as total market size and competition.  Venali's former CEO Pasquale Giordano responded that the market size was estimated at $6 Billion in 2005.  The attached calculation for the "total messaging market" included voice broadcasting, SMS [Short Message Service] production, MMS [Multimedia Messaging Service] production, production e-mail, enterprise fax, SOHO fax, and production fax.  See email correspondences between Pasquale Giordano and Engin Yesil (founder of Ntera Holdings, Inc.) dated from 8/11/05 to 8/17/05 and the attachment to the 8/17/05 email, entitled "MessagingMarket(2).xls," VEN291646 – 48.
[76] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 23-4, 111-2, 173-4, 240.

and for larger customers, fax servers).[77]  Internet facsimile services exist as a means to communicate with traditional fax machines and other fax devices.  Internet facsimile services are in direct competition with, and are useful because they are a substitute for fax machines and other fax products, which continue to be purchased and used by consumers and businesses.

Venali regards standalone fax machines as competitors to its Internet facsimile services.  For example, an undated Venali presentation identifies "Fax machines" as a competitor, along with MyFax and eFax.[78]  Venali's outside general counsel, Mr. O'Keefe, agreed Venali's "marketing people look at competition and price issues relating to just ordinary fax machines all the time."[79]  He also testified that Venali seeks to persuade consumers "to subscribe to Venali's service rather than buy or continue to use fax machines."[80]  Venali's website confirms its marketing strategy is to convince consumers to choose Internet facsimile services over a standalone fax machine.  On a portion of its website directed to SOHO consumers, Venali asks consumers, "Why buy a fax machine when you don't have to?  Never again worry about costs such as toner, paper, phone lines or machine maintenance."[81]

Similarly, the SOHO Internet facsimile competitors identified by Venali witnesses (e.g. eFax and MyFax)[82] all employ a similar marketing pitch on their websites.  The eFax website explains, "eFax is an online fax service that eliminates the need for a fax machine, an extra fax line and all the associated expenses (paper, ink cartridges, etc.). …It's all the reliability and security of faxing with the ease and convenience of email."[83]  The MyFax website touts, "MyFax eliminates the need for a fax machine, fax supplies (paper, ink, toner), a separate phone line for

---

[77] See Exhibit 2: "Examples of Document Delivery Products" for a description of each of these products.
[78] "Venali Sales Team Marketing Update," undated, Exhibit 18 to 9/19/07 Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), VEN 097617 – 41 at VEN 097622.  Mr. O'Keefe testified this list of competitors did not necessarily refer to competitors "in the SOHO Internet fax market" (p. 108).
[79] Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07, p. 49; deposing attorney's words in quotes.
[80] Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07, p. 110.  See also Deposition of Amin El-Gazzar (founder, former CEO, and former CTO of Venali, Inc.), 12/7/07, pp. 165-6.  Mr. El-Gazzar testified that when marketing its products, Venali "compared the cost efficiency of our service to using stand alone fax machines" because "it's a more efficient method of sending faxes."  See also Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, pp. 136-7.
[81] http://www.venali.com/soho/index.htm, accessed 8/15/08.  See also, http://www.venali.com/soho/packages.htm, accessed 6/24/08.  This web page lists as a feature and benefit of the service "[e]liminates costs of fax machines, supplies, phone lines and maintenance."
[82] eFax is a brand owned by j2.  MyFax is owned by Protus.  Mr. O'Keefe identified j2 and Protus as "the two biggest players in the market" for SOHO Internet facsimile services.  Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07, p. 52.  See also "Venali Sales Team Marketing Update," undated, Exhibit 18 to 9/19/07 Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), VEN 097617 – 41 at VEN 097622.
[83] https://www.efax.com/en/efax/twa/page/howItWorks, accessed 6/24/08.

faxing, and costly maintenance. It saves you money."[84]  These firms take this marketing approach, because, as Mr. Ressler of j2 noted, Internet facsimile service providers "lose business when people buy a fax machine."[85]

The substitutability between Internet facsimile services and fax machines is further evidenced by the data that j2 has periodically collected since at least 2006 about why customers cancelled their service.  Customers sometimes identify the product to which they are switching when they leave j2.  Of all the eFax customers who reported reasons why they cancelled eFax service from mid 2006 to mid 2008, almost six times as many customers stated they were leaving because they "bought a fax machine" than because they were going to an alternative Internet facsimile service provider, both domestically and internationally.[86]

Multi-function printers with fax capabilities are printers bundled with a fax machine; these devices also compete directly with Internet facsimile services.[87]  Most consumers who send and receive faxes likely have need for a printer, regardless of whether they accomplish their faxing through a fax machine or an Internet facsimile service.  Multi-function printers give users the same functionality as Internet facsimile services, allowing users to store faxes as electronic documents on their computer.  The multifunction printer additionally allows the user to scan hard copy faxes (and other documents) to store as electronic documents on their computer.  Selling points listed on Venali's website suggest that Venali also views multifunction printers as a competing product.[88]  Given that about 25 percent of U.S. households own a multi-function printer with faxing capabilities, multi-function printers pose a competitive threat to Venali's "SOHO" Internet facsimile services business.[89]  A recent Venali presentation indicates that Venali also views these devices to be a threat to its business with larger customers.[90]

---

[84] This quote was found after clicking on a link that reads "Personal & Small Business Faxing" on the MyFax website. http://www.myfax.com/overview.asp?bt=p, accessed 6/24/08.  From this page, if one clicks on "Key Features," one is taken to another page that touts the features of the MyFax Internet facsimile services, including "Fax confirmations are emailed to you.  No more walking back to the fax machine to wait for confirmations." http://www.myfax.com/features.asp?bt=p, accessed 6/24/08.
[85] Deposition of Richard Ressler (Chairman of the Board, j2), 12/19/07, p. 151.
[86] Exhibit 6:  "Number of eFax Customers that Identify Switching to an Alternative Provider or Product, Q3 2006 – Q2 2008."
[87] j2's co-president, Mr. Turicchi, listed multifunction printers as an alternative to Internet facsimile services:  "[t]here are standalone fax machines, manufactured by a number of companies.  There are multi-function devices manufactured by the likes of HP, Xerox, where generally they include copying, scanning, printing, and fax." Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, pp. 109.
[88] "There is no additional hardware or software to buy, install, maintain, or upgrade."  Also, "[e]liminates manual scanning of documents for electronic storing."  http://www.venali.com/solutions/email_to_fax.php, accessed 6/5/08.
[89] Energy Information Administration (U.S. Department of Energy), 2005 Residential Energy Consumption Survey – Detailed Tables, http://www.eia.doe.gov/emeu/recs/recs2005/hc2005_tables/hc11homeelectronics/pdf/tablehc2.11.pdf, accessed

Other products that compete directly with Internet facsimile services are desktop faxing software (coupled with a fax modem or fax server) and unified communications products. Microsoft includes desktop faxing software with some editions of its Windows XP and Windows Vista operating systems. This software allows the user to send and receive faxes using a fax modem, or fax server. However, the PC must be on and connected to a phone line or fax server for the faxing capability to work.[91]  On its FAQ page, Venali positions itself relative to such desktop faxing software.[92]  Some document management products, such as Adobe Acrobat Messenger, also provide users with desktop faxing capability.[93]  Unified messaging services that bundle fax and other services, such as voice services, also compete with services that simply provide faxing capabilities.

Fax servers are an additional substitute for Internet facsimile services for larger customers.[94]  An 8/19/03 draft of Venali's business plan states "[a]rguably the biggest competitor to Venali's solutions is traditional in-house fax server solutions"[95]  Both j2 and Venali compare their products to fax servers. For example, Venali provides ROI (Return on Investment) calculators for customers to compare the cost of using Venali's Internet facsimile service to that of using fax machines or fax servers.[96]

In his recent deposition, Professor Smith acknowledged that "some consumers would find [fax machines and Internet fax services] good substitutes in the economic terms... for a variety of reasons, others would not."[97]  When asked if the same is true for all of the different types of message delivery systems described in Mr. Davidson's reports (including fax machine, MFP and

---

7/24/08. Based on the 2005 survey, 27.7 million out of 111.1 million U.S. households have a PC printer with built-in fax/copier.

[90] This presentation identifies "Smarter Internet/ethernet capable multi-function office devices which can integrate with fax servers" as one of three "technological trends...affecting the market." "Venali Offsite Your Functional Area Presentation," by Vincent Marottoli, 1/18/07, VEN 100635 – 45 at VEN 100636.

[91] http://www.microsoft.com/windowsxp/using/setup/hwandprograms/printfaxscan.mspx#4, accessed 7/29/08.

[92] "Do I need to turn my computer on to receive faxes?  No.  All messages are stored in your email waiting for you to retrieve them whenever you want." http://www.venali.com/soho/faq.htm, accessed 6/24/08.

[93] http://www.adobe.com/aboutadobe/pressroom/pressmaterials/pdfs/acrmessenger/acrmdatasheet.pdf, accessed 7/29/08.  Some document management products are bundled with MFPs.

[94] Mr. O'Keefe said fax servers compete with Internet facsimile services for enterprise customers, but not SOHO customers.  Deposition of Douglas L. O'Keefe, 9/19/07, pp. 46-7.

[95] "Venali business plan 08-19-2003.doc," attachment to an 8/19/03 email from O'Keefe to several Venali personnel, VEN 107377 – 98 at VEN 107387. Another Venali presentation states that "Approximately half of new Venali customers come from displacing or replacing fax servers."  See "Venali Market Sizing and Dynamics," undated, VEN 133469 –79 at VEN 133477.  See also "Venali vs. Fax Server End-user and Reseller Speaking Bullets," by David Forsch (VP Sales, Venali), undated, VEN 132266 – 76.

[96] "Venali ROI Calculator – Comparing to Fax Machines," undated, VEN 030945 – 50; "Venali ROI Calculator – Comparing to Fax Server Systems," undated, VEN 030951 – 57; "Cost Comparison for mailings," undated, VEN 137318 – 24.

[97] Deposition of Richard Smith (rough transcript), 8/12/08, p. 173.

EXHIBIT ____7____ PAGE 136

unified messaging), he answered "of course."[98]  He further testified that "you might argue that even if I define the market as Internet fax services that I should include the group that you identified as competitors in that market.... I basically said that you could see them as potential competitors in the market."[99]

The testimony, advertising, marketing strategies, and customer cancellation data described above demonstrate that Venali, j2, and other Internet facsimile services competitors compete directly with other products that provide fax services, including standard fax machines, MFPs, desktop faxing software, unified messaging services, and fax servers.

## B.     Additional Competing Document Delivery Products

While alternative means to send and receive faxes are the closest current substitutes to Internet facsimile services, focusing on these products alone is likely to understate the scope of products that ultimately constrain the pricing of Internet facsimile services.[100]  Consumers have available to them many document delivery technologies other than fax, and the range of products is changing rapidly with new products continually being introduced.[101]  As stated by Mr. Davidson, "Email has eaten fax for lunch.  Email now is responsible for tens of trillions of messages every year, while fax is watching its message volume reduced."[102]  Electronic ways of delivering documents include email to email, and document management products that may not offer fax capabilities.  Exhibit 2:  "Examples of Document Delivery Products" explain these electronic delivery products in more detail.  Because each of these products provides an

---

[98] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 171, 174.

[99] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 180-1.

[100] Mr. Ressler, j2's Chairman of the Board testified, "The pricing in this market is really determined not by any of these little competitors, including us....The real pricing is determined by all of the other alternatives people have. I mean, people with existing fax machines that can convert their fax messages to E mail attachments, it's every machine that's out there in the marketplace.  You know people -- if you charge too much, there are so many alternatives that people can deploy."  Deposition of Richard Ressler (Chairman of the Board, j2), 12/19/07, pp. 167-8. Mr. Ressler also testified "[p]ricing is really determined by what alternatives people have, and they have so many in this space" (pp. 168-9).

[101] More traditional methods of sending hard copy documents, through U.S. postal mail or FedEx could also potentially compete with Internet facsimile services to some degree.  Mr. Musgrove testified that "there are certain scenarios...where there would be some type of competition between sending a hundred-and-five-page agreement to an attorney [through fax], as opposed to throwing it into an envelope and giving it to FedEx."  Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, p. 134.  It is interesting to note that Venali provides an ROI (Return on Investment) calculator for customers to compare the cost of Venali's service to that of "Print and Mail."  "Venali ROI Calculator – Comparing to Print and Mail," undated, VEN 030958 – 63; "Venali ROI Calculator: Venali Production Fax Services solution compared to "print and mail" method," undated, VEN 030964 – 67; "Cost Comparison for mailings," undated, VEN 137318 – 24.

[102] Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p. 116.

EXHIBIT __7__ PAGE _137_

interchangeable method for consumers to deliver documents electronically, they could be used as a substitute for Internet facsimile services.

   As email products develop and improve over time, they will offer even more compelling alternatives to Internet facsimile services and other fax products.  In a recent SEC filing, j2 discussed such risks and pointed to increased future competition from email:  "We believe that one of the attractions to fax versus alternatives, such as email, is that fax signatures are a generally accepted method of executing contracts.  There are on-going efforts by governmental and non-governmental entities, many of which possess greater resources than we do, to create a universally accepted method for electronically signing documents.  Widespread adoption of so-called 'digital signatures' could reduce demand for our fax services."[103]  This sentiment is echoed in recent Venali documents as well.[104]  Professor Smith also admitted in his deposition that some potential customers of Internet fax services would view email and Internet fax services as "acceptable substitutes for each other."[105]

   Some document management products will give the user faxing capabilities in addition to other delivery options.  Adobe Acrobat Messenger has six delivery options, one of which is fax, which is an option that can be used if the user has a modem.[106]  Even if the user does not have the necessary hardware to use the fax delivery option, Adobe Acrobat Messenger gives the user the ability to move and share electronic documents in other ways that could compete with Internet facsimile services.[107]

   There are many additional products existing today, and more being developed, that offer alternatives to consumers for traditional fax machines, Internet facsimile services, and other existing products that send and receive fax communications.  j2, Venali, and other fax competitors are not immune from new and increasing competition from these various electronic delivery services.

---

[103] j2 Global Communications, Inc. SEC Form 10-K for the year ended 12/31/07, filed on 2/25/08, p. 16.
[104] Venali presentation, undated, VEN 133578 – 605 at VEN 133603. Another Venali presentation also raises the question "Secure Email – Encrypt, Certify, Sign. Could it replace faxes?" See "Marketing," undated, VEN 171875 – 904 at VEN 171902.
[105] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 23-4. .
[106] http://www.adobe.com/aboutadobe/pressroom/pressmaterials/pdfs/acrmessenger/acrmdatasheet.pdf, accessed 7/29/08.
[107] "Send your documents to anyone as an e-mail attachment.  When you have a very large internal distribution, post your document to the embedded Web server and notify recipients by e-mail.  Choose the innovative Express option if you'd like to have the file open and waiting for you on your desktop when you return to your office.  Save your file to a removable disk, print to a local printer, and even fax to a standard fax machine."
http://www.adobe.com/aboutadobe/pressroom/pressmaterials/pdfs/acrmessenger/acrmdatasheet.pdf, accessed 7/29/08.

EXHIBIT ___7___ PAGE 138

**VII.    Internet Facsimile Services to SOHO Customers in The U.S. Is Not A Properly
Defined Market**

In addition to excluding from their market definition a multitude of products that compete
with Internet facsimile services, Venali asserts that it is appropriate to further limit the market to
only the portion of Internet facsimile services purchased on the Internet by individuals and small
businesses that reside in the U.S.  Professor Smith claims that this is an appropriate market
definition because larger enterprise customers can negotiate volume discounts for larger service
packages while individual, or "SOHO" customers, cannot.  He states that SOHO users "are
limited to service bundles that are offered generically to the market on set terms" and "large
enterprises with high demand for fax services generally can negotiate prices and service features
bilaterally with service providers."[108]

**A.    SOHO Customers Do Not Constitute A Distinct Market**

It is a common feature in product markets that large customers can negotiate volume
discounts.  It is also a common feature in product markets that there can be multiple types of
distribution channels for a given product.  And it is almost certainly the case that customers have
different preferences, and willingness to pay, for a given product in a given product market.
Neither volume discounts nor multiple distribution channels nor a different willingness to pay
imply that large and small customers constitute separate markets from an economic perspective.
Recall that a market is something that can be monopolized.  To limit a product market to a
specific customer group, and hence only to the suppliers that currently focus on that customer
group, is only appropriate if all the suppliers who sell the product could not serve all customer
groups.  This is not the case in the sale of Internet facsimile services.

As confirmed by witnesses from both Venali and j2, the product sold is the same to all
types of customers, but can be sold with different levels and gradients of services.  For example,
Mr. Musgrove, a former Venali Vice President, states that although the services for enterprise
customers have more "accounting and account management features," "the fax features [that

---

[108] Smith Report, ¶ 45.  In deposition, Mr. O'Keefe also emphasized this difference, as well as the difference in
marketing channels.  Mr. O'Keefe testified that he believed the SOHO Internet facsimile market was a separate
market [from a broader Internet facsimile market] because "it involves a different sales process [web-based], it
involves a different target [small customers without negotiating power], it involves a different pricing [fixed packages
with fixed pricing], it involves different considerations and…the whole service is different than—than selling it to larger
companies."  Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07, p. 25; see also pp. 21-4.

EXHIBIT ___7___ PAGE 139

Venali provides to SOHO, mid-size, and enterprise customers] are the same."[109]  Plaintiff's expert, Professor Smith, also recognizes that the Internet facsimile services provided to larger and smaller companies use the same technology, although it is marketed differently.[110]  And various witnesses state the difficulty of even defining the size of a SOHO customer.[111]  According to Mr. Davidson's July 2007 report, on which Professor Smith relies, more than half of the Internet facsimile service providers offered services to both individual and enterprise customers in 2006.[112]

Thus, any firm that is currently providing Internet facsimile services to one or multiple types of customers could (and would) shift its services and emphasis across customer segments if prices to any one customer segment offered especially high profits due to higher prices.  It is especially straight forward for firms that supply large customers to make the shift to supply smaller consumer accounts.[113]

Venali, for example, originally began its Internet facsimile services business by focusing on large customers, but was able to fairly easily shift into supplying services to SOHO customers.[114]  Premiere Global, which operates the Xpedite brand, made the same shift.[115]  Mr.

---

[109] Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, pp. 94-5.  See also Deposition of Douglas L. O'Keefe (General Counsel, Venali), 9/19/07, pp. 31-2; Deposition of Richard Ressler (Chairman of the Board, j2), 12/19/07, p. 157.

[110] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 67-9.

[111] Mr. Musgrove testified, "The SOHO market is the group of prospects or users that are in a single user, maybe up to four-or five-user environment.  Typically those would be home offices, like, a single person, attorney, a chartered accountant, very small offices that are either operated from a small office, which is the 'SO,' or 'HO,' which is the home office."  When asked the maximum number of people that could be in an office and still qualify as SOHO, Mr. Musgrove said, "[i]n my personal definition, it would go up to ten users.  In the [general technology] industry, if you look at software, typically SOHO is defined to either 25 or even up to 100 users, but that is not how I would define it."  He testified that enhanced fax services are part of the "technology sector."  Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, pp. 81-2  According to testimony by Venali's founder, Mr. El-Gazzar, there is not a fine line between the needs of small customers versus large customers.  In fact, Mr. El-Gazzar testified "[w]e had SOHO customers spending $7,000 a month and we had enterprise customers spending $150 a month.  Deposition of Amin El-Gazzar (founder, former CEO, and former CTO of Venali, Inc.), 12/7/07, p. 35.  Mr. Ressler, j2's Chairman of the Board also made clear that there is no clear distinction between "enterprise" and "SOHO" customers:  "I've seen people define SOHO users as including large companies."  Deposition of Richard Ressler (Chairman of the Board, j2), 12/19/07, p. 157.  Mr. Ressler also testified, "My understanding of the SOHO market is nobody understands what the SOHO market is.  I think it's nonsense nomenclature" (pp. 156-7).

[112] Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, Table 3-2 "Individual Internet Fax shares in 2005 [sic] ($M)" and Exhibit 3-6 Enterprise Internet Fax shares in 2006 ($M)."  See also Exhibit 3: "AudioFAX Patents: Licensing and Litigation Information for Internet Facsimile Service Providers."

[113] Mr. Turicchi characterized sales to large customers as "more demanding."  He noted that to sell to large customers, one would have to be prepared to answer security and reliability questions, but individual users were more of impulse buyers and less sophisticated.  Interview with Scott Turicchi, 7/2/08.

