# EXHIBIT 8

1

```
              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA


                            CASE NO. CV 05-4820 DDP(AJWx)
CATCH CURVE, INC.,          )
                            )
            Plaintiff,      )
                            )                ORIGINAL
         v.                 )
                            )
VENALI, INC.,               )
            Defendant.      )
_____)
                            )
AND RELATED CROSS-ACTION    )
AND THIRD PARTY COMPLAINT   )
                            )
_____)




              Carey Rodriguez Greenberg Paul
                   1395 Brickell Avenue
                       Suite 700
                     Miami, Florida
                Tuesday, August 21, 2007
                       9:37 a.m.


           V I D E O T A P E D   D E P O S I T I O N

                            O F

                   J O H N   P O N C Y




                  Taken pursuant to Notice,
                on behalf of the Plaintiff.
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT 8  PAGE 192

2

```
 1                    APPEARANCES:
 2
                SULLIVAN & CROMWELL, by
 3            ROBERT A. SACKS, ESQUIRE
               on behalf of the Plaintiff
 4
 5        CAREY RODRIGUEZ GREENBERG PAUL, by
              DOUGLAS L. O'KEEFE, ESQUIRE
 6             on behalf of the Defendant
 7
                     ALSO PRESENT:
 8
 9           THOMAS CHARRON, Videographer
10                  - - - - - - -
11                     I N D E X
12   Witness          Direct  Cross  Redirect  Recross
13   JOHN PONCY
       By Mr. Sacks      3             215
14     By Mr. O'Keefe           214             --
15
                     E X H I B I T S
16
17       Plaintiff's                              Page
18       No.  1 ............................... 24
         No.  2 ............................... 42
19       No.  3 ............................... 74
         No.  4 ............................... 85
20       No.  5 ............................... 104
         No.  6 ............................... 142
21       No.  7 ............................... 159
         No.  8 ............................... 169
22       No.  9 ............................... 197
         No. 10 ............................... 197
23       No. 11 ............................... 203
         No. 12 ............................... 214
24       No. 13 ............................... 214
         No. 14 ............................... 227
25
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT 8  PAGE 193

```
 1        Q    Easylink or Rapidfax?
 2        A    No, Rapidfax or Faxcom, I apologize.
 3        Q    Okay.  All right.  There is a -- if you go
 4   to Page 324, it's entitled SOHO relaunch, do you see
 5   that?
 6        A    Yes, I do.
 7        Q    What does that page relate to?
 8        A    The initiatives we undertook to improve our
 9   SOHO business.
10        Q    Okay, and why were you undertaking this?
11        A    We had -- we didn't feel it was performing
12   as aggressively as it should have.
13        Q    Okay.  Was there any financial analysis of
14   your SOHO business that was performed that led to the
15   conclusions and recommendations on this page?
16        A    There was some.
17        Q    What -- what did that analysis entail?
18        A    Particularly on the first one, the rates
19   and packages.
20        Q    Uh-huh.
21        A    We looked at the total number of customers
22   that were on the 4.95 or the 12.95 plans and
23   determined how many of those we could potentially
24   lose if we made a mandatory minimum of 14.95 and it
25   was a very small number, so we made the decision that
```

```
 1   it would not negatively impact us to increase the
 2   pricing.
 3        Q    Okay.  Meaning the 14.95 plan is your
 4   newest low tier non-multi user rate plan?
 5        A    Correct.  It's the smallest plan they can
 6   sign up for.
 7        Q    Okay.
 8        A    The least expensive.
 9        Q    Prior -- prior to this time you had a 4.95
10   plan?
11        A    Correct.
12        Q    And what was that?
13        A    I don't remember how many pages it was,
14   something along the lines of 40 pages a month or
15   somewhere in there.  It was minimal use.
16        Q    And the 12.95 plan?
17        A    It was slightly more.
18        Q    Okay.  Is that the same as what's now the
19   14.95 plan?
20        A    There are more pages in the 14.95 plan than
21   there were in either one of those two.
22        Q    Okay.  Did you, in fact, launch the 14.95
23   plan?
24        A    Yes, we did.
25        Q    Okay.  Then there is, just looking down
```

```
 1   here -- strike that.
 2           In connection with the work that you did
 3   here, did you go back, is there any analysis done of
 4   the number of users over any period of time at any
 5   different -- at different rate plans or the like?
 6      A    There has been.  It's been -- it's growing.
 7   It hasn't negatively or materially impacted the
 8   business to drop off the lower plans, but this was a
 9   pretty small adjustment, so we weren't expecting a
10   great deal of, you know, analysis that needed to be
11   made after that.
12      Q    Okay.  So the -- the -- the market impact
13   of going from getting rid of 4.95 and 12.95 and
14   putting in place a 14.95, didn't have -- didn't cause
15   you to lose very many customers?
16           MR. O'KEEFE:  Object to the form.  Go
17   ahead.
18           THE WITNESS:  No, it didn't, and it was
19   difficult to measure because we made other
20   changes at the same time, which also impacted it,
21   so we couldn't determine it in a vacuum.
22   BY MR. SACKS:
23      Q    Okay.  But your conclusion after having
24   done it is it didn't cause you to lose very many
25   customers?
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT 8 PAGE 196

1       A    Correct.

2       Q    Okay.  It says, going -- strike that.

3            The question that I meant to ask, and I
4  don't think I asked it very clearly was, in
5  connection with this work, did some -- in connection
6  with these recommendations, did somebody do any work
7  that involved an analysis going back historically of
8  the number of users that Venali had at different rate
9  plans?

10      A    I don't believe so.  I believe it was
11 fairly point in time.

12      Q    Okay.  Going back to Page 324, the fourth
13 item, I'd say bullet, except there is a U in front of
14 it.

15      A    Right.

16      Q    Says, "Got rid of free trial on all sign
17 ups and websites permanently."  What does that relate
18 to?

19      A    We had a number of customers who were
20 signing up for free trials and then basically never
21 being taken off, so they were getting free services.

22      Q    So prior to this time did you have a free
23 trial?

24      A    Yes, we did.

25      Q    Okay, and what were the terms of that?

245

CERTIFICATE

STATE OF FLORIDA )

COUNTY OF DADE   )

   I, Margaret Franzen, Notary Public for the State of Florida at Large, do hereby certify that I reported in shorthand the deposition of JOHN PONCY, the witness herein; that the said witness was first duly sworn by me; and that the foregoing pages, numbered from 1 to 244, inclusive, constitute a true record thereof.

   I further certify that I am not of counsel, I am not related to nor employed by any attorney in this case, nor financially interested in the outcome thereof.

   Dated at Miami, Dade County, Florida, this 31st day of August, 2007.

My Commission Expires:
April 14, 2010

        Margaret Franzen
        Notary Public
        STATE OF FLORIDA

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

EXHIBIT 8 PAGE 197

# EXHIBIT 9

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

CATCH CURVE, INC., )
)
      Plaintiff, )
)
vs. ) No. 05-4820 DDP (AJWx)
)
VENALI, INC., )
)
      Defendant. )
_____)

DEPOSITION OF SCOTT TURICCHI

Los Angeles, California

Wednesday, January 9, 2008

Reported by:

MARYAM T. SALAHUD-DIN

CSR No. 9669

Job No. 669932

**RESTRICTED CONFIDENTIAL**

EXHIBIT 9  PAGE 198

