Robert A. Sacks (SBN 150146)
sacksr@sullcrom.com
Brian R. England (SBN 211335)
englandb@sullcrom.com
Edward E. Johnson (SBN 241065)
johnsonee@sullcrom.com
SULLIVAN & CROMWELL LLP
1888 Century Park East, Suite 2100
Los Angeles, California 90067-1725
Tel.:   (310) 712-6600
Fax:    (310) 712-8800

Frank L. Bernstein (SBN 189504)
fbernstein@kenyon.com
KENYON & KENYON LLP
333 West San Carlos Street, Suite 600
San Jose, California 95110
Tel.:   (408) 975-7500
Fax:    (408) 975-7501

*Attorneys for Plaintiff and Counterclaim
Defendant Catch Curve, Inc. and
Third Party Defendant j2 Global
Communications, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATCH CURVE, INC., | Case No. CV 05-4820 DDP (AJWx) |
| Plaintiff | **CATCH CURVE, INC.'S OPPOSITION TO DEFENDANT VENALI, INC.'S MOTION FOR ATTORNEY FEES PURSUANT TO 35 U.S.C. § 285** |
| v. | |
| VENALI, INC. | |
| Defendant. | Judge:       Hon. Dean D. Pregerson |
| | Date:        October 20, 2008 |
| AND RELATED CROSS-ACTION | Time:        10:00 a.m. |
| AND THIRD PARTY COMPLAINT | Courtroom: 3 |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................ 2

ARGUMENT ..................................................................................... 5

   I.    Legal Standard .................................................................... 5

  II.   Catch Curve's Patent Infringement Claims Were Reasonable and Asserted in Good Faith ...................................................... 6

       A.  Catch Curve's Claim Construction Argument Was Reasonable ........... 6

       B.  Catch Curve's Summary Judgment Argument Was Reasonable ........... 8

       C.  The Licensing History of the AudioFax Patents Does Not Support an Exceptional Case Finding ................................... 10

       D.  j2's Initial Contentions in Prior Litigation Do Not Support an Exceptional Case Finding ................................. 14

 III.  Venali's Baseless Tortious Interference and Antitrust Claims Preclude an Exceptional Case Finding ................................ 15

CONCLUSION ................................................................................ 17

SULLIVAN & CROMWELL LLP

OPPOSITION TO MOTION FOR ATTORNEY FEES

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Argus Chem. Corp.* v. *Fibre Glass-Evercoat Co., Inc.*,
   812 F.2d 1381 (Fed. Cir. 1987) ........................................................................ 14

*Blonder-Tongue Labs., Inc.* v. *Univ. of Illinois Found.*,
   402 U.S. 313 (1971) .......................................................................................... 13

*Brooks Furniture Mfg., Inc.* v. *Tailier Int'l, Inc.*,
   393 F.3d 1378 (Fed. Cir. 2005) ........................................................................ 12

*Comark Commc'n, Inc.* v. *Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998) .......................................................................... 7

*Digeo, Inc.* v. *Audible, Inc.*,
   505 F.3d 1362 (Fed. Cir. 2007) .......................................................................... 5

*Forest Labs., Inc.* v. *Abbott Labs.*,
   339 F.3d 1324 (Fed. Cir. 2003) .......................................................................... 5

*In re Terazosin Hydrochloride Antitrust Litig.*,
   335 F. Supp. 2d 1336 (S.D. Fla. 2004) ............................................................ 10

*Intertrust Techs. Corp.* v. *Microsoft Corp.*,
   275 F. Supp. 2d 1031 (N.D. Cal. 2003) ............................................................. 7

*Micromesh Tech. Corp.* v. *American Recreation Products, Inc.*,
   2007 WL 2501783 (N.D. Cal. Aug. 30, 2007) ................................................ 13

*Nystrom* v. *Trex Co., Inc.*,
   374 F.3d 1105 (Fed. Cir. 2004) .......................................................................... 7

*Phillips* v. *AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .......................................................................... 7

*Professional Real Estate Investors, Inc.* v. *Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993) ............................................................................................ 10

*Q-Pharma, Inc.* v. *Andrew Jergens Co.*,
   360 F.3d 1295 (Fed. Cir. 2004) ................................................................. 5, 6, 11

*Rohm & Haas Co.* v. *Crystal Chem. Co.*,
   736 F.2d 688-690-91 (Fed. Cir. 1984) ............................................................... 5

-ii-

*Sony Electronics, Inc.* v. *Soundview Techs., Inc.*,
   2005 WL 1661696 (D. Conn. July 13, 2005)..................................................9, 13

*Ventana Med. Sys., Inc.* v. *Biogenex Labs., Inc.*,
   473 F.3d 1173 (Fed. Cir. 2006) ........................................................7

*Warner-Jenkinson Co.* v. *Allied Chem. Corp.*,
   477 F. Supp. 371 (S.D.N.Y. 1979), *aff'd without op.*, 633 F.2d 208 (2d
   Cir. 1980) ..................................................................................15


STATUTES

35 U.S.C. § 285 ..................................................................1, 5, 6

Fed. R. Civ. P. 54(b) ....................................................................10

1        Plaintiff and Counterclaim Defendant Catch Curve, Inc. ("Catch

2    Curve") and Third Party Defendant j2 Global Communications, Inc. ("j2")

3    respectfully submit this Opposition to Defendant Venali, Inc.'s ("Venali") Motion

4    for Attorney Fees Pursuant to 35 U.S.C. § 285.

