Robert A. Sacks (SBN 150146)
sacksr@sullcrom.com
Brian R. England (SBN 211335)
englandb@sullcrom.com
Edward E. Johnson (SBN 241065)
johnsonee@sullcrom.com
SULLIVAN & CROMWELL LLP
1888 Century Park East, Suite 2100
Los Angeles, California 90067-1725
Tel.:   (310) 712-6600
Fax:   (310) 712-8800

*Attorneys for Plaintiff and Counterclaim
Defendant Catch Curve, Inc. and
Third Party Defendant j2 Global
Communications, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATCH CURVE, INC., | Case No. CV 05-4820 DDP (AJWx) |
| Plaintiff | **DECLARATION OF EDWARD E. JOHNSON IN OPPOSITION TO VENALI, INC.'S MOTION FOR ATTORNEYS FEES** |
| v. | |
| VENALI, INC. | |
| Defendant. | Judge:     Hon. Dean D. Pregerson<br>Date:      October 20, 2008<br>Time:     10:00 a.m.<br>Courtroom: 3 |
| AND RELATED CROSS-ACTION | |
| AND THIRD PARTY COMPLAINT | |

## DECLARATION OF EDWARD E. JOHNSON

I, Edward E. Johnson, declare as follows:

1.     I am an attorney admitted to the Bar of the State of California and to the Bar of this Court.  I am an associate of the law firm of Sullivan & Cromwell LLP, co-counsel to Plaintiff Catch Curve, Inc. and Third Party Defendant j2 Global Communications, Inc. in this action.  I submit this Declaration in opposition to Defendant Venali, Inc.'s ("Venali") Motion for Attorneys Fees.  I

1   have personal knowledge of the facts set forth herein, and, if called to testify, could

2   and would testify competently thereto

3       2.      Attached hereto and marked as Exhibit "1" is a true and correct

4   copy of Venali's Supplemental Response to j2 Global Communications, Inc.'s

5   First Set of Interrogatories.

6       3.      Attached hereto and marked as Exhibit "2" is a true and correct

7   copy of Venali's Second Supplemental Response to j2 Global Communications,

8   Inc.'s First Set of Interrogatories.

9       4.      Attached hereto and marked as Exhibit "3" is a true and correct

10  copy of a declaration executed by a representative of UltraLevel, Inc.

11      5.      Attached hereto and marked as Exhibit "4" is a true and correct

12  copy of a declaration executed by a representative of ImageTag, Inc.

13      6.      Attached hereto and marked as Exhibit "5" is a true and correct

14  copy of a declaration executed by a representative of Innovative Data Processing

15  Solutions, Ltd.

16      7.      Attached hereto and marked as Exhibit "6" is a true and correct

17  copy of a declaration executed by a representative of CenterBeam, Inc.

18      8.      Attached hereto and marked as Exhibit "7" is a true and correct

19  copy of a declaration executed by a representative of Wall Street Network, Inc.

20      9.      Attached hereto and marked as Exhibit "8" is a true and correct

21  copy of a declaration executed by a representative of OnShore Software.

22      10.     Attached hereto and marked as Exhibit "9" is a true and correct

23  copy of a declaration executed by a representative of ZipRealty, Inc.

24      11.     Attached hereto and marked as Exhibit "10" is a true and

25  correct copy of a declaration executed by a representative of eNetwork Solutions.

26      12.     Attached hereto and marked as Exhibit "11" is a true and

27  correct copy of a declaration executed by a representative of Amos Data Systems,

28  Inc.

-1-

1    13.    Attached hereto and marked as Exhibit "12" is a true and

2  correct copy of a declaration executed by a representative of Ariba, Inc.

3    14.    Attached hereto and marked as Exhibit "13" is a true and

4  correct copy of a declaration executed by a representative of IronWare

5  Technologies.

6    15.    Attached hereto and marked as Exhibit "14" is a true and

7  correct copy of the transcript of the April 30, 2007 hearing in this matter on j2 and

8  Catch Curve's Motion to Dismiss.

9    16.    Attached hereto and marked as Exhibit "15" is a true and

10  correct copy of an excerpt of the file history for U.S. Patent No. 4,994,926,

11  consisting of the original application filed with the Patent & Trademark Office.

12    17.    Venali began participating in discovery in this matter only after

13  months of delay and multiple threats by Catch Curve to file a motion to compel.  It

14  took Venali over eight months to produce documents in response to Catch Curve's

15  discovery requests, and when it finally did, it produced roughly 80,000 pages of

16  useless documents consisting of unintelligible symbols.  After another two months,

17  Venali produced more documents, but again included thousands of unintelligible

18  documents, interspersed among the other documents.  A year after Catch Curve

19  served its discovery requests, Venali had produced less than ten pages of financial

20  documents and no business planning or strategy documents, and it was only after

21  another threatened motion to compel that Venali finally began to comply with its

22  discovery obligations.

23    I declare under penalty of perjury under the laws of the United States

24  that the foregoing is true and correct.

25    Executed this 30th day of September, 2008 at Los Angeles, California.

26

27    _____

28    Edward E. Johnson

-2-

**EXHIBIT 1**

1  LAW OFFICE OF STEVEN M. GOLDSOBEL
   Steven M. Goldsobel (SBN 166405)
2  1900 Avenue of the Stars
   Suite 1800
3  Los Angeles, CA 90067
   Telephone: 310-552-4848
4  Facsimile: 310-552-9291

5  CAREY, RODRIGUEZ, GREENBERG & PAUL, LLP
   JOHN C. CAREY (Admitted *Pro Hac Vice*)
6  DOUGLAS L. O'Keefe (Admitted *Pro Hac Vice*)
   1395 Brickell Avenue, Suite 700
7  Miami, FL 33131
   Telephone: 305-372-7474
8  Facsimile: 305-372-7475

9  Attorneys for Defendant and Third Party Plaintiff
   VENALI, INC.

10               **UNITED STATES DISTRICT COURT**

11               **CENTRAL DISTRICT OF CALIFORNIA**

12

13  CATCH CURVE, INC.,                    )   Civil Action No. CV 05-4820 DDP (AJWx)
                                          )
14            Plaintiff,                   )
                                          )
15  vs.                                    )   **DEFENDANT AND THIRD PARTY**
                                          )   **PLAINTIFF VENALI, INC.'S**
16  VENALI, INC.,                          )   **SUPPLEMENTAL RESPONSE TO j2**
                                          )   **GLOBAL COMMUNICATIONS, INC.'S**
17            Defendant/Third Party        )   **FIRST SET OF INTERROGATORIES**
              Plaintiff.                   )
18  _____    )
                                          )
19  AND RELATED CROSS-ACTION               )
    _____    )

20

21       Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and

22  Third Party Plaintiff Venali, Inc. ("Venali") hereby submits its Supplemental Response to

23  Third Party Defendant j2 Global Communications, Inc.'s ("j2") First Set of Interrogatories.

    **Interrogatory No. 2:**

24       State all facts upon which you base your allegation in Paragraph 113 of your

25  Counterclaim that "[t]here are substantial barriers to entry into the Relevant Product

26  Market," including, but not limited to, the identification of all of the "substantial barriers"

27  that Venali contends exist, beyond the ones alleged in Paragraph 113 of your Counterclaim.

28

                                    EXH ___1___ P ___3___

**Response to Interrogatory No. 2:**

Venali objects to the foregoing interrogatory as premature and in conflict with the schedule governing discovery in this action to the extent that the request calls for expert witness disclosures.

Notwithstanding the foregoing objections, Venali will produce non-privileged documents, which are responsive to this Interrogatory, in accordance with Fed. R. Civ. P. 33(d). Upon completion of its production, Venali will specify Bates ranges of such documents.

**Interrogatory No. 3:**

State all facts upon which you base your allegation in Paragraph 113 of your Counterclaim that "[t]here are no adequate alternative products or services for the end users in the Relevant Market."

**Response to Interrogatory No. 3:**

Venali objects to the foregoing interrogatory as premature and in conflict with the schedule governing discovery in this action to the extent that the request calls for expert witness disclosures.    Venali has produced or will produce relevant business plans and competitive analyses. Upon completion of its production, Venali will specify Bates ranges of such documents.

**Interrogatory No. 4:**

State all facts upon which you base your allegation in Paragraph 119(A) of your Counterclaim that the "[c]laims of" the Patents-in-Suit fail "to meet the requisite conditions for patentability specified by Title 35 of the United States Code, including without limitation Sections 101, 102, 103, 112, and 282", including, but not limited to, the identification of which Section(s) of Title 35 of the United States Code Venali contends each Patent-in-Suit fails to meet and, in the case of section 102 or 103 invalidity, the

EXH __1__ P. __4__

1  identification of every piece of allegedly invalidating prior art, and all imitation-by-

2  limitation matchup between that prior art and any allegedly invalid claim of any of the

3  Patents-in-Suit.

4  **Response to Interrogatory No. 4:**

5         Venali objects to the foregoing interrogatory as premature and in conflict with the

6  schedule governing discovery in this action to the extent that the request calls for expert

7  witness disclosures.  Additionally, Venali's investigation in this matter is ongoing and

8  Venali reserves its right to supplement its response.

9         Notwithstanding the foregoing objections, Venali will produce prior art in its

10  possession.  In addition, Venali states that at this time, its theories of invalidity include

11  invalidity based on prior art, lack of written description, lack of enablement, and failure to

12  disclose best mode.   In addition, Venali intends to conduct additional discovery regarding

13  invalidity issues and reserves the right to assert additional ground to establish the invalidity

14  of the Patents-In-Suit.

15

16  **Interrogatory No. 5:**

17         State all facts upon which you base your allegation in Paragraph 119(B) of your

18  Counterclaim that Venali has not infringed and does not infringe the Patents-in-Suit.

19

20  **Response to Interrogatory No. 5:**

21         Venali states that in accordance with Fed. R. Civ. P. 33(d), it will produce non-

22  privileged documents that demonstrate the facts upon which Venali bases its allegation that

23  it has not infringed and does not infringe the Patents-in-Suit, including without limitation

24  Venali's claim construction briefs.  Upon completion of its production, Venali will specify

25  Bates ranges of such documents.

26

27

28

EXH __1__ P __5__

**Interrogatory No. 8:**

State all facts upon which you base your allegation in Paragraph 126 of your Counterclaim that j2's alleged action of licensing patents together has "unreasonably restrained competition in the Relevant Product Market and stifled innovation in the Relevant Innovation Market."

**Response to Interrogatory No. 8:**

Venali objects to the foregoing interrogatory as premature and in conflict with the schedule governing discovery in this action to the extent that the request calls for expert witness disclosures.

Notwithstanding the foregoing objections, Venali will produce non-privileged documents, which are responsive to this Interrogatory, in accordance with Fed. R. Civ. P. 33(d). Upon completion of its production, Venali will specify Bates ranges of such documents.

**Interrogatory No. 10:**

State all facts upon which you base your allegation in Paragraph 139 of your Counterclaim that "j2 and Catch Curve [sent cease and desist letters] to intentionally, improperly and unjustifiably interfered with [existing business] relationships and thereby induce non-performance by Venali's existing customers and channel partners."

**Response to Interrogatory No. 10:**

Venali will produce non-privileged documents, which are responsive to this Interrogatory, in accordance with Fed. R. Civ. P. 33(d). Upon completion of its production, Venali will specify Bates ranges of such documents. In addition, Venali states that it has received telephone calls from several of its channel partners and/or customers informing Venali of their receipt of cease and desist letters.

EXH __1__ P. __6__

1    The Venali customers or channel partners that contacted Venali regarding receipt of
2    cease and desist letters from Catch Curve include:  HMB Information System Developers,
3    Ironware Technologies, Ariba, Inc., Kancharla Corporation, The Bear Sterns Companies,
4    Inc., Amos Data Systems, Image Tag, OnShore Software and CenterBeam, Inc.

5

6    **Interrogatory No. 11:**

7    State all facts upon which you base your allegation in Paragraph 141 of your
8    Counterclaim that "[a]s a result of j2 and Catch Curve's interference, Venali has been
9    damaged in its business or property as existing customers and channel partners canceled or
10   postponed existing business with Venali and/or curtailed sales of Venali's services,"
11   including, but not limited to, the identity of all of the existing customers and channel
12   partners who Venali contends canceled or postponed existing business with Venali and/or
13   curtailed sales of Venali's services, and each instance of cancellation, postponement, or
14   curtailment.

15   **Response to Interrogatory No. 11:**

16   See response to interrogatory No. 10.  Venali has not yet determined the full extent
17   of its damages caused by j2 and Catch Curve's interference.

18   Notwithstanding the foregoing objections, Venali will produce non-privileged
19   documents, which are responsive to this Interrogatory, in accordance with Fed. R. Civ. P.
20   33(d).  Upon completion of its production, Venali will specify Bates ranges of such
21   documents.  In addition, Venali states that it believes one or more of the companies
22   identified in response to interrogatory No. 10 canceled or postponed existing business with
23   Venali and/or curtailed sales of Venali's services on j2 and/or Catch Curve's interference.
24   Venali intends to conduct additional discovery on this issue and reserves the right to
25   supplement its response.

26

27

28

EXH ___/___ P. __7__

**Interrogatory No. 12:**

State all facts upon which you base your allegation in Paragraph 149 of your Counterclaim that "j2 purchased ads through Internet search engines such as the well-known Google search engine. As part of the search engine purchases, j2 submitted Venali's federally registered mark "Venali" in those Internet search engines in order to divert consumer traffic from Venali's website to j2's website", including, but not limited to, the identify of all search engines to which Venali contends j2 submitted Venali's federally registered mark.

**Response to Interrogatory No. 12:**

Venali states that it conducted searches of its trademarked name and the results yielded links to j2's services as sponsored links. In addition, Venali will produce non-privileged documents, which are responsive to this Interrogatory, in accordance with Fed. R. Civ. P. 33(d). Upon completion of its production, Venali will specify Bates ranges of such documents.

**Interrogatory No. 17:**

Identify the "multi-billion dollar fund" that purchased Venali as referenced in the Venali press release attached hereto as Exhibit "A".

**Response to Interrogatory No. 17:**

Venali supplements its response to state that the Cheyne Special Situations Fund, L.P. is the fund referenced in the press release that was attached to j2 Global Communications, Inc.'s First Set of Interrogatories. This information is designated as "Restricted Confidential" pursuant to the amended protective order in this case.

**Interrogatory No. 19:**

Identify All Persons with knowledge of any of the allegations of your Counterclaim, including which allegations each person has knowledge of.

EXH 1 P. 8

**Response to Interrogatory No. 19:**

Scott Turicchi – knowledge regarding j2 and Catch Curve's use of the Patents-In-Suit including efforts to impede competition.

Jeffrey Adelman - knowledge regarding j2 and Catch Curve's use of the Patents-In-Suit including the fact that the Patents-in-Suit are not applicable to fax to email services.

