1   Robert A. Sacks (SBN 150146)
    sacksr@sullcrom.com
2   Brian R. England (SBN 211335)
    englandb@sullcrom.com
3   Edward E. Johnson (SBN 241065)
    johnsonee@sullcrom.com
4   SULLIVAN & CROMWELL LLP
    1888 Century Park East, Suite 2100
5   Los Angeles, California 90067-1725
    Tel.:  (310) 712-6600
6   Fax:  (310) 712-8800

7   Frank L. Bernstein (SBN 189504)
    fbernstein@kenyon.com
8   KENYON & KENYON LLP
    333 West San Carlos Street, Suite 600
9   San Jose, California 95110
    Tel.:  (408) 975-7500
10  Fax:  (408) 975-7501

11  *Attorneys for Plaintiff and Counterclaim*
    *Defendant Catch Curve, Inc, and Third*
12  *Party Defendant j2 Global Communications, Inc.*

13

14                  **UNITED STATES DISTRICT COURT**

15                  **CENTRAL DISTRICT OF CALIFORNIA**

16  CATCH CURVE, INC.,                    )   Case No. CV 05-4820 DDP (AJWx)
                                          )
17                        Plaintiff,      )   **CATCH CURVE, INC. AND J2**
                                          )   **GLOBAL COMMUNCATIONS,**
18            v.                          )   **INC.'S  REPLY MEMORANDUM**
                                          )   **OF POINTS AND AUTHORITIES**
19  VENALI, INC.,                         )   **IN SUPPORT OF THEIR**
                                          )   **MOTION FOR PARTIAL**
20                        Defendant.      )   **SUMMARY JUDGMENT**
                                          )
21  _____       )
                                          )   Judge:      Hon. Dean D. Pregerson
22                                        )   Date:       October 20, 2008
                                          )   Time:       10:00 a.m.
23  AND RELATED CROSS-ACTION              )   Courtroom:  3
                                          )
24  AND THIRD PARTY COMPLAINT             )
                                          )
25  _____       )

26

27

28

1

# <u>TABLE OF CONTENTS</u>

INTRODUCTION................................................................................1

ARGUMENT ....................................................................................1

I.  Legal Standard .........................................................................1

II. Venali's Antitrust Counterclaims Fail Because Catch Curve's Claims
    are Protected By *Noerr-Pennington* Immunity ............................3

    A.   Venali's Claims Are Limited To The Filing Of Allegedly Sham
    Patent Infringement Litigation ................................................3

    B.   Federal Circuit Law Applies and Venali Must Prove That This
    Litigation Is Both Objectively and Subjectively Baseless,
    Otherwise *Noerr-Pennington* Immunity Is a Complete Defense..........4

        1.  Venali must prove that the litigations it relies upon are
        objectively baseless.............................................................4

        2.  Substantial Success in a Series of Lawsuits Is Sufficient
        To Overcome the "Series of Claims" Exception to Noerr-
        Pennington Immunity ..........................................................7

    C.   This Litigation Is Not Objectively Baseless............................8

    D.   This Litigation Is Not Subjectively Baseless .......................10

        1.  The claims and specification offered support for Catch
        Curve's proposed claim construction......................................11

        2.  The prosecution history did not limit the claims .....................12

        3.  The prior litigation between JFAX and AudioFax does
        not establish bad faith in this litigation ...................................13

        4.  Venali's argument that j2 "stealthily" used Catch Curve
        or anticompetitive sales practices are nonsense......................14

        5.  The licensing history demonstrates that Catch Curve's
        position was subjectively reasonable......................................14

-i-

SULLIVAN & CROMWELL LLP

6. j2 and Catch Curve have not engaged in vexatious
conduct in this litigation.............................................................16

III. Even If Venali Overcomes *Noerr-Pennington* Protection, Venali Has
Failed To Create a Triable Issue of Fact as to Market Definition or
Market Power.................................................................................................17

A.   There Is No Evidence That the Alleged Misconduct at Issue in
This Case Has Harmed Competition....................................................17

B.   Venali Offers No Support for Its Market Definition...........................18

C.   Venali Has No Direct Evidence of Market Power..............................20

D.   Venali Has No Circumstantial Evidence of Market Power ................22

CONCLUSION ............................................................................................24

-ii-

SULLIVAN & CROMWELL LLP

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*Argus Chem. Corp.* v. *Fibre Glass-Evercoat Co., Inc.*,
 812 F.2d 1381 (Fed. Cir. 1987) ........................................................................13

*Avery Dennison Corp.* v. *Acco Brands, Inc.*,
 No. CV-99-1877DT (MCX), 2000 WL 986995 (C.D. Cal. Feb. 22, 2000).....5, 6

*Brinson* v. *Linda Rose Joint Venture*,
 53 F.3d 1044 (9th Cir. 1995) ............................................................................9

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
 429 U.S. 477 (1977)..........................................................................................18

*C.R. Bard, Inc.* v. *M3 Sys., Inc.*,
 157 F.3d 1340 (Fed. Cir. 1998) .......................................................................3, 9

*California Motor Transport Co.* v. *Trucking Unlimited*,
 404 U.S. 508 (1972).........................................................................................5, 8

*Cascade Health Solutions* v. *PeaceHealth*,
 515 F.3d 883 (9th Cir. 2008) ..........................................................................18

*Celotex Corp.* v. *Catrett*,
 477 U.S. 317 (1986)......................................................................................1, 2, 9

*Comark Commc'n, Inc.* v. *Harris Corp.*,
 156 F.3d 1182 (Fed. Cir. 1998) .......................................................................12

*Director General of Railroads* v. *Kastenbaum*,
 263 U.S. 25 (1923)...............................................................................................2

*Forsyth* v. *Humana, Inc.*,
 114 F.3d 1467 (9th Cir. 1997) ..........................................................................20

*Gen-Probe, Inc.* v. *Amoco Corp. Inc.*,
 926 F. Supp. 948 (S.D. Cal. 1996)......................................................................6

*Globetrotter Software, Inc.* v. *Elan Computer Group, Inc.*,
 362 F.3d 1367 (Fed. Cir. 2004) ..........................................................................5

*Greyhound Computer Corp.* v. *Int'l Business Machines Corp.*,
 559 F.2d 488 (9th Cir. 1977) ...........................................................................19

SULLIVAN & CROMWELL LLP

*Guidroz-Brault* v. *Missouri Pac. R.R. Co.*,
    254 F.3d 825 (9th Cir. 2001) ....................................................................19

*Handgards, Inc.* v. *Ethicon, Inc.*,
    601 F.2d 986 (9th Cir. 1979) ...................................................................3, 9

*In re Circuit Breaker Litig.*,
    984 F. Supp. 1267 (C.D. Cal. 1997) ............................................................6

*In re Terazosin Hydrochloride Antitrust Litig.*,
    335 F. Supp. 2d 1336 (S.D. Fla. 2004) ........................................................7

*In re Terazosin Hydrochloride Litig.*,
    335 F. Supp. 2d 1336 (S.D. Fla. 2004) ........................................................4

*Intertrust Techs. Corp.* v. *Microsoft Corp.*,
    275 F. Supp. 2d 1031 (N.D. Cal. 2003) .....................................................11

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................ 2, 15, 17

*Nobelpharma AB* v. *Implant Innovations, Inc.*,
    141 F.3d 1059, 1068 (Fed. Cir. 1998) .........................................................4

*Nystrom* v. *Trex Co., Inc.*,
    374 F.3d 1105 (Fed. Cir. 2004) .................................................................12