[114] "Venali has a more sophisticated service, you know, that could–could be supplied to large corporations and thus, would easily be able to meet the—the needs of a smaller user" (p. 90).  Mr. O'Keefe also said, "[F]or marketing purposes…it would be easier to establish itself as an enterprise service provider and then sell down into the SOHO market than—than vice versa."  Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07, p. 87.

[115] Interview with Scott Turicchi, 7/2/08.  Exhibit 1A:  "Internet Facsimile Service Providers, 2005 – 2008" shows that according to Mr. Davidson, Premier Global earned revenue from sales to enterprise customers, but not individual

EXHIBIT __7__  PAGE __140__

Turicchi of j2 also confirmed that it is easy for a firm providing Internet facsimile services to enterprise customers to do the same for individual customers. According to Mr. Turicchi, a firm that already has Internet facsimile capabilities needs a website, telephone numbers, and a method to accept payments to begin selling Internet facsimile services to individual customers.[116]

If j2 increased the prices to smaller customers to an unduly profitable level, then Internet facsimile services companies serving enterprise customers could and would easily increase efforts to supply those smaller customers.

It is important to recognize here also that the patent litigation against which Venali complains, and the license fee which any Internet facsimile service provider pays to Catch Curve, covers Internet facsimile services to *all* customers, including enterprises and SOHO customers. To attempt to consider the impact of the licenses or litigation fees on only a subset of the business to which they apply is wrong. To the extent that Catch Curve's pursuit of patent licensing and litigation could have an impact, if at all, on an Internet facsimile provider, it would necessarily be on the provision of its services to all of its customers.

## B.    Geographic Market

Venali asserts that the geographic market is the United States. Professor Smith agrees with this assertion, even though "the relevant product is a service where market size is not restricted by distribution cost."[117] This is an acknowledgement that the product being sold is electronic, and thus could be accessed from anywhere that someone has Internet access. Thus, it is not surprising that entry into multiple countries, while requiring some investment, is something that most Internet facsimile providers have found to be attractive. Many of the competitors that serve SOHO customers in the U.S. also serve customers outside of the U.S. Venali and j2 are but two examples of this. If there are opportunities for exceptional profit from U.S. customers there is nothing stopping a competitor focused on international customers from

---

customers in 2005 (or the revenue from sales to individual customers was so small that it was lumped into the "Other" category) . Mr. Davidson reports that Premier earned about $2 million revenue from individual customers in 2006. Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, Table 3-2 "Individual Internet Fax shares in 2005 [*sic*] ($M)."
[116] Interview with Scott Turicchi, 7/2/08.
[117] Smith Report, ¶ 46.

offering services in the U.S. or increasing its focus on its U.S. business.[118]  All this points to a worldwide market.

Additionally, as discussed earlier, Mr. Davidson's report data on which Professor Smith relies does not break out sales by company between U.S. customers and customers abroad. Professor Smith in fact assesses the *total* U.S. and international revenue of all Internet facsimile providers that sell in the U.S as his proxy for revenue from U.S. customers.  That said, whether one views the market in which j2 competes as a U.S. market or a worldwide market is inconsequential.  j2 is not a dominant player in either.

## VIII.  j2 Does Not Have Monopoly Power, Regardless of Whether The Product Market Is Narrowly Or Broadly Defined

j2 does not have monopoly power regardless of whether one acknowledges the active competition it faces from products other than Internet facsimile services or not.  Whether one assesses its market share for all document delivery (or fax services), or its market share for Internet facsimile services, the conclusion is the same:  j2's market share is too insubstantial for it to have monopoly power.  In fact, j2 does not have monopoly power even in the inappropriately narrow "market" for Internet facsimile services purchased by SOHO customers in the U.S.

### A.    j2 Has A Very Small Share of Fax Products And Services

As of March 31, 2006, j2's paid eFax subscriber base in the U.S. was about 0.5 million.[119] This is a very small number compared to the more than 27.7 million U.S. households that owned fax machines or multifunctional printers in 2005.[120]  As discussed previously, fax machines and

---

[118] Venali's former VP, Mr. Musgrove testified that the "SOHO market" is not limited to the U.S.  Instead, he agreed that it is an international market.  See Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, pp. 83-4.  Professor Smith also testified in his deposition that "I don't think it would be particularly difficult [in] most cases for a company competing in Canada to compete in the United States …"  Deposition of Richard Smith (rough transcript), 8/12/08, pp. 116-7.
[119] j2 Table with column headings "Sum of Subscription Base" and "Marketing Region."
[120] Energy Information Administration (U.S. Department of Energy), 2005 Residential Energy Consumption Survey – Detailed Tables,
http://www.eia.doe.gov/emeu/recs/recs2005/hc2005_tables/hc11homeelectronics/pdf/tablehc2.11.pdf, accessed 7/24/08.  Based on the 2005 survey, 27.7 million U.S. households have a PC printer with built-in fax/copier.  In addition, based on the 2005 survey, it is estimated that 12.8 million U.S. households have a separate facsimile machine.  Since some households may own both a multi-function printer and a stand-alone fax machine, 27.7 million represents a lower bound on the number of households with a fax machine or multi-functional printer; 40.5 million would represent an upper bound.  Although the survey does not indicate how many people use their multi-function

EXHIBIT 7 PAGE 142

internet facsimile services still compete today for the consumer's dollar.  In 2006, approximately 1.357 million fax machines were sold through consumer channels in the U.S.[121]  But according to Mr. Davidson, between 2005 and 2006, the *worldwide* number of paid individual Internet facsimile service users increased by only 300,000.[122]  And j2 only increased its eFax paid U.S. customer base by about 44,000 over a similar period of time.[123]  These data show that j2 is too small to have monopoly power or any probability of gaining it relative to its competitors in fax products and services.

### B.    j2 Does Not Have A Dominant Share of Overall Internet Facsimile Services Sold in The U.S.

Even if one believes that the relevant market should exclude other fax products and focus on overall Internet facsimile services alone, the data on which Venali and Professor Smith rely show that j2 does not have a dominant share.[124]   j2's share has also declined over the time in which Venali alleges it was gaining monopoly power through sham litigation.   I follow Professor Smith's approach to calculating j2's share of U.S. Internet facsimile services revenue[125] and show that his own calculations would imply that j2 has a small fraction of overall Internet facsimile revenues between 2005 and 2007.   See Exhibit 7:  "Davidson Implied j2 Share of Internet Facsimile Services Revenue and Subscribers, 2005 – 2008."  Based on these calculations, j2's share of U.S. Internet facsimile services revenue has declined between 2005 and 2007, and was only 30 percent in 2007.[126]  These statistics and trends are inconsistent with any claim that j2's pursuit of allegedly sham litigation since 2005 has enabled it to obtain or maintain monopoly power.

---

[121] Gerson, Bob, "Digital Driving 2006-07 Sales," *TWICE*, 1/29/07, http://www.twice.com/index.asp?layout=articlePrint&articleID=CA6410725, accessed 8/15/08.

printer as a fax machine, it is clear that a large number of people have invested in fax alternatives to Internet facsimile services.

[122] Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p. 10.

[123] This increase in subscriber base took place between 3/31/06 and 3/31/07.  j2 Table with column headings "Sum of Subscription Base" and "Marketing Region."

[124] As discussed above, the only source for Internet facsimile services sales are the industry reports written by Davidson Consulting.  These data are understood to be imperfect.

[125] The method, which I discuss below in more detail when discussing Professor Smith's "market share" calculations, involves dividing j2's total Internet facsimile services revenue by the sum of revenue from companies that Professor Smith has determined operate primarily in the U.S.

[126] Exhibit 7:  "Davidson Implied j2 Share of Internet Facsimile Services Revenue and Subscribers, 2005 – 2008."

EXHIBIT 7 PAGE 143

**C.     j2 Does Not Have A Dominant Share of Internet Facsimile Services Sold to SOHO Customers in The U.S.**

Professor Smith uses data from Mr. Davidson's report to conclude that j2's market share in the alleged U.S. SOHO Internet facsimile services market is 44.2 percent.[127]   His estimate of 44 percent is the ratio of j2's 2006 individual Internet facsimile service revenue earned in the U.S. *and* abroad to the sum of individual Internet facsimile service "revenues [earned in the U.S. and abroad] of any company that appears to serve the US market" based on the data from Mr. Davidson's report.[128]  This method is obviously not a direct estimate of any company's actual revenue in the U.S.  But Professor Smith's calculation using this methodology implies that j2 does not have a share that is consistent with monopoly power.  Moreover, if I apply Professor Smith's approach to other years of Davidson data, the finding is that j2's share of U.S. individual Internet facsimile services has declined over time:  j2's share of U.S. individual Internet facsimile services revenue decreased from 52 percent in 2005 to 44 percent in 2006 to 43 percent in 2007.[129]  If j2 were amassing monopoly power as Venali alleges, then j2's share would increase over time.  Instead, it is eroding.  Again, the statistics and trend are inconsistent with the claim that j2 has obtained or will obtain monopoly power through the allegedly sham litigation, even in the narrowly defined SOHO market.

Professor Smith also offers in his report a set of calculations in which he *adds* to j2's revenue the revenue of independent companies that have licensed the AudioFAX patents, the revenue of independent companies that have been sued by Catch Curve for patent infringement (including Venali), and the revenue of companies that j2 acquired later in time.[130]  He characterizes these in his report as j2 "Adjusted U.S. Market Revenue," and states that they are "useful indications for market share" for j2.[131]  In his deposition he clarified that these are not market share calculations.[132]  This clarification is important, as it would not be founded on

---

[127] Smith Report, ¶ 13 and Exhibit 1.
[128] Smith Report, ¶ 55.
[129] Exhibit 7: "Davidson Implied j2 Share of Internet Facsimile Services Revenue and Subscribers, 2005 – 2008." In this Exhibit, I also report j2's estimated share of paid individual Internet facsimile service users worldwide, using the number of total worldwide eFax paid subscribers, as reported by j2 for the end of each quarter 2006 – present.   By my estimates, j2's current share of international paid individual Internet facsimile service users is about 27 percent, and has declined since 2006.
[130] Smith Report, Exhibit 1, ¶¶ 56, 61.
[131] Smith Report, ¶ 56 and Exhibit 1.
[132] In his deposition, Professor Smith explained his so-called "Adjusted U.S. Market Revenue" as follows: "The analysis in the last columns is focused on the question of companies that had their ability to compete in the market adversely effected by paying licensing revenues for the audio fax patents.  So it doesn't have something specific to do with j2 at that point.... The revenues are being attributed for the purpose of calculating a percent of the market that is

EXHIBIT ___7___ PAGE 144

accepted economic practice, and would be wholly inappropriate to include j2's direct competitors as part of j2's market share. j2 does not own the companies that have licensed the AudioFAX patents. j2 does not determine their pricing, nor is it free from competing against them.[133] Additionally, several of the companies for which Professor Smith assigns revenues to j2 paid license fees to AudioFAX and *not* j2.[134] j2 competed with and continues to compete with the firms that have licensed the AudioFAX patents. j2 also competed with (and continues to compete with) firms that Catch Curve was or is in litigation with re the AudioFAX patents.

Professor Smith's methodological departure from basic and accepted economic principles is made clear by some hypothetical examples: if j2 lost *all* of its customers to the competitors to which Catch Curve has either engaged in litigation or licensed the AudioFAX patents, Professor Smith would find j2's share *unchanged*. Similarly, if these same competitors won every new customer that chose to purchase an Internet facsimile service, and j2 won none of them, Professor Smith would find j2's share *growing*. These calculations are clearly not an indication of j2's market share. Professor Smith's only direct calculation of j2's actual revenue relative to the "market" from Mr. Davidson's report (44 percent in 2006) finds that j2's share is too low to imply current monopoly power, and it has fallen from 2005-2007.

Professor Smith offers another inappropriate analysis and conclusion regarding customer shares in his report. He calculates j2's share of paid, unpaid, and total subscribers to individual Internet facsimile services.[135] By any reasonable approach, j2's estimated share of paid

---

paying a cost based premium because of the audio fax patents in that particular example." He further clarified "...It's not about conduct by j2. It's about the ability of those in the market to compete without the limitations that flow from the AudioFAX or other patents..." Additionally, he recognized that by the logic in his Exhibit 2, j2 was similarly constrained in its ability to compete as the result of defending the patent infringement suit that was brought by AudioFAX and paying license fee for the AudioFAX patents. Deposition of Richard Smith (rough transcript), 8/12/08, pp. 207-13.

[133] All but three of the license agreements that Catch Curve has executed with Internet facsimile services providers involve one-time license payments. A one-time license fee would not affect firms' pricing. Catch Curve executed running royalty agreements with Callwave and Easytel, which together made up about 3 percent of the individual Internet facsimile services market in 2006. In all of the three cases, AudioFAX patents are only a subset of the patents that were being licensed. Exhibit 5: "Comparison of Revenues and License Fees for Internet Facsimile Service Provider Licensees to AudioFAX Patents."

[134] Professor Smith's Exhibit 2 indicates that his "litigation adjusted j2 revenues" include $6.0 million from Accessline, which he reports licensed the AudioFAX patents in 2004. His Exhibit 2 also indicates that his "litigation adjusted j2 revenue" includes $2.0 million from Premiere, which he reports licensed the patents in 2001. This date is wrong, but the conclusion still holds: Professor Smith assigns revenues of companies that licensed the patents before j2 purchased them in 2005. Premiere licensed the patents in 1997, and Xpedite, which Premiere later acquired, licensed the patents in 1998. j2 did not purchase the patents until 2005. See Exhibit 3: "AudioFAX Patents: Licensing and Litigation Information for Internet Facsimile Service Providers," Exhibit 4: "Timeline for the AudioFAX patents," and Exhibit 5: "Comparison of Revenues and License Fees for Internet Facsimile Service Provider Licensees to AudioFAX Patents."

[135] Smith Report, Exhibit 1. Because the Davidson Consulting reports do not report j2's total paid subscribers, Professor Smith assumes that j2's share of international paid subscribers to individual Internet facsimile services is equal to its share of international individual Internet facsimile services revenue.

customers is not high.  Professor Smith estimates this to be 31.3 percent in 2006.[136]  Professor Smith is undeterred by this.  He simply asserts that j2's market power is evidenced by the large amount of *free* "customers" it currently services.  This is turning economics on its head, and is not following the standards set out by economic practice.  Offering free trials or free samples is not the same as winning paying customers.  An individual that accepts a free sample or free trial is not a paying customer.  Market share is only an indicator of market power of a firm if it provides evidence that customers do not have alternatives to the product given the price the firm has charged.  Thus, j2's market share in the *sale* of Internet facsimile services must be measured by the customers who have purchased j2's product.

Professor Smith's analysis of free "customers" is internally inconsistent and does not follow basic economic principles.  He includes free "customers" in his customer share calculation to attempt to support his conclusion of a high "market share," which he believes implies j2 has market power.  He at the same time asserts that j2 charges *higher* prices to its customers than its competitors and that *this* is a sign of market power.  In his pricing calculation he does not include the free "customers," or the price (of zero) that the free "customers" pay.  Approximately 90% of j2's eFax "customers" do not pay.[137]  If one averaged in the "price" that these 90% of "customers" pay, then j2's average prices would be 10 percent of what Professor Smith reports.  So if Professor Smith is considering free "customers" to be customers, then j2 has attracted them by charging an extremely low average price relative to its competitors.  This should not and cannot be considered a sign of market power – to the contrary, it is a sign of competition.[138]

---

[136] Smith Report, Exhibit 1.  Professor Smith assumes j2's share of paid subscribers is equal to his estimate of j2's share of international individual Internet facsimile services revenue, which he estimates at 29.6 percent.  Due to rounding, he gets a higher figure for j2's estimated share of international paid individual Internet facsimile services users.

[137] Mr. Turicchi testified that j2's eFax business has about 8 million free U.S. subscribers and about 800,000 paid U.S. subscribers (88 to 90 percent of 900,000).  8,000,000 / 8,800,000 = 90.1 percent.  Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, pp. 28-9.  Figures calculated using the information in a j2 Table (j2 Table with column headings "Sum of Subscription Base" and "Marketing Region") reveal that from 2006 through the present, about 92 to 93 percent of j2's individual eFax subscribers in the U.S. are nonpaying users.

[138] Professor Smith (and Venali) suggest that j2's offer of free service is anticompetitive because users become attached to their fax number, and thereby become "locked" into j2's service, when they decide to for upgraded Internet facsimile services.  However, very few free users ever convert to paid accounts.  I discuss this in more detail below.

EXHIBIT ___7___ PAGE _146_

### D.    j2's Successes Are Explained by Competition

j2 was a successful company before it purchased the AudioFAX patents in 2005.  It was one of the first companies to offer Internet facsimile services.  It has an established brand through jFax and eFax, and actively advertises.[139]  All of this success predated the alleged anticompetitive conduct regarding patent licensing and litigation.  j2 has not seen its relative success grow since purchasing the AudioFAX patents – to the contrary, the data on which Professor Smith bases his calculations show that since 2005 j2 has lost relative share in the market defined by Professor Smith.

Venali also recognizes that j2's success relative to Venali is explained by j2's effective marketing and valuable products.  For example, a Venali presentation dated 1/18/07 lists the following reasons under the bullet "why do they have more market share": "Aggressive advertising.  Affiliate and referral programs.  Better Business Development initiatives.  Innovative product offerings."[140]  There is no discussion of exclusion through anticompetitive means, just head-to-head competition.  The same document also recognizes that some competitors have better customer service[141] and better products: "MyFax, eFax enable more direct control/functionality of account by customer.  [They offer] [i]ntuitive interface."[142]  The document also indicates that some competitors, such as MyFax and eFax, experimented with more competitive pricing models and packages.[143]

Other internal Venali documents also suggest that Venali's lack of R&D and marketing investment could explain Venali's lack of success in serving SOHO customers.  For example, Venali's 2005 update to its investors includes a SWOT (Strengths, Weaknesses, Opportunities, and Threats) analysis for Venali Corporate and its business units.  The "corporate perspective" analysis identifies one of the threats as "Competitor JCOM [j2] has delivered Desktop product

---

[139] Interview with Scott Turicchi, 7/16/08.  Professor Smith also recognized in his deposition that j2 has a very successful advertising and marketing strategy.  Deposition of Richard Smith (rough transcript), 8/12/08, pp. 150-1.

[140] "Venali Offsite Your Functional Area Presentation," by Vincent Marottoli, 1/18/07, VEN 100635 – 45 at VEN 100640.

[141] "In some cases…[Venali's competitors] likely have better ticket and knowledge base systems.  [They] may have better insight into customer installations…"  "Venali Offsite Your Functional Area Presentation," by Vincent Marottoli, 1/18/07, VEN 100635 – 45 at VEN 100640.

[142] "Venali Offsite Your Functional Area Presentation," by Vincent Marottoli, 1/18/07, VEN 100635 – 45 at VEN 100639.

[143] "Does our competition have better pricing?  That depends on competitors and market.  Internet Fax Service Market:  Some Internet fax competitors (MyFax, eFax) experiment with different pricing models and packages.  For soho offer per-paid model (with discounts for paying in advance) in some cases these pricing packages are more competitive."  "Venali Offsite Your Functional Area Presentation," by Vincent Marottoli, 1/18/07, VEN 100635 – 45 at VEN 100640

EXHIBIT _____7_____ PAGE 147

with superior interface to Small Business customers."[144]  The "SOHO perspective" analysis lists as Venali's weaknesses: "R&D bottleneck; low brand awareness; limited marketing ability (human and financial); limited international support, no SOHO dedicated resources, dependency on 3rd party (partners) for many SOHO solutions; lack of capital to expand at required speed."[145] Venali's former CEO, Pasquale Giordano, recognized issues with Venali's SOHO solution.  In a transition document he prepared in advance of his summer 2006 resignation, he wrote that Venali was losing profit in the SOHO segment because of "the inadequacies of the SOHO solution."[146]  He also pointed out that Venali has "not dedicated the development resources to fix the [SOHO] solution."[147]

Plaintiff's expert, Professor Smith, also agreed that j2's relative success could be the result of j2's effective marketing strategy.  Professor Smith opined in his report that j2 charged a supra competitive price.[148]  When asked how j2 could attract new customers despite this higher price, Professor Smith testified that j2 has a successful advertising and growth strategy.[149]  He also acknowledged that there is "nothing per se [anticompetitive]" in having a smart and successful marketing strategy.[150]


## IX.    j2 Cannot Have Monopoly Power Due to Lack of Barriers to Entry And Elastic Supply of Existing Firms That Offer Internet Facsimile Services

Even if there were, counter to fact, a "market" for SOHO Internet facsimile services, and, counter to fact, j2 had a large share of this "market," my analysis would still conclude that j2 does not have monopoly power in this "market."  This is because of a lack of barriers to entry and the elastic supply of existing firms offering Internet facsimile services ensuring that j2 does not have the power to control prices or exclude competitors.