```
 1                UNITED STATES DISTRICT COURT
 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4  CATCH CURVE, INC.,            )
                                  )
 5        Plaintiff,              )
                                  )
 6        vs.                     )  No. 05-4820 DDP (AJWx)
                                  )
 7  VENALI, INC.,                 )
                                  )
 8        Defendant.              )
    _____)
 9                                )
    VENALI, INC.,                 )
10                                )
          Cross-Complainant,      )
11                                )
          vs.                     )
12                                )
    CATCH CURVE, INC.,            )
13                                )
          Cross Defendant,        )
14                                )
          and                     )
15                                )
    j2 GLOBAL COMMUNICATIONS, INC.,)
16                                )
          Third-Party Defendant.  )
17  _____)
18
19
20
21
22
23
24
25
```

RESTRICTED CONFIDENTIAL

EXHIBIT 9   PAGE 199

Page 3

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10         Deposition of SCOTT TURICCHI, taken
11   on behalf of Defendant and
12   Cross-Complainant Venali, Inc., at 1888
13   Century Park East, Suite 2100, Los
14   Angeles, California, beginning at 9:45
15   a.m. and ending at 3:25 p.m. on
16   Wednesday, January 9, 2008, before
17   MARYAM T. SALAHUD-DIN, Certified
18   Shorthand Reporter No. 9669.
19
20
21
22
23
24
25
```