5                     **INTRODUCTION**

6        Venali completely fails to meet its burden to show, by clear and

7    convincing evidence, that anything about this case was exceptional.  This Motion,

8    in large part, simply rehashes Venali's arguments on claim construction, but the

9    fact that the Court construed the Patents-in-Suit more narrowly than Catch Curve

10    advocated is not nearly enough to merit an exceptional case finding.  Catch

11    Curve's position was supported by the language of the claims in the Patents-in-

12    Suit, and Venali points to nothing in the specification or prosecution history that

13    clearly forecloses Catch Curve's proposed constructions.

14        Moreover, Venali's assertion that Catch Curve disregarded the

15    Court's claim construction ruling in continuing to prosecute the case is simply

16    untrue.  Catch Curve dropped all but one patent from the case, and tailored its

17    infringement assertions to account for the Court's *Markman* ruling, by asserting

18    only claims that do not disclose transmission from the SAFF to the recipient — a

19    distinction that the Court disagreed with, but one that has considerable support in

20    the language of the patent, including in the specification.  Catch Curve's position

21    was reasonable, as confirmed in unrebutted expert testimony it submitted, and was

22    taken in good faith.

23        In fact, the only frivolous claims in this lawsuit were asserted by

24    Venali.  If Venali spent over a million dollars on this litigation, as it claims but

25    deliberately did not substantiate, it did so by choice.  Venali drastically expanded

26    the scope and expense of this case by asserting antitrust and other claims, none of

27    which had merit and only two of which are still in the case, pending a ruling by the

28

-1-

1  Court on summary judgment.  Among Venali's counterclaims were two tortious
2  interference claims which Venali agreed to dismiss only after j2 and Catch Curve,
3  by way of burdensome third party discovery, established were completely without
4  factual basis.  Having burdened j2, Catch Curve and the Court with meritless and
5  unnecessary counterclaims, Venali should not be rewarded with its attorneys' fees.
6  This motion should be denied.

7  **BACKGROUND**

8     This action involves five patents (the "Patents-in-Suit") owned by
9  Catch Curve.  j2 purchased the Patents-in-Suit from a company called AudioFax IP
10  LLC ("AudioFax") and assigned them to Catch Curve, its subsidiary, in 2005.
11  Previously, AudioFax had filed an infringement suit against JFAX, j2's
12  predecessor company.  JFAX initially denied liability and asserted that the Patents-
13  in-Suit were not infringed by Internet facsimile services.  Once the Patents
14  emerged from a re-examination with the United States Patent & Trademark Office
15  ("PTO"), JFAX then reversed course and paid $1 million for a license.  Since
16  purchasing the Patents-in-Suit, Catch Curve has brought a number of infringement
17  suits, primarily against companies that offer Internet fax services.  Venali does not
18  allege, because it cannot truthfully do so, that even one lawsuit brought by j2 or
19  Catch Curve was dismissed by any court for failure to state a claim or otherwise.
20  Nor does Venali allege that either j2 or Catch Curve was sanctioned in any case, or
21  that any of the Patents-in-Suit were held invalid, unenforceable, or not infringed in
22  any litigation.  Venali does not allege that any court that has considered any of the
23  infringement litigation has found anything at all wrong or questionable about any
24  case brought by j2 or Catch Curve.

25     Catch Curve brought this suit in 2005.  In response, Venali brought
26  counterclaims against both Catch Curve and j2 alleging sham litigation, tying,
27  attempted monopolization, tortious interference with contract and with prospective
28

-2-

1   business relationships, trademark infringement and unfair competition.[1]  Only the

2   sham litigation (now characterized as monopolization) and attempted

3   monopolization claims remain in the case.  j2 and Catch Curve's motion for

4   summary judgment as to those claims is pending.  The rest of the claims were

5   voluntarily dismissed at various times, with one exception; the Court dismissed

6   Venali's tying claim, and Venali never attempted to replead it.

7            Venali's tortious interference claims were based on the allegation that

8   Catch Curve sent cease and desist letters to some of Venali's customers or

9   distributors, who consequently, according to the claims, reduced the amount of

10  business they were doing with Venali or stopped it altogether.  In fact, Venali had

11  no good faith basis whatsoever to bring these claims.  In interrogatory responses

12  and statements to the Court during the hearing on j2 and Catch Curve's motion to

13  dismiss, Venali stated that 15 companies contacted Venali about the cease and

14  desist letters, and that four companies canceled or postponed business with Venali

15  as a result of them.  (Declaration of Edward E. Johnson ("Johnson Decl.") Exs. 1, 2

16  at Resp. to Interrogatory Nos. 10 & 11.)