Mark Bloomfield - knowledge regarding j2 and Catch Curve's use of the Patents-In-Suit including the fact that the Patents-in-Suit are not applicable to fax to email services.

Ryan Strong - knowledge regarding j2 and Catch Curve's use of the Patents-In-Suit including the fact that the Patents-in-Suit are not applicable to fax to email services.

Michael McLaughlin - knowledge regarding j2 and Catch Curve's use of the Patents-In-Suit including the fact that the Patents-in-Suit are not applicable to fax to email services.

Mark Toschek – knowledge regarding j2 and Catch Curve's actions towards Venali and their impact on Venali.

Ralph Musgrove - knowledge regarding Venali business development.

Douglas O'Keefe – knowledge regarding j2 and Catch Curve's patent license negotiations with Venali.

Jay Patel – knowledge regarding Venali customers or channel partners that received cease and desist letters from Catch Curve.

Vincent Marottoli – knowledge regarding j2's use of Venali's trademark.

<u>**VERIFICATION**</u>

I, John Poncy, declare under penalty of perjury pursuant to 28 U.S.C. §1746 that I am the CEO of Venali, Inc., that I have read the foregoing supplemental responses to j2 Global Communications, Inc. First Set of Interrogatories and that the same are true to the best of my knowledge, information and belief.

Dated: April 20, 2007

John Poncy
CEO
Venali, Inc.

EXH ___1___ P.___9___

MAY-04-2007(FRI) 15:12                                    (FAX)3053771055                    P. 009/009

**PROOF OF SERVICE**

1

2   STATE OF FLORIDA          )
                             )   ss
3   COUNTY OF MIAMI-DADE      )

4

5        I am employed in the County of Miami-Dade, State of Florida, over the age of eighteen
     years, and not a party to the within action.  My business address is: 1395 Brickell Avenue, Suite
6    700, Miami, Florida 33131.

7        On May 4, 2007 , I served the foregoing document on the interested parties in this action by
     placing a true copy thereof enclosed in a sealed envelope addressed as follows:

8    Robert A. Sacks, Esq.                    Frank Bernstein, Esq.
     SULLIVAN & CROMWELL LLP                  KENYON & KENYON LLP
9    1888 Century Park East, Suite 2100       333 W. San Carlos Street, Suite 600
     Los Angeles, CA 90067-1725               San Jose, CA 95110-2731

10

11   ☐   **(VIA PERSONAL SERVICE)**  By causing the document(s) listed above to be served
          on the person(s) at the address(es) set forth above.
12

13   ☐   **(VIA U.S. MAIL)**  In accordance with the regular mailing collection and processing
          practices of this office, with which I am readily familiar, by means of which mail is
14        deposited with the United States Postal Service at Miami, Florida that same day in the
          ordinary course of business, I deposited such sealed envelope, with postage thereon
15        fully prepaid, for collection and mailing on this same date following ordinary business
          practices, addressed as set forth below.

16   x   **(VIA FACSIMILE)**  By causing such document to be delivered to the office of the
          addressee via facsimile.
17

18   ☐   **(VIA OVERNIGHT DELIVERY)**  By causing such envelope to be delivered to the
          office of the addressee(s) at the address(es) set forth above by overnight delivery via
19        Federal Express or by a similar overnight delivery service.

20        I declare that I am employed in the office of a member of the bar of this court whose
     direction the service was made.  I declare under penalty of perjury under the laws of the State of
21   Florida that the above is true and correct.

22        Executed on May 4, 2007, at Miami, Florida.

23

24

25

26

27

28

EXH __1__ P __10__

**EXHIBIT 2**

1    LAW OFFICE OF STEVEN M. GOLDSOBEL
     Steven M. Goldsobel (SBN 166405)
2    1900 Avenue of the Stars
     Suite 1800
3    Los Angeles, CA 90067
     Telephone: 310-552-4848
4    Facsimile: 310-552-9291

5    CAREY, RODRIGUEZ, GREENBERG & PAUL, LLP
     JOHN C. CAREY (Admitted *Pro Hac Vice*)
6    DOUGLAS L. O'Keefe (Admitted *Pro Hac Vice*)
     1395 Brickell Avenue, Suite 700
7    Miami, FL 33131
     Telephone: 305-372-7474
8    Facsimile: 305-372-7475

9    Attorneys for Defendant and Third Party Plaintiff
     VENALI, INC.

10

11                   UNITED STATES DISTRICT COURT

12                   CENTRAL DISTRICT OF CALIFORNIA

13   CATCH CURVE, INC.,                )   Civil Action No. CV 05-4820 DDP (AJWx)
                                       )
                 Plaintiff,            )
14                                     )
     vs.                               )
15                                     )   **DEFENDANT AND THIRD PARTY**
     VENALI, INC.,                     )   **PLAINTIFF VENALI, INC.'S SECOND**
16                                     )   **SUPPLEMENTAL RESPONSE TO j2**
                 Defendant/Third Party )   **GLOBAL COMMUNICATIONS, INC.'S**
17               Plaintiff.            )   **FIRST SET OF INTERROGATORIES**
                                       )
18   ─────────────────────────────    )
     AND RELATED CROSS-ACTION          )
19                                     )

20        Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and

21   Third Party Plaintiff Venali, Inc. ("Venali") hereby submits its Second Supplemental

22   Response to Third Party Defendant j2 Global Communications, Inc.'s ("j2") First Set of

23   Interrogatories.

24

25   **Interrogatory No. 10:**

26        State all facts upon which you base your allegation in Paragraph 139 of your

27   Counterclaim that "j2 and Catch Curve [sent cease and desist letters] to intentionally,

28

                                                          EXH ___2___ P. __11__

1    improperly and unjustifiably interfered with [existing business] relationships and thereby

2    induce non-performance by Venali's existing customers and channel partners."

3    **Second Supplemental Response to Interrogatory No. 10:**

4         In addition to Venali's previous response, additional Venali customers or channel

5    partners that contacted Venali regarding receipt of cease and desist letters from Catch

6    Curve, include: B-Tec, Innovative Solutions, Zip Realty, Ultra Level, Wall Street Network,

7    Inc., and eNetwork Solutions.

8

9    **Interrogatory No. 11:**

10         State all facts upon which you base your allegation in Paragraph 141 of your

11    Counterclaim that "[a]s a result of j2 and Catch Curve's interference, Venali has been

12    damaged in its business or property as existing customers and channel partners canceled or

13    postponed existing business with Venali and/or curtailed sales of Venali's services,"

14    including, but not limited to, the identity of all of the existing customers and channel

15    partners who Venali contends canceled or postponed existing business with Venali and/or

16    curtailed sales of Venali's services, and each instance of cancellation, postponement, or

17    curtailment.

18    **Second Supplemental Response to Interrogatory No. 11:**

19

20

21

22

23

24

25

26

27

28

EXH 2 P. 12

1        Venali states that of the companies identified in response to interrogatory No. 10, the

2    following channel partners or end customers canceled or postponed business with Venali

3    and/or curtailed sales of Venali's services based on j2 and/or Catch Curve's interference:

4        a) B-Tec – integration of Venali services for Clariant Corporation of halted for

5    approximately two months;

6        b) Innovative Solutions – Great Lakes inbound fax to email and printing solution

7    halted;

8        c) ImageTag – Refused to sign up new clients for a period of time;

9        d) Ultra Level – stopped testing with a large medical integration project.

1
2
## VERIFICATION
3

I, John Poncy, declare under penalty of perjury pursuant to 28 U.S.C. §1746 that I am the

CEO of Venali, Inc., that I have read the foregoing Second Supplemental Response to j2 Global

Communications, Inc. First Set of Interrogatories and the contents are true to the best of my

knowledge, information and belief.

Dated: ~~April 27~~, May 3, 2007

John Poncy
CEO
Venali, Inc.

Dated: ~~April 27~~, May 3, 2007                    CAREY, RODRIGUEZ, GREENBERG & PAUL, LLP

By: _____

Douglas L. O'Keefe
Attorneys for Defendant/Third Party Plaintiff
Venali, Inc.

EXH ____2____ P.__14__

**PROOF OF SERVICE**

| | | |
|---|---|---|
| STATE OF FLORIDA | ) | |
| | ) ss | |
| COUNTY OF MIAMI-DADE | ) | |

I am employed in the County of Miami-Dade, State of Florida, over the age of eighteen years, and not a party to the within action. My business address is: 1395 Brickell Avenue, Suite 700, Miami, Florida 33131.

On May 4, 2007, I served the foregoing document on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Robert A. Sacks, Esq.               Frank Bernstein, Esq.
SULLIVAN & CROMWELL LLP             KENYON & KENYON LLP
1888 Century Park East, Suite 2100  333 W. San Carlos Street, Suite 600
Los Angeles, CA 90067-1725          San Jose, CA 95110-2731

☐   **(VIA PERSONAL SERVICE)** By causing the document(s) listed above to be served on the person(s) at the address(es) set forth above.

☐   **(VIA U.S. MAIL)** In accordance with the regular mailing collection and processing practices of this office, with which I am readily familiar, by means of which mail is deposited with the United States Postal Service at Miami, Florida that same day in the ordinary course of business, I deposited such sealed envelope, with postage thereon fully prepaid, for collection and mailing on this same date following ordinary business practices, addressed as set forth below.

x   **(VIA FACSIMILE)** By causing such document to be delivered to the office of the addressee via facsimile.

☐   **(VIA OVERNIGHT DELIVERY)** By causing such envelope to be delivered to the office of the addressee(s) at the address(es) set forth above by overnight delivery via Federal Express or by a similar overnight delivery service.

I declare that I am employed in the office of a member of the bar of this court whose direction the service was made. I declare under penalty of perjury under the laws of the State of Florida that the above is true and correct.

Executed on May 4, 2007, at Miami, Florida.

EXH 2 P. 15

**EXHIBIT 3**

### Declaration of Jason Davidson

1. My name is Jason M. Davidson. I am the controller of UltraLevel, Inc., Detroit, Michigan. I make this declaration as corporate the representative of UltraLevel, Inc. I have personal and corporate knowledge of the statements contained in this declaration.

2. UltraLevel was served with a subpoena for production of documents issued by attorneys for Catch Curve, Inc., in the case of <u>Catch Curve, Inc. v. Venali, Inc.</u>, Case No. CV 05-4820 DDP (AJWx), U.S. District Court for the Central District of California. UltraLevel produced documents as required by that subpoena.

3. UltraLevel gives this declaration in an effort to avoid incurring expense and time required for deposition of UltraLevel personnel. If subpoenaed to testify pursuant to Fed.R.Civ.Pro 30(b)(6), UltraLevel's testimony would be consistent with the statements set forth in this declaration.

4. UltraLevel received a communication ("Communication") from attorneys representing Catch Curve, Inc. asking UltraLevel to refrain from doing business with Venali, Inc.

5. Although UltraLevel gave due consideration to the Communication, UltraLevel did not cancel any business with Venali as a result of that Communication.

EXH 3 P. 16

6. UltraLevel did not cease doing business with Venali, or cease pursuit of any business relationship with Venali or any Venali customer, as a result of that Communication.

7. To the best of UltraLevel's knowledge, at or near the time of the Communication, UltraLevel was not working on, pursuing, or testing for, any business or project involving any medical integration project, whether with Venali or with any other company.  To the extent any statement has been made that UltraLevel stopped testing or pursuing business involving a medical integration project, UltraLevel does not know the basis for that statement, and does not have facts or information which UltraLevel believes would support such a statement.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Jason M. Davidson

Executed August 10, 2007

2

EXH __3__ P. __17__

**EXHIBIT 4**

## DECLARATION OF ANTHONY ARGENZIANO

I, Anthony Argenziano, declare as follows:

1.      I am an employee of ImageTag, Inc., located in Chandler, Arizona.  I am responsible for selecting vendors for providing outsourced facsimile services for ImageTag, Inc. I have personal knowledge of the facts set forth herein, and, if called to testify, could and would testify competently thereto.

2.      As of the present date, ImageTag, Inc. has not received any cease and desist letter or similar communication or correspondence from j2 Global Communications, Inc. ("j2"), Catch Curve, Inc. ("Catch Curve"), or their representatives regarding ImageTag, Inc.'s business relationship with Venali, Inc.

3.      As of the present date, ImageTag, Inc. has not cancelled any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

4.      As of the present date, ImageTag, Inc. has not postponed any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

5.      As of the present date, ImageTag, Inc. has not cancelled any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

6.      As of the present date, ImageTag, Inc. has not postponed any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

EXH 4 P. 18

7. As of the present date, ImageTag, Inc. has not curtailed sales or use of Venali's services as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of June, 2007 at Chandler, Arizona.

Anthony Argenziano

EXH __4__ P. __19__

SULLIVAN & CROMWELL LLP

DECLARATION OF ANTHONY ARGENZIANO

**EXHIBIT 5**

## DECLARATION OF DAVID SPAKER

I, DAVID SPAKER, declare as follows:

1.      I am the President of Innovative Data Processing Solutions, Ltd. ("Innovative"), located in Rochester, New York.  I am responsible for Innovative's business dealings and corporate relationship with Venali, Inc. ("Venali").  I have personal knowledge of the facts set forth herein, and, if called to testify, could and would testify competently thereto.

2.      Innovative was served with a third-party subpoena by Catch Curve, Inc. That subpoena requested the production of documents related to Innovative's business dealings with Venali, including whether Innovative has cancelled or postponed any existing or potential business activity with Venali as a result of any correspondence or communications with or from j2 Global Communications, Inc. ("j2"), Catch Curve, Inc. ("Catch Curve"), or anybody representing j2 and/or Catch Curve.

3.      Innovative has not cancelled any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

4.      Innovative has not postponed any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

5.      Innovative has not cancelled any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

6.      Innovative has not postponed any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

7.      Innovative has not curtailed sales or use of Venali's services as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

8.      In fact, Innovative's business relationship with Venali was terminated by Venali on January 5, 2007.

EXH___5___P___20_

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of August, 2007 at Rochester, New York.

_____
David Spaker

EXH 5 P 21

**EXHIBIT 6**

## DECLARATION OF KEITH ROBERTS

I, Keith Roberts, declare as follows:

1.      I am the Executive Vice President, Chief Financial Officer, and Chief Staff Officer of CenterBeam, Inc. ("CenterBeam"), located in San Jose, California.  I am responsible for CenterBeam's business dealings and corporate relationship with Venali, Inc. ("Venali").  I have personal knowledge of the facts set forth herein, and, if called to testify, could and would testify competently thereto.

2.      CenterBeam was served with a third-party subpoena by Catch Curve, Inc.  That subpoena requested the production of documents related to CenterBeam's business dealings with Venali, including whether CenterBeam has cancelled or postponed any existing or potential business activity with Venali as a result of any correspondence or communications with or from j2 Global Communications, Inc. ("j2"), Catch Curve, Inc. ("Catch Curve"), or anybody representing j2 and/or Catch Curve.