*Organon Inc.* v. *Mylan Pharms., Inc.*,
    293 F. Supp. 2d 453 (D.N.J. 2003) ..............................................................5

*Phillips* v. *AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .................................................................12

*Primetime 24 Joint Venture* v. *Nat'l Broad. Co.*,
    219 F.2d 92 (2d Cir. 2000).......................................................................6, 7

*Prof'l Real Estate Investors, Inc.* v. *Columbia Pictures, Inc.*,
    508 U.S. 49 (1993)............................................................................ passim

*Rebel Oil Co.* v. *Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .....................................................................19

*Travelers Express Co.* v. *Am. Express Integrated Payment Sys. Inc.*,
    80 F. Supp. 2d 1033 (D. Minn. 1999).........................................................4

-iv-

*U.S.* v. *Various Slot Machines on Guam*,
   658 F.2d 697 (9th Cir.1981) ...........................................................................19

*USS-POSCO Industries* v. *Contra Costa County Building & Constr. Trades
   Council*, 31 F.3d 800 (9th Cir. 1994)...........................................................5, 6

*Ventana Med. Sys., Inc.* v. *Biogenex Labs., Inc.*,
   473 F.3d 1173 (Fed. Cir. 2006) ....................................................................11

*White* v. *Lee*,
   227 F.3d 1214 (9th Cir. 2000) ........................................................................9


**STATUTES**

Fed. R. Civ. P. 1 ....................................................................................................2

Fed. R. Civ. P. 56 ...........................................................................................1, 2, 9

SULLIVAN & CROMWELL LLP

1    ## REPLY MEMORANDUM OF POINTS AND AUTHORITIES

2        Plaintiff and Counterclaim Defendant Catch Curve, Inc. ("Catch

3    Curve") and Third-Party Defendant j2 Global Communications, Inc. ("j2")

4    respectfully submit this Reply Memorandum of Points and Authorities in support

5    of their Motion for Partial Summary Judgment as to Counts II and III of Defendant

6    Venali, Inc.'s ("Venali") Second Amended Counterclaim ("SAC").

7        ## INTRODUCTION

8        Venali's Opposition fails to identify any documentary evidence or

9    testimony supporting its claims.  Lacking evidence, Venali resorts to speculation

10   and supposition — its Opposition is littered with factual assertions for which

11   Venali fails to cite evidence in the record.  Venali's failure to understand (much

12   less meet) its burden is highlighted by its "Statement of Genuine Issues of Material

13   Fact," which lists 34 questions without a single evidentiary citation in support.

14       When Venali does cite to the record, it relies almost entirely on the

15   Davidson Report — an "analysis" of the alleged market which everyone agrees is

16   unreliable and is inadmissible hearsay — and on the report of its expert witness,

17   which, in addition to itself relying almost exclusively on the Davidson Report, fails

18   to even attempt to connect j2's alleged market power with the misconduct at issue

19   in this case.  Unsupported assertions and inadmissible evidence are not sufficient to

20   defeat a summary judgment motion.  Fed. R. Civ. P. 56; *Celotex Corp.* v. *Catrett*,

21   477 U.S. 317 (1986).  Venali's antitrust claims should not go to trial.

22       ## ARGUMENT

23   **I.    Legal Standard**

24       Venali misstates the standard for summary judgment, alleging that

25   Rule 56 must used "sparingly" in antitrust cases because they "consist primarily of

26   factual issues."  (Opp. at 1.)  In fact, summary judgment is not a disfavored

27   procedural shortcut, but an integral part of the Federal Rules and their goal of

28                                    -1-

1  securing "the just, speedy and inexpensive determination of every action." *Celotex*

2  *Corp.* v. *Catrett*, 477 U.S. 317, 327 (1986); Fed. R. Civ. P. 1, 56.  Furthermore,

3  when applying *Noerr-Pennington* immunity to antitrust claims in the patent

4  enforcement context, summary judgment is an appropriate tool for avoiding

5  unnecessary trials where the significant hurdle of immunity cannot be overcome.

6  "Where, as here, there is no dispute over the predicate facts of the underlying legal

7  proceeding, a court may decide probable cause as a matter of law." *Prof'l Real*

8  *Estate Inv., Inc.*v. *Columbia Pictures, Inc.*, 508 U.S. 49, 64 (1993) (hereinafter

9  "*PRE*"); *see also Director General of Railroads* v. *Kastenbaum*, 263 U.S. 25, 28

10  (1923) ("The question is not whether [the defendant] thought the facts to constitute

11  probable cause, but whether the court thinks they did.")  Going further, the *PRE*

12  Court stated that "[t]he existence of probable cause eliminated any 'genuine issue

13  as to any material fact' … and summary judgment properly issued."  *PRE* at 66.

14          Here, not only is the determination regarding whether Catch Curve

15  and j2 had probable cause to bring the infringement case a question of law for the

16  Court to properly decide on summary judgment, but Venali has also failed to

17  present *any* facts sufficient to demonstrate a genuine issue for trial.  *Celotex*, 477

18  U.S. at 324 (quoting Fed. R. Civ. P. 56(e).  This failure alone mandates entry of

19  summary judgment in j2 and Catch Curve's favor.  Further, Venali must "do more

20  than simply show that there is some metaphysical doubt as to the material facts[;]

21  the nonmoving party must come forward with 'specific facts showing that there is

22  a genuine issue for trial.'" *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475

23  U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)) (citations omitted).

24          Venali has simply and completely failed to satisfy its burden to

25  establish genuine issues of material fact.  As but one illustrative example, when

26  discussing why this lawsuit is objectively baseless, Venali provides three pages of

27  "facts" and argument with virtually no citation to admissible evidence.  (*See* Opp.

28

-2-

1  at 12-14.)  Venali also repeatedly argues that "a jury could conclude" that its

2  position is supported, without so much as a citation to any admissible, record

3  evidence.  (*See* Opp. at 4.)

4         In fact, reading the Opposition, a reader would be justified in

5  forgetting that *Venali* bears the burden of proving its claims, not j2 and Catch

6  Curve.  The AudioFax Patents are presumptively valid, and "the law recognizes a

7  presumption that the assertion of a duly granted patent is made in good faith."

8  *C.R. Bard, Inc.* v. *M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998).  That

9  presumption can be overcome only with a showing of "clear and convincing

10 evidence."  *Handgards, Inc.*, 601 F.2d at 996; *see also C.R. Bard*, 157 F.3d at 1369

11 (*Noerr-Pennington* immunity can be pierced only with "affirmative evidence of

12 bad faith").  And yet, Venali does even attempt to offer such evidence, choosing

13 instead to attack j2 and Catch Curve's evidence in the vain hope that creating

14 smoke will convince the Court there is fire where none exists.  Lacking any

15 admissible record evidence to support its claims, Venali resorts instead to

16 unsupported argument and innuendo, which is insufficient as a matter of law to

17 avoid summary judgment.

## II.  Venali's Antitrust Counterclaims Fail Because Catch Curve's Claims are Protected By *Noerr-Pennington* Immunity.

### A.  Venali's Claims Are Limited To The Filing Of Allegedly Sham Patent Infringement Litigation.

22        As Venali has repeatedly made clear, the *only* alleged misconduct at

23 issue in this case is the assertion by j2, through Catch Curve, of allegedly sham

24 patent infringement claims against competitors.  (O'Keefe Dep.[1] at 113, 127-29

---

[1]  The portions of the Deposition of Douglas O'Keefe cited herein were attached as Exhibit 1 to the Declaration of Edward E. Johnson submitted with j2 and Catch Curve's Motion for Summary Judgment, at Docket No. 137.