---

[144] "Venali Investors' Perspectives 2005, 1/10/2005, VEN 137331 – 56 at VEN 137339.
[145] "Venali Investors' Perspectives 2005, 1/10/2005, VEN 137331 – 56 at VEN 137354.
[146] "Pasquale Giordano's Transition Document," undated, VEN200420 – 38 at VEN200423.  John Poncy testified that Mr. Giordano left Venali in the summer of 2006.  Deposition of John Robert Poncy (CEO, Venali), 8/21/07, pp. 91-2.
[147] "Pasquale Giordano's Transition Document," undated, VEN200420 – 38 at VEN200433.
[148] Smith Report, ¶ 62.
[149] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 150-1. .
[150] Deposition of Richard Smith (rough transcript), 8/12/08, p. 152. .

EXHIBIT ___7___ PAGE _148_

Barriers to entry are meaningful costs to entry faced by potential competitors that were not born by incumbent firms.[151]  Venali generally claims that barriers to entry to the alleged SOHO Internet facsimile services market are "substantial."[152]  That said, Venali does not allege any specific barriers to entry that would deter a company that is currently focusing on enterprise customers from servicing SOHO customers.[153]  The only direct mention of barriers to entry by Professor Smith in his report is when he says they are necessary for market power.[154]  In deposition, Professor Smith clarified that he believed that customers having lack of outbound portability was a significant barrier to entry.[155]  His report offers no analysis to support this opinion, nor did he offer any data or analysis in his deposition.  Thus his opinion is not founded upon any factual evidence or any standard economic analysis.

In the following sections I show that there has been a great deal of entry, and that lack of outbound portability is not a barrier to entry that insulates j2 from competition.  I also discuss the elasticity of supply of existing competitors, showing that they would easily be able to expand the number of customers they serve in order to compete with j2.

## A.    There Has Been Rapid Entry Since j2 Acquired The AudioFAX Patents

Recent entry is direct evidence of the lack of barriers to entry to protect j2 from competition.  This is true even if one focuses only on Internet facsimile services.  Venali's witnesses have been unable to identify a single firm that has been excluded from the alleged

---

[151] Barriers to entry occur when new entrants face hurdles that incumbent firms did not face.  George J. Stigler, "Barriers To Entry, Economies Of Scale, And Firm Size," in *The Organization of Industry*, R.D. Irwin, 1968, Chapter 6. Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th edition, Addison Wesley, pp.76-7.

[152] Counterclaim, 8/08, ¶ 111.  Venali discusses alleged barriers to entry that it argues disadvantage a new competitor relative to j2, including "…2. the ability to obtain sufficient local number coverage; 3. limited portability of fax numbers by subscribers to fax service providers; and 4. the ability to provide sufficient software and hardware to operate a reliable service.  Defendant and Third Party Plaintiff Venali, Inc.'s Third Supplemental Response to j2 Global Communications, Inc.'s First Set of Interrogatories, 11/5/07, p. 2.  I focus on the "barrier" of outbound portability, as it is the only feature of the market that Professor Smith offers as a barrier.  I note that the other "barriers" offered in the Venali interrogatory response are simply investments any company must make in order to offer an Internet facsimile service.

[153] This underscores why there cannot be a standalone SOHO market.  This is parallel to the fact that the patent litigation at issue covers Internet facsimile services to all customers.  Mr. Smith agreed that if the AudioFAX patent applies to the Internet fax services, "then in a technical sense, it applies equally [to providers that market the technology to large companies and those marketing it to smaller companies or individuals]."  Deposition of Richard Smith (rough transcript), 8/12/08, pp. 84-5. .

[154] He writes market power can be inferred "through relevant market analysis including showing that a firm has a dominant share in a defined relevant market *and* that there are significant barriers to entry in that market."  Smith Report, ¶ 25; emphasis added.  Professor Smith leaves out the third necessary condition that must be true for a firm to have market power:  capacity constraints on fringe firms.

[155] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 61-2.

EXHIBIT __7__ PAGE 149

market in this time period[156] and Professor Smith offers no examples of firms being excluded.[157] In fact, Venali witnesses agree that there are *more* competitors today than there were in 2005 when j2 acquired the AudioFAX patents.[158]

There have been many new companies in recent years providing Internet facsimile services to consumers and businesses. These include providers of fax servers, hosted e-mail solutions, Voice over IP ("VoIP"), and cable services. Since 2005, when j2/Catch Curve acquired the AudioFAX patents, the number of firms offering Internet facsimile services to the alleged SOHO market has *increased.* Mr. Davidson, on whom Professor Smith relies, identified by name 37 Internet facsimile service providers in 2005, of which 31 sold services to individuals and of which 18 sold services to individuals in the U.S.[159] These numbers increased in 2006 to 55 named Internet facsimile service providers, of which 47 sold services to individuals and of which 31 sold services to individuals in the U.S.[160] Mr. Davidson identified even more Internet facsimile service providers in 2007, for a total of 57 Internet facsimile service providers, of which 32 sold services to individuals in the U.S.[161] As noted above, Mr. Davidson has

---

[156] Mr. O'Keefe was unable to name a single firm that has decided to not enter the market due to a threat of litigation, but said "any company that is informed and looks at the market would...reasonably consider" it. Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07, pp. 58-9. Mr. O'Keefe further testified that Venali was not aware of any company that has "been prevented from competing in this market by virtue of the Catch Curve licensing practices." Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07, pp. 155-6; deposing attorney's words in quotes. Mr. Musgrove testified that Delrina Fax Services was sued by AudioFAX, Inc. in the summer of 1995, and agreed to discontinue its fax services as part of the settlement, but he is not aware of any other companies that have been forced out because of AudioFAX patents. See Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, pp. 13-5, 120-1. Mr. El-Gazzar could not identify any one or any firm that had communicated to him that they would not enter the Internet facsimile services business because of a threat of litigation from j2. Nor could he identify any firms that were forced to exit the market as a result of litigation with j2. Deposition of Amin El-Gazzar (founder, former CEO, and former CTO of Venali, Inc.), 12/7/07, pp. 151-2.

[157] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 86-7, 149-50.

[158] When asked to explain the factual basis for the statement found in the counterclaim that "historically SOHO users have had little choice when selecting an Internet facsimile service provider," Mr. O'Keefe answered, "I think that historically j2—it's been j2's dominance in the market and for long periods of time they—there were not many companies that—that were able to offer the service in a broad geographic area in the United States" (pp. 113-4). However, he agreed that this was *not* the case today, saying "[t]oday there are several alternatives, numerous alternatives to j2." He agreed that there were numerous alternatives to j2 in 2006 as well (p. 114). And he confirmed that "there are more players in the market" today than there were in 2005 (p. 116). Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07; see also pp. 115-7. Mr. Musgrove also testified that there are more companies competing in the Internet facsimile market today than there were in 2003. Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, p. 138.

[159] Davidson, Peter J., "Fax Service Markets, 2005-2009," pp. 13-4, 17-18. Exhibit 1B: "Number of Internet Facsimile Service Providers Identified by Davidson Reports, 2005 – 2007."

[160] Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, pp. 10-2, 17-19. Exhibit 1B: "Number of Internet Facsimile Service Providers Identified by Davidson Reports, 2005 – 2007."

[161] Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, pp. 9-10, 16-7. Exhibit 1B: "Number of Internet Facsimile Service Providers Identified by Davidson Reports, 2005 – 2007."

EXHIBIT __7__ PAGE __150__

undercounted the number of Internet facsimile service providers; j2 has identified over 70 providers in addition to those on Mr. Davidson's list.[162]

VoIP providers led the entry charge into Internet facsimile services in 2006.[163] According to Mr. Davidson, "[a]ny VoIP services supplier can fairly easily add Internet fax capabilities,"[164] and as cable TV and the local telephone companies enter the VoIP space, the competition in the outsourced, valued-added messaging and communications space, including Internet facsimile service, "continues to intensify."[165] Mr. Davidson warns that Internet facsimile service players should "watch closely" the development in the VoIP services market because "should it heat up and if the cable TV players should jump in," it could take "a large portion" of the individual Internet facsimile services.[166] Venali recognized the potential entry by VoIP providers as least as early as January 2005. In its 2005 update to investors, Venali identified as one of the "key market trends" in the SOHO segment: "VoIP services [are] expected to link up with FoIP [Fax over IP]."[167] Mr. Musgrove confirmed that several VoIP providers, including AT&T, Verizon, and Ring 9 Telecommunications have started offering Internet facsimile services.[168]

Additionally, Venali also recognizes the threat of entry from fax server providers. For example, a Venali presentation dated 1/18/07 states that one of the issues that "should be keeping [Venali staff] awake at night" is "[f]ax server competitors extending their product lines to offer comparable Internet fax or messaging services."[169] Testimony by Douglas O'Keefe of Venali indicates that firms that have historically sold fax servers, such as Captaris, may have recently begun selling services that are comparable to Internet facsimile services.[170]

In addition to the recent Internet facsimile services offerings from VoIP and fax server companies, Mr. Musgrove identified providers of hosted e-mail solutions as a "natural fit" to enter into the Internet facsimile service market. Specifically, he identified Go Daddy as a good example of a hosted e-mail solutions provider that added Internet facsimile service to its existing

---

[162] Exhibit 1A: "Internet Facsimile Service Providers, 2005 – 2008"
[163] Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, pp. 1, 7-8.
[164] Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p. 8,
[165] Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, pp. 7-9,
[166] Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p. 9.
[167] "Venali Investors' Perspectives 2005, 1/10/2005, VEN 137331 – 56 at VEN 137332.
[168] Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, pp.102-3.
[169] "Venali Offsite Your Functional Area Presentation," by Vincent Marottoli, 1/18/07, VEN 100635 – 45 at VEN 100638.
[170] Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07, p. 68. Captaris sells RightFax, which is "fax server, document delivery and fax software." http://www.captaris.com/rightfax/, accessed 8/1/08.

EXHIBIT ___7___ PAGE 151

business of providing domain names, web hosting and e-mail hosting.[171]  Mr. Musgrove also testified that some cable companies, such as Rogers Communications and Cox, have done some trials and could eventually enter the market.[172]  In fact, a visit to the website of Rogers Communications shows that the company is currently offering an Internet facsimile service in Canada.[173]

Professor Smith also acknowledges there are potential entrants to the Internet facsimile service.[174]  He attempts to discount these potential entrants by stating "it appears that their incentives to enter the market and their interest in the market are low and that historical price increases have not induced them to enter with comprehensive service packages."[175]  Professor Smith offers no analysis or fact to support his assertion.  It is also inconsistent with the rest of his testimony.  Professor Smith has offered the opinion that "a representative j2 customer would have paid average monthly service prices that are more than …the price that is likely to have existed in a competitive market."[176]  Supra competitive prices are directly contradictory to the idea that potential competitors would have a low interest or incentive to enter.

## B.    Limited Portability of Fax Numbers Is Not A Barrier to Entry

Venali claims that the inability of customers to port their fax numbers from j2 to other Internet facsimile service providers constitutes a barrier to entry.[177]  Lack of outbound portability is a common practice for Internet facsimile service providers.[178]  j2's choice not to allow customers to take numbers with them when they leave j2 cannot be viewed as a barrier to entry

---

[171] Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, pp.99, 104.
[172] Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, pp.103-5.
[173] http://your.rogers.com/business/businesssolutions/Internetfax.asp, accessed on 8/15/08.
[174] "Beyond existing service providers, it is possible that some Internet faxing services could be offered by voice-over-IP (VoIP) service providers or by local telephone service providers, and by others who have technologies for transmitting images over cable or wireless networks."  Smith Report, ¶ 47.
[175] Smith Report, ¶ 47.
[176] Smith Report, ¶ 62; see also ¶ 11.
[177] There are two types of porting services that an Internet facsimile service provider could potentially offer.  One is sometimes called inward porting.  That is, a service provider allows customers to keep their existing fax numbers when signing up with its service.  The other can be called outbound porting, that is, a service provider allows its customers to take ("port out") their assigned fax numbers when unsubscribing from its service.  It is the outbound portability to which Professor Smith refers.  Deposition of Richard Smith (rough transcript), 8/12/08, p. 76.  See also Smith Report, ¶¶ 20, 51, 52.
[178] Mr. Musgrove testified that he was not aware of any company "officially" offering outbound portability.  Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, pp. 115-6.

EXHIBIT    7    PAGE 152

for a number of reasons.[179]  This is evident when one considers how j2's lack of outbound portability would impact the customers for which j2, Venali, and others compete.  I consider both potential and current j2 customers.

### a)   Customers New to Internet Facsimile Services

The data on which Professor Smith relies shows that the total number of free and paying subscribers in Internet facsimile services has grown rapidly over time.  As shown in Exhibit 8: "Number of Worldwide Individual Internet Facsimile Service Users, 2004 – 2008," the worldwide number of paid individual Internet facsimile users almost doubled in the past 4 years: 1.1 million in 2004, 1.3 million in 2005, 1.6 million in 2006 and 2 million in 2007.[180]  j2 itself estimates that of the new customers it gains every month, only about 10% are converted from its existing free subscribers.[181]  It follows that Internet facsimile providers are gaining customers from other competing technologies.

j2's choice not to offer outbound portability does not create a barrier to entry that favors j2 over other competitors for these new customers.[182]  In fact, to the contrary, if new customers to Internet facsimile services did in fact value portability, and j2 didn't offer it, this provides an *opportunity* for those offering products and services that compete with j2.  It is an opportunity for others to compete by offering outbound portability, if it is in fact valuable to customers.

### b)   Current j2 Accounts

As of 6/30/08, j2 had 544,468 paid U.S. eFax customers and over 6.4 million free U.S. eFax accounts.[183]  Venali and Professor Smith believe that the lack of outbound portability for these *free* accounts poses a barrier to entry to others competing for these accounts as ultimate

---

[179] Indeed, Mr. Musgrove states that he "would argue [that the DID portability is] probably not" a barrier to entry. Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, p.114.  According to Mr. Adelman, it is not the case that j2 has never allowed outward porting for its eFax customers.  Mr. Adelman testified that while generally, individual eFax customers are not permitted to outward port their eFax number, "I believe, …that we have let some customers port for some amount of money.  But I don't know the specifics of whether it was individual or corporate."  Deposition of Jeffrey Adelman (Vice President and General Counsel, j2), 1/8/08, pp. 93-5.

[180] The worldwide number of free individual Internet facsimile service users has also increased, from 8.3 million in 2004 to 10.5 million in 2005 to 11.5 million in 2006 to 12.3 million in 2007.

[181] Smith Report, p. 18; j2 Communications Investor Presentation (Based upon Year End 2006 results), 3/12/07, p. 7, produced as part of Appendix 3 to Smith Report.

[182] Professor Smith agreed that lack of portability would not be an issue for the new customers, until they are signed up by one of the Internet facsimile service providers.  Deposition of Richard Smith (rough transcript), 8/12/08, p. 140.

[183] j2 Table with column headings "Sum of Subscription Base" and "Marketing Region."

paid customers.[184]  The suggestion is that consumers are lured to j2 due to the offer of free service, but then are locked into the phone number they are assigned and must stay with j2 regardless of what price it charges relative to competitive products.  Of course, by this logic since other Internet facsimile providers also do not offer outbound portability, j2 would be deterred from competing for their customers as well.[185]

Professor Smith admitted in deposition that he has not done any analysis to determine whether j2's free subscribers are in fact "locked in," nor has he determined the extent to which j2's free subscribers are affected by the lack of portability, if at all.[186]  His opinion is a guess, uninformed by data or analysis.

Evidence shows this hypothetical "lock-in" claim by Venali and its expert does not exist.[187]  Only a *very* small minority (less than 1 percent) of j2's free subscribers become j2 paying customers on an annual basis.[188]  In fact, more of them leave than become paying customers.[189]

Even more important, of the very small fraction that actually become paying customers, the vast majority choose a *new* number when they start to pay.  For example, about 70 percent of eFax's U.S. free subscribers and 80 percent of eFax's international free subscribers who became paid customers during the first half of 2008 chose a *new* fax number.[190]  Thus the outbound portability is clearly not what impacted the customer's decision to become a j2 paying customer.

---

[184] Mr. El Gazzar testified that a barrier to entry to the enhanced fax messaging market was "[t]he portfolio of I don't know how many millions of free subscribers j2 has.  And j2's refusal to let them port fax numbers away from j2" (p. 123).  He further clarified, "[t]he fact that they are free is also a barrier to entry because not everybody can afford to manage millions of fax numbers and the associated costs with it.  But the main reason that prevents other companies or customers to successfully compete in the market is the fact that the numbers are not portable."  Deposition of Amin El-Gazzar (founder, former CEO, and former CTO of Venali, Inc.), 12/7/07, p. 143.  See also Smith Report, ¶¶ 51-3.

[185] Professor Smith agreed that j2 would also be limited by lack of portability in competing for customers who have signed up with other Internet facsimile service providers.  Deposition of Richard Smith (rough transcript), 8/12/08, p. 141.

[186] Deposition of Richard Smith (rough transcript), 8/12/08, p. 157-8.

[187] Mr. Musgrove, a former Venali Vice President, also recognizes this.  He testified that, based on his conversations with various Internet facsimile service providers, although companies that offer a free trial get significantly higher initial subscriber rates that those who do not, it appears that a year later, there is no dramatic difference in terms of numbers of active subscribers.  Deposition of Ralph Musgrove (former VP of Product Management and former VP of Market Development, Venali), 12/6/07, pp. 125-6.

[188] Mr. Turicchi testified that at the time of his deposition, about 0.4 percent of free subscribers convert to paid subscribers, on an annual basis.  Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, pp. 27-8.  Additionally, j2's data show that only about 0.1 percent of free eFax subscribers convert or upgrade to paid services in the first two quarters of 2008, both domestically and internationally.  The calculation is based on j2 Tables with column headings "Prod 2," "Change," and "Data" and j2 Table with column headings "Sum of Subscription Base" and "Marketing Region."

[189] Scott Turicchi, Personal Communication, 8/20/08.

[190] Calculated using data produced by j2 (Tables with column headings "Prod 2," "Change," and "Data").  The data file classifies free subscribers who became paid customers into two categories: "converts" and "upgrades."  Mr. Turicchi (Co-President of j2) explained that "a 'convert' is a Free DID that becomes a PAID DID and keeps the same number.  An 'upgrade' changes their number" after upgrading to paid service.  Personal Communication, 8/18/08.

EXHIBIT 7 PAGE 154

It is worth reiterating here that potential customers available to competing Internet facsimile service providers are not limited to the current set of j2 free accounts. The potential customer base is much broader, and expands every year as more consumers sign up for Internet facsimile service each year.[191] As stated above, more than 90 percent of j2's monthly paid signups are subscribers that are new to j2's service.[192]

### C.    Existing Firms' Supply Is Capable of Constraining j2's Prices

Although Professor Smith fails to analyze, or even mention, elasticity of supply, I do not believe there is any dispute that supply of the many, existing firms in the market is relatively elastic. This can be seen by noting the fast expansion of some companies that sell Internet facsimile services. For example, according to Mr. Davidson, Protus's Internet facsimile revenues increased by about 40% from $38 million in 2006 to $53 million in 2007.[193] MaxEmail is another firm that quickly expanded its business between 2006 and 2007. Its Internet facsimile services revenues increased about 42% between 2006 and 2007 from $12 million to $17 million.[194] Additionally, there appears to be excess capacity of available DIDs.[195] Protus, for example, made an investment in more DIDs in 2007.[196] This is also evidenced by Venali's acquisition of numbers. As of 9/5/07, just over half of Venali's inventory of DIDs were unused (99,821 out of 188,337).[197] Additionally, as discussed above, there are more firms offering Internet facsimile services today than 2 years ago. This is itself is an example of elasticity of supply. Internet facsimile service providers have the ability to expand their supply very quickly and this elasticity would constrain any potential market power j2 might have.

---

[191] Exhibit 8: "Number of Worldwide Individual Internet Facsimile Service Users, 2004 – 2008."

[192] By "new" I mean subscribers that were not converted from free accounts. Smith Report, n. 18; j2 Communications Investor Presentation (Based upon Year End 2006 results), 3/12/07, p. 7, produced as part of Appendix 3 to Smith Report.

[193] Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, pp. 10, 18. Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, pp. 9, 16.

[194] Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, pp. 11, 18. Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, pp. 9, 17.

[195] Interview with Scott Turicchi, 7/2/08.