RESTRICTED CONFIDENTIAL

EXHIBIT 9  PAGE 200

```
                                                          Page 4
 1  APPEARANCES:
 2
 3  For Witness:
 4           SULLIVAN & CROMWELL LLP
             BY:   BRIAN R. ENGLAND
 5           Attorney at Law
             1888 Century Park East, Suite 2100
 6           Los Angeles, California 90067-1725
             (310) 712-6672
 7
    For Defendant and Cross-Complainant Venali, Inc.:
 8
             CAREY RODRIGUEZ GREENBERG PAUL
 9           BY:   RICHARD J. MOCKLER
             Attorney at Law
10           1395 Brickell Avenue, Suite 700
             Miami, Florida 33131
11           (305) 356-5471
12
    Videographer:
13
             MITCH LERMAN
14           ESQUIRE DEPOSITION SERVICES
             523 West 6th Street
15           Los Angeles, California 90014
             (800) 640-2461
16
17
18
19
20
21
22
23
24
25
```

RESTRICTED CONFIDENTIAL

EXHIBIT 9  PAGE 201

Page 25

1 numbers for which there was a payment. But there could
2 be a different number of customers because the customer
3 may have more than one telephone number.
4 BY MR. MOCKLER:
5    Q    Okay. Do you remember what j2 paid for eFax?
6    A    I believe it was approximately $8 million,
7 which represented about 25 percent of the company in
8 terms of stock consideration.
9    Q    When you say 25 percent of the company, you
10 mean 25 percent of j2?
11   A    That's correct.
12   Q    And has j2 -- now, the subscriber base, was
13 that international? Domestic? Or both?
14   A    I believe it was, if not exclusively, primarily
15 domestic, U.S.
16   Q    And is it correct that j2 continues that
17 business today?
18   A    That is correct.
19   Q    Can you describe that business now.
20   A    In terms of?
21   Q    Well, let me ask this first. Is that business
22 operated in a subsidiary?
23   A    I don't know.
24   Q    Okay. Do you know how many subscribers there
25 are today for that business?

RESTRICTED CONFIDENTIAL

EXHIBIT 9  PAGE 202

Page 26

1   A   That are branded eFax?

2   Q   Correct.

3   A   There would be approximately 9 million free
4   DIDs and approximately 900,000 paying DIDs.

5   Q   Now, when j2 acquired eFax, the paid service,
6   what were the -- do you remember what the rate was for a
7   subscriber at that time?

8   A   I believe it was about $3.35.

9   Q   Did the rate vary, or was it -- did the rate
10  vary at all?

11          MR. ENGLAND:  Object to the form.

12          THE WITNESS:  What do you mean by vary?

13  BY MR. MOCKLER:

14  Q   I mean, was it always $3.35 cents?  I mean,
15  when I say always, I mean, in that time frame did all
16  customers pay $3.35?

17  A   I believe there were two price points, if I
18  recall, 2.95 a month and 4.95 a month.  And the average
19  was 3.35.

20  Q   Now I understand.  Thank you.

21      Can you describe how those two price points
22  came about.  Are those people that subscribed at
23  different times?  Or can you just --

24  A   I don't know.

25  Q   Okay.  I was wondering if they were -- were

RESTRICTED CONFIDENTIAL

EXHIBIT 9 PAGE 203

```
 1
 2            I, the undersigned, a Certified Shorthand
 3   Reporter of the State of California, do hereby
 4   certify:
 5            That the foregoing proceedings were taken
 6   before me at the time and place herein set forth; that
 7   any witnesses in the foregoing proceedings, prior to
 8   testifying, were placed under oath; that a verbatim
 9   record of the proceedings was made by me using machine
10   shorthand which was thereafter transcribed under my
11   direction; further, that the foregoing is an accurate
12   transcription thereof.
13            I further certify that I am neither
14   financially interested in the action nor a relative or
15   employee of any attorney of any of the parties.
16            IN WITNESS WHEREOF, I have this date
17   subscribed my name.
18
19   Dated: _____
20
21
22            _____
              MARYAM SALAHUD-DIN
23            CSR No. 9669
24
25
```

EXHIBIT 9   PAGE 204