17           Through considerable effort and expense, Catch Curve was able to

18  contact and obtain declarations from eleven of the identified companies, each of

19  which denied canceling or postponing business with Venali.  (Johnson Decl. Exs. 3

20  – 13.)  Three of those companies had been specifically identified by Venali in its

21  discovery responses as having cancelled business — UltraLevel, which disclaimed

22  any knowledge whatsoever of the "medical integration project" Venali claimed in

23  an interrogatory response had been cancelled, ImageTag, which denied even

24  receiving a cease and desist letter, and Innovative Data Processing Solutions,

25

26  _____

[1]  Although the counterclaims were based largely on Catch Curve bringing this

27  suit, Venali initially filed its antitrust and other claims as a separate lawsuit
    in Florida.  Only after extensive correspondence and negotiations did Venali

28  agree to bring the claims here to avoid litigating the same issues in two
    different courts.

-3-

1   whose president testified that its business relationship with Venali was terminated

2   *by Venali*.  (*Compare* Johnson Decl. Exs. 2 [interrogatory response] *with id*. Exs. 3

3   - 5 [declarations].)  Moreover, four of the declarations (from CenterBeam, Wall

4   Street Network, OnShore Software, and ZipRealty) specifically denied

5   communicating with Venali about the cease and desist letters, directly

6   contradicting Venali's sworn discovery response and its representation to the Court

7   when trying to reverse the Court's tentative ruling dismissing these claims.

8   *Compare* Johnson Decl. Exs. 1, 2 [interrogatory response] *with id*. Exs. 6 - 9

9   [declarations]; *see id*. Ex. 14 [hearing transcript] at 5.)  Only when confronted with

10  overwhelming evidence that its claims were baseless, and having produced no

11  evidence whatsoever in support, did Venali dismissed the claims.

12          In mid-2007, the Court held a *Markman* hearing.[2]  The primary issue

13  was whether the Patents-in-Suit disclosed a system in which the transmission of an

14  image from the SAFF to the recipient must occur via facsimile protocol over the

15  Public Switched Telephone Network ("PSTN").  In Venali's system, the SAFF

16  sends images to the recipient via HTTP.  The Court construed the claims of the

17  Patents-in-Suit narrowly, precluding a finding of direct infringement on most of

18  the asserted claims.  The *Markman* ruling in this case was the first time any court

19  had ruled on the scope of the Patents-in-Suit.

20          Following the *Markman* ruling, Catch Curve briefly asserted that

21  Venali infringed certain claims under the doctrine of equivalents, but determined

22  that the theory was not viable and withdrew those claims before Venali had taken

23  any discovery or submitted a brief related to the doctrine of equivalents theory.

24

25

26  _____

    [2]      Approximately two weeks before the *Markman* hearing was scheduled,
27  CallWave, Inc., another Internet Facsimile Provider who was named in the
    related action before this Court, and on the exact same record before the
28  Court, settled with Catch Curve and j2, paying $ 4 million and a ten percent
    running royalty for a license to the Patents-in-Suit and j2's other patents.

1    The only remaining claims were five claims of the '021 Patent, which
2    did not include the step of forwarding the image to the recipient.  Because that step
3    was missing, Catch Curve believed in good faith, and supported by unrebutted
4    expert testimony, that the claims were not precluded by the Court's *Markman*
5    order.  The Court nevertheless granted summary judgment of non-infringement on
6    the remaining claims.

## ARGUMENT

### I.  Legal Standard.

9    Under 35 U.S.C. § 285, "[t]he court in exceptional cases may award
10   reasonable attorney fees to the prevailing party."  A determination whether to
11   award fees requires two steps.  *See Forest Labs., Inc.* v. *Abbott Labs.*, 339 F.3d
12   1324, 1327 (Fed. Cir. 2003).  First, the court must find that the case is exceptional,
13   *i.e.*, involving "inequitable conduct before the Patent Office; litigation misconduct;
14   vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful
15   infringement."  *Id.* at 1329 (quotes omitted).  If the court finds that the case is
16   exceptional, it then has discretion to award attorneys' fees.  *See id.* at 1328.

17   The moving party under Section 285 bears the burden of establishing
18   the exceptional nature of the case by *clear and convincing evidence*.  *Digeo, Inc.* v.
19   *Audible, Inc.*, 505 F.3d 1362, 1368 (Fed. Cir. 2007) (emphasis added).  The case
20   must be actually exceptional — "it is not contemplated that the recovery of
21   attorney's fees will become an ordinary thing in patent suits."  *Rohm & Haas Co.*
22   v. *Crystal Chem. Co.*, 736 F.2d 688-690-91 (Fed. Cir. 1984) (quoting S. Rep. No.
23   79-1503 (1946)).  Accordingly, merely successfully defending a patent suit does
24   not give rise to an exceptional case finding.  *See Forest Labs., Inc.* v. *Abbott Labs.*,
25   339 F.3d 1324, 1330-31 (Fed. Cir. 2003) (failure to offer evidence of infringement
26   as to a claim limitation is not clear and convincing evidence that patentee asserted
27   a baseless or frivolous claim); *see also Q-Pharma, Inc.* v. *Andrew Jergens Co.*, 360
28   F.3d 1295, 1301 (Fed. Cir. 2004)("Claim interpretation is not always an exact

-5-

science, and it is not unusual for parties to offer competing definitions of even the simplest claim language").