3.      CenterBeam has not cancelled any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

4.      CenterBeam has not postponed any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

5.      CenterBeam has not cancelled any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

6.      CenterBeam has not postponed any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

EXH __6__ P. __22__

1       7.      CenterBeam has not curtailed sales or use of Venali's services

2   as a result of any communication or correspondence with or from j2, Catch Curve

3   or their representatives.

4       8.      To the extent that CenterBeam has ceased, postponed, curtailed,

5   or decreased any business activity with Venali, all such actions were taken for

6   business reasons that are independent of any communication or correspondence

7   from j2, Catch Curve, or their representatives.  No such decisions were made as a

8   result of, nor influenced in any way by, any communication or correspondence

9   from j2, Catch Curve, or their representatives.

10      9.      Neither I, nor to my knowledge anyone else at CenterBeam had

11   any communications or correspondence with Venali or its representatives

12   regarding any communication or correspondence with or from j2, Catch Curve or

13   their representatives.

14          I declare under penalty of perjury that the foregoing is true and

15   correct.

16

17          Executed this _10th_ day of July, 2007 at San Jose, California.

18

19                                        _____
                                              Keith Roberts
20

21

22

23

24

25

26

27

28
                                                        EXH __6__ P __23__

DECLARATION OF KEITH ROBERTS

**EXHIBIT 7**

# DECLARATION OF KRISTINA MAZELIS

I, Kristina Mazelis, declare as follows:

1.    I am the CFO and COO of Wall Street Network, Inc. ("WSN"), located in New York, New York. I am fully familiar with WSN's relationship and dealings with Venali, Inc. I have personal knowledge of the facts set forth herein, and, if called to testify, could and would testify competently thereto.

2.    On June 25, 2007, WSN was served with a third-party subpoena by Catch Curve, Inc. That subpoena requested the production of documents related to WSN's business dealings with Venali, Inc. ("Venali"), including whether WSN has cancelled or postponed any existing or potential business activity with Venali as a result of any correspondence or communications with or from j2 Global Communications, Inc. ("j2"), Catch Curve, Inc. ("Catch Curve"), or anybody representing j2 and/or Catch Curve.

3.    WSN has not cancelled any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

4.    WSN has not postponed any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

5.    WSN has not cancelled any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

6.    WSN has not postponed any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

EXH __7__ P __24__

7.      WSN has not curtailed sales or use of Venali's services as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

8.      To the extent that WSN has ceased, postponed, curtailed, or decreased any business activity with Venali, all such actions were taken for business reasons that are independent of any communication or correspondence from j2, Catch Curve, or their representatives.  No such decisions were made as a result of, or influenced in any way by, any communication or correspondence from j2, Catch Curve, or their representatives.

9.      To my knowledge, WSN had never received correspondence from Catch Curve or j2, or any of their representatives, prior to its receipt of the subpoena referenced above.

10.     Neither I, nor to my knowledge anyone else at WSN, had any communications or correspondence with Venali or its representatives regarding any communication or correspondence with or from j2, Catch Curve or their representatives.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19 day of July, 2007 at New York, New York.

Kristina Mazelis

AIKIA JOHNSON
Notary Public, State of New York
No. 01JO6169496
Qualified in New York County
Commission Expires June 25, 2011

EXH __7__ P __25__

-2-

SULLIVAN & CROMWELL LLP

DECLARATION OF KRISTINA MAZELIS

**EXHIBIT 8**

# DECLARATION OF JIM VAN HOOK

I, Jim Van Hook, declare as follows:

1.      I am the Director of Business Development of OnShore Software ("OnShore"), located in Beaverton, Oregon. I am responsible for OnShore's relationship and dealings with Venali, Inc. I have personal knowledge of the facts set forth herein, and, if called to testify, could and would testify competently thereto.

2.      On June 26, 2007, I accepted service on behalf of OnShore of a third-party subpoena by Catch Curve, Inc. That subpoena requested the production of documents related to OnShore's business dealings with Venali, Inc. ("Venali"), including whether OnShore has cancelled or postponed any existing or potential business activity with Venali as a result of any correspondence or communications with or from j2 Global Communications, Inc. ("j2"), Catch Curve, Inc. ("Catch Curve"), or anybody representing j2 and/or Catch Curve.

3.      OnShore has not cancelled any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

4.      OnShore has not postponed any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

5.      OnShore has not cancelled any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

6.      OnShore has not postponed any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

EXH __8__ P __26__

1        7.     OnShore has not curtailed sales or use of Venali's services as a
2  result of any communication or correspondence with or from j2, Catch Curve or
3  their representatives.

4        8.     To the extent that OnShore has ceased, postponed, curtailed, or
5  decreased any business activity with Venali, all such actions were taken for
6  business reasons that are independent of any communication or correspondence
7  from j2, Catch Curve, or their representatives.  No such decisions were made as a
8  result of, nor influenced in any way by, any communication or correspondence
9  from j2, Catch Curve, or their representatives.

10        9.     Neither I, nor to my knowledge anyone else at OnShore, had
11  any communications or correspondence with Venali or its representatives
12  regarding any communication or correspondence with or from j2, Catch Curve or
13  their representatives.

14

15        I declare under penalty of perjury under the laws of the State of
16  California that the foregoing is true and correct.

17

18        Executed this 30TH day of June, 2007 at Beaverton, Oregon.

19

20                         Jim Van Hook

21

22

23

24

25

26

27

28                              EXH 8 P. 27

**EXHIBIT 9**

## DECLARATION OF SAMANTHA HARNETT

I, Samantha Harnett, declare as follows:

1.      I am an Assistant General Counsel of ZipRealty, Inc. ("ZipRealty"), located in Emeryville, California.  I am fully familiar with ZipRealty's relationship and dealings with Venali, Inc.  I have personal knowledge of the facts set forth herein, and, if called to testify, could and would testify competently thereto.

2.      On June 25, 2007, ZipRealty was served with a third-party subpoena by Catch Curve, Inc.  That subpoena requested the production of documents related to ZipRealty's business dealings with Venali, Inc. ("Venali"), including whether ZipRealty has cancelled or postponed any existing or potential business activity with Venali as a result of any correspondence or communications with or from j2 Global Communications, Inc. ("j2"), Catch Curve, Inc. ("Catch Curve"), or anybody representing j2 and/or Catch Curve.

3.      ZipRealty has not cancelled any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

4.      ZipRealty has not postponed any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

5.      ZipRealty has not cancelled any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

6.      ZipRealty has not postponed any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

EXH 9 P. 28

7.     ZipRealty has not curtailed sales or use of Venali's services as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

8.     To the extent that ZipRealty has ceased, postponed, curtailed, or decreased any business activity with Venali, all such actions were taken for business reasons that are independent of any communication or correspondence from j2, Catch Curve, or their representatives.  No such decisions were made as a result of, nor influenced in any way by, any communication or correspondence from j2, Catch Curve, or their representatives.

9.     Neither I, nor to my knowledge anyone else at ZipRealty, had any communications or correspondence with Venali or its representatives regarding any communication or correspondence with or from j2, Catch Curve or their representatives.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of June, 2007 at Emeryville, California.

_____
Samantha Harnett

EXH ___9___ P.___29___

-2-

**EXHIBIT 10**

# DECLARATION OF ALAN SIDLES

I, Alan Sidles, declare as follows:

1.      I am the CEO of eNetwork Solutions ("eNetwork"), located in Vero Beach, Florida. I am responsible for eNetwork's relationship and business dealings with Venali, Inc. ("Venali"). I have personal knowledge of the facts set forth herein, and, if called to testify, could and would testify competently thereto.

2.      On June 25, 2007, eNetwork Solutions was served with a third-party subpoena by Catch Curve, Inc. That subpoena requested the production of documents related to eNetwork's business dealings with Venali, including whether eNetwork has cancelled or postponed any existing or potential business activity with Venali as a result of any correspondence or communications with or from j2 Global Communications, Inc. ("j2"), Catch Curve, Inc. ("Catch Curve"), or anybody representing j2 and/or Catch Curve.

3.      eNetwork has not cancelled any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

4.      eNetwork has not postponed any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

5.      eNetwork has not cancelled any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

6.      eNetwork has not postponed any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

EXH 10 P 30

7.    eNetwork has not curtailed sales or use of Venali's services as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

8.    To the extent that eNetwork has ceased, postponed, curtailed, or decreased any business activity with Venali, all such actions were taken for business reasons that are independent of any communication or correspondence from j2, Catch Curve, or their representatives.  No such decisions were made as a result of, nor influenced in any way by, any communication or correspondence from j2, Catch Curve, or their representatives.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 28 day of June, 2007 at Vero, Florida.

Alan Sidles

-2-

**EXHIBIT 11**

## DECLARATION OF DAVID KAISER

I, David Kaiser, declare as follows:

1.     I am the General Manager of Amos Data Systems, Inc. ("Amos Data"), located in Akron, Ohio.  I am familiar with Amos Data's relationship and business dealings with Venali, Inc. ("Venali").  I have personal knowledge of the facts set forth herein, and, if called to testify, could and would testify competently thereto.

2.     On 5-7-07, Amos Data was served with a third-party subpoena by Catch Curve, Inc.  That subpoena requested the production of documents related to Amos Data's business dealings with Venali, including whether Amos Data has cancelled or postponed any existing or potential business activity with Venali as a result of any correspondence or communications with or from j2 Global Communications, Inc. ("j2"), Catch Curve, Inc. ("Catch Curve"), or anybody representing j2 and/or Catch Curve.

3.     Amos Data has not cancelled any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

4.     Amos Data has not postponed any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

5.     Amos Data has not cancelled any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

6.     Amos Data has not postponed any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

EXH __11__ P __32__

7.      Amos Data has not curtailed sales or use of Venali's services as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

8.      To the extent that Amos Data has ceased, postponed, curtailed, or decreased any business activity with Venali, all such actions were taken for business reasons that are independent of any communication or correspondence from j2, Catch Curve, or their representatives.  No such decisions were made as a result of, nor influenced in any way by, any communication or correspondence from j2, Catch Curve, or their representatives.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this _2n<sup>th</sup>_ day of June, 2007 at Akron, Ohio.

_____
David Kaiser

EXH _11_ P. _33_

-2-

**EXHIBIT 12**

## DECLARATION OF DAVID MIDDLER

I, David Middler, declare as follows:

1.      I am General Counsel for Ariba, Inc. ("Ariba"), located in Sunnyvale, California.  I have personal knowledge of the facts set forth herein, and, if called to testify, could and would testify competently thereto.

2.      On May 14, 2007, Ariba was served with a third-party subpoena by Catch Curve, Inc. ("Catch Curve") in connection with the case of *Catch Curve, Inc. v. Venali, Inc.*, No. CV 05-4820 DDP (AJWx) (the "Subpoena").  The Subpoena included an attachment purporting to seek production of documents related to Ariba's business dealings with Venali, Inc. ("Venali").  Ariba believes that that Subpoena was defective in a number of respects and served Objections on Catch Curve to that effect.  I am providing this declaration in lieu of further responses and disputation concerning subpoenas directed to Ariba.

3.      On or about March 14, 2007, Ariba received a letter from counsel for Catch Curve concerning the above-referenced case (the "Catch Curve Letter").

4.      Ariba has a pre-existing business relationship with Venali.  Ariba has not discontinued, diminished or postponed that relationship as a result of its receipt of the Subpoena.  Further, Ariba has not discontinued, diminished or postponed its relationship with Venali as a result of its receipt of the Catch Curve Letter or as the result of any communication or correspondence with or from j2 Global Communications, Inc., Catch Curve or any of their representatives.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26 day of June, 2007 at Sunnyvale, California

_____
DAVID MIDDLER

EXH 12 P 34

**EXHIBIT 13**

# DECLARATION OF GREGORY HOUSTON

I, Gregory Houston, declare as follows:

1.     I am an Executive Vice-President and the Chief Technology Officer of IronWare Technologies ("IronWare"), located in Denver, Colorado.  I am responsible for the product development team at IronWare.  I have personal knowledge of the facts set forth herein, and, if called to testify, could and would testify competently thereto.

2.     On May 8, 2007, IronWare was served with a third-party subpoena by Catch Curve, Inc.  That subpoena requested the production of documents related to IronWare's business dealings with Venali, Inc. ("Venali"), including whether IronWare has cancelled or postponed any existing or potential business activity with Venali as a result of any correspondence or communications with or from j2 Global Communications, Inc. ("j2"), Catch Curve, Inc. ("Catch Curve"), or anybody representing j2 and/or Catch Curve.

3.     IronWare has not cancelled any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

4.     IronWare has not postponed any existing business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

5.     IronWare has not cancelled any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

6.     IronWare has not postponed any potential business with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

EXH _13_ P _35_

7.     IronWare has not curtailed sales or use of Venali's services as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.

8.     Neither I, nor to my knowledge anyone else at IronWare, told or suggested to Venali or its representatives that IronWare was canceling, postponing or curtailing any business activity with Venali as a result of any communication or correspondence with or from j2, Catch Curve or their representatives.  Although IronWare received a cease and desist letter from j2 and Catch Curve's representative, this letter did not raise substantial concerns within IronWare or cause IronWare to alter or change its relationship with Venali in any way.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 30th day of May, 2007 at Denver, Colorado.

_Gregory Houston_
Gregory Houston

EXH __13__ P. __36__

-2-

DECLARATION OF GREGORY HOUSTON

**EXHIBIT 14**

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4                      - - -

5

6     HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING

7

8     CATCH CURVE, INC.,              )
                                      )
9              Plaintiffs,            )      CERTIFIED COPY
                                      )
10             vs.                    )  CV. 05-04820 DDP(AJWx)
                                      )
11    VENALI,            INC.,        )
                                      )
12             Defendants.            )
      _____)

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  *MOTION HEARING*

17             LOS ANGELES, CALIFORNIA

18           MONDAY, APRIL 30, 2007

19    _____

20

21                  MARIA R. BUSTILLOS
                  OFFICIAL COURT REPORTER
21                    C.S.R. 12254
22             UNITED STATES COURTHOUSE
                312 NORTH SPRING STREET
23                    ROOM 404
              LOS ANGELES, CALIFORNIA 90012
24                  (213) 894-2739

25

EXH 14 P. 37

```
1    APPEARANCES OF COUNSEL:

2          ON BEHALF OF PLAINTIFF:

3          SULLIVAN,  & CROMWELL
               BY:  EDWARD E. JOHNSON
4                   BRIAN R. ENGLAND
                    ATTORNEY AT LAW
5              1888 CENTURY PARK EAST
               LOS ANGELES, CALIFORNIA 90067-1725
6              (310) 712-6604

7

8          ON BEHALF OF DEFENDANT:

9          CAREY, RODRIGUEZ, GREENBERG, PAUL
               BY:  DOUGLAS L. O'KEEFE
10                  ATTORNEY AT LAW
               1395 BRICKELL AVENUE
11             SUITE 700
               MIAMI, FLORIDA 33131

12

13

14

15

16

17

18

19

20

21

22

23                        - - -

24

25
```

```
 1            LOS ANGELES, CALIFORNIA; MONDAY, APRIL 30, 2007

 2                              - - -

 3                 (COURT IN SESSION AT 10:00 A.M.)

 4

 5         THE CLERK:  Calling item nine, CV 05-04820 DDP (AJWx):

 6    Catch Curve v. Venali.

 7         Counsel, may we have appearances, please.

 8         MR. O'KEEFE:  Good morning, your Honor.

 9    Douglas O'Keefe for the defendant and counter-claimant, Venali,

10    Inc.

11         MR. JOHNSON:  Edward Johnson and Brian England for

12    Catch Curve and J2 Global Communications.

13         THE COURT:  Okay.  Mr. Johnson, do you want to be

14    heard?

15         MR. JOHNSON:  Yes, thank you, your Honor.  We

16    appreciate the detailed tentative.  I wanted to make just a

17    couple of brief points unless the Court has questions for me.

18         THE COURT:  Go ahead.

19         MR. JOHNSON:  The first is on the Noerr Pennington

20    point.

21         THE COURT:  On the what now?

22         MR. JOHNSON:  I'm sorry, on the Noerr Pennington

23    point.

24         THE COURT:  Yes.

25         MR. JOHNSON:  We appreciate the point that the Markman
```

U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

EXH 14 P. 39

1   hearing is upcoming on this.