-3-

SULLIVAN & CROMWELL LLP

1  ("all [of the antitust claims] derive from the – the sham litigation"); Second

2  Amended Counterclaims ¶¶ 118 - 127 (alleging no misconduct other than sham

3  litigation).)  Further, Venali has confirmed that its claims are not based on any

4  conduct prior to j2's acquisition of the AudioFax Patents.  (O'Keefe Dep. at 126-

5  27.)

6          In its Opposition, Venali improperly attempts to introduce new

7  theories of anticompetitive conduct into the case.  For example, without even

8  trying to connect it to a claim for sham litigation, Venali contends that j2 engaged

9  in "anticompetitive sales practices."  (Opp. at 11.)  This argument, which rests on

10  deliberately misrepresented facts, is not relevant in any way to Venali's sole claim

11  for sham litigation, and cannot provide a basis for denying summary judgment.

12  **B.**     **Federal Circuit Law Applies and Venali Must Prove That This**
            **Litigation Is Both Objectively and Subjectively Baseless,**
13          **Otherwise *Noerr-Pennington* Immunity Is a Complete Defense.**

14          **1.**     ***Venali must prove that the litigations it relies upon are***
                    ***objectively baseless.***
15

16          Initially, Venali attempts to avoid the high standard enunciated in

17  *PRE* by claiming that, where an antitrust action is premised on a series of lawsuits

18  rather than a single action, the objectively baseless prong of *PRE* is applicable.

19  Venali is incorrect, and under binding Federal Circuit precedent, the *PRE* test

20  applies.  In *Nobelpharma AB* v. *Implant Innovations, Inc.*, 141 F.3d 1059, 1068

21  (Fed. Cir. 1998), the Federal Circuit, en banc, held that "whether conduct in

22  procuring or enforcing a patent is sufficient to strip a patentee of its immunity from

23  the antitrust laws is to be decided as a question of Federal Circuit law.  *This*

24  *conclusion applies equally to **all** antitrust claims premised on the bringing of a*

25  *patent infringement suit*."  (Emphasis added.)  Courts have held that, under Federal

26  Circuit law, the *PRE* standard applies in cases alleging a series of sham litigations.

27  *See Travelers Express Co.* v. *Am. Express Integrated Payment Sys. Inc.*, 80 F.

28

-4-

1   Supp. 2d 1033, 1042 (D. Minn. 1999) (holding that under Federal Circuit law, the

2   *P.R.E.* standard applies to multiple lawsuits), *In re Terazosin Hydrochloride Litig.*,

3   F. Supp. 2d 1336, 1366 n. 26 (S.D. Fla. 2004) ("Federal Circuit law, which

4   governs this issue, applies the *PRE* objective/subjective test to claims of multiple

5   patent infringement lawsuits."); *Globetrotter Software, Inc.* v. *Elan Computer*

6   *Group, Inc.*, 362 F.3d 1367, 1377 (Fed. Cir. 2004); *Organon Inc.* v. *Mylan*

7   *Pharms., Inc.*, 293 F. Supp. 2d 453, 462 (D.N.J. 2003) (applying *PRE* sham

8   litigation standard to multiple patent infringement lawsuits filed against multiple

9   defendants).

10          Even applying Ninth Circuit law, however, does not save Venali's

11   frivolous claim.  Relying on *USS-POSCO Industries* v. *Contra Costa County*

12   *Building & Constr. Trades Council*, 31 F.3d 800 (9th Cir. 1994), Venali argues

13   that where a plaintiff brings multiple lawsuits, the merits of those lawsuits are

14   immaterial and the sham litigation exception can be invoked without proving that

15   any of the actions are objectively baseless.  (*See* Opp. at 3.) Venali incorrectly

16   interprets the holding of *Contra Costa*, and consequently misapplies the standard.

17          In *Contra Costa*, the Ninth Circuit held that *California Motor*

18   *Transport Co.* v. *Trucking Unlimited*, 404 U.S. 508 (1972), rather than *P.R.E.*,

19   governs the *Noerr-Pennington* analysis in cases where the defendant is accused of

20   bringing a series of cases.  *See* 31 F.3d at 810-11.  Contrary to Venali's argument,

21   however, the Ninth Circuit never suggested that the merits of the lawsuits are

22   irrelevant.  Rather, the Court noted that "nothing in *California Motor Transport*

23   retreated from the principle that unprotected activity must lack objective

24   reasonableness . . . regardless of intent or purpose." *Id.* at 810 (quoting *P.R.E.* at

25   58.)  *Contra Costa* merely stands for the proposition that "the fact that a small

26   number in the series of lawsuits turn out not to be frivolous will not be fatal to a

27   claim under *California Motor Transport.*" *Id.* at 811.  The series, as a whole, must

28

-5-

SULLIVAN & CROMWELL LLP

1  still be objectively baseless.  *See P.R.E.* at 58 ("We have described a sham as

2  evidenced by repetitive lawsuits carrying the hallmark of *insubstantial* claims.")

3  (emphasis in original) (internal quotation marks omitted); *Avery Dennison Corp.*,

4  2000 WL 986995 at *22  ("Without any information regarding the merits of the

5  lawsuits, this Court cannot determine 'whether the legal filings were made, not out

6  of a genuine interest in redressing grievances, but as part of a pattern or practice of

7  successive filings undertaken essentially for purposes of harassment.'") (quoting

8  *Contra Costa*, 31 F.3d at 811).  This reading of *Contra Costa* is confirmed by the

9  Court's application of its holding in that case.  *See Contra Costa*, 31 F.3d at 811

10 (holding that fifteen successful suits out of twenty-nine filed was sufficient to

11 demonstrate the suits had merit and thus *Noerr-Penington* immunity applied).

12         The district courts in the Ninth Circuit that have applied *Contra Costa*

13 have likewise looked at the objective merit of the actions to determine if a pattern

14 and practice of baseless petitioning existed. *See, e.g., Avery Dennison Corp.* v.

15 *Acco Brands, Inc.*, 2000 U.S. Dist. LEXIS 3938, No. CV-99-1877DT (MCX),

16 2000 WL 986995, at *22 (C.D. Cal. Feb. 22, 2000) ("without any information

17 regarding the merits of the lawsuit," the court could not conclude that defendant

18 engaged in a "pattern and practice of baseless filings."); *In re Circuit Breaker*

19 *Litig.*, 984 F. Supp. 1267, 1273 (C.D. Cal. 1997) (citing *Contra Costa* and applying

20 objective baselessness standard of *PRE* to multiple government petitions); *Gen-*

21 *Probe, Inc.* v. *Amoco Corp. Inc.*, 926 F. Supp. 948, 959 (S.D. Cal. 1996) ("under

22 either the *PRE* or *USS-POSCO [Contra Costa]* test, [plaintiffs] must demonstrate

23 objective baselessness" of lawsuits.).

24         Venali's reliance upon *Primetime 24 Joint Venture* v. *National*

25 *Broadcasting Co.*, 219 F.3d 92 (2d Cir. 2000) is misplaced, principally because

26 *Primetime* analyzed the "series of lawsuits" exception in the context of Rule

27 12(b)(6) motion, not at summary judgment.  As such, and similar to this Court's

28

-6-

1  ruling on j2 and Catch Curve's motion to dismiss, the *Primetime* Court was

2  concerned only with whether there were sufficient allegations to state a claim.  In

3  fact, the Court went on to expressly state that only if proven would the alleged

4  facts be sufficient to overcome *Noerr-Pennington* immunity.  Because Venali has

5  not presented any facts to this Court to create a disputed issue of fact regarding the

6  other lawsuits in the alleged "series of lawsuits," Venali's claim fails as a matter of

7  law.  Furthermore, in interpreting *Primetime*, other courts have acknowledged that

8  the facts there, which included the serial and automatic filing of *thousands* of

9  statutory challenges, render it inapplicable to cases involving a more reasonable

10 number of lawsuits.  *See In re Terazosin Hydrochloride Antitrust Litig.*, 335 F.