[196] "MyFax, one of the leading business Internet fax services, today announced the expanded coverage of local fax numbers throughout the continental United States. MyFax now offers more than 175 area codes to its customers and will reach close to 90% of the US population with local fax number options by the end of the year." "MyFax increases Coverage of Local Area Codes for Businesses," 6/8/07, produced as part of Appendix 3 to Smith Report.

[197] Untitled table, Exhibit 19 to the Deposition of Douglas O'Keefe, 9/19/07, VEN281501-34 at VEN281501.

## X.     j2 Has Not Harmed Competition Or Consumers by Enforcing Its Patents

Venali alleges that the "threat of litigation" by j2 and Catch Curve has in and of itself posed an anticompetitive barrier to entry from 2005 to the present.[198]  Venali alleges that this patent enforcement has harmed competition by "interfer[ing] with j2's competitors' ability to service existing customers and impede their ability to compete for new customers."[199]  Venali claims j2 "has precluded substantial new offerings to SOHO consumers…[and] has damaged consumers by attempting to eliminate competition in the market and quashing innovation in the SOHO Internet facsimile services market."[200]

Venali alleges that Catch Curve's patent enforcement actions related to the AudioFAX patents were part of an illegal, anticompetitive scheme that gave j2 the likelihood of reaching monopoly power.  For that to be true, Catch Curve's patent enforcement actions would need to be more than just a "cost" incurred by those who were in litigation with Catch Curve or who licensed the technology.  The litigation and licensing would have had to have the effect of excluding competitors or disabling them from competing, ultimately leading to market-wide harm.  Venali and Professor Smith have offered no evidence that harm has occurred.  j2's actions have not, and could not, harm competition in the market in which j2 competes.[201]  I discuss this in the following sections.

---

[198] Counterclaim, 8/08, ¶ 111.  Defendant and Third Party Plaintiff Venali, Inc.'s Third Supplemental Response to j2 Global Communications, Inc.'s First Set of Interrogatories, 11/5/07, p. 2.

[199] Counterclaim, 8/08, ¶ 126.  Venali focuses particularly on the claim that j2's allegedly "baseless lawsuits" raise the costs of competitors "while effectively lowering j2's costs."  Counterclaim, 8/08, ¶ 97; see also ¶ 126.

[200] Counterclaim, 8/08, ¶ 84.

[201] Venali also claims that j2's acquisition efforts are anti-competitive.  Specifically, Venali asserts that "j2…has sought ways to use its cash and other liquid assets…to eliminate its competitors.  One such method includes j2's attempts to gain complete control of the SOHO Internet facsimile market, by waging a campaign of acquiring its competitors.  If competitors are not receptive to j2's purchase offer, j2 directly or through Catch Curve has threatened and instituted objectively baseless infringement actions.  By threatening such baseless lawsuits against its acquisition targets, as well as other competitors in the market, j2 has subjected its competitors to unnecessary license fees and litigation expenses, thereby raising their costs while effectively lowering j2's costs."  Counterclaim, 8/08, ¶¶ 96-7. Professor Smith, Venali's expert does not assess this allegation.  Since purchasing the AudioFAX patents, j2 has acquired only three small U.S. Internet facsimile services companies:  Unifax in 2005, Send A Fax in 2007, and RapidFax in 2007.  The share numbers implied by the data on which Professor Smith relies show that j2's share has fallen since 2005, even with these acquisitions.

EXHIBIT ___7___ PAGE 156

### 1.   There Is No Evidence of Deterred Competition Or Entry

Venali's expert, Professor Smith, does not explain in his report how Catch Curve enforcing and licensing its patents has harmed competition.[202] He provides no analysis or examples. In his recent deposition, Professor Smith admitted that he is not aware of "any entrant or potential entrant who hasn't entered because of threat of litigation,"[203] nor does he know any example "of somebody who wasn't able to compete as a result of it."[204] Professor Smith admitted that beyond the payment of the license fee itself, which he agreed is "not a large number," he has not done any analysis of whether and to what extent the payments have limited the licensees' ability to compete against j2.[205] His analysis thus offers *no assessment* of whether the alleged sham patent litigation claims have harmed competition. He has not studied whether the AudioFAX patents have had any impact on its competitors, much less an impact that would harm the competitive process. Thus, his opinion can be of no use to determine the impact, if any, of the claimed j2/Catch Curve anticompetitive acts.

As discussed in detail above, according to the data on which Professor Smith relies, there has been rapid entry of new Internet facsimile providers since 2005. Additionally j2's share, as calculated based on Professor Smith's methodology using the data from Mr. Davidson's reports, has declined since 2005. This is contradictory to Venali's claim of harm to competition.

### 2.   j2 And Others Were, And Are, Able to Compete While Paying The License Fee

Licenses to the AudioFAX patents were available before j2 purchased them in 2005. If j2 intended to block competitors it could have refused to license the AudioFAX patents it acquired in 2005. j2/Catch Curve instead continued to make licenses available.[206]

Firms that licensed the AudioFAX patents *prior* to j2's ownership have been able to compete effectively. j2 itself is a prime example. Until 2005, j2 was in the position of *licensee*

---

[202] Professor Smith confirmed that he did no such analysis in his deposition. "A. Well, you're talking about a hypothetical. What would j2 be but for the lawsuit and I haven't done that analysis. Q. And you haven't done that analysis with respect to anybody else? A. No. Q. So in terms of this you're expressing no opinion that these lawsuits have caused any material competitive harm to any of the competitors in the market? ... [A.] For the 50 that we are talking about of 50 plus who are currently in the market." A. Yes. Q. I'm correct? A. You're correct." Deposition of Richard Smith (rough transcript), 8/12/08, p. 89.
[203] Deposition of Richard Smith (rough transcript), 8/12/08, p. 83. .
[204] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 214-5. .
[205] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 218, 223-4.
[206] Deposition of Richard Ressler (Chairman of the Board, j2), 12/19/07, pp. 96, 99.

EXHIBIT ___7___ PAGE 157

of the AudioFAX patents rather than an owner.  Licensing the AudioFAX patents cannot pose a material barrier to entry if j2 was able to successfully compete while being a licensee itself.  j2 and some of its competitors (such as Xpedite[207]) paid a licensing fee for the AudioFAX patents years ago (e.g., j2 took a license in 2001).

Catch Curve also licenses the AudioFAX patents today at licensing fees that are sufficiently low that firms can pay them and compete with j2 on price.  Professor Smith argues that j2 has been pursuing a strategy of licensing the patents while at the same time it has been charging prices higher than the firms he considers competitors.  Because the license fees are relatively low, not only would these firms not be barred from entering the market by the patents, but the alleged high prices charged by j2 would give firms an even *greater* incentive to license the patents and enter the market, offering competition to j2.   In almost every case the license fees were charged as a relatively small one-time lump sum, and represent a fixed cost.[208] Economic theory teaches that once the license was paid it would no longer affect these competitors' pricing decisions.

Additionally, competitors that have allegedly had to pay the cost of litigation or licensing fees represent a small slice of the relevant market in which j2 competes.  I understand the AudioFAX patents are not relevant for some of the products and services in the relevant market. Thus, Catch Curve's actions could not affect *market* prices.  Moreover, there is no allegation that j2 is attempting to pursue sham patent litigation against producers of other competing products like fax machines.

Lastly, in protecting its patent rights Catch Curve has incurred legal fees itself, just like its competitors.  As Venali's founder testified, it is "extremely expensive" to bring patent litigation.[209]  It follows that any patent litigation related to the AudioFAX patents in which Catch Curve was involved was costly to Catch Curve.  Because legal costs are born by both Catch Curve and those with whom it is in litigation, these fees alone cannot be considered a barrier to entry.

---

[207] "AudioFAX Patent Licensing Program," undated, CC/V 154617.  Xpedite is owned by Premiere Global Services.
[208] Exhibit 5:  "Comparison of Revenues and License Fees for Internet Facsimile Service Provider Licensees to AudioFAX Patents."   In the three cases where a running royalty was charged, the patents being licensed included other patents that are not part of the AudioFAX portfolio.
[209] Deposition of Amin El-Gazzar (founder, former CEO, and former CTO of Venali, Inc.), 12/7/07, p. 194.

EXHIBIT __7__ PAGE 158

## XI.     Summary Comments on Professor Smith's Analysis

Professor Smith states that j2 has a high market share – but analysis of the data on which Professor Smith relies shows that j2 does not have a dominant market share however you define the market in which it competes.  It also shows that j2's share has declined since j2 purchased the AudioFAX patents.  Professor Smith did not analyze barriers to entry in his report – but actual analysis of the single hypothetical barrier he discusses in deposition, outbound portability, shows it does not serve as a barrier to entry.  The number of j2's free subscribers that convert or upgrade to paying customers is very low, and the vast majority do not keep their existing number when they become paying customers.  Professor Smith offers no analysis of how j2/Catch Curve's pursuit of licensing its patents has in fact impacted competition.  He could not point to any excluded competitors,[210] nor could he link j2's actions to a direct impact on any competitor's ability to compete with j2 in the marketplace.[211]  Analysis of the data on which Professor Smith relies shows that entry has been rapid since j2 purchased the AudioFAX patents in 2005. Professor Smith's opinions about j2 are generally contradicted by the facts.  Industry participants also testified that the core data on which he relies are not complete or reliable.  He applies analyses to these data that are not conducted in accordance with accepted economic practice – and when the data are treated in a standard way, they do not support Professor Smith's conclusions.  Lastly, Professor Smith offers a summary opinion in his report that j2 has market power of antitrust concern, and that its actions have harmed competition, even when he admits in deposition that he has no evidence that *any* of j2's competitors has been harmed.   It follows that his summary opinion is not based on an accepted economic methodology.

The above facts are sufficient, without any other evidence or analysis, to conclude that j2 does not have monopoly power, nor does it have the "dangerous probability" of acquiring it. Catch Curve's practice of licensing the AudioFAX patents has not harmed competition, or insulated j2 from competition.  For completeness, however, I assess here Professor Smith's additional analyses, which he calls his "direct" evidence.[212]   Professor Smith assesses data and concludes that (1) j2's prices are higher in 2007 than some of its competitors,[213] (2) that j2 has a

---

[210] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 83, 149-50.
[211] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 214-5.
[212] Smith Report, ¶¶ 8, 11-13
[213] Smith Report, ¶ 11.

EXHIBIT ____7____ PAGE __159__

high profit margin which is higher than some of its competitors,[214] and (3) that j2 has been able to profitably increase the price of its basic service three times in the past 8 years.[215]  From these facts he concludes that j2 has substantial market power in an alleged market for Internet facsimile services purchased by SOHO customers.

Professor Smith's "direct" analysis is flawed conceptually and unreliable empirically. His "direct" analysis offers no information towards assessing whether j2 has monopoly power, or whether Catch Curve's patent enforcement actions have harmed competition.  I assess the problems with Professor Smith's analysis below.  Additionally, I analyze Professor Smith's calculations regarding "injury to competition" and damage to Venali and show that neither of these is reflective of or related to in any way to the concept of antitrust damage caused by j2/Catch Curve's alleged sham patent litigation in this case.

### A.       Professor Smith's "Direct Analysis" Is Unreliable

#### 1.       Professor Smith's "Merger Guidelines" Approach Implies That j2 Is in Its Own Product Market

Leaving aside the mistakes in his empirical calculations, Professor Smith's conceptual argument is that j2's margins are so high, and the short run customer losses at the time of its three price increases are low enough, that j2 has failed the Merger Guidelines test.[216]  The Merger Guidelines pose the question "what would happen if a hypothetical monopolist of that product imposed at least a 'small but significant and nontransitory' increase in price" in the context of defining a product market.[217]  If a monopolist of a product can profitably impose a small but significant and non-transitory price then the product is in its own product market.  Professor Smith's "test" of j2's pricing, following the Merger Guidelines logic, would find that j2 is in a product market of its own for the sale of j2 Internet facsimile services.

Obviously no one, even Professor Smith, believes that j2 is a monopolist in its own product market.  But this underscores the fact that Professor Smith's test cannot be used to infer anything about the product market in which j2 competes or whether j2 has market power of antitrust concern.  As j2's cancellation data show, more customers state that they are leaving j2's

---

[214] Smith Report, ¶¶ 11, 38.
[215] Smith Report, ¶ 11.
[216] Smith Report, ¶ 11.
[217] U.S. Department of Justice and Federal Trade Commission, 4/2/92, *1992 Horizontal Merger Guidelines*, Sections 1.0 and 1.1.

service to buy a fax machine than to go to another Internet facsimile provider.[218]  When asked about whether his analysis means j2 is in its own market, Professor Smith was unable to offer an explanation.  Instead, he said "my analysis…looks at the actions of j2 not just in terms of extracting super competitive prices from its existing paying customers but also its actions in terms of the efforts [to] restrain aggressively competitive behavior in the same market."[219]  However, as already discussed, Professor Smith has admitted that he did not analyze how j2's challenged conduct has impacted competition.

### 2.  Professor Smith's Approach Implies That Whenever A Firm Profitably Increases Its Price over Time, It Has Market Power of Antitrust Concern

Again, leaving aside the mistakes in his empirical calculations, Professor Smith's analysis implies that any time a firm increases the price of its product over time, and does not see an equal proportional loss in customers or a general loss in profit, that the firm has market power of antitrust concern.

There are obviously countless reasons why a firm could profitably increase its price over time that do not imply market power of antitrust concern.  A few examples include: Demand could be rising for all makers of the product because of general increases in the desirability relative to other competing products.[220]  Demand could be rising for the firm's product because of relative increases in demand for its own product due to success of its brand and advertising.[221]  The firm's product could be changing in quality, or the firm's product features could be

---

[218] Exhibit 6:  "Number of eFax Customers that Identify Switching to an Alternative Provider or Product, Q3 2006 – Q2 2008."

[219] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 185.  He also said, without clear explanation, "my reasoning actually is essentially similar to Turicchi's reasoning that he laid out in his deposition about…the limitations of the market."  Deposition of Richard Smith (rough transcript), 8/12/08, pp. 187.

[220] The growth in relative demand for the continually improving Internet facsimile services is evidenced by the total amount of paying Internet facsimile services individual customers in 2005 versus in 2007.  Since at least 2005, the number of paying customers in the industry has increased by 15-19% annually.  Davidson, Peter, J., "Fax Services Markets, 2005-2009," p. 12; Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p. 12; Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, p. 8.  This is due in part to increases in features and quality.  Protus added several new features to its MyFax product in 2007, including the ability to "[r]eceive fax notifications on a cell phone," receive faxes at multiple email addresses, and "[u]se spam filters."  Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, pp. 95-6.  j2 has also added new features to its eFax product over the years, including an on-line archiving service and extended customer service.  Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, pp. 32-3, 38.  Davidson, Peter, J., "Fax Services Markets, 2005-2009," 2006, p. 12; Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p. 12; Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, p. 8.

[221] As discussed previously, both Venali and its expert acknowledge j2's relative advantages, such as brand premium and successful advertising.  See, for example, "Venali Offsite Your Functional Area Presentation," by Vincent Marottoli, 1/18/07, VEN 100635 – 45 at VEN 100639 – 40.  See also Deposition of Richard Smith (rough transcript), 8/12/08, pp. 150-2.

EXHIBIT __7__ PAGE 161

changing.[222]  The firm's competitors could be raising their prices.[223]  The firm could have been offering the product unprofitably, and is simply raising price to reach positive profitability.[224]

Professor Smith does not conduct a proper analysis to control for *any* of these factors. It is important to recognize that when j2 raised its prices it was concerned about losing existing customers – and it did lose existing customers, 10-15% of them.[225]  Those customers likely went to competing products.  Professor Smith, rather than conducting a proper economic analysis, concludes that a profitable increase in price by j2 is in and of itself evidence of market power of antitrust concern. It is telling that by this logic Venali and CallWave could also have market power.  CallWave "hiked" prices for its packages in mid-2007.[226]  Venali also implemented a meaningful price increase which did not cause Venali to lose many customers.[227]  Professor Smith states in deposition that were Venali to raise its prices without an equal loss in customers that it too would have market power.[228]  That illustration, which is consistent with Venali's own testimony that it profitably raised prices, is perhaps the clearest statement that whatever concept of "market power" Professor Smith is speaking about, it is not one of antitrust concern or relevance to the claims Venali has made in this case.

---

[222] The price increase in 2003 from $9.95 to $12.95 coincided with feature enhancements, including extended customer service, and a new feature called the message center, which is a "third-party repository…where messages are kept for some number of days or months" that customers can access via the Internet.  Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, pp. 32-3.  The price increase in 2006 coincided with feature enhancements including an "extension of the message center storage from one year to two and the inclusion of 30 send pages as part of the bundle."  Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, p. 38.  For some customers, this price increase actually represented a price *decrease* because they no longer had to pay for incremental send pages.
[223] Venali and CallWave have increased prices. Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, p. 31. Deposition of John Robert Poncy (CEO, Venali), 8/21/07, pp. 137-8.
[224] Mr. Turicchi testified that as a result of the first price increase, "[l]osses became profits."  Deposition of Robert Scott Turicchi (Co-President, j2), 1/9/08, p. 31. Professor Smith's Exhibit 5, which reports a negative operating profit margin for j2 from 1Q 1999 through 4Q 2001, is consistent with this explanation.
[225] Smith Report, ¶ 30; Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p. 71.
[226] "[I]n mid-2007, Callwave hiked the rates for the firm's fax services, telling customers of the service that it has raised rates to $12.95 a month and a limited number of pages, up from what was previously $7.95 for unlimited service….The new $12.95 rate plans cut the number of pages a FAX number can receive to 300 pages, with 200 pages sent; unlimited service now costs $59.95 a month."  Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, p. 31.
[227] Deposition of John Robert Poncy (CEO, Venali), 8/21/07, pp. 137-40.
[228] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 37, 102.

EXHIBIT ____7____ PAGE 162

### 3. Professor Smith's Approach Implies That Whenever A Firm Has A Higher Price Than Some of Its Competitors, It Has Market Power of Antitrust Concern

Setting aside any empirical mistakes in his regression analysis, Professor Smith's interpretation of his regression is that j2 has higher prices than its competitors in 2007[229] and thus j2 must have market power of antitrust concern. By this logic, any time a competitor is able to charge a higher price for its product than that charged by competing products, the competitor has market power of antitrust concern.

This is not consistent with generally accepted economic principles. There are many reasons why competing products might be sold at different prices. Professor Smith's pricing analysis excludes both tangible features (e.g., whether the products in his sample bundle other services with Internet facsimile services, or the availability of an archive feature) and less tangible features, such as customer service, reliability of service, and brand.[230] In his deposition, Professor Smith admitted that in the real world, many companies price above marginal cost and a premium brand in a competition space could price higher than its competitors.[231] Professor Smith further agreed that the higher price due to a premium brand is not anticompetitive.[232] j2 and eFax are one of the oldest providers of Internet facsimile services. Brand recognition surely provides them a competitive advantage that they have earned over time through service and advertising.

---

[229] Smith Report, ¶ 11.

[230] The recent Davidson Consulting industry report lists some of these less tangible features, noting Internet facsimile service companies "compete on the basis of pricing, reliability of service, customer support, service and software ease of use, scalability, product branding, geographic coverage and local language support." Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p. 7. In Professor Smith's deposition, when questioned if he would agree with Mr. Davidson that Internet fax service providers compete on the basis of the multiple factors, he answered "I think they probably do." Deposition of Richard Smith (rough transcript), 8/12/08, p. 179. Venali's General Counsel, Mr. O'Keefe, similarly testified firms compete in the alleged SOHO Internet facsimile services market via marketing, price, features, availability of local, toll-free, and international numbers, reliability of service, and customer service. Deposition of Douglas L. O'Keefe (Outside General Counsel, Venali), 9/19/07, pp. 91-2, 96-7, 99-103

[231] "Q...In many markets in the real world, people don't price at marginal cost, do they? A. I would agree with that.... Q. If you're the premium brand in a space, don't you have the ability to price your product in a premium to others? A. ...I would call lack of competitive pressure. Q. That's not because it's anticompetitive, is it? A. No." Besides brand premium, Professor Smith testified that there are other factors that would enable companies to price above marginal cost, including location, intellectual property, quality, and perceived quality. He called them collectively as "lack of competitive pressure." Professor Smith admitted that he did not "parse out individual components" when analyzing j2's "market power." Deposition of Richard Smith (rough transcript), 8/12/08, pp. 48- 51. . Professor Smith also stated "You control for what you can. What's left over is the unexplained variance and the co-efficient on the j2 variable is a measure of...j2 specific rent.... And the case of the j2 specific rent could be just that it was a good brand if it weren't in the context of the approach that j2 takes to develop[] paid accounts and the litigation practices that j2 has in dealing with others in the market." Deposition of Richard Smith (rough transcript), 8/12/08, p. 165.