## II.   Catch Curve's Patent Infringement Claims Were Reasonable and Asserted in Good Faith.

Venali presents no evidence, much less clear and convincing evidence, that this is an exceptional case or that an award of attorneys' fees is warranted.  On the contrary, (i) Catch Curve's arguments both at the *Markman* hearing and in opposition to summary judgment were reasonable and made in good faith; (ii) Catch Curve's past success in licensing the Patents-in-Suit is evidence against, not for, an exceptional case finding; and (iii) j2's actions when it was sued for infringing the Patents-in-Suit — initially denying liability but then taking a license for $1 million — are evidence against, not for, an exceptional case finding.

### A.   Catch Curve's Claim Construction Argument Was Reasonable

Although the Court disagreed with Catch Curve's proposed claim construction, that construction was reasonable and asserted in good faith.  No fewer than five different law firms have concluded, under strictures of Rule 11, that the position Catch Curve advanced in this case, although ultimately rejected by this Court, had some chance of success.  There is good reason for that conclusion.

*First*, it finds support in the language of the claims.  Although Venali asserts that the Patents-in-Suit are strictly limited to fax-to-fax communications (Mot. at 8-9), in fact there are numerous claims in which a fax message is converted and transmitted in a different format.[3]  (*E.g.*, '302 Patent [Docket No.

---

[3]   In its *Markman* ruling, the Court recognized that some claims disclose conversion, but inferred from that fact that where the Patents-in-Suit contemplate conversion, they say so expressly. (*Markman* Order, Docket No. 81, at 16.)  The opposite inference is equally plausible, however — that because some claims expressly disclose conversion, an implicit limitation precluding conversion should not be read into the other claims.  Where the patent owner's infringement contentions are based upon a good faith interpretation of the language of the claims and specification, its position cannot construed as bad faith in order to justify fees under Section 285.  *See Q-Pharma, Inc.*, 360 F.3d at 1304 (Fed. Cir. 2004).

1  93, O'Keefe Declaration, Ex. B] at 4:44 *et seq.* & 11:6 *et seq.*)  Even in the earliest,

2  originally filed application, there was a claim in which a fax was sent from a fax

3  machine to a SAFF over the PSTN, but from the SAFF to a recipient via an

4  unspecified medium.  (Johnson Decl. Ex. 15 [Original Application] at 29-30.)

5  Moreover, facsimile protocol is expressly recited in some claims, such as Claim 69

6  of the '021 Patent, which recites such transmission from a sender to the SAFF.

7  Catch Curve's position that "facsimile protocol" should not be read into every

8  other claim because doing so would render it redundant in Claim 69 was supported

9  by caselaw, and certainly was not baseless.  *See Intertrust Techs. Corp.* v.

10  *Microsoft Corp.*, 275 F. Supp. 2d 1031, 1055 (N.D. Cal. 2003).

11          *Second*, Catch Curve's argument that the claims should not be limited

12  by the specification was supported by Federal Circuit law.  The specification

13  describes only embodiments that utilize traditional fax machines to receive and

14  transmit facsimile messages.  But, the circumstances under which it is appropriate

15  to read limitations from the specification into the claim terms are notoriously

16  murky, and numerous Federal Circuit decisions caution against confining claims to

17  what is disclosed in specification.  *See, e.g., Ventana Med. Sys., Inc.* v. *Biogenex*

18  *Labs., Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006); *Phillips* v. *AWH Corp.*, 415 F.3d

19  1303, 1323 (Fed. Cir. 2005); *Nystrom* v. *Trex Co., Inc.*, 374 F.3d 1105, 1111 (Fed.

20  Cir. 2004); *Comark Commc'n, Inc.* v. *Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed.

21  Cir. 1998).

22          *Third*, Catch Curve had a reasonable argument that the prosecution

23  history should not limit the claims.  Venali relies on the applicants for the '926

24  Patent distinguishing the Bishop reference by noting that "Bishop's system cannot

25  accept, process, or communicate a message originating from a fax machine," and,

26  similarly, to examiner's notes stating that Bishop "discloses only a one-way

27  communication system from a TTY to a fax machine."  (Mot. at 3, 10.)  Although

28  the Court's *Markman* ruling construed this disclaimer very broadly — as evidence

-7-

1  that "Catch Curve used the distinction between fax and other protocols to obtain its

2  patents" (*Markman* Order at 14) — a narrower reading, which is consistent with

3  Catch Curve's proposed construction, is certainly plausible.  As the quoted

4  passages make clear, Bishop did not disclose originating a message from a fax

5  machine — rather, Bishop disclosed a system in which messages originated from

6  telex devices and were sent to fax machines.  Thus, the file history can be read as

7  distinguishing the Patents-in-Suit from systems in which the message does not

8  originate from a fax machine.  Catch Curve has never asserted that the Patents-in-

9  Suit disclose a system in which the originating message is not from a fax machine.[4]

10  **B.    Catch Curve's Summary Judgment Argument Was Reasonable.**

11  Venali repeatedly asserts that by continuing to prosecute the case after

12  the *Markman* ruling, Catch Curve was trying to "reargue" the Court's order.  (Mot.