2           THE COURT:  Yes.

3           MR. JOHNSON:  But we would submit that given the very

4   high standard that Venali has to reach in order to plead

5   objectively baseless, that the Court could rule on that based

6   on the papers that it already has before it.

7           THE COURT:  Okay.  Understood.  Go on.

8           MR. JOHNSON:  The second point concerns Venali's

9   Count 2, which is called "Sham litigation."  It appeared from

10  the tentative that the Court agreed with what we said in our

11  opening brief, which is that this doesn't appear to be any

12  different than its attempted monopolization claim, and if that

13  is the Court's view, then we would ask that the Court dismiss

14  that claim to clarify the pleadings and to ensure that we know

15  exactly what causes of action Venali has alleged against us.

16          THE COURT:  Okay.  Next point... is that it?

17          MR. JOHNSON:  That's it.  Thank you.

18          THE COURT:  Okay.  Thanks.

19          MR. O'KEEFE:  Good morning, your Honor.  Just two

20  comments regarding your proposed order.  The first one is that

21  I agree that it would be helpful for Venali to clean up some of

22  the allegations regarding time, and take that suggestion well.

23  The second comment is regarding the tortious interference

24  claims:  While it's correct that Venali didn't identify each

25  customer and general partner that Catch Curve sent

1  cease-and-desist letters to, however, this is -- the issue here

2  is notice.  And Catch Curve is the one who actually has the

3  information regarding each customer and general partner that it

4  sent the letters to.

5        During discovery, Venali has identified between five

6  and ten customers or general partners that were sent this --

7  sent the letters and had called -- contacted Venali regarding

8  it and actually has a supplemental response that it's agreed to

9  specify particular existing and prospective business

10  relationships that either didn't come before issue that were

11  delayed due to it.  So to the extent that this is an issue

12  regarding notice, I -- I'd suggest that -- that Catch Curve has

13  ample notice regarding who its -- which behavior is being

14  complained about and to whom they have directed these

15  communications.

16        And then further, Venali will actually have to be

17  taken discovery from Catch Curve to understand the full extent

18  of this -- of this interference.

19        THE COURT:  Okay.  Thank you.  Submitted.

20

21        (Whereupon the proceedings were adjourned.)

22

23                      - - -

24

25              C E R T I F I C A T E


U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

EXH 14 P. 41

```
1

2

3    CATCH CURVE, INC.                    :

4                 vs.                     :   CR. 05-04820 DDP (AJWx)

5    VENALI, INC.                         :

6

7

8                    I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN

9    AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL

10   DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO

11   SECTION 753, TITLE 28, UNITED STATES CODE, THE FOREGOING IS A

12   TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

13   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

14   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

15   OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

16

17   _____
     MARIA R. BUSTILLOS                          DATED: 11-20-07
18   OFFICIAL COURT REPORTER

19

20

21

22

23

24

25
```

U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

EXH 14  P. 42

1                      **C E R T I F I C A T E**

2

3

4     CATCH CURVE, INC.                    :

5               vs.                        :   CR. 05-04820 DDP (AJWx)

6     VENALI, INC.                         :

7

8

9               I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN

10    AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL

11    DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO

12    SECTION 753, TITLE 28, UNITED STATES CODE, THE FOREGOING IS A

13    TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

14    PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

15    TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

16    OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

17

18    _____
      MARIA R. BUSTILLOS                          DATED: 11-20-07
19    OFFICIAL COURT REPORTER

20

21

22

23

24

25

**U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

EXH __14__ P __43__

**EXHIBIT 15**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

The Commissioner of Patents and Trademarks
Washington, D.C. 20231

Sir:

Our Account No. 09-0946

Our Order No. _____

Herewith is the patent application of:

Reference No. 108870/0002

Applicant: Richard J. Gordon and
James R. Kennedy

Date: September 22, 1988

For: FACSIMILE TELECOMMUNICATIONS SYSTEM AND METHOD
Including:

[X] Declaration       [X] Abstract  1  page(s),   42  numbered claims

 34 pages of Specification (only spec. and claims)

[ ] Specification in non-English language

 9 sheet(s) of drawing: [X] informal; [ ] formal size: [ ] A4  [ ] 14"

This is a [ ] CIP [ ] DIV [ ] CONT [ ] SUB  of SN 0  /  _____ .

[ ] This is a filing under Rule 47 (see attached Petition)

[ ] Attached is an assignment to _____

[ ] Priority hereby claimed under 35 USC 119 based on filing in _____
    Application No.    Filing Date    Inventors Nos. on Attached Declaration
    _____
    _____
    _____
    _____

    Certified copy (copies)  [ ] attached;  [ ] already filed on _____
    In U.S. Application, Serial No. _____, filed _____
[X] Attached: 1 Verified Statement(s) establishing "small entity" status under
    Rules 9 & 27
[ ] Attached:

[ ] Preliminary amendment:

**THE FOLLOWING FILING FEE IS BASED ON CLAIMS AS FILED LESS ANY ABOVE CANCELLED**

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | Basic Fee  = | | $ 340.00 |
| Total Effective Claims | 46 | - 20 = 26 | x $12.00 = | 312.00 |
| Independent Claims | 4 | - 3 = 1 | x $34.00 = | 34.00 |

If any proper multiple dependent claim (ignore improper) is present,
                                      add $100.00        100.00
                                      Subtotal           786.00
If "small entity" status box above is checked, enter half (½) of
                              Subtotal and subtract  -   393.00

                        TOTAL FILING FEE ENCLOSED  = $ 393.00

If "non-English" box above is X'd, add Rule 17(k) processing fee ($26.00) _____
If "assignment" box above is X'd, add recording fee ($7.00) _____
If "Rule 47" box above is X'd, add Petition fee ($140.00) per Rule 17(h) _____

                        TOTAL FEE ENCLOSED      $ 393.00

The Commissioner is hereby authorized to charge any fee specifically authorized
hereafter, or any missing or insufficient fee(s) filed, or asserted to be filed,
or which should have been filed herewith or concerning any paper filed hereafter,
and which may be required under Rules 16-18 (missing or insufficient fee only)
now or hereafter relative to this application and the resulting Official document
under Rule 20, or credit any overpayment, to our Account/Order Nos. shown in the
heading hereof for which purpose a duplicate copy of this sheet is attached. This
statement does not authorize charge of the issue fee until/unless an issue fee
CERTIFICATE OF informal form is filed.
CERTIFICATE OF MAILING BY EXPRESS MAIL

By Atty: Sherman O. Parrett Reg. No. 25,905

"EXPRESS MAIL" MAILING LABEL NUMBER 26172897
TE OF DEPOSIT      September 22, 1988

Sig: _Sherman O. Parrett_

EREBY CERTIFY THAT THIS PAPER OR FEE IS BEING DEPOSITED WITH
L UNITED STATES POSTAL SERVICE "EXPRESS MAIL POST OFFICE TO
       R 3: CFR 1.10 ON THE DATE INDICATED
       TO THE COMMISSIONER OF PATENTS AND
       D.C. 20231
       _S O. Parrett_
       (PERSON ... NG PAPER OR FEE)

EXH 15 P. 44



248700  $393.00-101  A

Facsimile Telecommunications System and Method

Field of the Invention

The field of this invention is telecommunications systems used in connection with facsimile transmissions.  More specifically, this invention relates to a system and method for enhancing ease of facsimile transmissions and providing features relative to facsimile transmissions not heretofore available.

Background of the Invention

The electronic transmission of documents by way of facsimile (fax) systems employing public and private switched telephone networks has become both commonplace and, often, an essential component in many business activities.  In such a setting, it is very common for the fax terminals (fax machines) to be kept quite busy during a major fraction of the business day.  Moreover, where sender and recipient are in different time zones, the "business day" can approach 24 hours, particularly in international activities.  It is common for fax users to "broadcast" documents to a number of different recipients, that is, send the same message to several different fax machines.  It is also true that the contents of some faxed documents are of such a sensitive nature that the originator or addressee would like to have a measure of control over who might see those documents as they move from the receiving machine to the hands of the actual addressee.

These circumstances present a number of practical problems for a fax user.  In order to make a successful fax transmission it is necessary that the receiving machine be available at the time that the transmitting machine attempts to contact it.  If the receiving machine is already in use handling another message, the transmitter will receive a "busy" signal.  The originator's only recourse is to continue initiating telephone calls until contact can be established.  This is a "hit or miss" process at best and can be very wasteful of the originating operator's time.

Some, rather expensive, fax machines have digital memories which will allow them to memorize the document to be transmitted and to be programmed to make multiple redials in an effort to establish contact in an automatic way.  However, this is limited to only one or two documents and, more importantly, it ties up the transmitting machine until the effort is successful or abandoned.  This is hardly an acceptable solution if that machine has other documents to send or receive.

PARR033I8.3

2

There are other conditions which can result in a failure to transmit even though a telephone connection has been established. Perhaps the most common of these is the absence of paper in the receiving machine. In such situations, repeated attempts to "redial" will lead to repeated toll charges with each attempt, with no actual success until the receiving machine is serviced (which may be some time if the machine is operating unattended because it is nighttime half-way around the world).

Busy machines which are destined to receive messages are affected by the converse problem. Since they and the prospective transmitting machines must engage in (perhaps, automated) "telephone tag", they are used very inefficiently. When a transmitting machine gets a busy signal, even if it automatically redials, it can only guess at when the receiving machine will be available. Thus, the receiving machine will likely remain idle for some fraction of the time until such an attempt is made.

The practice of broadcasting documents to a number of addressees obviously compounds these problems and adds still others of its own. Even if one does not encounter busy signals or impaired machines, convenient broadcasting demands an expensive memory-type fax machine on the transmitting end. Such machines read in the document once and then proceed to automatically dial the various recipient machines. This process ties up the sending machine and its telephone line and makes them unavailable for incoming calls. This, of course, exacerbates the busy signal problem for those units trying to contact the sending machine.

The security of sensitive documents is still another problem. Once contact is established between two fax machines, the transmission of the document proceeds automatically, irrespective of who may be standing by the receiving machine at the time. In a busy office, the contents of these documents are accessible to the fax operator and anyone else who happens to be in the vicinity.

It is also common for individuals to wish to deliver fax documents to a recipient who is not currently available through a known machine (eg. a person on a business trip). This is a very inconvenient situation in that it requires that the paper documents be held until the traveler phones in from a remote machine. It further requires that there be someone available at that time who has knowledge of and access to the documents intended for the recipient.

Still another concern is adequate accounting control over the billing of calls. Typically, many businesses wish to be

-2-

EXH __15__ P __62__

able to track the costs of both fax machine use and the asso-
ciated telephone charges.  While telephone charges can be
ascribed from telephone company records, in the present envi-
ronment these must be related to records of the number of
pages transmitted per call and so forth, separately maintained
by the fax machine or its attendants.

Summary of the Invention

The objects of this invention are to address these many
shortcomings of present fax systems and to provide an inte-
grated system for their solution.  Furthermore, the intention
is to achieve this in a way which is fundamentally compatible
with existing fax terminal machines.  The basic approach is to
provide special computer-based fax Store And Forward Facili-
ties (SAFF's) as an integral part of a switched telephone net-
work system.  All fax transmissions entered into the network
are routed to such a facility, typically geographically near
the originating machine, where they are temporarily stored or
"spooled" by the computer in a mass storage buffer, such as a
magnetic disk.

The fax message from the originating machine is intended
for a destination machine, which may or may not be in a posi-
tion to immediately answer the call.  If the destination
machine is within the service region of that SAFF, the system
then proceeds to attempt to call the destination fax machine.
If the destination machine is within the service area of a
different SAFF, the system forwards the fax document data to
that facility by long-distance lines, in which case this sec-
ond facility attempts to call the destination machine.  In
either case, if contact is established and the message is
delivered immediately, the system directs a printed report
back to the originating fax machine confirming delivery to the
destination machine, and other pertinent data.

If, on the other hand, the delivery cannot be completed
immediately due to a busy signal, a machine fault (eg, receiv-
ing machine out of paper) or any other reason, the spooled
document is saved and the system makes periodic attempts to
contact the destination machine and complete the transmission.

In the meantime, the system sends a printed report back
to the originating machine acknowledging that the message has
been entered into the system, indicating the reason the deliv-
ery is being delayed, stating the protocol the system will
take to deliver the message, and providing a reference number
or "Message Code" which identifies the message and may be used
at a later time to trace the status of the document.

-3-

Placing the delivering spooling system geographically near the destination machine has the advantage of more economical use of any long-distance lines that may be involved. These lines are used only to move the message from the originator to the spooling system in the vicinity of the destination, which is virtually certain to be successful on the first try. Subsequent attempts to contact the destination machine can be handled more or less locally and need not tie up the bulk of the long-distance facilities.

If the delayed delivery is ultimately successful, the system will send a printed delivery report to the originating machine. On the other hand, if the delivery attempt protocol has gone through its whole cycle without success, a report will be sent to the originator indicating that the delivery procedure has failed and requesting instructions as to how to proceed (eg. try again, redirect the message to an alternate number, or delete the message).

An important feature of the system is that it recognizes all of the documents that are spooled in the system at a given time for a given destination machine. These are identified and linked together to form a message queue for that machine. In this way, once contact is established, all of the waiting messages can be "dumped" to that machine in a continuous batch. Furthermore, if new messages arrive while that dump is occurring, they are simply appended to the end of the active queue and are transmitted when their turn comes. This has the advantage of greatly enhancing the utilization efficiency of a busy destination machine.