11 Supp. 2d at 1367.

12        **2.**   ***Substantial Success in a Series of Lawsuits Is Sufficient To***
   ***Overcome the "Series of Claims" Exception to* Noerr-**

13              **Pennington *Immunity.***

14       Furthermore, Venali cannot meet the test it advocates.[2]  Venali offers

15 no admissible evidence whatsoever to support its assertion that j2 or Catch Curve

16 brought any litigation without any regard for the potential outcome of the

17 litigation.  In fact, the undisputed evidence demonstrates that Catch Curve has been

18 singularly successful in enforcing the AudioFax Patents.  Venali offers no evidence

19 that even one lawsuit previously brought by j2 or Catch Curve was dismissed by

20 any court for failure to state a claim or otherwise.  Nor does Venali offer evidence

21 that either j2 or Catch Curve was sanctioned in any case, or that any of the Patents-

22 in-Suit were held invalid, unenforceable, or not infringed in any prior litigation.

23 Venali does not offer any evidence that any court that has considered any of the

24 infringement litigation has found anything at all wrong or questionable about any

25 case brought by j2 or Catch Curve.  In fact, Venali argues the opposite — that the

26 _____

   [2]    Conceding as much, Venali later argues that "it is the merit of the present

27 suit, not that of any other, that matters for purposes of the objective
   baselessness test." (Opp. at 13.)

28

-7-

1   fact that no court has ever conducted a *Markman* hearing or dismissed a Catch

2   Curve claim is evidence that the litigation is a sham.  (Opp. at 13.)  This Court

3   should reject such nonsense in favor of the uncontroverted facts.

4   The uncontroverted evidence concerning the other lawsuits is that

5   nearly all of them resulted in settlements in which the defendants purchased

6   licenses.  Venali asks the Court to infer that the settlements somehow demonstrate

7   that the suits were objectively baseless, but it is nonsensical to conclude that "a

8   plaintiff who has filed suit and receives the relief sought (*e.g.*, monetary

9   compensation, a change in conduct, etc.) could only have been deemed to have

10   "won" under *P.R.E.* if it continued to litigate the case and received a favorable

11   judgment from the court." *In re Terazosin*, 335 F. Supp. 2d at 1358 n.13; *see also*

12   *PRE*, 508 U.S. at 62 n.5 ("A winning lawsuit is by definition a reasonable effort at

13   petitioning for redress and therefore not a sham.").  In fact, the licenses and

14   settlements, particularly in light of the complete lack of evidence to the contrary,

15   prove that j2 and Catch Curve had reasonable expectations that bringing similar

16   infringement claims would lead to a successful outcome.[3]  That is all that is

17   necessary to secure *Noerr-Pennington* immunity.  *PRE*, 508 U.S. at 60.

18   **C.     This Litigation Is Not Objectively Baseless.**

19   Although Catch Curve's patent infringement claim in this case was

20   unsuccessful based upon this Court's construction, that fact does not alone provide

21   a basis for overcoming *Noerr-Pennington* immunity.  *See PRE*, 508 U.S. at 56-57,

---

[3]   For example, Venali begs the Court to disregard the $4 million (plus a 10% running royalty) license purchased by CallWave just weeks before the *Markman* hearing in this matter and based on nearly identical facts and record.  (Opp. at 10.)  Although technically true that the license covers j2's entire patent portfolio, there is no evidence whatsoever to support Venali's contention that CallWave attributed *no value* to the AudioFax Patents (in fact, since the only active litigation at the time of the settlement concerned those patents, Venali's speculation is highly implausible).  Having strategically chosen not to take discovery from CallWave, or any other licensee for that matter, Venali cannot now offer its unsupported contentions that each license was entered into without regard to the value of the Patents.

-8-

SULLIVAN & CROMWELL LLP

60 n.5; *California Motor Transport*, 404 U.S. at 510.  Rather, Venali must prove, by clear and convincing evidence, that Catch Curve's claims were objectively baseless.  *PRE*, 508 U.S. at 60-61; *White* v. *Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000); *Handgards, Inc.* v. *Ethicon, Inc.*, 601 F.2d 986, 996 (9th Cir. 1979).

Stated differently, to meet this high bar, Venali must prove that no reasonable litigant could have believed that Catch Curve had probable cause to institute this litigation.  Probable cause to bring a claim, which is an absolute defense, requires merely that a reasonable patent owner in j2/Catch Curve's position "could have believed that had *some* chance of winning an infringement suit."  *PRE*, 508 U.S. at 64-65 (emphasis added); *see also id*. at 62-63 ("Probable cause to institute civil proceedings requires no more than a 'reasonable belief that there is a chance that a claim may be held valid upon adjudication.'").

Venali offers no admissible record evidence to support its claim that Catch Curve's position was objectively baseless.  (*See* Opp. at 12-14.)[4]  In fact, Venali invites this Court to err by finding that Catch Curve's claims were objectively baseless due solely to the fact that Catch Curve did not prevail.  (Opp. at p. 12.)  As the Supreme Court has emphasized, "a court must resist the understandable temptation to engage in *post hoc* reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation."  *Id.*, 508 U.S. at 60 n.5; *see also C.R. Bard, Inc.*, 157 F.3d at 1369 ("Neither the bringing of an unsuccessful suit to enforce patent rights, nor the

---

[4]   Venali attacks Catch Curve and j2's evidence, but, once again forgetting which party bears the burden of proof on these issues, fails to offer any admissible evidence to support its claims.  For example, Venali attempts to diminish the value of statements made by its outside patent counsel when evaluating the AudioFax Patents and providing an opinion of non-infringement, claiming that these statements were made after "a five minute perusal."  (Opp. at 13-14.)  Of course, there is no evidence in the record to support Venali's statement concerning how long its counsel considered the patents.  Absent any such evidence, Venali cannot avoid summary judgment. *See Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *Brinson* v. *Linda Rose Joint Venture*, 53 F.3d 1044, 1048 (9th Cir. 1995).

-9-

1    effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust

2    liability.").

3            Further, j2 and Catch Curve submitted voluminous evidence

4    supporting the good faith basis for bringing the lawsuit.  (*See,* Mot. at 6-8.)  As

5    demonstrated at the *Markman* hearing and when opposing Venali's summary

6    judgment motion, although Catch Curve's position was rejected, it was based on

7    the language of the patent claims and supported by substantial briefing and an

8    unrebutted expert declaration.[5]  This evidence establishes probable cause to bring

9    the lawsuit, which prohibits a finding that it was objectively baseless.  "[A] proper

10   probable-cause determination irrefutably demonstrates that an antitrust plaintiff has

11   not proved the objective prong of the sham exception and that the defendant is

12   accordingly entitled to *Noerr* immunity."  *PRE,* 508 U.S. at 64.

13   **D.     This Litigation Is Not Subjectively Baseless.**

14           Even if a lawsuit is objectively baseless, it remains subject to *Noerr-*

15   *Pennington* protection unless it is "an attempt to interfere directly with the business

16   relationships of a competitor through the use of [the] governmental *process* — as

17   opposed to the *outcome* of that process — as an anticompetitive weapon."  *PRE,*

18   508 U.S. at 60-61 (internal quotation marks and citations omitted).