[232] Deposition of Richard Smith (rough transcript), 8/12/08, p. 51.

EXHIBIT 7 PAGE 163

It is well understood in markets in which products are differentiated that different prices can coexist without any given firm having market power of antitrust concern.[233]  Professor Smith's analysis shows that j2 does not even have a dominant share of Internet facsimile services purchased by U.S. SOHO customers.  Thus j2's "higher" price cannot be a sign that customers have nowhere to turn.  As Professor Smith acknowledges, there are more than 50 competitors to j2 in just the U.S. SOHO Internet facsimile services "market"[234] and they allegedly offer competitive services for lower prices.  Customers also have available to them alternative competing products.  There are thus plenty of places for customers who believe j2 is charging too much to turn.  It is plainly not a lack of competitive alternatives that enables j2 to charge a higher price than some of its competitors.  Professor Smith's regression analysis gives no insight as to which products constrain j2's pricing, nor whether j2 has market power of antitrust concern.

### 4.    Professor Smith's Approach Implies That Profitable Firms Have Market Power of Antitrust Concern

Professor Smith cites the level of j2's margins as evidence that j2 has market power.[235]  To draw such conclusions is inconsistent with generally accepted economic practices and academic literature.  Even if Professor Smith had been able to calculate margins that properly allocated costs over time for the relevant portion of j2's business, these margins would not shed light on the issues of whether or not j2 has monopoly power.

The economic literature is consistent with this view.  Baker and Bresnahan (1992) explain, "high profits or margins might reflect efficiencies, such as low costs or superior product design, rather than market power."[236]  Other authors agree:

"A focus on margins as an indicator of either market boundaries or market power is entirely inappropriate.  Empirical research has not supported the position that market share or concentration is particularly correlated with accounting margins.  In addition, high net margins may merely be reflective of the high returns required

---

[233] Hay (1991-1992) explains some firms in industries characterized by monopolistic competition (a situation in which each firm's products are differentiated from those of competitors and entry is unrestricted) might be able to charge prices that exceed marginal costs or average costs, and may be more profitable than other firms, but still lack market power of antitrust concern because "absent barriers to entry, genuine market power of the kind the antitrust laws ought to be concerned about cannot exist."  Hay, George, "Market Power in Antitrust." *Antitrust Law Journal* 60, pp. 807-27 at pp. 814-5.
[234] Deposition of Richard Smith (rough transcript), 8/12/08, p. 81.
[235] Smith Report, ¶¶ 11, 28, 36.
[236] Baker, Jonathan B. and Timothy F. Bresnahan (1992), "Empirical Methods of Identifying and Measuring Market Power," *Antitrust Law Journal* 61:  3 – 16 at 5.

EXHIBIT _____7_____ PAGE _164_

on successful products, given the inherent uncertainty and riskiness of such investment."[237, 238]

Economies of scale are likely to exist in providing Internet facsimile services, and j2 has invested and grown such that it could benefit from them.[239]  Professor Smith recognized in his deposition that his charts of j2's margins (Exhibits 5 and 6) contain some evidence that j2 achieved its margins by virtue of economies of scale.[240]  However, he also admitted that beyond his Exhibits 5 and 6, he has not done any analysis as to how much of j2's ability to achieve its margins is the result of economies to scale.[241]

Professor Smith additionally does not even compare j2's margins to those of other Internet facsimile companies, but rather to a set of companies in different industries or for which the Internet facsimile business is relatively less important.[242, 243]  There is nothing in this analysis that can shed light on which products constrain j2's pricing, nor whether it has market power of antitrust concern.

## B.      Professor Smith's "Direct Analysis" Is Empirically Unsound

Professor Smith purports to have calculated elasticities through two different methods. Neither calculation method is reliable nor follows basic economic principles.

---

[237] Pleatsikas, Christopher, and David Teece (2001), "The analysis of market definition and market power in the context of rapid innovation," *International Journal of Industrial Organization* 19:  665-693 at 675.

[238] Professor Smith recognized that JFAX and eFax took the economic risk to enter into the Internet facsimile service before it became a more established business.  Deposition of Richard Smith (rough transcript), 8/12/08, p. 51.

[239] Interview with Scott Turicchi, 7/16/08.

[240] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 102-3.

[241] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 105-6.

[242] See Smith Report, Exhibits 7, 8, and 9.  In the footnotes to the Exhibits, Professor Smith notes that only six of the ten "peer" companies offer Internet facsimile services.  Even among the six "peer" companies that sell Internet facsimile services, the relative importance of that business varies by company.  For example, Premiere Global Services reported $496 million in revenues in 2006, but only an estimated $54 million of those revenues (or about 11 percent) were from its Internet facsimile service business.  Another "peer" company, CallWave, reported $36.6 million total in revenue for fiscal year 2006, of which it is estimated only about $14 million (or 38 percent) is from its Internet facsimile service business.  In contrast, j2 reported $181.1 million in revenues in 2006, of which an estimated $138 million (or 76 percent) were from its Internet facsimile services business.  Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, pp. 10-1, 17, 30, 70, 88.  "Financial Statements for Premiere Global Services, Inc. - Google Finance" http://finance.google.com/finance?fstype=ii&q=NYSE:PGI, accessed 7/8/08; CallWave Inc SEC Form 10-K for the fiscal year ended 6/30/06, filed on 9/27/06, p. 18

[243] A more informative comparison might be with Venali's projected margins.  In September 2003, Venali projected that its gross margins would be 78 percent in 2003, 81 percent in 2004, and 79 percent in 2005.  This is similar to Professor Smith's calculations of j2's three-year average gross margins (2004-2006), which he calculated to be about 80 percent.  Recently, Venali's gross margins have been not that much lower than those of j2.  Venali's gross margin was around 63 percent in January 2007 and February 2007, and 68 percent in March 2007.  Exhibit 7 to Smith Report; Deposition of John Robert Poncy (CEO, Venali), 8/21/07, pp. 115, 124, Exhibit 5 [VEN 280281-349 at VEN280284], and Exhibit 12 [VEN 206936-9 at VEN 206938].

His first "elasticity" calculation is based on a statement by Mr. Turicchi in a conference call in which the late 2003 – mid 2004 price increase was discussed. Professor Smith decides from this information he can calculate that the elasticity of demand facing j2 is 0.6.[244] This is not a proper empirical estimate of elasticity because it does not control for all relevant j2 customers (both existing and new, as the market was growing) nor does it control for any other changes happening at the time. It is well understood in the academic literature that simply comparing a single price and quantity change over time is *not* a measure of demand elasticity.[245] In deposition, Professor Smith acknowledges that he "might have basically done [the calculation] back of the envelope"[246] and that he did nothing to control for other factors that could have changed at the time of the price increase. Instead, he "just rel[ied] on it being over a short period of time, which is …going to be a way of trying [to] hope that the world doesn't change too much around you."[247] This is wrong: among other changes, j2's product was enhanced at the same time as the price increase and the overall demand for Internet facsimile services relative to other competing products was increasing over the same period.

His second set of "elasticity" calculations is through his calculation of a "Lerner Index". Professor Smith suggests that "high" values of the Lerner Index imply j2 has market power of antitrust concern. It is well understood by economists and governmental authorities that the Lerner index alone is of limited use in identifying firms that have market power of antitrust concern.[248]

Professor Smith also has not, in fact, calculated a real Lerner Index.[249] The inappropriateness of his calculations can be seen by reviewing the underlying quarterly estimates

---

[244] Smith Report, ¶ 30. Professor Smith quotes a statement made by Mr. Turicchi's statement in a Q2 2006 Conference Call about j2's study of the 2003 price increase: "there was a very nice positive delta between a 25% price raise and an 85% retention rate." According to Professor Smith, this implies an elasticity of demand equal to $0.6 = (1-85\%)/25\%$.

[245] For a discussion of the advantages and disadvantages of several different methods to estimate demand, and identification challenges in doing so, see Nevo, Aviv (2000), "A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand." *Journal of Economics & Management Strategy* 9(4): pp. 513-48.

[246] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 254-5.

[247] Deposition of Richard Smith (rough transcript), 8/12/08, pp. 256.

[248] This is because it "does not offer a competitive benchmark except in perfectly competitive markets, where the Lerner Index should be zero." Federal Trade Commission. "How do Courts and Agencies Evaluate Market Power?" http://www.ftc.gov/opp/jointvent/classic3.shtm, accessed 8/15/08

[249] Smith Report, ¶ 39. Professor Smith approximates marginal cost with the change in cost of sales and the change in operating expenses, respectively. Neither cost measure is a good approximation to marginal cost. Moreover, it is worth noting that Professor Smith uses cost and revenue data on *all* of j2's operations (including its businesses that are not Internet facsimile services) in these estimations.

EXHIBIT ___7___ PAGE _166_

that are the basis of his eight-year period average.[250]  Professor Smith's methods yield estimates with very large variation.  Quarterly estimates reveal a range during this period from -1.9 to 2.3 (where changes in cost of sales proxy for marginal cost), and an even wider range from -4.1 to 3.6 (where changes in operating expenses proxy for marginal cost).[251]  The large variance in these calculations is evidence of their lack of reliability.  As another example, in the fourth quarter of 2006, the Lerner index is as high as 1.3 (using cost of sales), which would lead Professor Smith to conclude that j2 is not profit maximizing (in other words, it is pricing lower than it should).  In contrast, in the same quarter Professor Smith's measure (using operating expenses) yields a Lerner index as low as 0.03, which would lead Professor Smith to conclude that j2 is pricing consistent with participation in a perfectly competitive market.[252]

### C.   Professor Smith's "Direct Analysis" Is Unrelated to The Question of Whether j2 Has Been Able to Harm Competition through The Alleged Sham Patent Litigation

Professor Smith's "direct analysis" is unrelated to the question of whether j2 has harmed competition and gained monopoly power through its pursuit of licensing and litigating the AudioFAX patents.   Professor Smith's Exhibits 5 and 6 show that compared to 2004, j2's gross margin and operating profit margin actually dropped in 2005 and the following years after Catch Curve acquired and began to license the AudioFAX patents.  Additionally two of the three price increases on which Professor Smith focuses his analysis took place before Catch Curve acquired the AudioFAX patents.[253]  j2 was a licensee under the patents at the time of the second price increase, and involved in litigation with AudioFAX at the time of the first price increase.[254]  Beyond all the deficiencies cited above, there is a fundamental mismatch between his analyses and the question of whether j2 could harm competition through the alleged sham patent litigation.

---

[250] Professor Smith "can't remember specifically the calculation" when questioned in the deposition, nor has he provided any back-up materials to support his calculation.  Deposition of Richard Smith (rough transcript), 8/12/08, p. 259.   However, it appears that Professor Smith took the simple average of the quarterly Lerner indices estimated as the ratio of the difference between the changes in revenue and the changes in his measures of cost to the changes in revenue.  Professor Smith used data from March 31, 1999 to March 31, 2007, a rather long period with close to 75 percent of the sample period being prior to j2's acquisition of the AudioFAX patents.

[251] Exhibit 9:  "j2's Lerner Index and Demand Elasticities Calculated Using Professor Smith's Method."

[252] Exhibit 9:  "j2's Lerner Index and Demand Elasticities Calculated Using Professor Smith's Method."

[253] In his deposition, Professor Smith admitted that the first two price increases were not a result of its enforcement of the AudioFAX patents, and that he did not analyze "the role of that enforcement in that price increase."  Deposition of Richard Smith (rough transcript), 8/12/08, pp. 57-8.

[254] AudioFAX sued j2 on 10/28/99.  The parties settled and j2 became a licensee on 11/14/01.  Exhibit 4:  "Timeline for the AudioFAX Patents."

EXHIBIT ___7___ PAGE 167

**D.     Professor Smith's "Damages" Estimate Is Unrelated to The Antitrust Claims in This Case**

Professor Smith states that his regression model, in which he claims j2 charged higher prices than some of its competitors in 2007, quantifies harm to consumers from the alleged sham patent litigation pursued by j2.[255]  This regression does not relate j2's allegedly higher prices in 2007 to the allegedly anticompetitive licensing behavior between 2005 and 2007, nor does it offer any insight on *why* prices for j2-branded packages were higher in 2007, if they in fact were. Professor Smith discusses the fact that firms can have the power to charge higher prices due to pro-competitive means like producing a superior product.[256]  As discussed above, j2 might be able to charge a higher price for the same package compared to its rivals if j2 had more successful advertising or better-recognized brands.  An appropriate damages analysis would need to assess the impact that the alleged *anticompetitive behavior* has had on consumer pricing.  To my knowledge, Venali and its expert, Professor Smith, have not put forth *any* theory as to how consumers have been harmed by the alleged sham patent litigation.  That is, Venali and its expert have not linked consumer harm to the alleged anticompetitive j2 behavior.  This is not surprising given the relatively modest fee that Catch Curve charges for the use of the AudioFAX patents. The lack of any theory highlights the flimsiness of Venali's claim that the alleged sham patent behavior constitutes anticompetitive behavior from an antitrust perspective.

Professor Smith also offers an opinion on the alleged antitrust damages suffered by Venali as a result of the alleged sham patent litigation.  He states, without any explanation, that these alleged damages are the attorneys' fees and costs to defend the patent infringement lawsuit that Catch Curve has brought against Venali.[257]  From an economic perspective, these fees do not represent harm to competition or antitrust damages.  Such damages would necessarily require Venali to show that it has been harmed in its ability to *compete* with j2 in the market in which they both participate and that this has lead to general harm in the market.  Neither Venali nor Professor Smith has offered evidence of this type of harm.  Again, given the facts, I am not surprised that they have fallen short on this burden.  A modest lump sum cost suffered by Venali would not be expected to impact its pricing to customers or its approach to the market in which it competes.  The lack of any claim of harm to Venali in its ability to compete makes clear that the

---

[255] Smith Report, ¶¶ 62-5.
[256] Smith Report, ¶¶ 23.
[257] Smith Report, ¶66.

EXHIBIT ____7____ PAGE 168

alleged sham patent behavior does not constitute *anticompetitive* behavior from an antitrust perspective.


Dated:  August 26, 2008

Vandy M. Howell, Ph.D.

EXHIBIT __7__ PAGE 169

# Appendix A:  Curriculum Vitae

## VANDY M. HOWELL, Ph.D.
### Vice President

**Cornerstone Research**
353 Sacramento Street, 23rd Floor • San Francisco, CA  94025
415.229.8156 • fax 415.229.8199
vhowell@cornerstone.com

## ACADEMIC BACKGROUND

1992 – 1997   **Massachusetts Institute of Technology**                Cambridge, Massachusetts
*Ph.D.*
Fields:  Labor economics, applied microeconomics, econometrics.  General examinations in macroeconomic theory and labor economics.

1985 – 1989   **University of California at Berkeley**                Berkeley, California
*Bachelor of Arts in Mathematical Economics with High Honors.*
Member Phi Beta Kappa.

1988   **London School of Economics**                London, England
Visiting student in economics, towards completion of UC Berkeley Economics degree.

## PROFESSIONAL EXPERIENCE

1997 – Present   **Cornerstone Research, Inc.**                San Francisco, California
*Vice President*
Manage and conduct economic analysis on a variety of complex business litigation issues.  Areas of experience include antitrust, intellectual property, class action, breach of contract and matters focusing on labor markets.

Expertise in large dataset and survey analysis.  Conceive, execute and direct empirical analysis and modeling on large data sets.  Set surveys and evaluate survey data.

Expertise in class certification issues.

Present complex results to a variety of audiences including industry clients, attorneys and academic and industry experts.

Examples of consulting work include assessing market definition and market power in many industries including biotechnology, consumer products, agricultural products, electronics and labor markets; clarifying economic relationships in antitrust tying and exclusive dealing cases; estimating damages due to alleged antitrust violations; determining appropriate royalty rates; constructing and analyzing survey data on consumer preferences; estimating damages due to product failure; determining the value of new technologies.

**VANDY M. HOWELL**
**Vice President**

## PROFESSIONAL EXPERIENCE (cont.)

| | | |
|---|---|---|
| 2005 | **University of California at Berkeley** | Berkeley, California |

*Lecturer*

Instructor of Industrial Organization and Public Policy (upper division undergraduate course focusing on the economics of competition and antitrust policy).

| | | |
|---|---|---|
| 1995 – 1996 | **Chicago Partners** | Chicago, Illinois |

*Senior Economist*

| | | |
|---|---|---|
| 1994 | **Department of Labor, Office of the Secretary** | Washington, D.C. |

*Researcher*

| | | |
|---|---|---|
| 1994 – 1997 | **Massachusetts Institute of Technology** | Cambridge, Massachusetts |

*Instructor*

Lectured and taught courses in macroeconomics and labor economics to MIT undergraduates and graduate students.  Received outstanding reviews from students.

*Research Assistant, 1994*

Coauthored paper "The Role of Small Firms in Wage Adjustments" with Frank Levy (MIT).  Presented paper at AEA meetings in January 1994.

*Research Assistant, 1993*

Examined how various Federal welfare programs affect the well-being of children for monograph, "Welfare and the Well-Being of Children".  Published as part of *Fundamentals of Pure and Applied Economics* series (1995).  With Janet Curry (UCLA).

| | | |
|---|---|---|
| 1990 – 1992 | **Federal Reserve Board** | Washington, D.C. |

*Lead Research Assistant*

Coordinated and contributed to regular confidential internal domestic forecast for FOMC meetings.  Research support to Chairman Greenspan and Darrell Cohen on paper using automobile scrappage rates to estimate pent up automobile demand.  Greenspan, A. and Cohen, D, "Motor Vehicle Stocks, Scrappage, And Sales", *The Review of Economics and Statistics*, Volume: 81 Number: 3 Page: 369-83.

## PUBLICATIONS

"Economics of Antitrust: The Current State of Law and Economics on Bundled Discounts," with C. Saravia (forthcoming) *Global Competition Review: The Antitrust Review of the Americas* (special issue) 2009

"Economics of Antitrust: An Economic Analysis of Resale Price Maintenance," with D. Garrett and M. Burtis *Global Competition Review: The Antitrust Review of the Americas* (special issue) 2008

"Class Certification Under Rule 23," (contributor) *ABA Indirect Purchaser Litigation Handbook* 2007

"Economics of Class Certification in Indirect Purchaser Antitrust Cases," with D. Garrett and S. Hussain, *Competition*, Journal of the Antitrust and Trade Regulation Section of the State Bar of California, Vol. 10, No. 1.

**VANDY M. HOWELL**
**Vice President**

## PRESENTATIONS

Expert in mock trial program focusing on conscious parallelism and price fixing. At the ABA Spring Meetings in Washington D.C., March 2005. Sponsored by the ABA, Section of Antitrust Law.

Panel presentation to the New York State Bar Association, Antitrust section, on the implications of current legal rulings in antitrust on the operation of joint ventures. January 2007.

Panel presentation on the use of survey methodologies in intellectual property litigation for Law Seminars International (LSI). Feb 2007.

## EXPERT TESTIMONY

*Monsanto Company v. Joe Kyle, et.al.* U.S. District Court, Eastern District of Arkansas, Eastern Division. Filed expert report in regard to antitrust counterclaims in response to patent litigation.