13  at 5-6, 12-15.)  That is false.  In light of the *Markman* ruling, Catch Curve dropped

14  four of the five Patents-in-Suit from the case and adapted its theory of

15  infringement.  Accordingly, the cases cited by Venali in which a party was

16  awarded attorneys' fees when the other party ignored an adverse claim

17  construction ruling are inapposite.  (Mot. at 13-14.)

18  Specifically, because the Court held that the transmission of facsimile

19  messages from the SAFF to the recipient must be via facsimile protocol over the

20  Public Switched Telephone Network, Catch Curve limited its claims to those in

21  which a message is sent from a facsimile machine and then stored in the SAFF.

22  Those claims do not include the function of transmitting a message (in any format)

23  from the SAFF to a recipient.

---

[4]   As further evidence that Catch Curve's construction was reasonable, correspondence between Venali and its outside patent attorneys indicates that the outside attorneys had concerns that Venali infringed the Patents-in-Suit.  (Memo. in Support of Motion for Partial Summary Judgment, Docket No. 137, at 12-13.)

1    The Court nevertheless granted summary judgment, on the ground

2    that Venali's system converts facsimile messages to digital images before

3    transmitting them from one server to another for storage.  (Docket No. 132.)  In

4    other words, the Court extended its *Markman* ruling to require that this internal

5    transmission (in the terms of the Patent, from one SAFF to another SAFF) be via

6    facsimile protocol.  Crucially, though, the ruling was an *extension* — the nature of

7    transmissions from one SAFF to another SAFF had not previously been briefed or

8    decided.  Moreover, Catch Curve had substantial support for its view that these

9    internal transmissions were not limited to facsimile protocol, even though the

10   Court had so limited the transmissions from the SAFF to the recipient: the

11   specification expressly contemplates that these internal transmissions may be

12   digital.  ('021 Patent [Docket No. 93, O'Keefe Declaration, Exh. E] at 8:33-41.)

13   Given this evidence in the specification the Patents-in-Suit contemplate that

14   internal transmissions may not occur via facsimile protocol, Catch Curve's

15   infringement argument was neither improper nor unreasonable.

16           Catch Curve's position is further supported by testimony from an

17   expert witness concluding that it would have been reasonable for a person of

18   ordinary skill in the relevant art to read the Patents-in-Suit the way Catch Curve

19   did.[5]  Venali does not suggest that the opinion is in any way deficient, nor has

20   Venali submitted expert testimony that Catch Curve's position was unreasonable

21   from the standpoint of one of ordinary skill in the art.  Venali's assertion that Catch

22   Curve's position was baseless cannot stand where there is unrebutted expert

23   testimony establishing the opposite.  *See Sony Electronics, Inc.* v. *Soundview*

24   *Techs., Inc.*, 2005 WL 1661696, at *8 (D. Conn. July 13, 2005) (denying

25   exceptional case motion even though patentee's "construction lacked merit," in

26   part because "two experts supported [the patentee's] construction").

27

28   _____

     [5]    Declaration of Nicholas Bambos, Docket No. 137.

                                            -9-

1    Finally, Venali asserts that it was somehow improper for Catch Curve
2  to increase the number of claims it was asserting after the *Markman* hearing, even
3  though Catch Curve withdrew those claims shortly thereafter.  (Mot. at 5, 13.)  The
4  increase was due not to Catch Curve disregarding the *Markman* order, as Venali
5  suggests, but to Catch Curve *acknowledging* the Order, and therefore shifting to a
6  doctrine of equivalents theory that swept in more claims than had its previous
7  direct infringement theory.  Upon further investigation, including limited
8  discovery, Catch Curve determined that the doctrine of equivalents theory was not
9  viable, and dropped it — an action which is directly contradictory to Venali's
10  claim that Catch Curve proceeded in bad faith.  Nor does Venali cite any evidence
11  that it was prejudiced by Catch Curve briefly asserting a doctrine of equivalents
12  theory.  Venali conducted no discovery and filed no briefs related to the doctrine of
13  equivalents.  Its conclusory assertion that it suffered "extensive" costs is
14  unsupported and implausible.[6]  (Mot. at 13.)