Since all outgoing fax documents are temporarily stored at the facility near the originating machine, it is also practical to provide for automatic broadcasting of documents to multiple destinations. Lists of "broadcast groups" of phone numbers can be programmed into the facility by users, or a list of destination phone numbers entered "by hand" at the time of a call. The SAFF can then broadcast the message to every machine of the selected list. This is a great advantage to broadcast users in that they need only tie up their machines for one outgoing transmission, the one to the SAFF. The SAFF copies the message to all of the destination machines as outlined above. In the meantime, the originating machine is available for receiving or transmitting other documents.

Similarly, since the documents are stored near the originator, the system can permit messages which have already been sent to be copied to other destinations after the fact, without the necessity of resending the message to the SAFF. Likewise, since the messages are also spooled in a facility near the destination, the system also provides the recipient with

-4-

5

the option of forwarding or redirecting documents to still other destinations, as if the recipient were the originator. The system can also accept and store messages destined for a fictitious destination or "Mail Box". Thus, individuals who are traveling can, at their convenience, dial into the system and pick up any waiting documents.

Closely akin to these features is the ability to have the originator of a transmission include the requirement that the recipient provide a security code, such as a PIN number, in order to release the document from the spool to the destination machine. In this case, the SAFF sends a written report to the destination machine advising that a secure message is waiting for a particular recipient and the fax identification of the originating machine. The recipient must then call in to the SAFF and key in the security code to initiate the delivery of the document. Since the document is spooled, the delivery easily may be delayed until the recipient is available to supply the code.

Finally, since the documents and their delivery are both under the control of the telephone system, as a special service the telephone call accounting system can provide both time and charges for the telephone services rendered and fax information, such as pages transmitted, sorted according to the originator's clients. This can greatly facilitate the fax user who wishes to do cost accounting or to bill clients for costs incurred.

Brief Description of the Drawings

Other objects and advantages of the present invention will be apparent from the following Detailed Description of the preferred embodiments thereof and from the attached Drawings of which:

Fig. 1 illustrates the inter-relationships of the principal elements of a connection between two SAFFs.

Fig. 2 shows a more detailed view of the various systems within a single SAFF, such as those shown in Figure 1.

Fig. 3 illustrates the major components of the Originate Function in the SAFFs shown in Figures 1 and 2.

Fig. 4 illustrates the major components of the Answer Function in the SAFFs shown in Figures 1 and 2.

Figs. 5a and b show a flow chart describing the general processing steps required to handle a fax or voice message

-5-

incoming to the Originate Function of a SAFF, as described particularly in Figures 2 and 3.

Figs. 6a and b show a flow chart describing the general processing steps required to handle the delivery of a fax message incoming to the Answer Function of a SAFF, as described particularly in Figures 2 and 4.

Fig. 7 shows a flow chart of the general processing steps required to handle a service request in the General Service unit of a SAFF, as described particularly in Figure 2.

Detailed Description

Introduction

The preferred embodiment of this invention is a multi-function, interactive facsimile transmission system which is integrated into a switched telephone distribution network, where "network" is taken broadly to mean the entire system required to complete a communication from an originator to an answerer. This embodiment provides a comprehensive computerized fax message management system based on automated fax Store And Forward Facilities (SAFF) embedded in the network. This system requires no modifications to existing facsimile machines, but rather, relies on the network to provide the enhanced services.

The system contains several components which actually transmit the fax messages and related information, provide written fax reports to users about the status of messages within the system, allow user intervention in the sequence of automatic actions of the system, provide an accounting of services rendered for both the customer and the telephone company, and control and supervise all of these activities.

In the preferred embodiment, it is presumed that the SAFF's are placed at the interface between the local telephone delivery system and the long-distance delivery system, as indicated in Figures 1 and 2. In this setting, the SAFF system can be controlled and its services offered by either one. However, it is obvious that useful systems can be constructed where the SAFF exists as close to the user as a component of his or her own in-house telephone system (such as a PBX or Centrex) or as remotely as a single, independent, stand-alone SAFF serving a wide geographical area. It is also obvious that commercially viable systems can be constructed which provide subsets of the features of the preferred embodiment. The choice of site/control setting and service features might be driven by any number of economic, market, or legal

-6-

EXH 15 P. 50

considerations, which would militate toward offering the sys-
tem at an alternate location in the network, or in a "stripped
down" form.

To more clearly understand the present invention, it is
useful to consider the manner in which a fax transmission
occurs in the traditional setting.  Here the communication
between two machines is initiated when the destination machine
answers a telephone call directly from the originating
machine.  Typically, there is an exchange of digital data
identifying the sending and receiving machines to each other
and establishing the fax mode or format to be used.  If this
exchange is satisfactory, then the actual image transmission
takes place.  Otherwise, the call is terminated, usually with
some form of written diagnostic to the respective users.

Message Interception

In the present invention, all fax transmissions initiated
by a subscriber to the fax management system are first inter-
cepted by an "originator" SAFF; that is, the SAFF which
directly services the originating fax machine.  Figure 1 shows
two exemplary SAFFs 8 and 18, with interconnections between
the SAFFs and with subscriber fax machines being
·diagrammatically indicated.  Thus in Figure 1, the SAFF 8
includes an originate function 9 coupled over telephone
lines 4 to originating fax machines 1.  Likewise, the SAFF 18
includes an originate function 22 coupled over telephone
lines 26 to originating fax machines 30.  Each of the SAFFs 8
and 18 also includes respective answer function blocks 12 and
19 respectively connected over telephone lines 6, 24 to fax
machines 3, 28.  Each of the SAFFs 8, 18 also includes service
interfaces 10, 21 coupled via telephone lines 5, 25 to
telephones 2, 29.  The function and purpose of the service
interfaces is more fully explained hereafter, and they are
under control of status and control blocks 11 and 21.

Access to the system of Figure 1 can be obtained much the
same as access to a specific long-distance company's network.
That is, subscribers such as 1 in Figure 1 can dial a unique
access code at the time a call is initiated, or a telephone
line dedicated to a fax terminal may be permanently routed to
the SAFF system, in this case the SAFF 8 of Figure 1.  Either
way, one accesses SAFF Directed Lines 4 and the SAFF 8 itself
in the process of dialing the destination fax machine.

The SAFF 8 then answers the phone in place of the desti-
nation machine, such as one of 28 shown in Figure 1 as ser-
viced by SAFF 18.  For the moment, this SAFF 8 near the origi-
nator becomes the proxy for the destination machine 28.  While

-7-

noting the actual destination telephone number, the SAFF 8
engages the originating machine in the same digital dialogue
that would have occurred if a direct connection to the desti-
nation machine had actually been made.  Thus, it echoes back
the destination telephone number, to identify the intended
destination machine, and agrees to accept the fax format
requested by the originating machine.

This causes the originating machine 1 to respond by
transmitting the fax document image data.  The originating
machine's identification, the destination machine's telephone
number, the fax format, and the document image data are all
stored on a mass storage device 67 (in Figure 3), such as a
computer magnetic disk unit.  Furthermore, a unique alphameric
Message Code is assigned to the block of data to identify it
while it is resident in the SAFF system.  This Message Code is
related to the file name for the stored data.

Delivery

At this point the SAFF 8 initiates two actions.  The
first is to generate an "Acceptance Record" of the transaction
to this point.  This record, in one form or another, will be
returned to the originator as will be described below.  The
second step is to begin to deliver the fax message to the des-
tination machine 28.

The details of the delivery process depend to some degree
on the geographic location of the destination within the net-
work.  A single SAFF can, in principle, service a broad geo-
graphical area.  However, in the preferred embodiment, commu-
nications beyond a certain limiting distance involve at least
two SAFFs, one 8 near the originator 1 and the other, a "des-
tination SAFF", 18 near the recipient 28 of the document.  The
choice of one, two, or more SAFFs is determined by network
economics, or other considerations, and is not essential to
the invention.

For the sake of this discussion, we will define a "local"
message to imply that the originating and the destination
machines are serviced by the same SAFF.  (Although, this does
not preclude the possibility that the two machines are some
considerable distance apart and connected by a toll call.)  On
the other hand, we will define a "long-distance" message to
mean that the originating and destination fax machines are
serviced by different SAFFs and, thus, one SAFF must exchange
data with the other, perhaps through intermediaries.  Simi-
larly, the term "near" used in connection with a SAFF refers
to being within the service area of that SAFF.

-8-

Each SAFF 8, 18 has two clearly defined roles:  the
"Originate Function" 9, 22 for handling data with an originat-
ing machine, and the "Answer Function" 19, 12 for handling
data with a destination machine.  The details of these two
subsystems are illustrated in Figures 3 and 4 respectively.
In the local message mode, the connection between the Origi-
nate Function, such as 9, and the Answer Function, such as 12,
is linked within the single SAFF 8 by way of a Local Call
Loop-back connection 13, between the two Functions.  In the
long-distance mode, the Originate Function 9 of SAFF 8, near
the originator, is linked to the Answer Function 19 of another
SAFF 18, near the destination, by long-distance lines, such as
14, or 16 for SAFF 18.  Thus, processing a long-distance mes-
sage involves the same basic steps as a local message, except
that the activity is shared interactively between at least two
different SAFFs.


Originate Function

With this understanding of SAFF functions, the following
detailed discussion will illustrate the operation of the sys-
tem in the long-distance case, since it is the more complex,
and therefore provides a more comprehensive example.  Figures
1, 2, 3, and 4 all show elements of the SAFF system in varying
degrees of detail and all will be referred to in the follow-
ing.  It will be noted that some critical elements are shown
in more than one of the Figures.

As an example, it is assumed that one of the subscribers
1 attached to SAFF 8 wishes to send a fax message to one of
the subscribers 28 attached to SAFF 18.  The subscriber 1
places the call to the destination machine 28 which is routed
over SAFF Directed Lines 4 to the Originate Function 9 of
SAFF 8.  These signals originate within the SAFF system and
they are picked up by the On-net Interface 64 which is part of
the Originate Function, as shown in Figure 3.  This Interface
signals the Originate Host Computer 70 of the incoming call
and the Host responds by directing the incoming data to a Mass
Storage Unit 67 where it is stored in a file 68.

During this storage process the Host directs two other
activities.  It creates a call status record file 69
(Figure 3) in mass storage, recording the time and date of the
origination, the telephone number of the calling machine, the
telephone number of the destination machine, any security or
other special services requested, various housekeeping  infor-
mation, and it assigns the Message Code number which locates
not only the status file but also the fax data file associated
with it.  The Host also passes the destination machine's tele-
phone number to the Outbound Control unit 74 which proceeds to

-9-

connect the originating SAFF 8 with the nearest available SAFF 18 to the destination through a long-distance interface 75 over long-distance circuits 79 (14 in Figure 1). In the process of establishing this connection, the Outbound Control unit employs an algorithm which examines the number and kind of available trunk resources and chooses the most efficient combination of these lines for the task required.

Answer Function

The originating SAFF 8 then proceeds to transmit the originator and destination telephone numbers, the stored fax image, the Message Code, and other housekeeping data to the destination SAFF 18. These data are sent by the most expedient mechanism offered by the long-distance service. For example, if this service employs digital communications, the fax data may well be transmitted at a significantly higher rate than it was originally received into the system.

The fax data is received by the Long-distance Interface 95 (Figure 4) in the Answer Function 19 of the destination SAFF. This unit signals the Answer Host Computer 85 of the incoming data. The Host then routes these data to its Mass Storage facility 87. (It should be noted for later reference that the originator SAFF and the destination SAFF now both have a copy of these data.) The Host notes whether other messages are pending for the destination machine and either opens a Delivery Queue file 88, or appends the new message to the existing Queue File.

The Host also records the arrival time and other pertinent information about the fax message in a Call Status file 90 in Mass Storage unit 87, and sends a status update back to the originating SAFF 8 by way of the Status and Control Interface 84, and the System Status and Control Unit 11 via Long-distance Trunks 15.

It then signals the Local Interface 83 to dial the destination machine's (81 in Figure 4) telephone number on ordinary outgoing local lines 24, 82. If the destination fax's line is available, the destination SAFF now becomes the proxy for the originating fax machine and engages the destination machine in the necessary preliminary digital dialogue.

If this is successful, the document image, including the source and destination identification information, the Message Code, and the entry and delivery times, is played back from storage and delivered to the destination. A "Delivery Record" is then created by the Answer Host 85 which indicates the date and time of delivery, and any other pertinent data. The

-10-

Delivery Record is sent back to the originating SAFF 8, again by way of the Status and Control Interface 84, and the System Status and Control Unit 11, via Long-distance Trunks 15.  The originator SAFF 8 then appends this information to the Acceptance Record to form a complete "Transaction File".  The originating SAFF 8 then sends this file, as a delivery receipt or report, back to the originating machine 1, 60, as a fax document.

If the destination machine's line is busy, or the contact fails for some other reason, the destination SAFF's Host Computer 85 will enter a sequence whereby it will attempt to contact the destination machine and transmit the document on a predetermined schedule for a specific period of time or number of tries.  As this sequence is entered, a "Retry Record" is generated documenting the situation and the system's response to it.  This record contains the reason that the delivery was delayed and it indicates which protocol the system will use to attempt to deliver the message.  This is transmitted back to the originating SAFF 8, as described above, and appended to the previously described Acceptance Record to form a Transaction File which is then sent as a fax message back to the originator.  The assigned Message Code is a part of every transaction report and may be used at any time to trace the status of undelivered documents, as will be described shortly.

If the retry effort is ultimately successful, a Delivery Record is appended to the Transaction File which is sent back to the originating machine.  If the effort fails after reaching the predetermined limit, this is also recorded, appended, and sent back to the originator.  In this case, the originator is given the option of dialing back into the system within a certain length of time (typically several hours) and instructing the destination SAFF as to how to dispose of the document (eg. repeat retry sequence, forward to a different telephone number, or delete the message).

This process is handled by using an ordinary touchtone phone to dial a multipurpose (perhaps, toll free) fax system "Service Number"; which will be referred to here and in later sections.  This might be a unique number for every SAFF, or it might be a standardized number common to many localities, except perhaps for area code, such as is 555-1212 for calling "Information".  This Service Number is answered by the General Service Control units (10 in Figure 1, 50 in Figure 2) of the SAFF to which the call is directed.  This unit contains an automated voice response system that presents a menu of the available services and prompts the user to select the desired choices by pressing particular numbers on the touchtone keypad.  In an advanced embodiment, a computer-based voice

-11-

12

EXH 15 P 55

recognition system replaces the keypad and accepts verbal commands in a conversational way.

The General Service Control unit 50 can communicate with its own System Status and Control unit 11, and through that unit, any other such unit 11, 20 via Long-distance Trunks 15. Through these connections, both inquiries relating to messages in the system and instructions as to their disposition may be addressed to the entire SAFF system.

Having selected the "failed-connection message disposition" choice, the user is prompted to key in the Message Code. The system verbally repeats the code and the delivery discrepancy for verification, and then presents a menu of disposition options for the user to select with the keypad.