19           Venali offers a laundry list of items in an attempt to raise a factual

20   question regarding j2 and Catch Curve's subjective state of mind in bringing this

21   action.  Venali's list is noticeably devoid of factual support in the record and is

22   mostly irrelevant, and in any event, comes nowhere near satisfying Venali's burden

23

24   _____
     [5]     In its procedurally defective response to Catch Curve's Statement of

25   Undisputed Facts, Venali attacks the expert declaration submitted by
     Professor Nicholas Bambos and inexplicably states that the submission of

26   the expert report demonstrating that one skilled in the art finds Catch
     Curve's position to be objectively reasonable is somehow evidence of bad

27   faith.  In fact, Professor Bambos' unrebutted expert testimony conclusively
     establishes that Catch Curve had probable cause for bringing its action

28   against Venali.  (*See* Decl. of Professor Nicholas Bambos.)

                                         -10-

1  to identify facts sufficient to establish, by clear and convincing evidence, that the

2  suit was brought to interfere with Venali's business relationships through the use

3  of the governmental process.

4          **1.**    ***The claims and specification offered support for Catch***

5  ***Curve's proposed claim construction.***

6        First, Venali argues, based on the claims and specification, that j2 and

7  Catch Curve knew their position had absolutely no merit. (Opp. at 4.)  Venali is

8  wrong.  Although the Court disagreed with Catch Curve's proposed claim

9  construction, that construction was reasonable and asserted in good faith.  No

10  fewer than five different law firms have concluded, under strictures of Rule 11,

11  that the position Catch Curve advanced in this case had some chance of success.

12  There is good reason for that conclusion.

13        *First*, it finds support in the language of the claims.  Although Venali

14  asserts that the Patents-in-Suit are strictly limited to fax-to-fax communications, in

15  fact there are numerous claims in which a fax message is converted and transmitted

16  in a different format.  (*E.g.*, '302 Patent [Docket No. 93, O'Keefe Declaration, Ex.

17  B] at 4:44 *et seq*. & 11:6 *et seq*.)  Even in the earliest, originally filed application,

18  there was a claim in which a fax was sent from a fax machine to a SAFF over the

19  PSTN, but from the SAFF to a recipient via an unspecified medium.  (Original

20  '926 Application[6] at 29-30.)  Moreover, the limitation that transmission from the

21  SAFF to the recipient be via facsimile protocol is expressly recited in some claims,

22  such as Claim 69 of the '021 Patent.  Catch Curve's position that "facsimile

23  protocol" should not be read into every other claim because doing so would render

24  it redundant in Claim 69 was supported by caselaw, and certainly was not baseless.

25

26  ───────────────

[6]     The portion of the file history with the original application is attached to the

27  Declaration of Edward E. Johnson in Opposition to Venali, Inc.'s Motion for

28  Attorneys Fees, filed concurrently herewith.

-11-

SULLIVAN & CROMWELL LLP

1 | *See Intertrust Techs. Corp.* v. *Microsoft Corp.*, 275 F. Supp. 2d 1031, 1055 (N.D.
2 | Cal. 2003).

3 |        *Second*, Catch Curve's argument that the claims should not be limited
4 | by the specification was supported by Federal Circuit law. The specification
5 | describes only embodiments that utilize traditional fax machines to receive and
6 | transmit facsimile messages. But, the circumstances under which it is appropriate
7 | to read limitations from the specification into the claim terms are notoriously
8 | murky, and numerous Federal Circuit decisions caution against confining claims to
9 | what is disclosed in specification. *See, e.g., Ventana Med. Sys., Inc.* v. *Biogenex*
10 | *Labs., Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006); *Phillips* v. *AWH Corp.*, 415 F.3d
11 | 1303, 1323 (Fed. Cir. 2005); *Nystrom* v. *Trex Co., Inc.*, 374 F.3d 1105, 1111 (Fed.
12 | Cir. 2004); *Comark Commc'n, Inc.* v. *Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed.
13 | Cir. 1998).

14 |      **2.**     ***The prosecution history did not limit the claims.***

15 |        Venali next wrongly contends that Catch Curve's position is
16 | "irreconcilable" with the prosecution history. (Opp. at 4-5.) In fact, Catch Curve
17 | had a reasonable argument that the prosecution history should not limit the claims.
18 | Venali relies on the applicants for the '926 Patent distinguishing the Bishop
19 | reference by noting that "Bishop's system cannot accept, process, or communicate
20 | a message originating from a fax machine," and, similarly, to examiner's notes
21 | stating that Bishop "discloses only a one-way communication system from a TTY
22 | to a fax machine." (Opp. at 4-5.) Although the Court's *Markman* ruling construed
23 | this disclaimer very broadly — as evidence that "Catch Curve used the distinction
24 | between fax and other protocols to obtain its patents" (*Markman* Order at 14) — a
25 | narrower reading, which is consistent with Catch Curve's proposed construction, is
26 | certainly plausible. As the quoted passages make clear, Bishop did not disclose
27 | originating a message from a fax machine — rather, Bishop disclosed a system in
28 |

-12-

1   which messages originated from telex devices and were sent to fax machines.

2   Thus, the file history can reasonably be read as distinguishing the Patents-in-Suit

3   from systems in which the message does not originate from a fax machine.  Catch

4   Curve has never asserted that the Patents-in-Suit disclose a system in which the

5   originating message is not from a fax machine.[7]

6         **3.   *The prior litigation between JFAX and AudioFax does not
7   establish bad faith in this litigation.***

8         Venali, once again incorrectly, contends that the fact that j2's

9   predecessor was sued by AudioFax on the Patents-in-Suit and denied in its initial

10  disclosures that the Patents cover fax-to-email technology somehow renders Catch

11  Curve's position baseless.  (Opp. at 6-7.)  These mandatory disclosures — filed

12  prior to the commencement of discovery — are irrelevant.  Companies charged

13  with infringement frequently (if not always) initially claim that they do not infringe

14  and that the patent is invalid and/or unenforceable.  *See Argus Chem. Corp.* v.

15  *Fibre Glass-Evercoat Co., Inc.*, 812 F.2d 1381, 1386 (Fed. Cir. 1987).  Absent

16  unusual circumstances, to do otherwise would be reckless; those issues are

17  contested in nearly every patent case, and the defendant must preserve those

18  contentions until it has had adequate time to take discovery, analyze the patents,

19  and make an informed decision about what defenses to pursue.

20        Moreover, there is nothing inherently improper about asserting

21  different or inconsistent positions in different litigations.  Litigants are expected to,

22  and their counsel required to, assert non-frivolous arguments in support of their

23  interests.  If (as j2 and Catch Curve believe) reasonable minds could differ about

24  the proper scope the Patents-in-Suit, then it was entirely proper both for JFAX to

25  _____

26  [7]    As further evidence that Catch Curve's construction was reasonable,
    correspondence between Venali and its outside patent attorneys indicates
27  that the outside attorneys had concerns that Venali infringed the Patents-in-
    Suit.  (Memo. in Support of Motion for Partial Summary Judgment, Docket
28  No. 137, at 12-13.)

-13-

1    assert that the Patents-in-Suit were fax-to-fax patents, and for Catch Curve to

2    assert, years later in a different lawsuit, that they extended to fax-to-email systems.