EXHIBIT ___7___ PAGE 172

# Appendix B
# Documents Relied Upon by
# Vandy M. Howell, Ph.D.

**Document Title, Bates Numbers**                                               **Document Date**

## CASE MATERIALS

### Legal Pleadings

| | |
|---|---|
| Claim Construction Order | May 11, 2007 |
| Defendant and Third Party Plaintiff Venali, Inc.'s Third Supplemental Response to j2 Global Communications, Inc.'s First Set of Interrogatories | November 5, 2007 |
| Venali, Inc.'s Answer to Amended Complaint, Affirmative Defenses, Amended CounterClaim, and Third Party Complaint | August 2008 |

### Depositions

| | |
|---|---|
| Deposition of John Robert Poncy, with Exhibits | August 21, 2007 |
| Deposition of Douglas L. O'Keefe, with Exhibits | September 19, 2007 |
| Deposition of Douglas L. O'Keefe, with Exhibits | December 18, 2007 |
| Deposition of James R. Kennedy, Ph.D., Volume 1, with Exhibits | November 28, 2007 |
| Deposition of Michael W. McLaughlin, with Exhibits | December 5, 2007 |
| Deposition of Ralph Musgrove, with Exhibits | December 6, 2007 |
| Deposition of Amin El-Gazzar, with Exhibits | December 7, 2007 |
| Deposition of Richard Ressler, with Exhibits | December 19, 2007 |
| Deposition of Jeffrey Adelman | January 8, 2008 |
| Deposition of Robert Scott Turicchi | January 9, 2008 |
| Deposition of Richard Smith, Ph.D. (Rough Transcript) | August 12, 2008 |

### Expert Reports

| | |
|---|---|
| Expert Report of Richard L. Smith, Ph.D., with Appendices, Exhibits | July 3, 2008 |
| Excerpts from Appendix 3 to Smith Report: | |
| "j2 Communications Investor Presentation (Based Upon Year End 2006 Results)" | March 12, 2007 |
| "MyFax Increases Coverage of Local Area Codes for Businesses" | June 8, 2007 |
| "Contractor Builds More Efficient Communication with MyFax" | July 19, 2007 |

| Document Title, Bates Numbers | Document Date |
|---|---|

**Bates Stamped Documents**

| | |
|---|---|
| Patent License Agreement between AudioFAX IP LLC and j2 Global Communications, Inc. CC/V 461-74 | November 14, 2001 |
| Email from D. O'Keefe, to D. O'Keefe, A. Gazzar, P. Maher, et al., Subject: Business Plan Responsibilities, with Attachments: Venali Business Plan 6.06.03.doc; Executive Summary Final 2nd DRAFT.doc VEN 107501-43 | July 15, 2003 |
| Email from D. O'Keefe, to A. Gazzar, U. Hinderer, et al., with Attachment, Venali Business Plan 08-19-2003.doc VEN 107377-98 | August 19, 2003 |
| Venali Investors' Perspectives 2005 VEN 137331-56 | January 10, 2005 |
| Email Exchange between P. Giordano, and E. Yesil, Subject: Follow Up to Our Meeting, with Attachment: Messaging Market (2).xls VEN 291646-8 | August 17, 2005 |
| Patent License Agreement between Catch Curve, Inc., j2 Global Communications, Inc., and EasyTel.Net CC/V 128135-54 | November 8, 2006 |
| Venali Presentation: Venali Offsite Your Functional Area Presentation VEN 100635-45 | January 18, 2007 |
| Patent License and Settlement Agreement between Catch Curve, Inc. and j2 Global Communications, Inc., and CallWave, Inc. CC/V 153705-45 | March 13, 2007 |
| Patent License Agreement between Catch Curve, Inc., j2 Global Communications, Inc., and Dynamic Depth, Inc., and Copia International, Ltd. CC/V 159121-45 | December 13, 2007 |
| Venali vs. Fax Server End-user and Reseller Speaking Bullets VEN 132266-76 | |
| Pasquale Giordano's Transition Document VEN 200420-38 | |
| Venali: Venali ROI Calculator - Comparing to Fax Machines VEN 030945-50 | |
| Venali: Venali ROI Calculator - Comparing to Fax Server Systems VEN 030951-7 | |
| Venali: Venali ROI Calculator - Comparing to Print and Mail VEN 030958-63 | |
| Venali: ROI Calculator: Venali Production Fax Services Solution Compared to "Print and Mail" Method VEN 030964-7 | |
| Venali Innovative eMessaging Solutions: Cost Comparison for Mailings VEN 137318-24 | |
| Venali Presentation VEN 133578-605 | |

| Document Title, Bates Numbers | Document Date |
|---|---|

Venali Presentation:  Venali Market Sizing and Dynamics
VEN 133469-79;

Venali Presentation:  Marketing
VEN 171875-904

AudioFAX Patent Licensing Program - Executed License Agreements by Date
CC/V 154617

Davidson Reports

Davidson, Peter, "Fax, Email and Voice Messaging Services, 2003-2008"

Davidson, Peter J., "Fax Service Markets, 2005-2009"

Davidson, Peter J., "Fax Service Markets, 2006-2010"                          July 2007

Davidson Consulting, "Fax Service Markets, 2007-2012"                        July 2008

Other Case Documents

j2 Table with Column Headings "Sum of Subscription Base" and "Marketing Region"

j2 Tables with Column Headings "Prod 2," "Change,"  and "Data"

j2 Table with Column Headings "Supplier" and "Website"

j2 Table with Column Headings "Sum of Cancels," "Cancel Code," and "Cancel Description"

AudioFax Patent Licensing Program - Executed License Agreements - by Date (as of 8/4/08)

## OTHER DOCUMENTS

World Wide Web Sites

http://www.twice.com/index.asp?layout=articlePrint&articleID=CA6410725, accessed 8/15/08

http://www.efax.com/en/efax/twa/page/howItWorks, accessed 06/24/08

http://www.venali.com/support/quickstart/index.htm, accessed on 06/24/08

http://www.eia.doe.gov/emeu/recs/recs2005/hc2005_tables/hc11homeelectronics/pdf/tablehc2.1 1.pdf, accessed 7/24/08

http://www.adobe.com/aboutadobe/pressroom/pressmaterials/pdfs/acrmessenger/acrmdatasheet.p df, accessed 7/29/08

http://catchcurve.com/AudioFAX_Executed_Agreements_Litigation.asp, accessed 4/18/08

http://catchcurve.com/AudioFAX_Overview_Patented_Tech.asp, accessed 6/18/08

http://www.captaris.com/rightfax/, accessed 8/1/08

https://www.efax.com/en/efax/twa/page/howItWorks, accessed 6/24/08

http://www.ftc.gov/opp/jointvent/classic3.shtm, accessed 8/15/08

| Document Title, Bates Numbers | Document Date |
|---|---|

http://office.microsoft.com/en-us/help/HP010377981033.aspx, accessed 7/29/08

http://www.myfax.com/overview.asp?bt=p, accessed 6/24/08

http://your.rogers.com/business/businesssolutions/Internetfax.asp, accessed on 8/15/08

http://www.microsoft.com/windowsxp/using/setup/hwandprograms/printfaxscan.mspx#4, accessed 7/29/08

http://www.venali.com/solutions/email_to_fax.php, accessed 6/5/08

http://www.venali.com/soho/faq.htm, accessed 6/24/08

http://www.venali.com/soho/index.htm, accessed 8/15/08

http://www.venali.com/soho/packages.htm, accessed 6/24/08

http://www.venali.com/about/service/servicemap.php, accessed 8/15/08

http://www.techweb.com/encyclopedia/shared/printArticlePageSrc.jhtml?term=e-mail, accessed 8/4/08

http://www.iec.org/online/tutorials/unifeid_mess/index.html, accessed 6/24/08

http://www.microsoft.com/windows/windows-vista/features/fax-scan.aspx, accessed 8/6/08

http://www.techweb.com/encyclopedia/shared/printArticlePgeSrc.jhtml?term=fax, accessed 8/6/08

http://searchcio-midmarket.techtarget.com/sDefinition/0,,sid183_gci1064916,00.html, accessed 8/6/08

http://www.mfpa.org/, accessed 8/20/08

http://www.techweb.com/encyclopedia/shared/printArticlePgeSrc.jhtml?term=unified+messaging, accessed 8/6/08

http://www.venali.com/support/quickstart/index.htm, accessed 8/6/08

http://www.myfax.com/features.asp?bt=p, accessed 6/24/08

http://finance.google.com/finance?fstype=ii&q=NYSE:PGI, accessed 7/8/08

http://www.accessmylibrary.com/coms2/summary_0286-16229274_ITM, accessed 7/31/08

http://www.accessmylibrary.com/coms2/summary_0286-33567683_ITM, accessed 7/31/08

http://it.toolbox.com/wiki/index.php/Document_Management, accessed 8/6/08

http://www.thus.net/aboutus/contactus.shtml, accessed 8/21/08

http://www.eagletel.com/, accessed 8/26/08

http://datafax.datainfosys.net/, accessed 8/26/08

http://www.demon.net/aboutus/index.html, accessed 8/26/08

http://www.demon.net/toolkit/electronicfax/, accessed 8/26/08


Academic and Government Publicationss

Baker, Jonathan B., and Timothy F. Bresnahan, "Empirical Methods of Identifying and Measuring Market Power," *Antitrust Law Journal*, Vol. 61, 1992, pp. 3-16

| Document Title, Bates Numbers | Document Date |
|---|---|

Carlton, Dennis W., and Jeffrey M. Perloff, *Modern Industrial Organization*, Pearson, Addison Wesley, Fourth Edition, 2005, pp. 76-7

Federal Trade Commission, "How Do Courts and Agencies Evaluate Market Power?" http://www.ftc.gov/opp/jointvent/classic3.shtm, accessed 8/15/2008

Fisher, Franklin M.,"Diagnosing Monopoly," in *Industrial Organization, Economics and the Law*. John Mons (ed.).  MIT Press, 1991, pp. 9-15

Hay, George A., "Market Power in Antitrust," *Antitrust Law Journal*, Vol. 60, 1992, pp. 807-27

Nevo, Aviv, "A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand," *Journal of Economics & Management Strategy*, Vol. 9, No. 4, Winter 2000, pp. 513-48

Pleatsikas, Christopher, and David Teece, "The Analysis of Market Definition and Market Power in the Context of Rapid Innovation," *International Journal of Industrial Organization*, Vol. 19, 2001, pp. 665-93

Stigler, George J., "Barriers to Entry, Economies of Scale, and Firm Size," Chapter 6 of *The Organization of Industry*, Homewood, Illinois:  Richard D. Irwin, Inc., 1968

U.S. Department of Justice and Federal Trade Commission, 4/2/92, *1992 Horizontal Merger Guidelines* (with April 8, 1997, Revisions to Section 4 on Efficiencies)

White, Lawrence J., "Wanted:  A Market Definition Paradigm for Monopolization," New York University Center for Law and Business, Working Paper #CLB-99-002, February 1999


SEC Filings

| | |
|---|---|
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 3/31/00 | May 15, 2000 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 6/30/00 | August 14, 2000 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 9/30/00 | November 14, 2000 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 3/31/01 | May 15, 2001 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 6/30/01 | August 13, 2001 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 9/30/01 | November 14, 2001 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 3/31/02 | May 15, 2002 |
| j2 Global Communications, Inc. Form 10-Q for the Quarterly Period Ended 6/30/02 | August 14, 2002 |
| j2 Global Communications, Inc. Form 10-Q for the Quarterly Period Ended 9/30/02 | November 8, 2002 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 3/31/03 | May 9, 2003 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 6/30/03 | August 13, 2003 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 9/30/03 | November 14, 2003 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 3/31/04 | May 10, 2004 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 6/30/04 | August 9, 2004 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 9/30/04 | November 8, 2004 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 3/31/05 | May 9, 2005 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 6/30/05 | August 9, 2005 |

| Document Title, Bates Numbers | Document Date |
|---|---|
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 9/30/05 | November 8, 2005 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 5/03/06 | May 10, 2006 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 6/30/06 | March 12, 2007 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 9/30/06 | March 12, 2007 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 3/31/07 | May 9, 2007 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 6/30/07 | August 7, 2007 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 9/30/07 | November 9, 2007 |
| j2 Global Communications, Inc. Form 10-Q for the Period Ended 3/31/08 | May 8, 2008 |
| j2 Global Communications, Inc. Form 10-K/A for the Fiscal Year Ended 12/31/00 | April 30, 2001 |
| j2 Global Communications, Inc. Form 10-K/A for the Period Ended 12/31/01 | April 29, 2002 |
| j2 Global Communications, Inc. Form 10-K for the Period Ended 12/31/05 | March 27, 2006 |
| j2 Global Communications, Inc. Form 10-K for the Period Ended 12/31/07 | February 25, 2008 |
| JFAX.COM, Inc. Form S-1 | April 16, 1999 |
| CallWave Inc. Form 10-K for the Period Ended 6/30/06 | September 27, 2006 |
| MCI, Inc. Form 10-K for the Period Ended 12/31/03 | April 29, 2004 |

Bloomberg Corporate Action Calendar

| | |
|---|---|
| Bloomberg Corporate Action Calendar for j2 Global Communications, Inc. | December 8, 2000 |
| Bloomberg Corporate Action Calendar for j2 Global Communications, Inc.'s Acquisition of YAC Ltd. | July 19, 2007 |

Case Opinions

*United States v. DuPont and Co.*, 351 U.S. 377 (1956), http://laws.findlaw.com/us/351/377.html, accessed 8/16/2008

## Exhibit 1A
## Internet Facsimile Service Providers
### 2005 – 2008

Source:  Various Reports by Peter J. Davidson[1]; Exhibit 2 to Smith Report; j2 Table with Column Headings "Supplier" and "Website"; Various Websites; *Bloomberg*

| Supplier | Internet Fax Service Providers Identified by Davidson Reports | | | | | | | | | Internet Fax Service Providers Identified by j2[6] |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Internet Fax Service Providers Selling to Individuals,[2] with Service in the U.S.[3] | | | Internet Fax Service Providers Selling to Individuals and/or Enterprises,[4] with Service in the U.S.[3] | | | Internet Fax Service Providers Selling to Individuals and/or Enterprises,[4] Currently not Serving in the U.S.[5] | | | |
| | 2005 | 2006 | 2007 | 2005 | 2006 | 2007 | 2005 | 2006 | 2007 | 2008 |
| CallWave | y | y | y | y | y | y | | | | |
| Cbeyond | y | y | y | y | y | y | | | | |
| Comodo | y | y | y | y | y | y | | | | |
| EasyLink | y | | y | y | y | y | | | | |
| Easytel | y | y | y | y | y | y | | | | |
| Faxaway | y | y | y | y | y | y | | | | |
| FreedomVOICE Systems | y | y | y | y | y | y | | | | |
| Global Virtual Office | y | y | y | y | y | y | | | | |
| Intelicomm | y | y | y | y | y | y | | | | |
| j2 Global Communications | y | y | y | y | y | y | | | | |
| MaxEmail | y | y | y | y | y | y | | | | |
| Melobr (GreenFax) | y | y | y | y | y | y | | | | |
| Protus IP Solutions | y | y | y | y | y | y | | | | |
| RingCentral | y | y | y | y | y | y | | | | |
| Send2Fax (now part of j2)[8] | y | | | y | | | | | | |
| Telanetix, formerly Accessline | y | y | y | y | y | y | | | | |
| Teleconnect | y | y | y | y | y | y | | | | |
| Venali | y | y | y | y | y | y | | | | |
| Biscom | | | | y | y | y | | | | |
| Concord Fax | | | | y | y | y | | | | |
| Esker | | | | y | y | y | | | | |
| Graphnet | | | | y | y | y | | | | |
| MCI | | | | y | y | y | | | | |
| Premier Global, formerly Ptek (Xpedite) | | y | y | y | y | y | | | | |
| 8x8 | | y | y | y | y | y | | | | |
| BabyTel | | y | y | | y | y | | | | |
| Eagle Telecommunications[9] | | y | | | y | | | | | |
| GoDaddy | | y | y | | y | y | | | | |
| Intelliverse | | y | y | | y | y | | | | |
| Metro High Speed | | y | y | | y | y | | | | |
| Packetel | | y | y | | y | y | | | | |
| PATlive | | y | y | | y | y | | | | |
| Popfax | | y | y | | y | y | | | | |
| TalkFree | | y | y | | y | y | | | | |
| Uniserve | | y | y | | y | y | | | | |
| uReach | | y | y | | y | y | | | | |
| Whaleback | | y | y | | y | y | | | | |
| InterFax | | | | | y | y | | | | |
| MessageVision | | | | | y | y | | | | |
| Intermedia | | | y | | | y | | | | |
| MongoNet | | | y | | | y | | | | |
| OneSuite | | | y | | | y | | | | |
| China Telecom | | | | | | | y | y | y | |
| CommuniLink | | | | | | | y | y | y | |
| Data Info Systems[10] | | | | | | | y | y | y | |
| Digital Host | | | | | | | y | y | y | |
| Digital Message Network (Fujitsu South Africa) | | | | | | | y | y | y | |
| Fax Ltd. | | | | | | | y | y | y | |
| Fax Online Australia | | | | | | | y | y | y | |
| GnatX | | | | | | | y | y | y | |
| Mbfax | | | | | | | y | y | y | |
| Teamphone | | | | | | | y | y | y | |
| THUS[11] | | | | | | | y | y | y | |
| Webonline | | | | | | | y | y | y | |
| Yac (now part of j2)[12] | | | | | | | y | y | | |
| Beijing Yuantel | | | | | | | | y | y | |
| Bezeq | | | | | | | | y | y | |
| China VoIP & Digital Telecom | | | | | | | | y | y | |
| Shanghai Telecom | | | | | | | | y | y | |
| Tiscali | | | | | | | | y | | |
| British Telecom | | | | | | | | | y | |
| PamFax | | | | | | | | | y | |
| 2Point | | | | | | | | | | y |
| 800 PBX | | | | | | | | | | y |
| Actual Software | | | | | | | | | | y |
| Arcosoft | | | | | | | | | | y |
| Aspect Software | | | | | | | | | | y |
| Avtex Incorporated (iTELconnect.com) | | | | | | | | | | y |
| Big Sky Tech | | | | | | | | | | y |
| Boomerang | | | | | | | | | | y |
| Broadriver | | | | | | | | | | y |
| CALLWARE | | | | | | | | | | y |
| Captaris | | | | | | | | | | y |
| CASTELLE | | | | | | | | | | y |
| Charles River Consultants (E-sync) | | | | | | | | | | y |
| Click4Help | | | | | | | | | | y |
| ConnectMeVoice | | | | | | | | | | y |
| Copia | | | | | | | | | | y |
| CTI2 | | | | | | | | | | y |
| CTL (www.ctiinc.com) | | | | | | | | | | y |
| Diamond Voice (FOD) | | | | | | | | | | y |
| Digital Messaging Solutions Pty | | | | | | | | | | y |
| Digital Speech | | | | | | | | | | y |
| ECN Media | | | | | | | | | | y |
| Electrasoft | | | | | | | | | | y |
| EmFast (FACSys_Optus) | | | | | | | | | | y |
| Equisys | | | | | | | | | | y |
| FAR Systems | | | | | | | | | | y |

| Supplier | Internet Fax Service Providers Selling to Individuals,[3] with Service in the U.S.[3] | | | Internet Fax Service Providers Selling to Individuals and/or Enterprises,[4] with Service in the U.S.[3] | | | Internet Fax Service Providers Selling to Individuals and/or Enterprises,[4] Currently not Serving in the U.S.[5] | | | Internet Fax Service Providers Identified by j2[4] |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2005 | 2006 | 2007 | 2005 | 2006 | 2007 | 2008 |
| Fax Broadcasting Service | | | | | | | | | | y |
| Fax Micro Systems | | | | | | | | | | y |
| Fax2me.com | | | | | | | | | | y |
| FaxBack | | | | | | | | | | y |
| Faxbin | | | | | | | | | | y |
| FaxCore | | | | | | | | | | y |
| Faxit | | | | | | | | | | y |
| Fenestrae | | | | | | | | | | y |
| FNC Inc | | | | | | | | | | y |
| GFI | | | | | | | | | | y |
| Global Access, Inc. | | | | | | | | | | y |
| GoFaxer | | | | | | | | | | y |
| GotVmail | | | | | | | | | | y |
| Hostway | | | | | | | | | | y |
| InPhonics | | | | | | | | | | y |
| Interactive Intelligence | | | | | | | | | | y |
| Internet America | | | | | | | | | | y |
| Interpage (uReach reseller) | | | | | | | | | | y |
| King Communications | | | | | | | | | | y |
| LaunchFax | | | | | | | | | | y |
| Mobile Storm | | | | | | | | | | y |
| Officeworxx (Faxxis) | | | | | | | | | | y |
| OMTOOL | | | | | | | | | | y |
| Openfax | | | | | | | | | | y |
| Parus Interactive (Webley) | | | | | | | | | | y |
| PSNext | | | | | | | | | | y |
| Quadrant Software | | | | | | | | | | y |
| Shadowstorage Inc. (Protus Reseller) | | | | | | | | | | y |
| SRFax | | | | | | | | | | y |
| SS8 Networks (CENTIGRAM) | | | | | | | | | | y |
| StoneVoice | | | | | | | | | | y |
| Streem | | | | | | | | | | y |
| Teleco | | | | | | | | | | y |
| TelePacific | | | | | | | | | | y |
| Telus | | | | | | | | | | y |
| TollFreeMax | | | | | | | | | | y |
| Topcall (KoFax) | | | | | | | | | | y |
| UFAX | | | | | | | | | | y |
| Unified Mailbox | | | | | | | | | | y |
| Unix USA | | | | | | | | | | y |
| Virtualplus | | | | | | | | | | y |
| Vocalocity | | | | | | | | | | y |
| Voice Mail Depot Inc (Cisco reseller) | | | | | | | | | | y |
| VoiceNation | | | | | | | | | | y |
| Web-fax | | | | | | | | | | y |
| WorkEasy (FOD) | | | | | | | | | | y |
| XIFAX | | | | | | | | | | y |
| Other[13] | | | | | | | | | | |
| **Total Counts[13]** | 18 | 31 | 32 | 0 | 24 | 38 | 40 | 0 | 13 | 17 | 17 | 0 | 74 |