15  **C.    The Licensing History of the AudioFax Patents Does Not Support an Exceptional Case Finding.**
16
17    Venali argues that the fact that Catch Curve has asserted the Patents-
18  in-Suit in other lawsuits supports a finding that this is an exceptional case.  (Mot. at
19  11-12.)  In fact, it does just the opposite.  Catch Curve and AudioFax together have
20  licensed at least 15 companies offering Internet facsimile services similar to
21  Venali's services.[7]  In other words, whatever Venali may claim about the merits of
22

23  [6]  Venali also makes the puzzling claim that Catch Curve should have
24  stipulated to a judgment on the four Patents-in-Suit it stopped asserting.
   (Mot. at 6.)  Normally, no judgment is issued until all of the claims in an
25  action are resolved, Fed. R. Civ. P. 54(b), and Venali does not explain why
   entry of judgment as to only some of the claims would have been
   appropriate here.

26  [7]  *See* Catch Curve and j2's Separate Statement of Uncontroverted Facts, filed
27  in support of its Motion for Partial Summary Judgment, at Docket No. 137,
   at ¶¶ 16-18.  In its response (filed under seal, *see* Docket No. 147), Venali
28  disputed these facts but asserted that "as many as nineteen internet fax
   companies" have taken licenses.

1 Catch Curve's litigation position in this case, numerous other attorneys and

2 business people have looked at similar allegations and opted to license the

3 AudioFax Patents, often after the onset of litigation. *See In re Terazosin*

4 *Hydrochloride Antitrust Litig.*, 335 F. Supp. 2d 1336, 1358 n. 13 (S.D. Fla. 2004)

5 (a settlement constitutes a successful lawsuit because the plaintiff obtains the relief

6 sought); *PRE*, 508 U.S. at 62 n.5 ("A winning lawsuit is by definition a reasonable

7 effort at petitioning for redress and therefore not a sham."). The successful

8 licensing history of the Patents-in-Suit indicates that Catch Curve could reasonably

9 believe that its suit against Venali could be successful. *See Q-Pharma, Inc.*, 360

10 F.3d at 1303 (Fed. Cir. 2004) (concluding that an infringement suit was not

11 frivolous in part because the patentee "reasonably believed its patent to be valid in

12 light of . . . the licenses that several companies took under the patent").

13 　　　　　Venali contends Catch Curve's success is actually "extortion," based

14 on the fact that many of the licenses cost less than the purported cost of litigating a

15 patent case. (Mot. at 12.) That contention fails for several reasons.

16 　　　　　*First*, some Internet fax companies have paid large sums for licenses,

17 including j2 itself, which paid $1 million — hardly a nuisance settlement.[8] More

18 recently, in 2006 Callwave, Inc. settled two cases pending before this Court by

19 taking licenses to the AudioFax Patents, as well as four other patents owned by j2

20 that are not at issue here, for $4 million plus a running royalty of 10% on

21 CallWave's Internet fax revenue.[9] (Johnson Decl., Docket No. 137-5, ¶ 8 & Ex.

22

---

23 [8]　　Highlighting Venali's inconsistency, at the same time that is implores the
24 　　Court to ignore the $1 million j2 paid for a license to the Patents-in-Suit,
　　Venali characterizes the "over one million dollars" it allegedly incurred in
　　litigation costs in this case as "enormous." (Mot. at 1, 6.)

25 [9]　　Venali's Motion ignores the CallWave license, but in its summary judgment
26 　　opposition, Venali accuses Catch Curve of a "particularly disgraceful effort
　　to mislead the Court" because the CallWave license was to "j2's entire
27 　　patent portfolio of 129 patents and applications worldwide." (Opp. to Mot.
　　for Partial Summary Judgment, filed under seal (*see* Docket No. 147), at 10.)
28 　　Venali's vitriol is unseemly and unfounded. CallWave entered into a license
　　agreement to settle two pending litigations, and the notion that it was paying
　　for 121 patents which had never been asserted against it, and most or all of

-11-

7.) CallWave entered into the settlement when the claim construction issues were fully briefed and with the *Markman* hearing in this Court just two weeks away. (*Id.*) It is difficult to imagine why CallWave would have paid $4 million for a license just days before the hearing if it believed that no reasonable person could disagree with its position.

*Second*, Venali asks this Court to conclude that it is improper to file multiple lawsuits, particularly if the defendants are small companies. (Mot. at 11-12.) The Federal Circuit, however, recently rejected that argument. *See Brooks Furniture Mfg., Inc.* v. *Tailier Int'l, Inc.*, 393 F.3d 1378, 1384 (Fed. Cir. 2005) ("That [the patentee] is a larger company than [the defendant], that it has sued others, and that it was unwilling to grant a license, are not indicative of bad faith."). If a patentee cannot protect his or her rights by filing multiple suits without risking exceptional case liability, then those rights are seriously undermined: companies routinely file multiple infringement lawsuits, not in an improper attempt to stifle competition, but because there are often multiple companies infringing the same patent. Likewise, "[a] duly granted patent is a grant of the right to exclude all infringers, not just those of comparable size." *Id.*