If the user does not take advantage of this "what to do now" opportunity within the time limit, the message is retransmitted back to the originator with a report. It is then erased from both the originator and destination SAFF files after a suitable delay (typically six hours). If the originator wishes to resend the message during this "grace" period, it may be recovered and resent to the original destination or forwarded to another destination(s), as will be described later.

In each of the various cases where the SAFFs automatically direct fax message status reports (such as, the Acceptance, Delivery, or Retry records above), the system can be programmed to accumulate records from all calls over a period of time (eg. an hour) at the originator SAFF and deliver them as a single fax document at the end of the period or upon request by the originator. This has the advantage of reducing the number of report calls and the subsequent burden on the originating fax machine. The originator SAFF will enter a retry sequence if it finds the originator's line busy or the machine unavailable when it attempts to deliver reports. This is a persistent sequence which it will continue trying for direct contact at intervals of an hour or so for a considerable length of time (eg. 72 hours). It also places a copy of the report in the originator's Mail Box (described below) so that the originator may recover it in between SAFF delivery attempts.

It should also be noted that the originator has the option of dialing the Service Number at any time and inquiring about the status of a given message. Here again, the voice response system prompts, presents menus, and uses the Message Code to locate and report on the current location and condition of the message. A written record can be directed to the originating or destination fax machine, if desired.

-12-

Another feature of the system is that the act of accept-
ing and storing an incoming message at the originator SAFF,
and the act of dialing and forwarding that message to the des-
tination by the destination SAFF, can overlap in time.  That
is, if the originator SAFF has lines available, once the ini-
tial connection dialogue between the originator and the SAFF
is complete, the SAFF may immediately make its first attempt
to contact the destination SAFF and, thus, the destination
machine, while it is beginning to spool the document.

If this immediate contact is successful, then the message
is passed from the originator SAFF 8 to the destination SAFF
18 to the destination machine 28 directly from the Originate
Host Computer's memory 70 while the two SAFFs are still in the
process of spooling the document to disk.  This is facilitated
by a "write-through pipeline" whereby the Originate Host 70
passes the incoming fax data through directly to the Outbound
Control unit 74 at the same time it is being written to mass
storage.  It is held in a temporary memory buffer in the Out-
bound unit until it is clear whether or not an immediate con-
nection to the destination machine is possible.  At that point
the temporary buffer fax data is either sent and then deleted,
or merely deleted.  The net effect is that the spooling pro-
cess only adds a few seconds delay in the message delivery
over the traditional direct machine-to-machine contact when
the destination machine is readily available.

On the other hand, if lines are limited, the originating
SAFF can choose to delay until suitable lines are available.
This has the advantage of improving communications resource
management and enhancing the efficiency of the telephone
system's line usage over the direct contact scheme.

The foregoing describes the basic fax SAFF message han-
dling system and from this discussion several advantages
should be apparent.  The originating machine always functions
as if it makes contact and delivers documents on the first
try, thus immediately freeing the machine and the attendant
personnel for sending or receiving other transmissions.  Like-
wise, the telephone system only handles one call across its
local and long-distance lines from the originating machine to
the destination SAFF, since the state of the destination
machine has no impact on the call.  This significantly
improves the efficiency of line usage when messages are
addressed to busy fax terminals.

Although some additional calls are needed to deliver the
various reports, these require very little long-distance time,
as they are transmitted over the circuits as highly compressed
coded messages.  It is the nearby originating SAFF that trans-
lates them into "plain language" for fax delivery as a local

-13-

EXH 15 P. 57

message.  As pointed out, additional savings in these local
messages can be gained by compiling multiple reports and
delivering them in bulk as a single call.  It should be noted
that the delivery of reports to an originator is a cooperative
process between the Originate Function and the Answer Function
of the originate SAFF.  The Originate Function 9 actually gen-
erates these reports and passes them through the Local Call
Loop-back 13 (76 in Figure 3) to the Answer Function 12 for
delivery as an ordinary fax message.

In addition to these basic features, the design of the
system also provides for a number of additional services and
advantages which are described below.

Message Queuing

As pointed out, all fax messages directed to a particular
telephone number are spooled by the Answer Function of the
destination SAFF, as detailed in Figure 4.  The Host Computer
85 controlling this function monitors the incoming messages
and links all undelivered messages for a given telephone num-
ber into a message Delivery Queue file 88.  The computer also
compiles a constantly updated, ordered catalog of the file
names of the messages waiting for each fax machine.

Consequently, when messages arrive at a rate faster than
they can be delivered, for whatever reason, they are held in
this queue for delivery.  As soon as the destination SAFF
establishes contact with the destination machine, it begins
sending the entire queue of messages in a single, essentially
uninterrupted transmission.  Messages that arrive while the
transmission is in progress are appended to the end of the
queue.

This scheme eliminates the "trial and error" dial and
redial attempts that result from a number of independent
incoming calls competing in an uncoordinated way for the sin-
gle destination line.  It can significantly enhance the effi-
ciency of the destination fax machine and the long-distance
and local telephone circuits connected to a busy machine.

When the queue exceeds a certain limiting size, the des-
tination SAFF will periodically insert and send a "Queue
Report" (as a fax document) to the destination machine showing
a list of the waiting messages.  This list shows the originat-
ing machine identification, the time entered into the origina-
tor SAFF, the number of pages in the document, and the approx-
imate time that the message will be delivered based on its
position in the queue.

-14-

The user can advance a particular message to the head of
the queue by calling the fax Service Number and supplying the
desired message number, by using the voice response menus.
The General Service unit 50 directs these instruction to the
System Status and Control Unit 11, which in turn directs them
to the Answer Function Host 85 through its Status and Control
Interface 84.

Alternately, the originator can designate a priority
level to a given fax message at the time it is dialed in (eg.
by using a different access code). In this case, the destina-
tion SAFF will insert higher priority messages ahead of lower
priority messages in the queue as they are received. The
originator would normally pay a premium price for this serv-
ice.

Another originator option is the time of delivery. If
desired, the originator can specify the time of day which the
message should be delivered. In this case the message is for-
warded to the destination SAFF directly, but is not entered
into the queue until the specified time. This can be used in
combination with an assigned high priority to insert the mes-
sage at the head of the queue at the appointed time.

When messages are finally delivered to the destination
machine they are not immediately erased from the spool file 88
at the destination SAFF. Rather, they are maintained in a
"Delivered Message" directory 90 for a period of time (typi-
cally six hours). A feature offered by this action is the
opportunity for the subscribing recipient of a message to make
additional copies, redirect, or forward copies of selected
messages to other destinations. This is accomplished by call-
ing the Service Number and selecting the appropriate choices
from the voice response menus.

## Security and Mail Boxes

It is not uncommon for documents of a sensitive nature to
be sent by facsimile from place to place. This is often a
problem, especially in a busy office or where a machine is
nominally unattended during the transmission, in that the
originator has no control over who may be standing by the
machine when the document prints out, or who may leaf through
a stack of faxes piled up in a hopper right after lunch.

This is a problem which others have attempted to deal
with in a variety of ways. For example, Bond, U.S. Pats.
3,594,495 and 3,641,432, discloses a "radio facsimile postal
system" which features the direct delivery of documents to
specific addressees by facsimile via communications

-15-

EXH _15_ P _59_

satellites.  In this system, intended as a replacement for or supplement to the ordinary "paper" postal system, fax messages were directed from special public fax terminals operated by the post office to a central satellite earth-station.  Here the messages were sorted according to their geographical destination for concentration and uplinking to a satellite servicing that area.  The satellite then broadcasts all of the uplinked messages back to Earth.

In principle, anyone with a radio receiver in the satellite's service area could access any of the messages, so Bond built in a "privacy code" which operated with the receiver to allow the message to print out only on the desired machine.  In reality, this privacy code was nothing more than an addressing signal which enables the selected fax receiving system.  Thus, Bond's system is merely a restricted version of the services presently provided to fax users by the telephone networks.  His privacy code function is the same as a telephone number:  it selects which of a plurality of fax machines will actually receive the message.  Unfortunately, his approach leads to exactly the security dilemma facing telephone fax users.

Chapman, U.S. Pat. 4,106,060, has approached the problem in a somewhat different way.  He too discloses a facsimile-based mail system.  However, in his system, the messages are directed by whatever means to a "paper" post office near the addressee, rather than the addressee's home or place of business.  This post office then makes a paper copy of the the fax message, places it in an envelope, and delivers it to the addressee as ordinary mail.  This is a reasonably effective solution to the security problem, but it can only be relied upon to provide "next day" delivery, and there are a number of other, competing alternatives for document delivery service on that time scale.

In the present invention the security problem is addressed by a control variation of the destination SAFF queuing system.  Messages which the originator wishes to designate as secure are temporarily directed to a auxiliary storage file 54, 89 in the Answer Function of the destination SAFF called a "Mail Box".  Instead of being delivered to the destination machine, a report is sent to that machine indicating that a secure message is waiting for a particular addressee.  Optionally, a voice message may be directed to a designated telephone number by the General Service Control 50.

This feature works in the following way.  Each individual SAFF is assigned its own unique telephone exchange code or codes (typically indicated by the first three digits of a seven digit local number).  Thus, the SAFF appears to the

-16-

world as if it were a distinct telephone exchange(s), separate
from all other exchanges in that area code region.  All
subscriber's to a given SAFF are assigned their fax telephone
numbers with that exchange prefix.  Subscribing individuals
wishing Mail Boxes (typically associated with a "default" fax
machine) are issued "fictitious" telephone numbers which actu-
ally terminate in fax Mail Boxes, rather than in an actual
telephone line.

Mail Box numbers are published so that correspondents may
use them.  In addition, each individual is also given a secret
security code or PIN number which will access his or her box.
The host computer managing the SAFF maintains a list that
relates each fictitious number with the individual's name, the
security code, and the real telephone number of the default
destination machine.  This default machine is the one to which
messages and reports will normally be sent, when appropriate.

An originator wishing to send a secure message merely
dials the (fictitious) Mail Box telephone number at the time
the document is sent.  The system directs the message to the
Mail Box file 89 in the destination SAFF associated with that
number, and the Answer Host 85 sends a "Message Waiting"
report to the default destination fax machine through the
Local Interface 83.  If more than one message is in the Mail
Box queue, then this report lists them all.

In order to get the fax document actually sent to the
destination, the security code must be sent back to the desti-
nation SAFF.  Typically, this would be done by the addressee
dialing his or her own Mail Box number.  Since this call orig-
inates from a "normal" telephone 34 over Ordinary Local Lines
40, rather than the fax's SAFF Directed Lines 38, the call is
directed to the Off-net Incoming Screener 48 in the (destina-
tion) SAFF which functions in conjunction with a mailbox serv-
ice control 49.  This unit recognizes that the call is not a
fax transmission and thus treats it as a voice service
request.  A voice response system then prompts the caller to
key in the security code.  When the correct code is supplied,
the SAFF system announces the number of messages waiting and,
if desired, the message codes of each.  Mail Box contents are
maintained in a queue 89 just as are "regular" spool files.
Thus, the user is also given the opportunity to reorder the
messages within a Mail Box Delivery queue, through the System
Status and Control units 11, 20 in the same way as other mes-
sages.

The system finally permits the addressee to make a selec-
tion of messages for immediate release, and provides an oppor-
tunity to "redirect" them to a fax machine 3 other than the
default machine over ordinary local lines 39.  The SAFF then

-17-

EXH 15 P 61

releases the selected documents and moves them to the head of
the appropriate destination Delivery Queue 88 for immediate
delivery.

When messages are accepted into the SAFF system and
arrive at a mail box, The Answer Function of the destination
SAFF issues a "Posting Report" which is directed back to the
Originator in the manner described for other reports.  The
report is similar to a Delivery Report, except that it indi-
cates that the message has been received by the mail box.
When the Mail Box Queue is actually read by the addressee the
Destination SAFF sends an actual Delivery Report to the origi-
nator indicating the date and time of delivery and so forth.

Another advantage of the Mail Box system is that it can
provide a convenient way for individuals who are away from
their "home" machine to still have access to their documents.
Such individuals may call in to their Mail Box number to hear
from the voice response unit whether they have any messages
waiting.  By use of the redirection feature, messages sent to
a fax Mail Box can be accessed by an individual with the secu-
rity code from any telephone with a fax machine.

For example, a person on a business trip can have all his
or her fax documents directed to their Mail Box.  Upon arriv-
ing at a hotel that has a fax machine, the traveler places a
call to the Mail Box number and supplies the information out-
lined above, including the telephone number of the hotel fax
machine.  The SAFF then calls the hotel machine and dumps the
queue of waiting documents.

Broadcasting

The queuing, Mail Boxes, and security codes are all
derivative benefits of the spooling of messages at the desti-
nation SAFF.  There is a counterpart advantage to the origina-
tor SAFF's spooling as well.  Since the originator SAFF main-
tains a copy of each message, that copy can be used to broad-
cast messages to multiple destinations.

This can be initiated in a number of ways.  For example,
the user can dial in a code prefix indicating that a list of
destination numbers is to follow.  The numbers are then
entered and finally another code is entered to signal "end of
list".  The Originate Host 70 recognizes these inputs and
attaches them to the message which follows.  As an alterna-
tive, the user can store different numbered broadcast tele-
phone lists in the Originate SAFF mass storage files 69
(entered much as described above) and invoke them simply by
dialing a two or three digit "short-cut" code.  In either

-18-

case, from there the fax transmission to the originator SAFF proceeds normally.

Upon reception of the list and the document, the originator SAFF proceeds to open as many local loop-back or long-distance lines as it can to deliver the broadcast message to the various destinations, essentially simultaneously. Although the originator is billed for making a number of different calls, in fact the originating machine is only tied up for the time required to make one call. Furthermore, the full power of the delivery system is asserted for each destination machine, including reporting, redials, queuing, and so forth.

A feature related to broadcasting is the redirection of messages by the originator. Since fax messages are spooled at the originator SAFF and held for a period of time even after delivery (typically six hours), the originator can dial the Service Number any time during this period and direct a copy of the spooled message to be sent to other destination machines.

## Communications With Non-subscribers

Thus far, the discussion has presumed that both the originator and answerer were subscribers to the SAFF system. It is quite reasonable to assume that subscribers will wish to send or receive fax messages with non-subscribers, as well. While the services provided by the SAFF are more limited in such cases, nevertheless, the system both anticipates and enhances communications with non-subscribers for the benefit of the subscribers.

When a subscriber originates a call to a non-subscriber the delivery process is almost identical to subscriber-to-subscriber calls. The fax data is forwarded to the Answer Function of the appropriate destination SAFF and delivery is pursued, all in the usual way. For the benefit of the subscribing originator, the message is stored in the usual way at the destination SAFF until delivery is completed. If multiple SAFF-processed messages arrive before the delivery is complete, a temporary Delivery Queue will be created and used as required. However, since the non-subscriber will have no account in the system, attempts to use the Service Number to manipulate the queue, forward messages, make multiple copies, and use the other special services available to a subscribing answerer, will be unsuccessful.