3          Even passing those problems, the notion that JFAX's initial

4    disclosures establish that JFAX believed it would be frivolous to assert that the

5    Patents-in-Suit cover Internet fax services is completely undermined by j2's

6    subsequent actions.  j2 paid $1 million to license the Patents-in-Suit, and then,

7    three years later, paid millions more to purchase them.  These actions are far more

8    telling than boilerplate initial disclosures.  It is nonsensical to claim that j2 would

9    license (for a very substantial amount of money) and then purchase a portfolio of

10   patents if it believed that there was no good faith basis to assert them.

11       **4.**     ***Venali's arguments that j2 "stealthily" used Catch Curve or anticompetitive sales practices are nonsense.***

12

13         Venali offers a throw-away argument that j2 hid its ownership of

     Catch Curve and that this justifies piercing *Noerr* immunity.  (Opp. at 7-8.)  Venali

14   refers to a statement by j2's president in a conference call, which is indisputably

15   accurate, to support this ridiculous claim.  Venali cannot point to any legal

16   obligation to disclose the ownership of Catch Curve, and makes no effort to

17   connect this alleged "deception" to any issue in the case.  It must be disregarded.

18         Similarly, Venali's contention that a single email from j2's third-party

19   sales agent constitutes an anticompetitive sales practice is absurd.  (Opp. at 11-12.)

20   The third party's email was accurate in every material respect (the only mistake

21   was that he said three lawsuits were pending against Venali when only two

22   lawsuits were pending) and there is nothing improper about notifying a potential

23   customer of pending litigation.  And, in any event, this email, like the statement by

24   j2's president in a conference call, has nothing to do with the issues in this case.

25

26

27

28

-14-

SULLIVAN & CROMWELL LLP

5.     ***The licensing history demonstrates that Catch Curve's
position was subjectively reasonable.***

As discussed above, the consistent success of Catch Curve (and the
prior owner) in licensing the Patents-in-Suit completely undermines Venali's
contention that Catch Curve brought this case to interfere with Venali's business
through the process of litigation, rather than to win the lawsuit.  Venali contends
Catch Curve's success is actually "extortion," based on the fact that many of the
licenses cost less than the purported cost of litigating a patent case.  (Opp. at 8-11.)
That contention fails.

*First*, Venali offers no evidence to support its contention.  Venali
identified no witness to testify as to the other j2/Catch Curve licenses.  Venali did
not depose a single witness concerning these licenses.  Venali also offers no
documents regarding these licenses.  Absent any admissible evidence to support
Venali's contentions, they must be rejected.  *Matsushita*, 475 U.S. at 586-87.

*Second*, several Internet fax companies have paid large sums for
licenses, including j2 itself, which paid $1 million — hardly a nuisance
settlement.[8]  And Venali is incorrect that "almost all" of the licenses for over
$500,000 "were during the AudioFax licensing era."  (Opp. at 9.)  Since Catch
Curve purchased the patents in early 2005, it has licensed nine companies for
$500,000 or more.  (Declaration of Douglas L. O'Keefe in Support of Venali's
Opposition to Summary Judgment ("O'Keefe Decl. i/s/o MSJ"), Ex. G.)

In particular, in 2006 Callwave, Inc. settled two cases pending before
this Court by taking licenses to the AudioFax Patents, as well as four other patents
owned by j2 that are not at issue here, for $4 million plus a running royalty of 10%
on CallWave's Internet fax revenue.  (*Id.* ¶ 25.)  CallWave entered into the

---

[8]     Highlighting Venali's inconsistency, at the same time that is implores the
Court to ignore the $1 million j2 paid for a license to the Patents-in-Suit,
Venali characterizes the "over one million dollars" it allegedly incurred in
litigation costs in this case as "enormous."  (Mot. for Attorneys Fees at 1, 6.)

-15-

1  settlement when the claim construction issues were fully briefed and with the

2  *Markman* hearing in this Court just two weeks away.  (*Id.* ¶ 26.)  It is difficult to

3  imagine why CallWave would have paid $4 million for a license just days before

4  the hearing if it believed that no reasonable person could disagree with its

5  position.[9]

6         *Third*, Venali suggests there is something sinister about entering into a

7  license for anything less than the millions of dollars it can cost to try a major patent

8  case.  (Mot. at 11.)  That ignores the obvious reason for the relatively small size of

9  many of Catch Curve's licenses:  Catch Curve is licensing small companies.

10 Internet fax makes up a relatively small portion of the facsimile communications

11 market, and most of the companies offering Internet fax services have modest

12 revenues.  The modest revenues limit the amount of potential damages and make it

13 economically sensible for both parties to settle for relatively small amounts, not

14 because the claims lack merit, but because there is simply a limited amount of

15 money at stake.  It is not surprising that many of the earlier licenses entered into by

16 AudioFax were for much larger amounts of money given that the licensees were

17 often very large companies, such as Sprint and AT&T.

18        In short, Venali invites this Court to speculate, without evidence or

19 legal authority, that Catch Curve's undeniable success in licensing the Patents-in-

20 Suit is actually evidence of nefarious intent.  No jury could properly so speculate,

21 and neither should this Court on summary judgment.

22     **6.     *j2 and Catch Curve have not engaged in vexatious conduct in
             this litigation.***

23

24        Finally, Venali argues that Catch Curve and j2 engaged in "vexatious"

25 conduct in this case and that this conduct is evidence of their desire not to win the

26

27 [9]    Venali's criticism of Catch Curve's reliance on the CallWave license is
        addressed above at n.3.

28

-16-

1  case, but to harm Venali. (Opp. at 12.) The only evidence cited by Venali is the
2  fact that Catch Curve included additional claims under a doctrine of equivalents
3  theory after the Court's initial *Markman* Order. Venali offers no evidence
4  whatsoever to show that this "conduct" harmed Venali in any way. In fact, Venali
5  conducted no discovery and filed no briefs related to the doctrine of equivalents.
6  Given the lack of record evidence to support this assertion, it cannot be used to
7  avoid summary judgment.

8         Further, Venali is factually wrong. The increase was due not to Catch
9  Curve disregarding the *Markman* order, as Venali suggests, but to Catch Curve
10 *acknowledging* the Order, and therefore shifting to a doctrine of equivalents theory
11 that swept in more claims than had its previous direct infringement theory. Upon
12 further investigation, including limited discovery, Catch Curve determined that the
13 doctrine of equivalents theory was not viable, and dropped it — an action which
14 directly contradicts Venali's claim that Catch Curve proceeded in bad faith.

15 **III.  Even if Venali Overcomes *Noerr-Pennington* Protection, Venali Has
16       Failed To Create a Triable Issue of Fact as to Market Definition or
         Market Power.**

17         **A.    There Is No Evidence That the Alleged Misconduct at Issue
18                 in This Case Has Harmed Competition.**

19         Venali's antitrust claims must be dismissed because Venali has failed
20 to come forward with any evidence that the alleged misconduct at issue in this case
21 — litigation brought by Catch Curve — has had any effect on competition.
22 Venali's attempts to avoid this fundamental problem fail.

23         *First*, Venali cites the conclusion of Dr. Richard Smith, its purported
24 economics expert, that j2 customers pay $9.36 more than they would in a
25 competitive market. (Opp. at 25-26.) Passing the myriad other deficiencies in Dr.
26 Smith's analysis, he admits that he made no effort to determine whether any such

27

28

-17-

SULLIVAN & CROMWELL LLP

1  premium is connected to litigation brought by Catch Curve. (Smith Dep.[10] at 57.)

2  In fact, Dr. Smith's analysis was based in part on events that occurred *before* j2

3  acquired the AudioFax Patents and therefore could not possibly be connected to

4  Venali's current theory of harm to competition. (O'Keefe Decl. i/s/o MSJ, Ex. M

5  [Expert Report of Dr. Richard Smith] at, *e.g.*, ¶¶ 28, 29.)