Note:
[1] Davidson, Peter J., "Fax Service Markets, 2005-2009" ("2005-2009 Report"); Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, ("2006-2010 Report"); and Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, ("2007-2012 Report").
[2] Companies that are explicitly listed in Table 3-3 of 2005-2009 Report, Table 3-2 of 2006-2010 Report, and Table 3-2 of 2007-2012 Report, respectively.
[3] Companies that are identified in Exhibit 2 to Smith Report are Internet facsimile service providers selling to individuals. Additionally, based on Professor Smith's method, several companies that are not in Exhibit 2 to Smith Report were also identified as serving in the U.S. These companies are Internet facsimile service providers selling to enterprises (Biscom, Concord, Esker, Graphnet, Interfax, MCI, and Message Vision) and companies identified in the 2007-2012 Report, but not the 2006-2010 Report that Professor Smith relied upon (Intermedia, MongoNet, OneSuite, and Telanetix (Telanetix acquired Accessline, a firm that Professor Smith identified as a U.S. service provider)).
[4] Companies that are explicitly listed in Table 3-3 and Exhibit 3-6 of 2005-2009 Report, Table 3-2 and Exhibit 3-6 of 2006-2010 Report, and Table 3-2 and Exhibit 3-6 of 2007-2012 Report, respectively.
[5] Companies that are not identified in Exhibit 2 to Smith Report as serving in the U.S. , and are not in the list identified in footnote [3] above.
[6] Companies that are identified by j2 as Internet facsimile service providers, see a j2-provided table with column headings "Supplier" and "Website." The majority of these companies provide service in the U.S. http://www.accessmylibrary.com/coms2/summary_0286-33567683_ITM.
[7] Rapidfax, the individual Internet fax service unit of Easylink Services International Corporation, was acquired by j2 Global Communications in December 2007.
[8] Send2Fax was acquired by j2 Global Communications in 7/27/2006. http://www.accessmylibrary.com/coms2/summary_0286-16229274_ITM.
[9] Besides the 2006 revenue figures, no further information is listed for Eagle Telecommunications in the Davidson report. Eagle Telecommunications continues to offer full conferencing solutions at http://www.eagletel.com/.
[10] Despite a lack of 2007 revenue figures in the Davidson report, Data Info Systems (based in India) continues to operate their Datafex service which can be found at http://datafax.datainfosys.net/. However, it seems to have "disposed of" Demon Netherlands, which may have been part of its Internet facsimile services business, in June 2006. http://www.thus.net/aboutus/index.shtml; see also 2005-2009 Report pp. 83-4.
[11] THUS is a U.K.-based firm that still operates today. It offers Internet facsimile services under the brand name Demon. http://www.demon.net/aboutus/index.html; http://www.demon.net/toolkit/electronicfax/.
[12] Yac Limited was acquired by j2 Global Communications on 7/19/07. See Bloomberg Corporate Action Calendar for j2 Global Communications Inc's acquisition of YAC Ltd, 7/19/07.
[13] The Davidson Reports lump an unknown number of companies into an "other" category rather than listing them by name. These "other" companies are not included in the total counts.

EXHIBIT _7_ PAGE _180_

# Exhibit 1B
# Number of Internet Facsimile Service Providers
# Identified by Davidson Reports
# 2005 – 2007

Source: Various Reports by Peter J. Davidson[1]; Exhibit 2 to Smith Report; Various Websites

|  | Number of Providers[5] | | |
|---|---|---|---|
|  | 2005 | 2006 | 2007 |
| Internet Fax Service Providers Selling to Individuals,[2] with Service in the U.S.[3] | 18 | 31 | 32 |
| Internet Fax Service Providers Selling to Individuals and/or Enterprises,[4] with Service in the U.S.[3] | 24 | 38 | 40 |
| Internet Fax Service Providers Selling to Individuals Worldwide[2] | 31 | 47 | 48 |
| Internet Fax Service Providers Selling to Individuals and/or Enterprises Worldwide[4] | 37 | 55 | 57 |

Note:
[1] Davidson, Peter J., "Fax Service Markets, 2005-2009" ("2005-2009 Report"); Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, ("2006-2010 Report"); and Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, ("2007-2012 Report").
[2] Companies that are explicitly listed in Table 3-3 of 2005-2009 Report, Table 3-2 of 2006-2010 Report, and Table 3-2 of 2007-2012 Report, respectively.
[3] Companies that are identified in Exhibit 2 to Smith Report as U.S. Internet facsimile service providers selling to individuals. Additionally, based on Professor Smith's method, several companies that are not in Exhibit 2 to Smith Report were also identified as serving in the U.S. These companies are Internet facsimile service providers selling to enterprises (Biscom, Concord, Esker, Graphnet, Interfax, MCI, and Message Vision) and companies identified in the 2007-2012 Report, but not the 2006-2010 Report that Professor Smith relied upon (Intermedia, MongoNet, OneSuite, and Telanetix (Telanetix acquired Accessline, a firm that Professor Smith identified as a U.S. service provider)).
[4] Companies that were explicitly listed in Table 3-3 and Exhibit 3-6 of 2005-2009 Report, Table 3-2 and Exhibit 3-6 of 2006-2010 Report, and Table 3-2 and Exhibit 3-6 of 2007-2012 Report, respectively.
[5] The Davidson Reports lump an unknown number of companies into an "other" category rather than listing them by name. These "other" companies are not included in the total counts.

*Highly Confidential*

EXHIBIT 7 PAGE 181

# Exhibit 2
## Examples of Document Delivery Products

Source: Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07; j2 Global Communications, Inc. SEC Form 10-K for 2007, filed on 2/25/2008; Deposition of Ralph Musgrove, 12/6/07; Various Websites

| Product/Service | Description[1] | User Interface for Sending and Receiving Documents | Selected Providers/Manufacturers (Product/Service Brand) |
|---|---|---|---|
| **Products that Allow Consumers to Send Faxes** | | | |
| Internet Facsimile Services | Internet fax services allow users to send and receive faxes through email or from a web interface. | Electronic documents (usually PDF or TIFF format) received or sent as attachments to email messages. | See Exhibit 1A: "Internet Facsimile Service Providers, 2005 – 2008" |
| Fax Machine | Fax machines scan a paper form and transmit a coded image over the telephone system. The receiving machine prints a copy (a facsimile) of the original. A fax machine is made up of a scanner, printer and modem with fax signaling. | Paper documents received or sent through a fax machine. | Brother, Canon, HP, Panasonic, Samsung, Sharp, Xerox, etc. |
| Multifunction Printer / Multifunction Peripheral (MFP), or Multifunction Device (MFD) | An MFP (Multi Function Printer/Product/Peripheral) or Multifunction Device (MFD), is an office machine that incorporates the functionality of multiple devices in one, so as to have a smaller footprint in a home or small business setting, or to provide centralized document management/distribution/production in a large-office setting. A typical MFP may act as a combination of some or all of the following devices: printer, scanner, photocopier, and fax. | Depending on the functionality of the MFP, either paper documents received or sent through a MFP; or electronic documents (in PDF, TIFF or other format) received or sent as an attachment to email or a document in a pre-specified network folder (electronic sending and receiving features are usually available in medium to high-end MFPs) | Brother, Canon, Dell, Epson, Hewlett-Packard, Konica Minolta, Kyocera, Lexmark, Oce, Okidata, Olivetti, Ricoh, Samsung, Sharp, Toshiba, Xerox, etc. |
| Desktop fax software | Desktop fax software makes it easy to send and receive faxes, scan documents and images, and share those items with others right from a computer. Microsoft includes desktop fax software with some versions of its operating systems. | Electronic documents (usually PDF or TIFF format) received or sent as an attachment to an email. With Windows Fax and Scan (WFS) users can send and receive faxes, fax or email scanned documents and forward faxes as email attachments from the computer. WFS supports one-click scanning of documents from locally connected scanners, network-connected scanners and multifunction devices. | Microsoft (Windows Fax and Scan available in Business, Ultimate and Enterprise editions of Windows Vista, Windows XP Fax is available with some Windows XP editions), Symantec (WinFax Pro), etc. |
| Unified Messaging/ Communications | Unified messaging is the integration of several different communications media, such that users will be able to retrieve and send voice, fax, and e-mail messages from a single interface, whether it be a wireline phone, wireless phone, PC, or Internet-enabled PC. | Users can have a different interface depending on the choice of a solution. Systems can integrate a number of incoming message types with any one of optional collection methods. E.g., one of the combinations allows users to receive emails, faxes and voicemail in email. | Accessline, Avaya, j2 Onebox, Mpathix, RingCentral, uReach, etc. |

Highly Confidential

EXHIBIT ___7___ PAGE 182

# Examples of Document Delivery Products

Source: Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07; j2 Global Communications, Inc. SEC Form 10-K for 2007, filed on 2/25/2008; Deposition of Ralph Musgrove, 12/6/07; Various Websites

| Product/Service | Description[1] | User Interface for Sending and Receiving Documents | Selected Providers/Manufacturers (Product/Service Brand) |
|---|---|---|---|
| Fax Server (and Related Software) | A fax server is a system installed in a local area network (LAN) server that allows computer users who are attached to the LAN to send and receive fax messages. Fax messages can be stored as printable word processing, graphics, database, or spreadsheet files. | Electronic documents (e.g. PDF, TIFF, PCL) as an attachment to email or a document in a pre-specified network folder. Users can also upload or receive electronic documents from a web interface. | Best Software, Biscom, Captaris, Castelle, Equisys, Esker, Faxcore, Fenestrae, GFI, Interstar, Omtool, Quadrant, etc. |

**Additional Competing Document Delivery Products[2]**

| Product/Service | Description[1] | User Interface for Sending and Receiving Documents | Selected Providers/Manufacturers (Product/Service Brand) |
|---|---|---|---|
| E-mail | The transmission of text messages and optional file attachments over a network. | Electronic documents (any format) received or sent as an attachment to an email. | Google, Yahoo, Microsoft, AOL, etc. |
| Document Management Products | Document management products allow users to produce, store, control, and track documents in a workgroup environment. There are as many procedures and methods for managing documents as there are organizations. Some document management products are bundled with MFPs, thus allowing greater flexibility in integrating paper documents into the electronic workflow and more distribution options. | Users can distribute documents using document management software and their system's native email application to create emails with the documents as an attachment. Documents can be distributed via fax or email, and posted to embedded Web servers, depending on the products and setup. | eCopy (bundled with Canon MFPs), Questys (bundled with Toshiba MFPs), Adobe Acrobat Messenger, etc. |

Note:
[1] Description of products was generally copied verbatim from the underlying sources. (http://www.venali.com/support/quickstart/index.htm; https://www.efax.com/en/efax/twa/page/howitWorks; http://www.techweb.com/encyclopedia/shared/printArticleSrc.jhtml?term=fax; http://www.mfpa.org/; http://www.microsoft.com/windows/windows-vista/features/fax-scan.aspx; http://www.techweb.com/encyclopedia/printArticlePage.jhtml?term=unified+messaging; http://www.iec.org/online/tutorials/unified_mess/index.html; http://searchcio-midmarket.techtarget.com/sDefinition/0,,sid183_gci1064916,00.html; http://www.techweb.com/encyclopedia/printArticlePage.jhtml?term=e-mail; http://it.toolbox.com/wiki/index.php/Document_Management)
[2] Other products and services that might compete with Internet Facsimile Services include overnight delivery services (see Deposition of Ralph Musgrove, 12/6/07, pp. 134-5), telephone service (see Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p. 7; j2 SEC Form 10-K for 2007, p.6), and voicemail service (see Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p.7; j2 SEC Form 10-K for 2007, p.6). and voicemail service (see Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, p.7; j2 SEC Form 10-K for 2007, p.6).

*Highly Confidential*

EXHIBIT _____7_____ PAGE 183

## Exhibit 3
## AudioFAX Patents:  Licensing and Litigation Information
## for Internet Facsimile Service Providers[1]

Source:  Davidson, Peter J., "Fax Service Markets: 2006-2010," 7/07; Exhibit 2 to Smith Report;
CC/V 154617; CC/V 14376 – 416; CC/V 461 – 74; CC/V 153705 – 45; Catch Curve Website

| Supplier | 2006 Revenue (Individual)[2] ($M) | 2006 Revenue (Enterprise)[3] ($M) | 2006 Revenue (Individual & Enterprise)[3] ($M) | Effective Date of License | Licensed from AudioFAX | Licensed from Catch Curve | Sued by AudioFAX | Sued by Catch Curve |
|---|---|---|---|---|---|---|---|---|
| j2 | 102 | 36 | 138 | 11/15/01 | ✔ | | ✔ | |
| Premiera | 2 | 52 | 54 | 2/11/97 | ✔ | | ✔ | |
| EasyLink | 4 | 39 | 43 | | | | | |
| Protus IP Solutions | 34 | 4 | 38 | | | | | ✔ |
| Mbfax | 10 | 6 | 16 | | | | | |
| Teamphone | 10 | 6 | 16 | | | | | |
| China Telecom | 9 | 6 | 15 | | | | | |
| Digital Message Network | 10 | 5 | 15 | | | | | |
| Beijing Yuantel | 8 | 6 | 14 | | | | | |
| CallWave | 7 | 7 | 14 | 3/13/07 | | ✔ | | ✔ |
| Digital Host | 9 | 4 | 13 | | | | | |
| Venali | 3 | 10 | 13 | | | | | ✔ |
| Accessline | 6 | 6 | 12 | 9/20/04 | ✔ | | | |
| MaxEMail | 7 | 5 | 12 | | | | | |
| Communilink | 6 | 5 | 11 | | | | | |
| Global Virtual Office | 7 | 4 | 11 | | | | | |
| GnetX | 7 | 4 | 11 | | | | | |
| Graphnet | | 11 | 11 | | | | | |
| Bezeq | 7 | 3 | 10 | | | | | |
| Fax Online Australia | 6 | 4 | 10 | | | | | |
| Faxaway | 6 | 4 | 10 | | | | | |
| Yac | 9 | | 9 | | | | | |
| Data Info Systems | 8 | | 8 | | | | | |
| Shanghai Telecom | 3 | 5 | 8 | | | | | |
| Cbeyond | 7 | | 7 | | | | | |
| China VoIP & Digital Telecom | 7 | | 7 | | | | | |
| Fax Ltd. | 7 | | 7 | | | | | |
| Tiscali | 4 | 3 | 7 | | | | | |
| uReach | 3 | 4 | 7 | 11/17/05 | | ✔ | | ✔ |
| Comodo | 4 | 2 | 6 | | | ✔ | | ✔ |
| GoDaddy | 6 | | 6 | | | | | ✔ |
| Easytel | 2 | 3 | 5 | 11/8/06 | | ✔ | | ✔ |
| Intellicomm | 3 | 2 | 5 | 2/26/08 | | ✔ | | |
| Webonline | | 5 | 5 | | | | | |
| Concord Fax | 4 | | 4 | 4/12/00 | ✔ | | | |
| Interfax | | 4 | 4 | | | | | |
| MCI | | 4 | 4 | 3/6/98 | ✔ | | | |
| Eagle Telecommunications | 3 | | 3 | | | | | |
| Meixler (GreenFax) | 1 | 2 | 3 | | | | | |
| Message Vision (part of VillageEDOCS) | | 3 | 3 | 5/12/06 | | ✔ | | |
| RingCentral | 3 | | 3 | 12/15/06 | | ✔ | | |
| Uniserve | 1 | 2 | 3 | | | | | |
| 8x8 | 1 | 1 | 2 | | | | | |
| BabyTel | 1 | 1 | 2 | | | | | |
| Biscom | | 2 | 2 | 3/31/06 | | ✔ | | ✔ |
| FreedomVOICE | 2 | | 2 | 7/11/07 | | ✔ | | |
| Metro High Speed | 1 | 1 | 2 | | | | | |
| Popfax | 1 | 1 | 2 | | | | | |
| Esker (FlyDoc) | | 1 | 1 | 5/30/06 | | ✔ | | ✔ |
| Intelliverse (formerly Voicecom)[4] | 1 | | 1 | 9/12/97 3/27/06 | ✔ | ✔ | | |
| Packetel | 1 | | 1 | | | | | |
| PATlive | 1 | | 1 | | | | | |
| TalkFree | 1 | | 1 | | | | | |
| Teleconnect | 1 | | 1 | | | | | |
| Whaleback | 1 | | 1 | | | | | |
| Other | 8 | 7 | 15 | | | | | |
| Total[5] | 351 | 284 | 635 | | 6 | 10 | 2 | 9 |

Note:
[1] This table includes only companies that are explicitly listed in Table 3–2 and Exhibit 3–6 of "Fax Service Markets: 2006-2010" by Peter J. Davidson.  Additionally, there are 16 licensees to the AudioFAX patents that provide internet facsimile services according to either Mr. Davidson or j2, but are not explicitly listed in Table 3–2 and Exhibit 3–6 of Davidson Report.  See Exhibit 5.
[2] Source:  Table 3–2 of "Fax Service Markets: 2006-2010" by Peter J. Davidson.
[3] Source:  Exhibit 3–6 of "Fax Service Markets: 2006-2010" by Peter J. Davidson.
[4] Intelliverse licensed the AudioFAX patents in 1997 from AudioFax.  After it acquired iNuntius, it took another license to the AudioFAX patents (from Catch Curve) in 2006.
[5] Total revenue figures represent the sum of the revenue numbers presented in each column.  The totals reported here do not match the totals reported in the Davidson report for the 2006 total individual revenue (Davidson reports $345 million total) and 2006 enterprise revenue (Davidson reports $300 million total), likely due to rounding.

Highly Confidential

EXHIBIT 7 PAGE 184

**Exhibit 4**
## Timeline for the AudioFAX Patents

Source:  CC/V 14376 – 416;  CC/V 154617;  Claim Construction Order;  Deposition of Robert Scott Turicchi;  Deposition of James R. Kennedy and Exhibit 13 to Deposition of James R. Kennedy; Deposition of Michael W. McLaughlin; j2 Global Communications, Inc. SEC Form 10-Q for the period ended 6/30/00, filed

| Date | Event |
|---|---|
| **1988** | |
| 9/22 | Filing date for the '926 patent |
| **1991** | |
| 2/19 | Issuing date for the '926 patent |
| 10/31 | '926 patent is assigned to AudioFAX, Inc. |
| 12/4 | James Kennedy, one of two inventors of the '926 patent, signed independent contractor agreement with AudioFAX that stipulates all inventions he creates will be property of AudioFAX, Inc.[1] |
| **1992** | |
| 10/2 | Filing date for the '302 patent |
| **1993** | |
| 8/5 | AudioFAX, Inc. licensed the AudioFAX patent portfolio to its first licensee, Northern Telcom, Inc. |
| **1994** | |
| 3/1 | Issuing date for the '302 patent |
| **1995** | |
| 1/12 | Filing date for the '584 patent |
| 10/17 | Issuing date for the '584 patent |
| **1996** | |
| 5/24 | AudioFAX patent portfolio is assigned to AudioFAX IP LLC. |
| **1999** | |
| 10/28 | AudioFAX IP LLC filed a patent infringement litigation against j2. |
| **2000** | |
| 10/11 | Filing date for the '034 patent |
| 11/21 | Filing date for the '021 patent |
| **2001** | |
| 11/14 | j2 settled the litigation brought by AudioFAX IP LLC and licensed AudioFAX patents.[2] |
| **2003** | |
| 11/4 | Issuing date for the '034 patent |
| **2004** | |
| 8/31 | Issuing date for the '021 patent |
| **2005** | |
| 1/18 | AudioFAX IP LLC transferred its entire title and interest in the AudioFAX patents to j2. |
| 2/5 | j2 transferred the AudioFAX patent portfolio to Catch Curve, a patent-holding company. |
| 7/1 | Catch Curve filed patent infringement suit against Venali. |
| **2011** | |
| Pending | Final AudioFAX patent expires. |

Note:
[1]  The second inventor of the '926 patent, Richard Gordon, signed a similar independent contractor agreement.  See Deposition of James R. Kennedy, 11/28/07, pp. 181-2.
[2]  "Asset Purchase Agreement," 1/18/05, CC/V 14376–416 at CC/V 14395.  However, according to "AudioFAX Patent Licensing Program," CC/V 154617, the agreement date is 11/15/01.