*Third*, Venali suggests there is something sinister about entering into a license for anything less than the millions of dollars it can cost to try a major patent case. (Mot. at 11.) That ignores the obvious reason for the relatively small size of many of Catch Curve's licenses:  Catch Curve is licensing small companies. Internet fax makes up a relatively small portion of the facsimile communications

---

which are unrelated to its business, rather than for patents it was actively litigating, is nonsense. Indeed, because one of the lawsuits was stayed at the time of the settlement, with no immediate prospects for re-starting, the only plausible inference is that CallWave's decision to pay $4 million was driven principally by the one *active* lawsuit resolved by the settlement: Catch Curve's suit on four of the Patents-in-Suit at issue here. Importantly, Venali offers *no evidence whatsoever* to support its supposition. Having strategically chosen not to take any discovery regarding any of the licensees to the Patents-in-Suit, Venali cannot assert as fact its suppositions regarding the subjective analysis of third parties.

-12-

1    market, and most of the companies offering Internet fax services have modest

2    revenues.  The modest revenues limit the amount of potential damages and make it

3    economically sensible for both parties to settle for relatively small amounts, not

4    because the claims lack merit, but because there is simply not that much money at

5    stake.  It is not surprising that many of the earlier licenses entered into by

6    AudioFax were for much larger amounts of money given that the licensees were

7    often very large companies, such as Sprint and AT&T.

8            *Fourth*, Venali cites no authority for the extraordinary proposition that

9    this Court should award attorneys' fees because Catch Curve has settled other

10   patent suits.  Venali quotes dicta in *Blonder-Tongue Laboratories, Inc.* v.

11   *University of Illinois Foundation*, 402 U.S. 313, 347-48 (1971) about the cost of

12   patent litigation (Mot. at 11-12), but there the Court was discussing a lawsuit

13   asserting patents that previously had been held by a court to be invalid, in the

14   context of collateral estoppel.  Here, in contrast, until this Court granted summary

15   judgment there had never been a finding that the patents were invalid or not

16   infringed.  Nor does *Micromesh Technology Corp.* v. *American Recreation*

17   *Products, Inc.*, 2007 WL 2501783 (N.D. Cal. Aug. 30, 2007), help Venali.  (Mot.

18   at 12.)  *Micromesh* primarily addressed an inadequate presuit investigation, and

19   there is no allegation or evidence here that Catch Curve's presuit investigation was

20   deficient.  Likewise, Venali points to the fact that the *Micromesh* plaintiff raised its

21   demand for a license fee from $500,000 to $1.5 million, but there is no allegation

22   here that Catch Curve ever increased its demand for a license fee.

23           Unlike Venali's cases, *Sony Electronics*, 2005 WL 1661696, is on

24   point.  There, the court viewed the fact that the patentee, Soundview, had licensed

25   three quarters of the television industry as a factor weighing against an exceptional

26   case finding.  *Id.* at *8.  The court noted that "while it is possible to speculate, as

27   the non-Soundview parties urge, that some of the manufacturers accepted licenses

28

-13-

1  as a part of a litigation-averse business decision, . . . there is no evidence in the

2  record supporting such speculation." *Id*. There is likewise no such evidence here.

3           In short, Venali invites this Court to speculate, without evidence or

4  legal authority, that Catch Curve's undeniable success in licensing the Patents-in-

5  Suit is actually evidence of nefarious conduct that could support an exceptional

6  case finding. The invitation should be rejected.

7  **D.   j2's Initial Contentions in Prior Litigation Do Not Support an Exceptional Case Finding.**

8           Venali also relies on mandatory disclosures made by JFAX (j2's

9  predecessor) in a patent infringement action brought by AudioFAX, the previous

10 owner of the Patents-in-Suit, wherein JFAX stated that the patents are limited to

11 fax to fax systems. (Mot. at 10-11.) These mandatory disclosures — filed prior to

12 the commencement of discovery — are irrelevant. Companies charged with

13 infringement frequently (if not always) initially claim that they do not infringe and

14 that the patent is invalid and/or unenforceable. *See Argus Chem. Corp.* v. *Fibre*

15 *Glass-Evercoat Co., Inc.*, 812 F.2d 1381, 1386 (Fed. Cir. 1987). Absent unusual

16 circumstances, to do otherwise would be reckless; those issues are contested in

17 nearly every patent case, and the defendant must preserve those contentions until it

18 has had adequate time to take discovery, analyze the patents, and make an

19 informed decision about what defenses to pursue.

20           Moreover, there is nothing inherently improper about asserting

21 different or inconsistent positions in different litigations. Litigants are expected to,

22 and their counsel required to, assert non-frivolous arguments in support of their

23 interests. If (as j2 and Catch Curve believe) reasonable minds could differ about

24 proper scope the Patents-in-Suit, then it was entirely proper both for JFAX to

25 assert that the Patents-in-Suit were fax-to-fax patents, and for Catch Curve to

26 assert, years later in a different lawsuit, that they extended to fax-to-email systems.