Calls originated by a non-subscriber directed to a subscribing answerer move by a somewhat different mechanism. As noted, each SAFF appears to the world as a distinct telephone

-19-

2 6

EXH 15 P 63

exchange and all subscriber's to a given SAFF are assigned
their fax telephone numbers with that exchange prefix.  Conse-
quently, all calls directed to a SAFF subscriber eventually
end up at the subscriber's SAFF, whether they originated from
within the SAFF system network or not.  Messages originating
"off-network" can arrive by any route.  For example, they may
be truly local calls, or they may be long-distance calls which
arrive over any available long-distance network.

In any case, messages originating from a non-
subscriber 33 are delivered to the answering fax machine's
SAFF by the local lines 39 provided by the local telephone
company.  They are answered by the SAFF's Off-net Incoming
Screener 48, which, upon noting that they are fax transmis-
sions, directs the calls to the Originate Function 9 of that
SAFF.  From that point, the call is treated as if it were a
local fax call and it is passed over to the Answer Function 12
via the Local Call Loop-back 13 for delivery to the
subscriber.

In this situation an Acceptance Record will be returned
to the originating machine, but no further originator services
are provided.  On the other hand, the answering subscriber has
the full range of Answer Function available.

Charges and Detailed Billing

Normally, the Originate Function of the originator SAFF
has ultimate responsibility for the management of outgoing
messages.  It initiates all connections to the Answer Func-
tions of the various SAFFs with which it must communicate.  It
is the node to which all reports concerning message status and
disposition must flow.  It interrogates Answer SAFFs when
extraordinary updates are required.  Consequently, the Origi-
nate Function is also the focus of charging data.

The telephone company presumably charges for all of the
various services provided by this system.  The method, algo-
rithm, and rates are determined by actual costs and applicable
regulations.  Typically, the user would be billed for tele-
phone connect time, toll charges, extraordinary services, such
as those provided by calling the Service Number, the amount of
mass storage space consumed as a function of time, and so
forth.

One of the user services for which a special charge might
be made is a subscriber's customer specific billing system.
In this option the user can "flag" each fax transmission with
a keyed-in prefix which contains a user customer, client, or
project number.  This number is stored as a key field in the

-20-

EXH 15 P 64

Transaction File for that call.  Thus, when the telephone bill is prepared, the billing computer can sort the subscriber's bill on this field and present the user with a list of all fax messages, total usage time, number of pages, and related charges, all grouped by the subscriber's own customers, clients, or projects.  Furthermore, it can accept the subscriber's particular algorithm for billing calls to customers or clients and generate a column showing what the subscriber will bill for the service (as a separate matter from what the SAFF system and the telephone company have billed the subscriber).  This can be of great assistance in attributing costs and billing customers for services rendered.

Software Control

     In the preferred embodiment, each of the principal units of the SAFF such as described in Figures 2,3, and 4 is controlled by its own computer processing unit or units.  These units are interrupt-driven computers which are connected together by the System Status and Control unit 11.  This unit is an electronic switch yard for control communications between the Originate, Answer, and other units within a  given SAFF, as well as the the other SAFFs in the system through the control long-distance trunks 15.   While there are many tasks which the various control processors must perform to handle fax operations, the primary ones are intercepting incoming calls, either for fax forwarding or service requests, and delivering the fax messages to their destinations.  The general software organization of these principal activities is shown in Fig. 5, 6, and 7.  It should be noted that these figures are simplified and intended to be generally descriptive.  For example, some procedures illustrated here as sequential (for the sake of simplicity) can actually be performed concurrently.  Likewise, not every function of the system is represented in detail.  Generally speaking, similar results also can be obtained with a number of other obvious arrangements of the functional blocks.

     Broadly speaking, fax messages addressed to the Originate Function of a SAFF arise either through the special SAFF Directed Local Lines 4 (Figures 2 and 3) as a result of direct connection or dialing a special access code, or they arise from Ordinary Local Lines (off-net lines) 39, 40, 63.  Those which arrive via off-net lines are processed first by the Off-net Screener 48, which may direct them to either the Originate Function 9 or to Mail Box Service 49.  Figure 5, therefore combines all three of these related functions.

     At the outset one of the two incoming call interfaces 64 and 65 signals the Host Computer 70 that it is beginning to

-21-

process a call at 100 in Figure 5a.  These units have their
own buffer capability and can tolerate some delay before the
Host responds.  Ultimately the Host must decide whether it is
responding to an on-net or off-net call 101.  If it is an
off-net call there are two possibilities (excluding wrong num-
bers) 102:  it may either be a fax call, in which case it is
from a non-subscriber to a subscriber, or it is a mail box
service call.  If it is a fax call then the billing for serv-
ices must be directed to the subscribing destination addressee
112.  From that point it is handled like an on-net call as
will be described shortly.

If it is not a fax call then it is presumed to be a mail
box service call 103, and the caller is presented with the
voice response menu 104 for such service.  The user responds
to these prompts with a touchtone keypad, or verbally, 105 and
a decision ladder, shown succinctly as 107 selects the desired
implementation routine 108, 109, 110 (for brevity only three
typical choices are shown, and this element is actually a loop
which will permit multiple commands).  The chosen routine
passes parameters to a command parser 121 (Figure 5b) which
prepares an command statement which is then sent  122 to the
System Status and Control unit 11, through the interface  72.
This command will be passed to the Answer Host 85 through its
interface 84 for actual action on the Mail Box Queue 89.  If
the service requires a response to the caller the transmission
path is reversed.  When the operation is completed 123 the
call is terminated.

If on the other hand, the original call is found at 101
to be an on-net call, billing is generally directed to the
originator 113 and the Host 70 begins the opening digital dia-
logue 114 with the calling machine, acting in place of the
destination machine.  This dialogue includes gathering and
storing the fax identifications, originating and destination
telephone numbers and so forth 116.  The Host opens a Transac-
tion File and links it to a data file 117 for the expected
data, and then stores all of the call and file information 118
keyed to the Message Code.  The destination telephone number
and other information are passed almost immediately 119 to the
Outbound Controller 74, which then opens a temporary buffer to
hold the fax message in case immediate contact can be estab-
lished, and it attempts to establish that contact through the
destination SAFF.

In pursuing this contact, the Outbound Controller 74
examines the status of available trunks.  If trunks are avail-
able, it will immediately attempt to connect with the destina-
tion SAFF, otherwise it will defer the call until a trunk is
available.  In the event of a broadcast message, the Outbound
Controller will select the number of trunks to use

-22-

23

EXH  15  P  66

simultaneously based on the percentage of the trunks already in use, in order to avoid tying up all of the SAFF's outgoing capacity with a single message task.  Other considerations can affect these usage choices depending on the details of the setting of the system.

The Host then enters a loop which gets the incoming fax data 125 (Figure 5b) from the On-net 64 or Off-net 65 Interface's buffer and stores each byte in the fax data file 126 while sending another copy 127 to the Outbound controller 74 until the incoming data is complete 128.  The Host then checks 129 with the Outbound controller to see if it was successful in making immediate connection with the destination machine.  If it was successful and a satisfactory transfer occurred, then a Delivery Report is sent back 132 to the originating machine before it leaves the line.  Otherwise, an Acceptance Report is sent 131, and in either case the outcome is reported 133 to the Transaction File and the call is terminated 134.

A complementary set of activities occurs in the Answer Function of the destination SAFF as described in Figure 6a and b.  Here an incoming call is detected 136 by the Inbound Control 92 (Figure 4).  The Answer Host Computer 85 then opens a new fax data and Transaction file for the message if there is no current queue for that destination machine, or it prepares to append the data to an existing queue 137.  The various call and file parameters are linked and stored 138 and the call parameters are passed through 139 to the Local Interface 83, which then decides 141 whether the call is addressed to a "real" fax number, or a fictitious number terminating in a mail box.  If the number is real the Local Interface attempts to contact the destination machine for immediate delivery.

The Host then enters a loop where it gets the incoming data 147, stores it 148 in the fax Delivery Queue, and passes it through 149 to the Local Interface buffer.  When the Host determines that the fax transfer is complete 150, it then checks 152 (Figure 6b) to see if the Local Interface has been able to make immediate delivery.  If it has, the Host initiates the transmission of the Delivery Report 167 back through its Status and Control Interface 84 to the System Control and Status unit 11, which in turn updates the Transaction File and sends it back to the originator SAFF over Trunk 15.  It is this communication which ultimately results in the immediate Delivery Report described previously.  The transaction in then terminated 169.

If immediate connect is not established a Retry Report is sent 153 back through the System Status and Control unit and the Retry sequence begins.  The Retry criteria can be varied

-23-

24

154, both in place and with the SAFF setting.  For example, if the SAFF is integrated into a local exchange, the SAFF can actually monitor the desired line and simply wait for it to become available.  In other settings it will be necessary for the SAFF to actually redial at prescribed intervals.  In any case attempts to connect are made 155 and if they are not successful 156 a counter or timer is checked 159 to see if the retry limit has been exceeded.  If not, the process is repeated and if so, a Failed Delivery Report 160 is sent back through the system and the effort terminated 170.

If the retry effort is successful the Delivery Queue is retrieved 158 and message by message 162 the queue is dumped, with a pause 163 after each message to confirm receipt, send a Delivery Report 164 and to check for end of queue 165.  If a message fails during the queue dump the retry sequence at 154 is resumed at the failure point and the process repeated to a conclusion.  When the last message has been received satisfactorily, the transaction is terminated 168.

If it is determined at 141 (Figure 6a) that this is a mail box call, a loop is entered which gets the fax data 142 and stores it 143 in the appropriate Mail Box Queue.  When the end of message is detected 144, a Posting Report 145 is sent back through the system and a Message Waiting Report 146 is sent forward through the system to the default destination machine.

General Service calls always arrive on Ordinary Local Lines 5.  Upon detection and answering 172, the voice response menu is presented 173 to the user.  As with the Mail Box Service, the user keys in responses or gives them orally 174 and a decision ladder 175 identifies the desired service routine such as 177, 178, or 179.  Here again only a few of the possible choices have been shown for sake of illustration and looping for multiple service requests is provided.  The selected service routine generates command parameters which are parsed 181 as system commands and sent 182 to the System Status and Control unit 11 for execution.  Upon completion of all requests the call is terminated 183.

What has been described are the presently preferred embodiments of a system and method for providing a comprehensive interactive facsimile message management system embedded in a switched telephone network.  It should be apparent that many modifications to the system and the method are possible without departing from the true spirit and scope of the invention.

-24-

We claim: Claims 25

EXH 15 p 68

CLAINS

SUB A1)    1.    A system for facilitating facsimile communications
between a transmitting facsimile machine and at least one
intended receiving facsimile machine, comprising at least one
store and forward facility, means coupling the at least one
store and forward facility to the switched telephone network
for receiving transmissions from a transmitting facsimile
machine, said store and forward facility including computer
means for controlling its operation and including mass storage
means for storing facsimile transmissions together with infor-
mation identifying the transmitting facsimile machine and the
at least one intended receiving facsimile machine under con-
trol of said computer means, said store and forward facility
also including means coupling it to the switched telephone
network for transmitting facsimile messages stored in the mass
storage means to at least one intended receiving facsimile
machine.

2.    The system of claim 1 wherein said computer means is
programmed such that if the at least one intended receiving
facsimile machine is busy or otherwise unable to receive a
transmission at the time the store and forward facility
attempts to transmit a facsimile message stored in the mass
storage means, the store and forward facility periodically
retries transmitting the facsimile message to the at least one
intended receiving facsimile machine.

SUB A2)    3.    The system of claim 2 wherein said computer means is
additionally programmed to establish a linked queue in said
mass storage means spooling all stored facsimile messages
intended for a particular receiving facsimile machine, and
transmitting all the spooled facsimile messages intended for
that particular receiving facsimile machine upon successfully
making contact with the intended receiving facsimile machine.

4.    The system of claim 1 wherein said computer means of
said at least one store and forward facility is programmed,
upon successful completion of a facsimile transmission to an
intended receiving facsimile machine, to transmit a message to
the transmitting facsimile machine confirming delivery of the
transmission to the intended receiving facsimile machine.

SUB A3)    5.    The system of claim 2 wherein said computer means of
said at least one store and forward facility is programmed,
upon being unsuccessful in making a transmission to an
intended receiving facsimile machine, to transmit a message to
the transmitting facsimile machine indicating that the message
has been entered into the mass storage means at the store and
forward facility, and at least also indicating the reason for

-25-

a delay in transmitting the message to the intended receiving facsimile machine.

6. The system of claim 1 wherein the at least one store and forward facility includes means for receiving broadcast instructions from a user at a transmitting facsimile machine and associating those broadcast instructions with a facsimile message received from the transmitting facsimile machine and stored in the mass storage means, and for transmitting the stored facsimile message to a plurality of receiving facsimile machines in accordance with the broadcast instructions.

7. A system in accordance with claim 1 wherein said mass storage means additionally includes mailboxes associated with particular system subscribers and wherein facsimile messages received and stored by the mass storage means and intended for receiving facsimile machines associated with those subscribers are stored in the respective mailboxes, said store and forward facility being responsive to instructions received from a subscriber to transmit the facsimile messages stored in that subscriber's mailbox to any particular facsimile machine designated in the instructions by the subscriber, whereby a subscriber who is traveling or otherwise away from the fixed location of his facsimile machine may have facsimile messages intended for receipt by his facsimile machine collected, and retrieve them from any location where any other facsimile machine is situated.

8. A system in accordance with claim 1 wherein said computer means of said at least one store and forward facility is programmed to retain a facsimile message in the mass storage means for a predetermined time period even after successful transmission of the facsimile message to an intended receiving facsimile machine, and wherein the store and forward facility is responsive to instructions received from either originating or receiving subscribers to retransmit the facsimile message to another intended receiving facsimile machine.

9. A system in accordance with claim 1 for use in system operation wherein individual subscribers may be provided with unique PIN numbers, wherein individual subscriber PIN numbers are stored in the mass storage means, and wherein the store and forward facility recognizes an incoming facsimile message that is security coded by a transmitting facsimile machine, and wherein the security coded facsimile message is sent to an intended receiving facsimile machine only upon receipt from the intended receiving facsimile machine of the appropriate subscriber PIN number.

10. A system in accordance with claim 9 where said computer means is programmed such that, upon receipt by the store

-26-

and forward facility of a security coded facsimile message
from a transmitting facsimile machine, the store and forward
facility sends a transmission to an intended receiving facsim-
ile machine indicating that the store and forward facility is
holding a security coded facsimile message, whereby a sub-
scriber at the intended receiving facsimile machine is
prompted to input to the store and forward facility his PIN in
order to have the facsimile message transmitted to the
intended receiving facsimile machine.