6       *Second*, Venali claims that CallWave raised its prices as a result of

7  litigation with Catch Curve. (Opp. at 26.)  Venali has offered no evidence, taken

8  no depositions, and offered no documents to substantiate its allegations with

9  respect to CallWave's pricing.  Rather, Venali's assertion is based exclusively on a

10 statement in the Davidson Report, which is inadmissible hearsay, and which does

11 not even purport to be anything other than a guess.  An unsupported guess is not

12 enough to create a triable issue of fact regarding the reason for CallWave's

13 supposed price increase. *Matsushita*, 475 U.S. at 586-87.

14      *Third*, Venali speculates that customers are "immobilize[ed]"

15 "through fear of service interruption" and competitors are "diminish[ed]" by

16 litigation costs. (Opp. at 26.)  But Venali fails to cite any evidence in support of its

17 speculation; the entire paragraph, in fact, does not cite a single piece of evidence.

18      *Fourth*, Venali argues that it does not need to prove that Catch

19 Curve's litigation caused any injury to competition — it is enough that, by forcing

20 Venali to incur litigation expenses, the litigation injured Venali. (Opp. at 25-27.)

21 It is well established, however, that "the antitrust laws' prohibitions focus on

22 protecting the competitive process and not on the success or failure of individual

23 competitors." *Cascade Health Solutions* v. *PeaceHealth*, 515 F.3d 883, 902 (9th

24 Cir. 2008); *see also Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477,

25

26 [10]   The portions of the transcript of the deposition of Dr. Richard Smith cited
       herein were attached as Exhibit 24 to the Declaration of Edward E. Johnson
27     submitted with j2 and Catch Curve's Motion for Summary Judgment, at
       Docket No. 137.
28

-18-

SULLIVAN & CROMWELL LLP

1  489 (1977).  Venali's position, if adopted, would make any malicious prosecution

2  claim based on a patent suit into an antitrust case.  That is not the law.  *Prof'l Real*

3  *Estate Inv., Inc.* v. *Columbia Pictures, Inc.*, 508 U.S. 49, 61 (1993).[11]

4         In short, Venali lacks any evidence whatsoever to support its claims,

5  and j2 and Catch Curve are entitled to summary judgment.

6         **B.     Venali Offers No Support for Its Market Definition.**

7         Venali's Opposition points to no record evidence supporting the

8  alleged "SOHO internet fax" market.  Rather, it simply rehashes the inadequate

9  "analysis" of its expert, Dr. Smith.  With respect to whether Internet facsimile

10 services have reasonable substitutes (such as a traditional fax machine), both Dr.

11 Smith and Venali simply list differences in features that could, in theory, lead to

12 distinct markets, without pointing to any evidence that those differences do, in fact,

13 lead to distinct markets.  (Opp. at 20-21; O'Keefe Decl. i/s/o MSJ, Ex. M [Expert

14 Report of Dr. Richard Smith] at ¶¶ 43-44.)  An expert opinion without any

15 evidentiary basis is not sufficient to survive summary judgment.  *See Guidroz-*

16 *Brault* v. *Missouri Pac. R.R. Co.*, 254 F.3d 825, 831 (9th Cir. 2001) ("in the

17 context of a motion for summary judgment, an expert must back up his opinion

18 with specific facts" (quoting *U.S.* v. *Various Slot Machines on Guam*, 658 F.2d

19 697, 700 (9th Cir.1981)).

20         The principal case upon which Venali relies, *Greyhound Computer*

21 *Corp.* v. *Int'l Business Machines Corp.*, 559 F.2d 488 (9th Cir. 1977), illustrates

22 the inadequacy of its showing.  (Opp. at 20.)  In *Greyhound*, the Court held that the

23 plaintiff had offered sufficient evidence of a distinct computer leasing market,

24 "though by no great margin," where it offered testimony that different kinds of

25 ───────────────

[11]   Venali relies on *Cascade Health Solutions* for the proposition that an
26     adverse effect on competition is not part of the anticompetitive conduct
       element (Opp. at 25), but that case merely confirms that, whichever element
27     it goes in, a plaintiff must show that the allegedly anticompetitive conduct
       had an adverse effect on competition.  515 F.3d at 910 n.21.
28

-19-

SULLIVAN & CROMWELL LLP

1  companies lease rather than purchase computers; that a single company may

2  purchase computers for some tasks and lease for others; and that the decision to

3  purchase or lease may not be affected by price changes. *Id*. at 494-95. In contrast,

4  Venali points to no testimony or documents that support its proposed market.

5  (Opp. at 20.)  This is unsurprising, as no such documents or testimony exist.

6         With respect to whether business customers are in the same market as

7  individual customers, Venali completely ignores that Internet facsimile services are

8  essentially the same whether sold to individuals or businesses. (*Id*. at 21.) Thus, a

9  company selling Internet facsimile services to businesses could easily shift

10  capacity to serve individuals should prices rise to a supracompetitive level. That

11  compels the conclusion that individuals and businesses are in the same market as a

12  matter of law. *See Rebel Oil Co.* v. *Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th

13  Cir. 1995) ("If producers of product X can readily shift their production facilities

14  to produce product Y, then the sales of both should be included in the relevant

15  market.").[12]

16         **C.     Venali Has No Direct Evidence of Market Power.**

17         Venali's "direct evidence" of market power largely consists of its

18  expert witness's unsupported opinion that j2's ability to charge relatively high

19  prices and raise its prices establish that j2 has market power. (Opp. at 16.) As an

20  initial matter, that opinion is unreliable and should be excluded.[13] Moreover,

21  neither Venali nor Dr. Smith points to a shred of evidence that j2's prices result

22  from anticompetitive conduct involving sham litigation, as opposed to a superior

23  _____

[12]   Instead of addressing that basic point, Venali's opposition claims that larger
24     customers are able to negotiate volume discounts unavailable to smaller
       customers. That is the case with virtually any product and does not, by
25     itself, make smaller customers a separate market. Venali also mentions the
       Davidson Report and Dr. Smith's flawed "price elasticity analysis," both of
26     which are addressed below. (Opp. at 21.)

27  [13]   *See* Catch Curve and j2's Motion to Strike and/or Exclude Testimony from
       Dr. Richard Smith, at 12-16.
28

-20-

SULLIVAN & CROMWELL LLP

1  product and brand.[14]  That failure is unsurprising given that it is undisputed that

2  there are over thirty competitors in the alleged market, virtually all of whom

3  charge less than j2 and provide alternatives to customers purchasing Internet fax

4  services.  (Venali's Statement of Genuine Issues of Fact, at ¶ 39 (objecting to the

5  assertion but not disputing it).)

6         Even if it were possible to trace j2's prices to something improper, Dr.

7  Smith's opinion ignores the power to reduce output, which, as Venali apparently

8  concedes, is necessary to establish direct evidence of market power.  (Opp. at 17);

9  *Forsyth* v. *Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997).  Venali argues that

10  j2 reduces output by "locking in" customers to its free service.  (Opp. at 17.)  That

11  argument fails for several reasons.

12         *First*, Venali cites no authority suggesting that output is reduced in an

13  economic sense when a customer chooses to pay less for a service for fewer

14  features.  Reduced output matters from an antitrust standpoint because it enables

15  firms to charge more for the same product or service.  That is fundamentally

16  different from charging less for less of a product or service, which j2 does with its

17  free service and which simply gives customers more choice.