*Highly Confidential*

EXHIBIT 7 PAGE 185

## Exhibit 5
## Comparison of Revenues and License Fees for Internet Facsimile Service Provider Licensees to AudioFAX Patents

Source: Davidson, Peter J., "Fax Service Markets: 2006-2010," 7/07; CCrV 154617; CCrV 128135 – 54; CCrV 153705 – 54; CCrV 159121 – 45; Catch Curve Website: AudioFAX Patent Licensing Program as of 8/4/08, undated; j2 Table with Column Headings "Supplier" and "Website"; Deposition of Ralph Musgrove, 12/6/07; MCI SEC Form 10-K for the year ended 12/31/03, filed on 4/29/04

| Company (Product/Service Brand) | Date of License | 2006 Revenue (Individual) ($M) | 2006 Revenue (Enterprise) ($M) | 2006 Revenue (Total) ($M) | Fixed Fee ($M) | Running Royalty | Notes to License Agreements |
|---|---|---|---|---|---|---|---|
| **Companies that licensed from AudioFAX[1]** | | | | | | | |
| Premiere Global (Fax2Mail), formerly Ptek (Xpedia) | 2/11/97 | 2 | 52 | 54 | 3.05 | | Premiere Technologies licensed on 2/11/97 at $1.55 million; Xpedite, now part of Premiere Global, licensed on 4/7/98 at $1.5 million ($1.1 million of this fee was paid by Premiere) |
| Intelliverse, formerly Voicecom | 9/12/97 | 1 | 1 | 1 | 0.85 | | After the company acquired iNuntius, it took another license to AudioFAX patents (from Catch Curve) on 3/27/06 with a fixed fee of $0.25 million. |
| MCI | 3/6/98 | | 4 | 4 | 1.00 | | |
| Concord Fax[2] (FaxAnywhere) | 4/12/00 | | 4 | 4 | 1.36 | | |
| j2 (eFax, fax.com-formerly Data-on-call, jBlast, jConnect, RapidFax, Onebox, additional brands acquired after 2006 SendZFax, YAC) | 11/15/01 | 102 | 36 | 138 | 1.00 | | |
| Accessline (SmartFax) | 9/20/04 | 6 | 6 | 12 | 1.00 | | $0.6 million guaranteed, $0.4 million in triggers |
| **Companies that licensed from Catch Curve[1]** | | | | | | | |
| uReach (uFax) | 11/17/05 | 3 | 4 | 7 | 0.50 | | $0.25 million guaranteed, $0.25 million in triggers |
| Data Fabrication, Inc. (ClickFax) | 1/3/06 | | | | 0.25 | | $0.15 million guaranteed, $0.1 million in triggers |
| Intelliverse, formerly Voicecom | 3/27/06 | 1 | 1 | 1 | 0.25 | | Intelliverse first took a license to the AudioFAX patents on 9/12/97 (from AudioFAX). It took a second license (from Catch Curve) after it acquired iNuntius. |
| Biscom (FAXCOM) | 3/31/06 | | 2 | 2 | 0.50 | | |
| Message Vision (part of VillageEDOCS) | 5/12/06 | | 3 | 3 | 0.60 | | |
| Esker (FlyDoc) | 5/30/06 | | 1 | 1 | 0.45 | | |
| Easylel | 11/8/06 | 2 | 3 | 5 | 0.45 | The greater of $0.75 per customer account or 10% of revenue | The agreement includes both AudioFAX patents and j2 patents. |
| RingCentral (eXtreme Fax) | 12/15/06 | 3 | | 3 | 0.25 | | |
| DICOM group (TOPCALL) | 12/29/06 | | | | 0.45 | | |
| CallWave | 3/13/07 | 7 | 7 | 14 | | The greater of $1 per customer per month or 10% of fax revenues. | The agreement includes both AudioFAX patents and j2 patents. Callwave also pays a $4 Million paid-up fee for non-fax services. |
| FreedomVOICE Systems (FaxFreedom) | 7/11/07 | 2 | | 2 | 0.13 | | |
| Intermedia, Inc | 10/30/07 | | | | 0.10 | | |
| Intellicomm Inc | 2/26/08 | | | | 0.11 | | |
| EC Data Systems, Inc. | 7/11/08 | 3 | 2 | 5 | 0.07 | | |
| **Total Revenue of All Internet Service Providers Identified in Mr. Davidson's July 2007 Report[3]** | | 351 | 284 | 635 | | | |

Highly Confidential

EXHIBIT ___7___ PAGE ___186___

# Comparison of Revenues and License Fees for Internet Facsimile Service Provider Licensees to AudioFAX Patents

Source: Davidson, Peter J., "Fax Service Markets: 2006-2010," 7/07, CCIV 154617, CCIV 128135 – 54, CCIV 153705 – 45, CCIV 159121 – 45, Catch Curve Website; AudioFAX Patent Licensing Program as of 8/4/08, undated; j2 Table with Column Headings "Supplier" and "Website", Deposition of Ralph Musgrove, 12/6/07, MCI SEC Form 10-K for the year ended 12/31/03, filed on 4/29/04

| Company (Product/Service Brand) | Date of License | 2006 Revenue (Individual) ($M) | 2006 Revenue (Enterprise) ($M) | 2006 Revenue (Total) ($M) | Fixed Fee ($M) | Running Royalty | Notes to License Agreements |
|---|---|---|---|---|---|---|---|
| **Companies that licensed from AudioFAX but not identified by Mr. Davidson's July 2007 Report [4,5]** | | | | | | | |
| Omtool, Ltd. | 5/30/98 | | | | 1.30 | | |
| Captaris, Inc. | 4/17/02 | | | | 1.65 | | |
| Interactive Intelligence, Inc. | 12/31/04 | | | | 1.00 | | |
| **Companies that licensed from Catch Curve but not identified by Mr. Davidson's July 2007 Report [4]** | | | | | | | |
| Castelle | 9/1/05 | | | | 0.40 | | |
| SSB Networks, Inc. | 12/13/05 | | | | 0.50 | | |
| GFI Software, Ltd. | 9/22/06 | | | | 0.61 | | |
| FAXBACK Inc. | 12/28/06 | | | | 0.50 | | |
| Fenestrae Inc. | 2/8/07 | | | | 0.38 | | |
| Quadrant Software, Inc. | 3/14/07 | | | | 0.26 | | |
| Copia International Ltd. | 12/13/07 | | | | 0.34 | 10% of revenue from the sale of published fax software products and maintenance contracts, 5% of revenue from the sale of programming enhancements to those products. | The agreement includes all patents and applications owned by j2 and Dynamic Depth, Inc., in addition to AudioFAX patents |
| Faxcore, Inc. | 3/27/08 | | | | 0.09 | | |
| emFast, Inc. | 3/28/08 | | | | 0.10 | | |

Note:
[1] This group includes companies that are identified in "Fax Service Markets: 2006-2010" by Peter J. Davidson. Revenue figures are from Table 3-2 and Exhibit 3-6 of the report when available.
[2] Davidson Report lists Concord Fax twice on p. 18 (with $4 million and $3 million, respectively).
[3] Total revenue figures represent the sum of the individual revenue numbers totaled in the Davidson report. The totals reported here do not match the totals reported in the Davidson report for the 2006 total individual revenue (Davidson reports $345 million total) and 2006 enterprise revenue (Davidson reports $300 million total), likely due to rounding effect.
[4] These companies are not identified in Mr. Davidson's July 2007 Report, but are identified by j2 as providing Internet facsimile services. See j2 Table with column headings "Supplier" and "Website."
[5] Additionally, two other Internet facsimile services providers licensed from AudioFAX (Delrina in 12/95 for a fixed fee of $1.5 million and WorldCom in 4/04 for a fixed fee of $1 million). Delrina was acquired by Symantec (Deposition of Ralph Musgrove, 12/6/07, p 12). WorldCom merged into MCI in 2004 (MCI SEC Form 10-K for the year ended 12/31/03, filed on 4/29/04).

Highly Confidential

EXHIBIT 7 PAGE 187

## Exhibit 6: Number of eFax Customers that Identify Switching to an Alternative Provider or Product
### Q3 2006 – Q2 2008

Source: j2 Table with Column Headings "Sum of Cancels," "Cancel Code," and "Cancel Description"

| Region | Quarter | "Moving to Another Provider" | "Bought a Fax Machine" | % "Bought a Fax Machine" |
|---|---|---|---|---|
| Domestic - US | 06-Q3 | 633 | 3,060 | 83% |
| | 06-Q4 | 916 | 4,813 | 84% |
| | 07-Q1 | 773 | 4,303 | 85% |
| | 07-Q2 | 864 | 5,126 | 86% |
| | 07-Q3 | 866 | 5,852 | 87% |
| | 07-Q4 | 799 | 5,107 | 86% |
| | 08-Q1 | 723 | 4,655 | 87% |
| | 08-Q2 | 821 | 3,906 | 83% |
| US Total (06Q3 – 08Q2) | | 6,395 | 36,822 | 85% |
| | | | | |
| International | 06-Q3 | 45 | 296 | 87% |
| | 06-Q4 | 65 | 395 | 86% |
| | 07-Q1 | 37 | 407 | 92% |
| | 07-Q2 | 66 | 539 | 89% |
| | 07-Q3 | 75 | 564 | 88% |
| | 07-Q4 | 77 | 547 | 88% |
| | 08-Q1 | 81 | 440 | 84% |
| | 08-Q2 | 101 | 431 | 81% |
| International Total (06Q3 – 08Q2) | | 547 | 3,619 | 87% |
| | | | | |
| Worldwide Total (06Q3 – 08Q2) | | 6,942 | 40,441 | 85% |

*Highly Confidential*

EXHIBIT ____7____ PAGE __188__

## Exhibit 7
## Davidson Implied j2 Share of Internet Facsimile Services Revenue and Subscribers
### 2005 – 2008

Source: Various Reports by Peter J. Davidson[1]; Exhibits 1 and 2 to Smith Report; j2 Table with Column Headings "Sum of Subscription Base" and "Marketing Region"

| | Internet Facsimile Services Sold to Individuals & Enterprises (Professor Smith's Methodology) | | Internet Facsimile Services Sold to Individuals (Professor Smith's Methodology) | | | Internet Facsimile Services Sold to Individuals (Using j2 Reported eFax Subscriber Base) |
|---|---|---|---|---|---|---|
| | Worldwide Revenue[2] ($M) | U.S. Revenue[3] ($M) | Worldwide Revenue[2] ($M) | U.S. Revenue[3] ($M) | Worldwide Paid Subscribers[4,5] (M) | Worldwide Paid Subscribers[4,6] (M) |
| **2005** j2 | 110 | 110 | 85 | 85 | 0.4 | 0.6 |
| total | 449 | 288 | 280 | 183 | 1.3 | 1.6 |
| j2 Share | 24.5% | 38.2% | 30.4% | 52.1% | 30.4% | 36.5% |
| **2006** j2 | 138 | 138 | 102 | 102 | 0.5 | 0.6 |
| total | 635 | 453 | 351 | 231 | 1.6 | 1.6 |
| j2 Share | 21.7% | 30.6% | 29.1% | 44.2% | 28.1% | 35.5% |
| **2007** j2 | 166 | 166 | 124 | 124 | 0.6 | 0.6 |
| total | 747 | 550 | 410 | 287 | 2.0 | 2.0 |
| j2 Share | 22.2% | 30.2% | 30.2% | 43.2% | 30.2% | 31.0% |
| **2008** j2 | | | | | 0.6 | 0.6 |
| total | | | | | 2.4 | 2.4 |
| j2 Share | | | | | 26.9% | 26.9% |

Note:

[1] Davidson, Peter J., "Fax Service Markets, 2005-2009" ("2005-2009 Report"); Davidson, Peter J., "Fax Service Markets, 2006-2010," 7/07, ("2006-2010 Report"), and Davidson Consulting, "Fax Service Markets, 2007-2012," 7/08, ("2007-2012 Report").

[2] Source for individual revenue: Table 3-3 of 2005-2009 Report, Table 3-2 of 2006-2010 Report and Table 3-2 of 2007-2012 Report. Source for enterprise revenue: Exhibit 3-6 of 2005-2009 Report, Exhibit 3-6 of 2006-2010 Report, and Exhibit 3-6 of 2007-2012 Report (2006-2010 and 2007-2012 reports include production faxing in enterprise revenue). The total revenue figures are calculated as the sum of all the companies in each table, which do not always match the totals reported in Davidson Reports, likely due to rounding effect.

[3] U.S. revenue numbers are calculated as the total revenue from companies that are identified in Exhibit 2 to Smith Report as U.S. Internet facsimile service providers selling to individuals. Additionally, based on Professor Smith's method, several companies that are not in Exhibit 2 to Smith Report were also identified as serving in the U.S. These companies are Internet facsimile service providers selling to enterprises (Bitcom, Concord, Esker, Graphnet, Interfax, MiCi, and Message Vision) and companies identified in the 2007-2012 Report, but not the 2006-2010 Report that Professor Smith relied upon (Intermedia, Mongolmail, OneSuite, and Telanetix (Telanetix acquired Accessline as a U.S. service provider)).

[4] The total number of worldwide paid subscribers are from Exhibit 3-1 of 2005-2009 Report, Exhibit 3-1 of 2006-2010 Report, and Exhibit 3-1 of 2007-2012 Report.

[5] Following Professor Smith's method as described in footnote (B) to his Exhibit 1, j2's number of paid subscribers is estimated as total worldwide paid subscribers * j2's share in the worldwide individual internet services.

[6] Number of j2's worldwide paid individual subscribers is taken from a j2 produced table (with column headings "Sum of Subscription Base" and "Marketing Region"), which reports the number of worldwide eFax paid users on a quarterly basis between Q1 2006 and Q2 2008. 2006 figure is the number of eFax worldwide paid subscribers reported as of 6/30/06; 2007 figure is the number of eFax worldwide paid subscribers reported as of 6/30/07; and 2008 figure is the number of eFax worldwide paid subscribers reported as of 6/30/08.

Highly Confidential

EXHIBIT 7 PAGE 189



Exhibit 8:  Number of Worldwide Individual Internet Facsimile Service Users 2004 – 2008

Source: Various Reports by Peter J. Davidson at Davidson Consulting[1]

No. of Subscribers (Millions)

■ Paid Subscribers
■ Free Users

Note:
[1] 2004 figures are from Exhibit 3-1 in "Fax Service Markets, 2005-2009" by Peter J. Davidson; 2005 and 2006 figures are from Exhibit 3-1 in "Fax Service Markets, 2006-2010" by Peter J. Davidson, published in July 2007; 2007 and 2008 figures are from Exhibit 3-1 in "Fax Service Markets, 2007-2012" by Peter J. Davidson, published in July 2008.

*Highly Confidential*

EXHIBIT 7 PAGE 190

# Exhibit 9: j2's Lerner Index and Demand Elasticities
## Calculated Using Professor Smith's Method

Source: j2 Form 10-K and Form 10-Q SEC filings [1]

| No | Quarter[2] | Total Revenue | Cost of Revenues | Operating Expenses | Lerner Index[3] | | Demand Elasticity[4] | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Cost of Rev. | Op. Exp. | Cost of Rev. | Op. Exp. |
| 1 | 99-Q1 | $1,411 | $1,054 | $2,715 | – | – | – | – |
| 2 | 99-Q2 | $1,647 | $1,179 | $3,076 | 0.47 | (0.53) | -2.13 | 1.89 |
| 3 | 99-Q3 | $1,952 | $1,167 | $3,951 | 1.04 | (1.87) | -0.96 | 0.54 |
| 4 | 99-Q4 | $2,633 | $1,241 | $6,418 | 0.89 | (2.62) | -1.12 | 0.38 |
| 5 | 00-Q1 | $2,865 | $1,362 | $7,601 | 0.48 | (4.10) | -2.09 | 0.24 |
| 6 | 00-Q2 | $3,008 | $1,676 | $7,943 | (1.20) | (1.39) | 0.84 | 0.72 |
| 7 | 00-Q3 | $3,266 | $1,709 | $8,168 | 0.87 | 0.13 | -1.15 | -7.82 |
| 8 | 00-Q4 | $4,794 | $2,565 | $7,480 | 0.44 | 1.45 | -2.27 | -0.69 |
| 9 | 01-Q1 | $7,212 | $3,505 | $7,170 | 0.61 | 1.13 | -1.64 | -0.89 |
| 10 | 01-Q2 | $7,863 | $3,063 | $6,886 | 1.68 | 1.44 | -0.60 | -0.70 |
| 11 | 01-Q3 | $8,597 | $3,387 | $6,942 | 0.56 | 0.92 | -1.79 | -1.08 |
| 12 | 01-Q4 | $9,581 | $3,458 | $7,562 | 0.93 | 0.37 | -1.08 | -2.70 |
| 13 | 02-Q1 | $10,379 | $3,440 | $5,516 | 1.02 | 3.56 | -0.98 | -0.28 |
| 14 | 02-Q2 | $11,306 | $2,701 | $5,519 | 1.80 | 1.00 | -0.56 | -1.00 |
| 15 | 02-Q3 | $12,503 | $2,550 | $6,101 | 1.13 | 0.51 | -0.89 | -1.95 |
| 16 | 02-Q4 | $14,024 | $2,510 | $6,070 | 1.03 | 1.02 | -0.97 | -0.98 |
| 17 | 03-Q1 | $15,208 | $3,010 | $7,004 | 0.58 | 0.21 | -1.73 | -4.74 |
| 18 | 03-Q2 | $17,037 | $3,247 | $7,632 | 0.87 | 0.66 | -1.15 | -1.52 |
| 19 | 03-Q3 | $18,903 | $3,494 | $7,988 | 0.87 | 0.81 | -1.15 | -1.24 |
| 20 | 03-Q4 | $20,474 | $8,048 | $4,531 | (1.90) | 3.20 | 0.53 | -0.31 |
| 21 | 04-Q1 | $22,942 | $4,805 | $8,146 | 2.31 | (0.46) | -0.43 | 2.15 |
| 22 | 04-Q2 | $25,831 | $5,133 | $9,695 | 0.89 | 0.46 | -1.13 | -2.16 |
| 23 | 04-Q3 | $27,771 | $5,455 | $10,376 | 0.83 | 0.65 | -1.20 | -1.54 |
| 24 | 04-Q4 | $29,799 | $5,625 | $11,756 | 0.92 | 0.32 | -1.09 | -3.13 |
| 25 | 05-Q1 | $32,224 | $6,497 | $12,368 | 0.64 | 0.75 | -1.56 | -1.34 |
| 26 | 05-Q2 | $34,885 | $6,962 | $12,833 | 0.83 | 0.83 | -1.21 | -1.21 |
| 27 | 05-Q3 | $37,689 | $8,120 | $13,499 | 0.59 | 0.76 | -1.70 | -1.31 |
| 28 | 05-Q4 | $39,143 | $8,252 | $14,746 | 0.91 | 0.14 | -1.10 | -7.02 |
| 29 | 06-Q1 | $42,018 | $9,010 | $16,656 | 0.74 | 0.34 | -1.36 | -2.98 |
| 30 | 06-Q2 | $44,266 | $9,289 | $17,787 | 0.88 | 0.50 | -1.14 | -2.01 |
| 31 | 06-Q3 | $45,891 | $9,648 | $20,474 | 0.78 | (0.65) | -1.28 | 1.53 |
| 32 | 06-Q4 | $48,904 | $8,776 | $23,402 | 1.29 | 0.03 | -0.78 | -35.45 |
| 33 | 07-Q1 | $54,141 | $10,990 | $21,318 | 0.58 | 1.40 | -1.73 | -0.72 |

| | | | | |
|---|---|---|---|---|
| Average (Q199-Q107) | | | 0.76 | 0.34 | -1.14 | -2.42 |
| Minimum (Q199-Q107) | | | -1.90 | -4.10 | -2.27 | -35.45 |
| Maximum (Q199-Q107) | | | 2.31 | 3.56 | 0.84 | 2.15 |
| Standard deviation (Q199-Q107) | | | 0.73 | 1.44 | 0.65 | 6.40 |
| Standard error (Q199-Q107) | | | 0.13 | 0.25 | 0.12 | 1.13 |

Note:

[1] If data for a given quarter are available in multiple SEC filings, data from the latest version are used.

[2] Q4 figures are calculated by subtracting the amounts for nine months ended in September from the annual amounts.

[3] Lerner index is calculated using Professor Smith's method as described in ¶ 39 of his report: dividing the difference between change in revenue from the last quarter and change in cost from the last quarter by the change in revenue from the last quarter. Two Lerner indices are calculated for each quarter, using the two measures of cost proposed by Professor Smith: cost of sales (also called cost of revenue) and operating expenses.

[4] Demand elasticity is calculated as the inverse of Lerner index, multiplied by (-1).

*Highly Confidential*

EXHIBIT ___7___ PAGE __|9|__