27

28

-14-

1    Even passing those problems, the notion that JFAX's initial

2    disclosures establish that JFAX believed it would be frivolous to assert that the

3    Patents-in-Suit cover Internet fax services is completely undermined by j2's

4    subsequent actions.  j2 paid $1 million to license the Patents-in-Suit, and then,

5    three years later, paid million mores to purchase them.  These actions are far more

6    telling than boilerplate initial disclosures.  It is nonsensical to claim that j2 would

7    license (for a very substantial amount of money) and then purchase a portfolio of

8    patents if it believed that there was no good faith basis to assert those patents.

9    **III.   Venali's Baseless Tortious Interference and Antitrust Claims Preclude**
     **an Exceptional Case Finding.**

10

11   Venali's complaints about spending "over a million dollars" ring

12   hollow given that much of that money was spent because Venali chose to

13   dramatically and unnecessarily expand the scope of the case by bringing antitrust

14   and other counterclaims that were wholly without merit.  Only two of the six

15   counterclaims remain in the case, and they are subject to a pending motion for

16   summary judgment.  Venali dismissed the rest, but not before j2 and Catch Curve

17   were forced to spend an inordinate amount of time and resources defending them.

18   Those counterclaims should preclude any finding in Venali's favor that this case is

19   exceptional. *See Warner-Jenkinson Co.* v. *Allied Chem. Corp.*, 477 F. Supp. 371,

20   399-400 (S.D.N.Y. 1979), *aff'd without op.*, 633 F.2d 208 (2d Cir. 1980) (denying

21   attorneys fees in patent case where defendant was equally responsible for the high

22   cost of the litigation)

23   Most egregiously, Venali asserted tortious interference claims based

24   on supposedly losing business after Catch Curve sent cease and desist letters to

25   certain of its customers and distributors.  But when j2 and Catch Curve contacted

26   the customers and distributors identified by Venali, it quickly became apparent that

27   *none* of them had cancelled any business.  Several had never even discussed the

28   letters with Venali, meaning both that Venali's sworn discovery responses were

-15-

false, and that Venali could not possibly have conducted a reasonable inquiry before bringing the claims.[10]  Although Venali eventually dropped the tortious interference claims, j2 and Catch Curve were forced to serve over a dozen subpoenas and spend a significant amount of time addressing claims which had no basis and should not have been brought.

Moreover, Venali began participating in discovery in this matter only after months of delay and multiple threats by Catch Curve to file motions to compel.  It took Venali over eight months to produce documents in response to Catch Curve's initial discovery requests, and when it finally did so, it produced roughly 80,000 pages of useless documents consisting of unintelligible symbols.  After another two months, Venali produced more documents, but again included thousands of unintelligible documents, interspersed among the other documents (requiring Catch Curve to review all of them in order to locate any potentially relevant documents).  A year after Catch Curve served its discovery requests, Venali had produced less than ten pages of financial documents and no business planning or strategy documents, and it was only after another threatened motion to compel that Venali finally began to comply with its discovery obligations.  In short, Venali would stonewall all reasonable discovery requests, participate in numerous meet and and confer discussions with no intention of responding in good faith, and would only begin to produce information *after* j2 and Catch Curve incurred considerable expense preparing its portion of the joint statement required by Central District Local Rule 37-2.  Such bad faith conduct unnecessarily prolonged this litigation and dramatically increased the costs for j2 and Catch Curve.  (*See* Johnson Decl., ¶ 17.)  Venali should not be awarded attorneys' fees in light of its own vexatious tactics.

---

[10]   The eleven declarations, signed by third parties and establishing that Venali's claims were frivolous, are attached as Exhibits 3 – 13 to the Declaration of Edward E. Johnson.

-16-

1    **<u>CONCLUSION</u>**

2        For the foregoing reasons, Catch Curve respectfully requests that

3    Venali's motion for attorneys' fees be denied.

4    Dated:  September 30, 2008              Respectfully submitted,

5

6                                          Robert A. Sacks /BNE

7                                          Robert A. Sacks (SBN 150146)
                                           Brian R. England (SBN 211335)
8                                          Edward E. Johnson (SBN 241065)
                                           SULLIVAN & CROMWELL LLP
     Of Counsel:                           1888 Century Park East
9    Jeffrey S. Gerchick                   Los Angeles, California 90067-1725
     KENYON & KENYON LLP                   (310) 712-6600
10   1500 K Street, N.W.                   (310) 712-8800 facsimile
     Suite 700
11   Washington, D.C.  20005-1257          Frank L. Bernstein (SBN 189504)
     (202) 220-4200                        KENYON & KENYON LLP
12   (202) 220-4201 facsimile              333 West San Carlos Street, Suite 600
                                           San Jose, California 95110
13                                         (408) 975-7500
                                           (408) 975-7501 facsimile
14
                                           *Attorneys for Plaintiff and Counterclaim*
15                                         *Defendant Catch Curve, Inc.. and*
                                           *Third Party Defendant j2 Global*
16                                         *Communications, Inc.*

17

18

19

20

21

22

23

24

25

26

27

28

-17-