11. A system for facilitating facsimile communications
between a transmitting facsimile machine and at least one
intended receiving facsimile machine, comprising a plurality
of geographically separated store and forward facilities, with
a plurality of subscriber facsimile machines in a particular
geographic area being associated with one of said store and
forward facilities, means coupling each store and forward
facility to the switched telephone network for receiving
transmissions from any transmitting facsimile machine that is
associated with each respective store and forward facility,
each of said store and forward facilities including computer
means for controlling its operation and including mass storage
means for storing facsimile transmissions together with infor-
mation identifying the transmitting facsimile machine and the
at least one intended receiving facsimile machine under con-
trol of said computer means, said store and forward facility
also including means coupling it to the switched telephone
network for directly transmitting a facsimile message stored
in the mass storage means to an intended receiving facsimile
machine if the intended receiving facsimile machine is in the
plurality of facsimile machines associated with that particu-
lar store and forward facility, and for transmitting the
stored facsimile message to a particular another of the store
and forward facilities when the intended receiving facsimile
machine is in the plurality of facsimile machines associated
with that particular another store and forward facility.

12. The system of claim 11 wherein the computer means of
each store and forward facility is programmed such that with
respect to facsimile messages received and stored in its mass
storage means if the at least one intended receiving facsimile
machine is busy or otherwise unable to receive a transmission
at the time the store and forward facility attempts to trans-
mit a facsimile message stored in its mass storage means, the
store and forward facility periodically retries transmitting
the facsimile message to the at least one intended receiving
facsimile machine.

13. The system of claim 12 wherein the computer means of
each store and forward facility is additionally programmed to
establish a linked queue in its mass storage means spooling

-27-

all stored facsimile messages intended for a particular receiving facsimile machine, and transmitting all the spooled facsimile messages intended for that particular receiving facsimile machine upon successfully making contact with the intended receiving facsimile machine.

14. The system of claim 13 wherein the computer means of said store and forward facility is programmed, upon successful completion of a facsimile transmission to an intended receiving facsimile machine, to transmit a message to the transmitting facsimile machine or to another store and forward facility having the transmitting facsimile machine associated therewith for passing the message to the transmitting facsimile machine, indicating that the message has been entered into the mass storage means at the store and forward facility, and at least also indicating the reason for a delay in transmitting the message to the intended receiving facsimile machine.

SUBAS

15. The system of claim 14 wherein the computer means of each store and forward facility is programmed, upon being unsuccessful in making a transmission to an intended receiving facsimile machine, to transmit a message to the transmitting facsimile machine or to another store and forward facility having the transmitting facsimile machine associated therewith for passing the message to the transmitting facsimile machine, indicating that the message has been entered into the mass storage means at the store and forward facility, and at least also indicating the reason for a delay in transmitting the message to the intended receiving facsimile machine.

16. The system of claim 15 wherein each store and forward facility includes means for receiving broadcast instructions from a user at a transmitting facsimile machine and associating those broadcast instructions with a facsimile message received from the transmitting facsimile machine and stored in the mass storage means, and for transmitting the stored facsimile message to a plurality of receiving facsimile machines, either directly or through other store and forward facilities having the intended receiving facsimile machines associated therewith, in accordance with the broadcast instructions.

17. A system in accordance with claim 16 wherein said mass storage means of at least one of the store and forward facilities additionally includes mailboxes associated with particular system subscribers and wherein facsimile messages received and stored by the mass storage means and intended for receiving facsimile machines associated with those subscribers are stored in the respective mailboxes, said store and forward facility being responsive to instructions received from a subscriber to transmit the facsimile messages stored in that

-28-

subscriber's mailbox to any particular facsimile machine des-
ignated in the instructions by the subscriber, whereby a sub-
scriber who is traveling or otherwise away from the fixed
location of his facsimile machine may have facsimile messages
intended for receipt by his facsimile machine collected, and
retrieve them from any location where any other facsimile
machine is situated.

18. A system in accordance with claim 16 wherein the
computer means of each store and forward facility is pro-
grammed to retain a facsimile message in its mass storage
means for a predetermined time period even after successful
transmission of the facsimile message to an intended receiving
facsimile machine, and wherein the store and forward facility
is responsive to instructions received from either originating
or receiving subscribers to retransmit the facsimile message
to another intended receiving facsimile machine, either
directly or through other store and forward facilities having
the intended receiving facsimile machines associated there-
with.

19. A system in accordance with claim 16 for use in sys-
tem operation wherein individual subscribers may be provided
with unique PIN numbers, wherein individual subscriber PIN
numbers are stored in the mass storage means of the store and
forward facility having the facsimile machines of those indi-
vidual subscribers associated therewith, and wherein the store
and forward facility recognizes an incoming facsimile message
that is security coded by a transmitting facsimile machine,
and wherein the security coded facsimile message is sent to an
intended receiving facsimile machine only upon receipt from
the intended receiving facsimile machine of the appropriate
subscriber PIN number.

20. A system in accordance with claim 19 where said com-
puter means is programmed such that, upon receipt by the store
and forward facility of a security coded facsimile message
from a transmitting facsimile machine, the store and forward
facility sends a transmission to an intended receiving facsim-
ile machine either directly or through another store and for-
ward facility indicating that the store and forward facility
is holding a security coded facsimile message, whereby a sub-
scriber at the intended receiving facsimile machine is
prompted to input to the store and forward facility his PIN in
order to have the facsimile message transmitted to the
intended receiving facsimile machine.

21. A method for facilitating facsimile communications
between a transmitting facsimile machine and at least one
intended receiving facsimile machine, comprising the steps of
providing at least one store and forward facility having

-29-

EXH 15 P 73

computer means for controlling its operation and having mass
storage means for storing facsimile messages, coupling the at
least one store and forward facility to the switched telephone
network for receiving facsimile messages from transmitting
facsimile machines, recording received facsimile messages in
the mass storage means together with information indicating
the transmitting facsimile machine and the intended receiving
facsimile machine, and transmitting facsimile messages stored
in the mass storage means to intended receiving facsimile
machines.

22.  A method in accordance with claim 21 including the
step that if an intended receiving facsimile machine is busy
or otherwise unavailable to receive at the time the at least
one store and forward facility attempts contact to transmit a
facsimile message, of periodically retrying to transmit the
facsimile message to the intended receiving facsimile machine.

~~29~~ ~~23~~.  A method in accordance with claim ~~21~~ 28 including the
step of establishing a linked queue in the mass storage means
spooling all stored facsimile messages intended for a particu-
lar receiving facsimile machine, and transmitting all the
spooled facsimile messages intended for that particular
receiving facsimile machine upon successfully making contact
with the intended receiving facsimile machine.

24.  A method in accordance with claim 21 including the
step, upon successful completion of a facsimile transmission
to an intended receiving facsimile machine, of transmitting a
message to the transmitting facsimile machine confirming
delivery of the transmission to the intended receiving facsim-
ile machine.

25.  A method in accordance with claim 24 including the
step, upon being unsuccessful in making a transmission to an
intended receiving facsimile machine, of transmitting a mes-
sage to the transmitting facsimile machine indicating that the
message has been entered into the mass storage means at the
store and forward facility, and at least also indicating in
the message the reason for a delay in successfully transmit-
ting the message to the intended receiving facsimile machine.

~~36~~ ~~26~~.  A method in accordance with claim ~~21~~ 28 including the
step of providing the at least one store and forward facility
with means for receiving broadcast instructions from a user at
a transmitting facsimile machine and associating those broad-
cast instructions with a facsimile message received from the
transmitting facsimile machine and stored in the mass storage
means, and including the step of transmitting the stored fac-
simile message to a plurality of receiving facsimile machines
in accordance with the broadcast instructions.

-30-

EXH 15  P 74

27. A method in accordance with claim 21 including the step of defining mailboxes in the mass storage means associated with particular system subscribers, and including the step of storing facsimile messages intended for those particular system subscribers in their respective mailboxes, and further including the step, in response to instructions received from a system subscriber, of transmitting facsimile messages stored in that subscriber's mailbox to a facsimile machine designated by that subscriber in the instructions.

28. A method in accordance with claim 21 including the step of retaining facsimile messages in the mass storage means for a predetermined time period after successful delivery of the facsimile messages to intended receiving facsimile machines, and, in response to instructions received from either the transmitting or receiving facsimile machines with respect to a particular facsimile message, the step of retransmitting that particular facsimile message to additional intended receiving facsimile machines.

29. A method in accordance with claim 21 including the step of providing subscribers with unique individual PIN numbers, storing the individual PIN numbers in the mass storage means, recognizing an incoming facsimile message from a transmitting facsimile machine which has been security coded, transmitting to the intended receiving facsimile machine for the security coded message a message indicating that the store and forward facility is holding a security coded message, and transmitting to the intended receiving facsimile machine the security coded message only after receipt by the store and forward facility from the intended receiving facsimile machine of the unique PIN number of a subscriber associated with that intended receiving facsimile machine.

30. A method for facilitating facsimile communications between a transmitting facsimile machine and at least one intended receiving facsimile machine, comprising the steps of providing a plurality of store and forward facilities at geographically spaced locations each having computer means for controlling its operation and having mass storage means for storing facsimile messages, coupling each store and forward facility to the switched telephone network for both receiving from and transmitting to a plurality of facsimile machines associated with each store and forward facility facsimile messages, recording in the mass storage means each facsimile message transmitted from an associated facsimile machine together with information indicating the transmitting facsimile machine and the intended receiving facsimile machine, and transmitting facsimile messages stored in the mass storage means to intended receiving facsimile machines if those intended receiving facsimile machines are associated with the store and

-31-

forward facility which received the facsimile message from a transmitting facsimile machine, or to another of the plurality of store and forward facilities if the intended receiving facsimile machine is associated with the another store and forward facility.

31. A method in accordance with claim 30 including the step that if an intended receiving facsimile machine is busy or otherwise unavailable to receive at the time a store and forward facility attempts contact to transmit a facsimile message, or periodically retrying to transmit the facsimile message to the intended receiving facsimile machine.

32. A method in accordance with claim 31 including the step of establishing a linked queue in each mass storage means spooling all stored facsimile messages intended for a particular receiving facsimile machine, and transmitting all the spooled facsimile messages intended for that particular receiving facsimile machine upon successfully making contact with the intended receiving facsimile machine.

33. A method in accordance with claim 32 including the step, upon successful completion of a facsimile transmission to an intended receiving facsimile machine, of transmitting a message to the transmitting facsimile machine, either directly or through another store and forward facility associated with that particular transmitting facsimile machine, confirming delivery of the transmission to the intended receiving facsimile machine.

34. A method in accordance with claim 33 including the step, upon being unsuccessful in making a transmission to an intended receiving facsimile machine, of transmitting a message to the transmitting facsimile machine, either directly or through another store and forward facility associated with that particular transmitting facsimile machine, indicating that the message has been entered into the mass storage means at one of the store and forward facilities, and at least also indicating the reason for a delay in successfully transmitting the message to the intended receiving facsimile machine.

35. A method in accordance with claim 34 including the step of providing the store and forward facilities with means for receiving broadcast instructions from a user at a transmitting facsimile machine and associating those broadcast instructions with a facsimile message received from the transmitting facsimile machine and stored in the mass storage means, and including the step of transmitting the stored facsimile message to a plurality of receiving facsimile machines in accordance with the broadcast instructions, either directly or through additional store and forward facilities associated

-32-

with particular ones of the plurality of intended receiving facsimile machines.

36. A method in accordance with claim 35 including the step of defining mailboxes in the mass storage systems of each store and forward facility associated with particular system subscribers associated with particular store and forward facilities, and including the step of storing facsimile messages intended for those particular system subscribers in their respective mailboxes, and further including the step, in response to instructions received from a system subscriber, of transmitting facsimile messages stored in that subscriber's mailbox to a facsimile machine designated by that subscriber in the instructions.

37. A method in accordance with claim 36 including the step of retaining facsimile messages in the mass storage means for a predetermined time period after successful delivery of the facsimile messages to intended receiving facsimile machines, and, in response to instructions received from either the transmitting or receiving facsimile machines with respect to a particular facsimile message, the step of retransmitting that particular facsimile message to additional intended receiving facsimile machines.

38. A method in accordance with claim 37 including the step of providing subscribers with unique individual PIN numbers, storing the individual Pin number in the mass storage means of a store and forward facility associated with a particular subscriber, recognizing an incoming facsimile message from a transmitting facsimile machine which has been security coded, transmitting to the intended receiving facsimile machine for the security coded message a message indicating that the store and forward facility is holding a security coded message, and transmitting to the intended receiving facsimile machine the security coded message only after receipt by the store and forward facility from the intended receiving facsimile machine of the unique PIN number of a subscriber associated with that intended receiving facsimile machine.

38. A system in accordance with claims 1 or 11 wherein said computer means is programmed to store in the mass storage means relevant charging parameters including number of pages, destination and special system feature options provided for each facsimile message sent by a subscriber and received by a subscriber from a non-subscriber, and to generate charging summaries for subscribers periodically from the stored charging parameters.

40. A method in accordance with claims 21 or 30 including the step of storing in the mass storage means relevant

-33-

charging parameters including number of pages, destination and special system feature options provided for each facsimile message sent by a subscriber and received by a subscriber from a non-subscriber, and generating charging summaries for sub-scribers periodically from the stored charging parameters.

31. A method in accordance with claims 21 or 30 includ-ing the step, upon receipt of a facsimile message from a transmitting facsimile machine, of immediately attempting delivery of the facsimile message to an intended receiving machine at the same time the message is being recorded in the mass storage means.

32. A method in accordance with claims 21 or 30 includ-ing the step that when an additional facsimile message intended for a particular receiving facsimile machine is received by a store and forward facility while that facility is in communication with that particular facsimile machine, the additional facsimile message is immediately appended to a message queue for the particular facsimile machine and deliv-ered as part of the communication with that particular facsim-ile machine.

ADD A18

-34-

Abstract of The Disclosure

    A system and method for facilitating facsimile transmissions has one or more store and forward facilities, each associated with a plurality of subscriber facsimile machines, typically coupled over the switched telephone network.  The store and forward facilities include a computer for controlling operations and mass data storage equipment.  A subscriber to the system delivers an outgoing facsimile message to the store and forward facility with which it is associated, which records the fax message together with data as to originating facsimile machine and destination facsimile machine.  The store and forward facility then delivers the facsimile message to the intended receiver facsimile machine, either directly or through another store and forward facility.  If unsuccessful on an initial attempt, the store and forward facility periodically retrys to send the facsimile message.  The system also provides spooling of all facsimile messages for an intended receiver machine, which are all transmitted upon making connection with the receiver machine.  Subscriber mailboxes are provided as part of the mass storage, which can be accessed by a subscriber to have his messages delivered to any facsimile machine he designates.  Secure facsimile transmission is achieved through use of subscriber PIN numbers.  Broadcasting, redirecting messages and cost accounting can also be achieved by the system and method.

-35-

EXH _15_ P _79_