18         *Second*, Venali has no evidence that customers are "locked in" to j2's

19  free service, other than a single statement by a j2 witness that customers "can

20  become attached to the number."  (Opp. at 17.)  This statement falls far short of

21  creating a triable issue of fact, particularly given that the same witness expressly

22  rejected the suggestion that customers are "locked in."  (O'Keefe Decl. i/s/o MSJ,

23  Ex. E [Turicchi Dep.] at 83.)  The only concrete evidence in the record (ignored by

---

14  Venali does not dispute that charging a higher price based on a premium
brand name is not anticompetitive, but claims that it is "preposterous" that j2
is able to command a premium price based on its brand name, as Philip
Morris does.  (Opp. at 17.)  Venali cites no evidence in the record for that
assertion, which in any event is nonsense.  The Internet facsimile business
has only been in existence for roughly a decade, so it is unsurprising that j2
was able to build a premium brand in that time.

-21-

SULLIVAN & CROMWELL LLP

1    Venali) is that among j2's customers who switch from the free to the paid service,

2    roughly two thirds could not have opted to stay with j2 due to the switching cost

3    associated with changing their fax numbers, because they chose to change their fax

4    numbers when they upgraded to the paid service.  (O'Keefe Decl. i/s/o MSJ, Ex. O

5    at 38.)

6            *Third*, even if subscribers to j2's free service were "locked in," there

7    is no evidence that would give j2 market power or deter entry into the alleged

8    market.  Once again, the only evidence in the record establishes the opposite.  Less

9    than 10% of j2's paying customers switched from its free service.[15]  It defies logic

10   to suggest, as Venali does, that j2 charges a high price because it has already

11   locked in its customers when, in fact, barely any of its new customers were "locked

12   in."

13           **D.      Venali Has No Circumstantial Evidence of Market Power.**

14           Venali contends that j2 "dominates the market" based almost

15   exclusively on its assertion that j2's market share is 70%.  (Opp. at 22-23.)  In

16   addition to contradicting Venali's own expert (who calculated a market share of

17   only 44.2%, O'Keefe Decl. i/s/o MSJ, Ex. M at ¶ 54) the calculation is not based

18   on admissible evidence and must be discarded.  The 70% figure is based on the

19   size of the total alleged market claimed in the most recent Davidson Report.  But,

20   that report is not admissible evidence.  Venali did not identify Mr. Davidson as a

21   witness or as someone with relevant knowledge of this dispute, did not depose Mr.

22   Davidson, and offers no evidence whatsoever from any admissible source as to

23   what the Davidson Report consists of or how it is created.  Even accepting Dr.

24   _____

25   [15]   *See* O'Keefe Decl. i/s/o MSJ, Ex. E at 81.  Venali asserts that this figure is
        incorrect because documents produced by j2 show that j2 added a *net* of
26      55,000 customers from 2006 through the middle of 2008, and over the same
        period more customers than that upgraded to the paid service.  (Opp. at 23.)
27      Without information about the number of cancellations in that period,
        however, it is impossible to calculate the percentage of *gross* new customers
28      that converted from the free service.  Venali's numbers are meaningless.

-22-

SULLIVAN & CROMWELL LLP

1  Smith's statements about the Davidson Report, allegedly based on a conversation

2  that he had with Mr. Davidson, which itself introduces two levels of inadmissible

3  hearsay, the Davidson Report is based on nothing more than Mr. Davidson (i)

4  calling various Internet fax companies and asking what their revenue is, and (ii)

5  outright guessing at the revenue of other Internet fax companies.[16]  It is

6  inadmissible hearsay and Venali's calculations based upon it must be disregarded.

7      Venali does not argue that the Davidson Report is not hearsay, but

8  claims that j2's expert, Dr. Howell, also relies on it.  (Opp. at 21 n.3.)  That is

9  incorrect.  As Dr. Howell's report makes clear, she does not accept the reliability

10  of the Davidson Report.  Rather, she occasionally refers to it for the sake of

11  argument, to establish that *even if* it were reliable, j2 does not have market power.

12  (O'Keefe Decl. i/s/o MSJ, Ex. O [Howell Report] at 6 n.9 ("I have referred to the

13  Davidson Report data in this report in order to respond to Professor Smith.").)  In

14  any event, it is inadmissible regardless of who relies on it.  Nor does it matter that,

15  according to Venali, the Davidson Report is "the best evidence available."  (Opp.

16  at 21 n.3.)  Inadmissible evidence does not become admissible simply because the

17  party proffering it does not have alternative evidence to offer.

18      Likewise, Venali fails to point to evidence that there are barriers to

19  entry or expansion in the alleged market, instead relying on speculation that

20  potential entrants are scared off by j2's free customers or the possibility of a

21

22  [16]  *See* Smith Dep. (Ex. 2 to the Declaration of Edward E. Johnson in support of
Catch Curve and j2's Motion to Strike and/or Exclude Testimony, Docket
No. 145-2) at 130-31.  j2 and Catch Curve have no information about Mr.
Davidson's methodology other than what Dr. Smith (Venali's antitrust
expert) told them, because Venali failed to identify Mr. Davidson as a
person with knowledge of relevant information, despite its reliance (revealed
after the close of fact discovery) upon his report both in this brief and in Dr.
Smith's report.  (Johnson Declaration in Support of Opposition to Motion
for Attorneys Fees, filed concurrently herewith, Ex. 1 (Resp. to Interr. No.
19).)  Thus, j2 and Catch Curve were unable to ask Mr. Davidson even basic
questions such as whether he has any financial interest in the content of the
report.  Venali's attempt to rely on hearsay is particularly unfair in these
circumstances.

-23-

SULLIVAN & CROMWELL LLP

1  lawsuit by j2. (Opp. at 23-24.)  It is undisputed, however, that there are more

2  competitors in the alleged market than there were when this litigation began in

3  2005. (Venali's Statement of Genuine Issues of Fact, ¶ 40.) And Venali has yet to

4  identify a single company that has been deterred from entering the market, by the

5  fear of litigation, lack of number portability, or anything else. (*Id.*) In the face of

6  this uncontroverted evidence that competitors can and do enter the alleged market,

7  Venali's speculation cannot create a triable issue of fact.

8                                                **CONCLUSION**

9                 For the foregoing reasons, j2 and Catch Curve respectfully request

10  that the Court enter summary judgment in their favor.

11

12  Dated:  September 30, 2008                    Respectfully submitted,

13

14                                                *Robert A. Sacks /EEJ*

15                                                Robert A. Sacks (SBN 150146)
                                                 Brian R. England (SBN 211335)
                                                 Edward E. Johnson (SBN 241065)
16                                                SULLIVAN & CROMWELL LLP
    Of Counsel:                                  1888 Century Park East
17  Jeffrey S. Gerchick                          Los Angeles, California 90067-1725
    KENYON & KENYON LLP                          (310) 712-6600
18  1500 K Street, N.W.                          (310) 712-8800 facsimile
    Suite 700
19  Washington, D.C.  20005-1257                 Frank L. Bernstein (SBN 189504)
    (202) 220-4200                               KENYON & KENYON LLP
20  (202) 220-4201 facsimile                     333 West San Carlos Street, Suite 600
                                                 San Jose, California 95110
21                                                (408) 975-7500
                                                 (408) 975-7501 facsimile
22
                                                 *Attorneys for Plaintiff and Counterclaim*
23                                                *Defendant Catch Curve, Inc. and*
                                                 *Third Party Defendant j2 Global*
24                                                *Communications, Inc.*

25

26

27

28

                                    -24-

SULLIVAN & CROMWELL LLP