**ORIGINAL**

1  MATTHEW D. POWERS (State Bar No. 104795)
   matthew.powers@weil.com
2  VERNON M. WINTERS (State Bar No. 130128)
   vernon.winters@weil.com
3  STEVEN C. CARLSON (State Bar No. 206451)
   steven.carlson@weil.com
4  WEIL, GOTSHAL & MANGES LLP
   Silicon Valley Office
5  201 Redwood Shores Parkway
   Redwood Shores, CA  94065
6  Telephone: (650) 802-3000
   Facsimile: (650) 802-3100
7
   Attorney for Defendant,
8  CALLWAVE, INC.

FILED
CLERK, U.S. DISTRICT COURT

OCT 1 3 2006

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

9

10                    UNITED STATES DISTRICT COURT                **FAXED**

11                    CENTRAL DISTRICT OF CALIFORNIA

12

13  CATCH CURVE, INC.,                    Case No. 2:05-cv-4819-DDP (AJW)

14              Plaintiff and Counter-
                Defendant,

15      v.                                Complaint Filed:  July 01, 2005
                                          Trial Date:       October 2, 2007
16  CALLWAVE, INC.,                       Hearing Date:     December 11, 2006

17              Defendant and Counter-    Hon. Dean D. Pregerson
                Claimant.
18

19

20

21

22                       CALLWAVE, INC.'S

23              OPENING CLAIM CONSTRUCTION BRIEF

24

25

26

27

28
    CALLWAVE'S OPENING CLAIM
    CONSTRUCTION BRIEF                     Case No. 04-07068-DDP (AJW)

OCT 2 5 2006

# TABLE OF CONTENTS

**Page**

I.    Introduction and Summary ................................................................. 1

II.   Background of the Technology ........................................................... 1

    A.    Communication protocols matter – they distinguish a facsimile
message from the sending of a telex, an email message, or some
other kind of transmission ........................................................... 1

    B.    Store and forward facilities ......................................................... 3

    C.    Modern fax-to-email technology ................................................ 4

III.  Analysis .............................................................................................. 4

    A.    The fax machine/device/message terms .................................... 5

        1.    A "fax machine" is a machine that transmits and receives
fax messages using fax protocol, not some other protocol
such as email ......................................................................... 5

            a.    The claim language ....................................................... 6

            b.    The specification ........................................................... 7

            c.    The prosecution history ................................................ 10

            d.    Prior statements:  Catch Curve's Bloomfield patent .... 11

        2.    The claims and the specification make clear that a
"paperless facsimile terminal machine" is a machine that
emulates fax terminals using fax protocol ............................... 12

        3.    "Facsimile protocol" means the standardized procedure
that governs the transmitting and receiving of facsimile
messages, and thus excludes other protocols ......................... 14

    B.    In '034 Patent, Claim 1, which requires a SAFF accessible
through a switched telephone network, a "call" is a request to
initiate communication over a switched telephone network .............. 16

    C.    The patentees defined "mailbox" to mean "a  storage file in the
mass storage of the Store and Forward Facility," a definition that
the claim language confirms .............................................................. 18

    D.    "Together with" means in the same mass storage device .................. 19

    E.    "Determining … if the particular call is a mailbox call" .................... 20

    F.    The SAFF terms and § 112(6) ........................................................... 21

        1.    The "mass storage means" limitations ..................................... 22

        2.    The "computer means" limitation ............................................. 23

        3.    The "store and forward facility" limitation .............................. 23

IV.   Conclusion ......................................................................................... 25

1 **TABLE OF AUTHORITIES**

2 **Page(s)**

3 **CASES**

4 *Aquatex Industries, Inc. v. Techniche Solutions,*
   419 F.3d 1374 (Fed. Cir. 2005).................................................................... 10

5

*Arthur A. Collins, Inc. v. Northern Telecom Ltd.,*
6    216 F.3d 1042 (Fed. Cir. 2000)................................................................... 15

7 *Biogen, Inc. v. Berlex Laboratoriess, Inc.,*
   318 F.3d 1132 (Fed. Cir. 2003).................................................................. 11
8

*C.R. Bard, Inc. v. United States Surgical Corp.,*
9    388 F.3d 858 (Fed. Cir. 2004)...................................................................... 9

10 *Elkay Manufacturing Co. v. Ebco Manufacturing Co.,*
   192 F.3d 973 (Fed. Cir. 1999), *cert. denied,* 529 U.S. 1066 (2000)............... 5
11

*General Creation LLC v. Leapfrog Enterprises,*
12    232 F. Supp. 2d 661 (W.D. Va. 2002) ........................................................ 22

13 *Genzyme Corp. v. Transkaryotic Therapies, Inc.,*
   346 F.3d 1094 (Fed. Cir. 2003)..................................................................... 9
14

*Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.,*
15    209 F.3d 1337 (Fed. Cir. 2000)............................................................. 9, 19

16 *Honeywell International, Inc. v. ITT Industries, Inc.,*
   452 F.3d 1312 (Fed. Cir. 2006)..................................................................... 9
17

*InPro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.,*
18    450 F.3d 1350 (Fed. Cir. 2006)............................................................ passim

19 *J&M Corp. v. Harley Davidson, Inc.,*
   269 F.3d 1360 (Fed. Cir. 2001)................................................................... 21
20

*Kumar v. Ovonic Battery Co., Inc.,*
21    351 F.3d 1364 (Fed. Cir. 2003)................................................................... 15

22 *Mas-Hamilton Group v. LaGard, Inc.,*
   156 F.3d 1206 (Fed. Cir. 1998)............................................................. 22, 24
23

*Micro Chemical Inc. v. Great Plains Chemical Co.,*
24    194 F.3d 1250 (Fed. Cir. 1999)............................................................. 21, 22

25 *Microsoft Corp. v. Multi-Tech System, Inc.,*
   357 F.3d 1340 (Fed. Cir. 2004), *cert. denied,* 125 S.Ct. 61 (2004).... 9, 17, 18
26

*NTP, Inc. v. Research In Motion, Ltd.,*
27    418 F.3d 1282 (Fed. Cir. 2005)................................................................ 5, 7

28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Network Commerce, Inc. v. Microsoft Corp.,*
    422 F.3d 1353 (Fed. Cir. 2005)...................................................... 10, 18

*Nystrom v. Trex Co., Inc.,*
    424 F.3d 1136 (Fed. Cir. 2005)............................................................ 10

*Omega Engineering, Inc. v. Raytek Corporation,*
    334 F.3d 1314 (Fed. Cir. 2003)............................................................ 22

*On Demand Machine Corp. v. Ingram Industrial, Inc.,*
    442 F.3d 1331 (Fed. Cir. 2006)............................................................ 10

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005).....................................................passim

*Salazar v. Procter & Gamble Company,*
    414 F.3d 1342 (Fed. Cir. 2005)...................................................... 11, 12

*Smiths Industries Medical Systs. v. Vital Signs, Inc.,*
    183 F.3d 1347 (Fed. Cir. 1999)............................................................ 22

*TA Instruments, Inc. v. Perkin-Elmer Corp.,*
    277 F. Supp. 2d 367 (D. Del. 2003)...................................................... 23

*Technology Licensing Corp. v. Videotek, Inc.,*
    2002 U.S. Dist. LEXIS 26803 (N.D. Cal. 2002) ...................................... 24

*Terlep v. Brinkmann Corp.,*
    418 F.3d 1379 (Fed. Cir. 2005)........................................................ 9, 19

*Toro Co. v. Deere & Co.,*
    355 F.3d 1313 (Fed. Cir. 2004)............................................................ 24

*WMS Gaming Inc. v. International Game Tech.,*
    184 F.3d 1339 (Fed. Cir. 1999)............................................................ 23

**STATUTES**

35 U.S.C. § 112, ¶ 6................................................................passim

## I.    Introduction and Summary

In this patent lawsuit, Catch Curve, Inc., asserts one claim from each of four patents against CallWave, Inc.   These patents, which stem from the same initial application filed in September 1988, concern the transmission of fax messages by transmitting facsimile machines to, ultimately, receiving facsimile machines.   That is what the claims say; that is what the specification says; and that is how these patents were distinguished from prior art during prosecution.   Indeed, in a different patent, the patentee's former President described the patented technology as fax-to-fax technology.   But that was before this lawsuit.   Now Catch Curve posits that its 1988 application somehow covers modern fax-to-email technology.

As last year's *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) emphasizes, the patent law does not allow a patentee to obtain patent coverage for one thing and then, in the guise of claim construction, stretch or change its claims to cover another.   Particularly post-*Phillips,* patent claims are tethered to what the specification describes.   Catch Curve's patents describe fax machine-to-fax machine systems, and that is all they do – or could – claim.

## II.    Background of the Technology

### A.    Communication protocols matter – they distinguish a facsimile message from the sending of a telex, an email message, or some other kind of transmission

The patents-in-suit involve a specific communication method – 'fax transmissions.'   '021 Patent 1:22.[1]   What distinguishes one communication method from another?   The communication protocols.   Suppose, for example, one prints out an email and reads it over the phone – is that 'sending or transmitting an email message'?   No.   The sending and receiving machines' protocols are what distinguishes one communication method from another Halpern ¶ 4.

Consider, for example, the transmission and receipt of facsimile messages.

---

[1] "Halpern ¶ ___" refers to the Halpern declaration, and "Decl.," to the Carlson declaration, submitted herewith.   All emphasis supplied unless noted otherwise.

CALLWAVE'S OPENING CLAIM
CONSTRUCTION BRIEF                           1                    Case No. 04-07068-DDP (AJW)

1   As a patent (Bishop) intrinsic to the patents in suit explains, "facsimile equipment

2   requires the completion of a plurality of handshaking functions between

3   communicating transceivers prior to transmission to ensure that appropriate phasing

4   and transmitter-receiver relationships are established."   Decl. Exh. 5 at 3:20-29

5   (Bishop).   This 'handshaking function' is the "necessary . . . digital dialogue" to

6   which the patents in suit refer.   '021 Patent 8:64; *see also id.* 6:62-64, 11:20-25;

7   *see generally* Halpern ¶¶ 9.   In this digital dialogue – the telltale "chirping" that

8   distinguishes a facsimile transmission – the fax machines determine a variety of

9   variables such as the manner by which the message will be sent, the transmission

10  rate, the resolution, and the like.   Without this digital dialogue, the receiving fax

11  machine cannot decipher the information it receives.   Halpern ¶ 9.

12  Unsurprisingly, protocols have become standardized.   However, in the early

13  1970's, different manufacturers' fax machines could not engage in the necessary

14  digital dialogue, because they had "incompatibilities in . . . handshaking procedures

15  . . . existing in various equipment produced by competitive manufacturers."   Decl.

16  Exh. 6, at 1:60-64 (Crager).   Prior artist Crager disclosed a store and forward

17  facility (SAFF) that could mediate those incompatible protocols or handshaking

18  procedures.   This "enable[ed] otherwise incompatible terminals to communicate

19  with each other with a system-wide protocol to enable effective information

20  exchange."   *Id.* at 1:24-27.   Crager solved the problem of incompatible fax-to-fax

21  protocols more than a decade before Catch Curve's first patent application.[2]

22  Indeed, Catch Curve told the PTO that Crager had "solv[ed] a problem that

23  no longer exists," Decl. Exh. 7, at CWI 0000154 ('926 file history excerpts), and

24  told a prospective customer in 1988, in art cited in the patents, that standardization

25  occurred in the mid-1970's.   "Additionally, standards did not exist, so machines

26  made by different manufacturers could not communicate with each other.   That

27
28  [2] Catch Curve was formed on 1/30/2005, and in February 2005 announced that it had purchased the patents-in-suit from AudioFAX.   Decl. Exh. 18 (press release). In this brief, "Catch Curve" refers to both the new entity and AudioFAX.

incompatibility changed in 1974 with the introduction by the CCITT (Consultive Committee for Telephone and Telegraph) of the first worldwide facsimile standard, the Group 1 standard. This was followed in 1976 with the Group 2 standard." Decl. Exh. 8, at CWI 0005316-0005317 (Audiofax, Inc. Oct. 1988 Proposal for Bellsouth Advanced Networks); '021 Patent, Facepage (citing Bellsouth proposal). The Group 3 protocols of the CCITT (now known as the International Telecommunication Union) are the standard today. Halpern Decl. ¶ 11.

## B. Store and forward facilities

Even when protocols can be standardized, other problems can impede or prevent the transmission of messages. The telecommunications field has for decades relied on "store and forward facilities" to serve as intermediaries in the telecommunications chain to address such problems.

For example, a SAFF can serve as an intermediary translator between telex and fax machines, which operate using different protocols and thus cannot transmit messages to each other. Decl. Exh. 7, at CWI 0000152 ('926 file history excerpts); *id.* Exh. 5, at 3:13-29 (Bishop). The SAFF can translate or convert a message sent by telex protocol into fax protocol so that a receiving fax machine can process it. The '896 patent to prior artist Bishop discloses such a system – a SAFF for "translating messages received from said teleprinter [*i.e.*, telex] apparatus to stations employing facsimile equipment," *id.* at 1:9-11; *see also id.* at 112: 1-118:48; Claim 1 (drawn to "[i]nformation translating apparatus").

A SAFF can also address problems in fax machine-to-fax machine transmissions. The manufacturer-specific protocol problem having been solved by the time of the patents, such problems included: the receiving fax machine's unavailability or lack of paper; inefficient usage of both the transmitting and receiving fax machines; broadcasting documents to a number of addressees; the security of sensitive documents; the inaccessibility of recipients who were traveling; and "adequate accounting control over the billing of calls." '021 Patent

1  1:29-2:63.   The patents-in-suit were addressed to such problems.  *E.g.,* '021

2  Patent 2:66-3:1.   The patents purported to address these problems "in a way which

3  is fundamentally compatible with existing fax terminal machines," and the patents'

4  "approach is to provide special computer-based fax Store And Forward Facilities

5  (SAFF's ) as an integral part of a switched telephone network system,"   '021

6  Patent 3:1-6 – in other words, to splice a SAFF into a switched telephone network.[3]

7          **C.      Modern fax-to-email technology**

8          In the nearly two decades since Catch Curve first filed the initial patent

9  application, new technologies developed whereby a message initially transmitted by

10  fax protocol can be received, converted or translated, and then retransmitted using a

11  different protocol – such as email protocol over the Internet – to a personal

12  computer.   (Such systems can be thought of as the mirror image of the Bishop

13  system, which converted incoming telex protocol into outgoing fax protocol.)

14  Various companies, including CallWave, offer different types of fax-to-email

15  services.   With fax-to-email technology, people do not need to buy fax machines

16  to receive messages that are initially transmitted as fax messages.

17          Its patents having been technologically outpaced, Catch Curve is now trying

18  to stretch then to cover the changes and in particular to cover fax-to-email.   This is

19  inappropriate, particularly as the assignee owns a purported fax-to-email patent (not

20  asserted in this lawsuit) that issued to the patentee's former President and that

21  describes   the   technology   in   the   patents-in-suit   as   limited   to   fax-to-fax

22  transmissions.   Decl. Exh. 10 (Bloomfield Patent).

23  **III.   Analysis**

24          In *Phillips*, the Federal Circuit, *en banc*, clarified fundamental claim

25

---

26  [3]  For all asserted patents, Catch Curve claims priority to a 9/22/88 application,
from which the '926 patent issued directly.   Before issuance, Catch Curve filed a
27  continuation-in-part, from which the other three patents in suit issued.   Decl. Exh.
9 (highlighting the new matter).   The latter three patents' specifications are
28  essentially identical.   Catch Curve has asserted one claim from each of the patents
in suit:   '926 Claim 55; '302 claim 24; '034 claim 1; and '021 claim 69.

1   construction rules.   The court underscored that "[t]he patent system is based on the
2   proposition that the claims cover only the <u>invented</u> <u>subject</u> <u>matter</u>," *id.* at 1321, and
3   that claim construction requires "a <u>full</u> <u>understanding</u> <u>of</u> <u>what</u> <u>the</u> <u>inventors</u> <u>actually</u>
4   <u>invented</u> and intended to envelop with the claim.   The construction that stays true
5   to the claim language and most naturally aligns with <u>the</u> <u>patent's</u> <u>description</u> <u>of</u> <u>the</u>
6   <u>invention</u> will be, in the end, the correct construction." *Id.* at 1316.

7         This is because "the person of ordinary skill in the art is deemed to read the
8   claim term . . . in the context of the entire patent, including the specification." *Id.*
9   at 1313.   Thus "the specification 'is always highly relevant to the claim
10   construction analysis.   <u>Usually</u>, <u>it</u> <u>is</u> <u>dispositive</u>; it is the <u>single</u> best guide to the
11   meaning of a disputed term.'" *Id.* at 1315 (citations omitted).   Finally, "the
12   ordinary and customary meaning of a claim term is the meaning that the term would
13   have to a person of ordinary skill in the art in question at the time of the invention,
14   *i.e.*, as of the effective filing date of the patent application." *Id.* at 1313.

15         Further, when, as here, all patents "derive from the same parent application
16   and share many common terms, we <u>must</u> interpret the claims consistently across all
17   asserted patents." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293
18   (Fed. Cir. 2005).   And when, as here, "multiple patents derive from the same
19   initial application, the prosecution history regarding a claim limitation in any patent
20   that <u>has</u> issued applies with equal force to subsequently issued patents that contain
21   the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980
22   (Fed. Cir. 1999), *cert. denied*, 529 U.S. 1066 (2000).

23       **A.      The fax machine/device/message terms**

24           **1.      A "fax machine" is a machine that transmits and receives
25              fax messages using fax protocol, not some other protocol
                such as email**

26         Consistent with the claim language, the specification, the prosecution history,
27   and common sense, one of ordinary skill would have understood the claim terms
28   "facsimile machine" and "facsimile message" to require that the message be sent

CALLWAVE'S OPENING CLAIM
CONSTRUCTION BRIEF                    5           Case No. 04-07068-DDP (AJW)

1    using fax protocol – the digital dialogue that the patents, and art cited in the patents,

2    instruct is necessary.    Catch Curve, however, proposes to ignore its patents'

3    teachings (and technological reality), and remove the understanding that a facsimile

4    machine transmits and receives using facsimile protocol:

| Claim Term | CallWave's Construction | Catch Curve's Position |
|---|---|---|
| facsimile machine | a machine for transmitting or receiving messages while using facsimile protocol | equipment for receiving or transmitting facsimile messages |
| facsimile message | a message transmitted and received by facsimile protocol | image data for facsimiles |

9    Under Catch Curve's litigation position, any further transmission of a

10   document that was once transmitted by a facsimile machine remains a fax

11   transmission.    Even the act of folding a printed fax into an envelope and dropping

12   it into a mailbox on a streetcorner would be a fax transmission.    Catch Curve's

13   litigation position cannot be reconciled with the patents that it convinced the PTO

14   to issue.

15                    **a.       The claim language**

16   The use of a term within a claim "can be highly instructive," and can provide

17   a "firm basis for construing the claim."    *Phillips,* 415 F.3d at 1314.    The claims

18   make clear that a fax machine transmits and receives messages using fax protocol.

19   First, the claims say so.    In the '021 patent, for example, claim 69 requires

20   "receiving at the call handling facility from the originating fax device a fax

21   message, using facsimile protocol."    Likewise, the claims distinguish between

22   computer communications in "fax communication mode" and those in "computer

23   communication mode."    *E.g.,* '302 Patent, Claims 6, 26.    According to the

24   claims, a computer acts in "computer mode" when it calls a SAFF to request the

25   retrieval of messages from a mailbox, but acts in "fax mode" when it toggles to

26   receive the requested messages.    *Id.* ("said paperless facsimile terminal machine

27   being programmed to be able to communicate in both computer communication

28   mode and facsimile communications mode ..."); *see also* '302 Patent, 16:23-27.

1  The claim language recognizes that when computers are equipped to receive fax

2  messages, there is a special "mode" that they must use to do so.

3      Second, the claim structure makes clear that the transmission and receipt of a

4  fax message requires fax protocol.    The claimed fax routing systems start with a

5  "transmitting facsimile machine" – not a telex, or a computer sending an email.

6  *E.g.*, '035 Patent, Claim 1.    As explained above, the transmitting fax machine

7  must send messages in fax protocol.    If it used a telex protocol, then the resulting

8  message would be a telex message, not a fax message.    If it used an email

9  protocol, then the resulting message would be an email message, not a fax message.

10      Likewise, the receiving facsimile machine must receive messages using

11  facsimile protocol.    Claim terms – here, 'facsimile machine' – <u>must</u> be given the

12  same meaning throughout any given claim, and throughout the asserted patents as a

13  family.    *NTP*, 418 F.3d at 1293.    Catch Curve has agreed that "facsimile

14  machine" should be construed consistently throughout the patents.    Decl. Exh. 12.

15      Finally, when a conversion from one protocol to some other protocol is

16  claimed, the claims say so.    The '302 Patent, Claim 9 claims "<u>converting</u> facsimile

17  message signals received from said store and forward facility into suitable video

18  display signals for display on the normal television set."    The '302 Patent, claim

19  13 claims "a video display generator and RF modulator means for <u>converting</u>

20  facsimile messages received from a store and forward facility into display signals

21  supplied to the ordinary television set."    Claim 34 of the '302 patent claims "a

22  <u>conversion</u> means for converting facsimile signals received from said store and

23  forward facility into suitable video display signals for display on the normal

24  television set."    The claims are specific about the kinds of signal conversions

25  contemplated by the patent.    There is not a hint in the asserted claims that they

26  cover converting fax messages to email or Internet communications.

27              **b.    The specification**

28      *Phillips* and its progeny, *see* n. 5, *infra*, emphasized the specification's

1    importance in claim construction.   The specifications in this case recognize that
2    when a protocol conversion is contemplated, it is specified.

3        As an initial matter, the specification recognizes that fax machines transmit
4    and receive fax messages only in "fax mode" – that is, only after establishing the
5    digital dialogue that distinguishes the transmission and receipt of a fax message
6    from other forms of transmission. The specification, *e.g.*, '302 Patent, 6:18-27.
7    describes this "fax mode" as the exchange of digital data between two fax machines
8    before the message is actually sent (*i.e.*, the telltale handshaking):

9        [C]onsider the manner in which a fax transmission occurs in the traditional
10    setting.   Here the communication between two [fax] machines is initiated when the
11    destination machine answers a telephone call directly from the originating machine.
12    Typically, there is an <u>exchange of digital data</u> identifying the sending and receiving
13    machines to each other and <u>establishing the fax mode</u> or format to be used.   <u>If</u> this
14    <u>exchange</u> is <u>satisfactory</u>, then the actual image transmission takes place.

15        The specification makes clear that, in the patents' system, the SAFF does <u>not</u>
16    convert the fax message to an email message.   Rather, in the patents' system, the
17    SAFF simply intercepts the transmitted fax message, '926 Patent, 5:45-48; '021
18    Patent, 5:31-34; Fig. 1, that is, it "answers the phone in place of the destination
19    machine," and thus "becomes the proxy for the destination machine 28."   '926
20    Patent, 6:6-10; '021 Patent, 6:57-61; Fig. 1.   The "SAFF 8 engages the originating
21    machine in the <u>same digital dialogue</u> that would have occurred if a direct
22    connection to the destination machine had actually been made."   '926 Patent,
23    6:11-17; '021 Patent, 5:48-58.   The Store and Forward Facility then stores the fax
24    message.   '926 Patent, 8-7; '021 Patent, 7:1-9; Figs. 1, 3.

25        Having done so, "[t]he second step is to begin to deliver the fax message to
26    the destination machine."   '926 Patent, 6:34-35; '021 Patent, 7:15-17.   In the
27    patents' system, the SAFF has simply become a "proxy for the originating fax
28    machine," '926 Patent, 8:15; '021 Patent, 8:62-63, and "[i]f the destination fax's

1  line is available, the . . . SAFF . . . engages the destination machine in the <u>necessary</u>

2  preliminary <u>digital dialogue</u>," '926 Patent, 8:13-17; '021 Patent, 8:61-64, and

3  thereby transmits the fax message to the receiving fax machine.    The specification

4  says nothing about translating facsimile protocol into email protocol, either between

5  the storage and delivery steps or at any other point.    As the Federal Circuit has

6  recently emphasized, "[t]he public is entitled to take the patentee at his word and

7  the word was that the invention," *Honeywell Int'l, Inc. v. ITT Industries, Inc.*, 452

8  F.3d 1312, 1318 (Fed. Cir. 2006), did not include conversion to email protocol.

9      To the contrary, when the specification contemplates conversion, it says so –

10  starting with the Abstract.    "We have frequently looked to the abstract to

11  determine the scope of the invention."   *Hill-Rom Co., Inc. v. Kinetic Concepts,*

12  *Inc.*, 209 F.3d 1337, 1341 n.1 (Fed. Cir. 2000) (numerous citations omitted).    The

13  only conversion the Abstract discusses is of fax messages into voicemail messages:

14  "[t]he system can convert the received fax message into voice mail message."

15      Likewise, the only conversion that the Summary of the Invention discusses is

16  "convert[ing] an inbound fax message into a voicemail message."    '021 Patent,

17  4:44-49.    Statements from the Summary of the Invention are strong evidence that

18  the invention is limited to what is thus described.    *Terlep v. Brinkmann Corp.*, 418

19  F.3d 1379, 1383 (Fed. Cir. 2005) (post-*Phillips*).[4]    The rest of the specification,

20  like the claims, Abstract, and Summary of the Invention, teaches that in order to

21  receive a fax, the paperless fax device must "switch" from "computer mode" to

22  "fax mode."    '021 Patent, 15:61-65, '302 Patent, 6:18-27.

23      The argument that the claims can be stretched to reach the receipt of email

24  messages is akin to the arguments rejected in *InPro II Licensing, S.A.R.L. v. T-*

25  *Mobile USA, Inc.*, 450 F.3d 1350 (Fed. Cir. 2006).    The disputed claim term there

26  ────────────

27  [4]  *See also C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir.

28  2004), *cert. denied*, 125 S.Ct. 61 (2004); *Genzyme Corp. v. Transkaryotic Therapies, Inc.*, 346 F.3d 1094, 1099 (Fed. Cir. 2003).

was "host interface." As here, the patentee argued for a broad construction – that a "host interface" was not limited to a "direct parallel bus interface." However, the "only host interface described in the specification [was] a direct parallel bus interface." *Id.* at 1354. Because of that, and because that "[a]lthough claims need not be limited to the preferred embodiment when the invention is more broadly described, 'neither do the claims enlarge what is patented beyond what the inventor has described as the invention,'" the Federal Circuit affirmed that "host interface" meant a "direct parallel bus interface." *Id.* at 1355. [5]

### c. The prosecution history

The clarity of the claim language and specification in this case are good examples of why the prosecution history can be "less useful" for claim construction purposes, although "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Phillips*, 415 F.3d at 1317. Catch Curve's efforts to overcome prior art during prosecution confirm that the fax machine/fax message terms require fax protocol.

The PTO initially rejected draft '926 claims based on Bishop. But Catch Curve argued that Bishop could not "accept, process, or communicate a message originating from a fax machine," Decl. Exh. 7 at CWI 0000151 ('926 file history excerpts), because Bishop transmitted messages initially using digital teletype protocols that were converted into fax protocols – only after which the receiving fax machine could receive the message: "Bishop's system cannot accept, process, or communicate a message originating from a fax machine, . . ." Decl. Exh. 7 at

---

[5] *See also On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331 (Fed. Cir. 2006) (based on the specification, "customer" means retail customers); *Aquatex Industries, Inc. v. Techniche Solutions*, 419 F.3d 1374, 1380-81 (Fed. Cir. 2005) ("fiberfill batting material" had to be synthetic based on the specification); *Nystrom v. Trex Co., Inc.*, 424 F.3d 1136 (Fed. Cir. 2005) (based on the specification, "board" meant wooden boards); *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1358-61 (Fed. Cir. 2005) (based on the specification, "download component" required the inclusion of a boot program).

1  CWl 0000151 ('926 file history excerpts). That argument succeeded, and in an
2  Examiner interview, Catch Curve used the distinction between fax and other
3  protocols to persuade the Examiner to withdraw the final rejection, Decl. Exh. 7 at
4  CWl 0000179 ('926 file history excerpts). Likewise, in distinguishing Crager,
5  which addressed the problem of fax machine-to-fax machine transmissions where
6  the transmitting and receiving machines used manufacturer-specific protocols, the
7  applicants argued that unlike their system, the Crager system could "translate the
8  generalized digital fax data into the correct protocol and remodulate it according to
9  the scheme used by the destination machine." Decl., Exh. 7, at CWl 0000154
10  ('926 file history excerpts).

11      Thus, here "the prosecution history . . . inform[s] the meaning of the claim
12  language by demonstrating how the inventor understood the invention and whether
13  the inventor limited the invention in the course of prosecution." *Phillips*, 415 F.3d
14  at 1317. The fax machine/fax message limitations require the handshaking – the
15  fax protocol – that distinguishes the transmission and receipt of a fax messages
16  from other messages such as email.

17      The '926 reexamination proceedings, which are part of the prosecution
18  history, also confirm that the claimed invention does not involve the conversion of
19  data to other protocols. In distinguishing prior art, the PTO stated in its "Reasons
20  for Confirmation/Patentability" that the '926 patent "does **not** perform any
21  conversion of data as is suggested" by the prior art reference. Decl. Exh. 11 at
22  CWI0010554 (file history excerpts from first reexamination of U.S. Patent No.
23  4,994,926, 90/004,806). By reciting this scope in the Reasons for Allowance, "the
24  examiner recognized that the only supportable scope for the claims" was as stated.
25  *Biogen, Inc. v. Berlex Labs, Inc.*, 318 F.3d 1132, 1139 (Fed. Cir. 2003); *Salazar v.*
26  *Procter & Gamble Company*, 414 F.3d 1342, 1347 (Fed. Cir. 2005).

27          **d.    Prior statements:    Catch Curve's Bloomfield patent**
28      Currently, in litigation, Catch Curve asks this Court to rule that the asserted

1   claims of the '302 and other asserted patents cover a fax-to-email system.

2   However, before this litigation, the patentee's then-President, Mr. Bloomfield, in

3   obtaining a patent on a particular fax-to-email system, described the '302 patent as

4   a involving only a fax-to-fax system.   Decl. Exh. 10 at 1:57-61 (Bloomfield).   In

5   that specification, the patentee's President stated that the patented technology at

6   issue in this lawsuit was "dedicated to the ultimate delivery of the message to a

7   destination fax machine or fax capable device such as an equipped personal

8   computer."   Decl. Exh. 10 at 1:57-61 (Bloomfield).   Mr. Bloomfield

9   distinguished this patented technology from his own, which the specification states

10  involves "a fax to E-mail system and related method whereby a facsimile

11  transmission is sent to its recipient via electronic mail (such as through the

12  "Internet") rather than via another facsimile machine."   Id. at 1:64-2:1.   In that

13  specification, the patentee's president also noted that fax protocols underlie the

14  transmission of fax messages:   "The fax image data is, typically, created by a

15  rasterizing process performed at the sender's fax device 106 by hardware, by

16  software, or by cooperation between hardware and software and is, typically

17  communicated in what is known as 'G3 protocol,' all of which is well-known to

18  those skilled in the art."   Id. at 13:13-18.   These fax protocols are different than

19  the protocols used for sending emails.   Id. at 4:42-44 (discussing TCP/IP).

20      The patentee's then-President having told the PTO under oath that the (a)

21  '302 patent is a fax-to-fax system and (b) a fax-to-email system involves different

22  protocols, it ill behooves Catch Curve now to tell this Court the opposite:   that (i)

23  the patents in suit are fax-to-email patents, and (ii) a fax-to-email system does not

24  require different protocols.

25          2.      **The claims and the specification make clear that a
                    "paperless facsimile terminal machine" is a machine that**

26                  **emulates fax terminals using fax protocol**

27      In the asserted claims, "paperless facsimile terminal machine" appears only

28  in the '302 patent, claim 24, and "paperless facsimile device" appears only in the

1  '034 patent, claim 1.[6]    These phrases did not appear in the initial application; they

2  were part of the new matter that required the C.I.P. filing.    Decl. Exh. 9 at Cols. 2,

3  4, 10, 14, 15, 16, 17 (shading the new portions of the specification).    These claim

4  phrases appear in other, unasserted claims.    *See, e.g.*, '302 Patent, Claims 5-8.

5      Catch Curve is trying to remove the requirement that a facsimile machine

6  transmits and receives using facsimile protocol:

| Claim Term | CallWave's Construction | Catch Curve's Position |
|---|---|---|
| paperless facsimile terminal machine | machine that emulates facsimile terminals by using facsimile protocol | equipment for receiving or transmitting facsimile messages which enables a user to see a facsimile in electronic form |

10      Neither the claim language nor the specification permit the result that Catch

11  Curve seeks to achieve.

12      As the claim language makes clear, it is the modem and specific software that

13  allow a paperless fax terminal device to emulates fax terminals by using fax

14  communication mode – that is, fax protocol.    '302 Patent, Claim 6 recites a

15  "paperless facsimile terminal machine," and the balance of the claim requires a

16  "signal modem" that can be programmed to operate in "facsimile communications

17  mode so that facsimile message stored in the subscriber's mailbox can be directly

18  displayed on said display means of the paperless facsimile terminal machine."

19      Likewise, the Summary of the Invention states that "so-called 'paperless' fax

20  terminals" are "small portable computers equipped with <u>modems</u> and <u>software</u>

21  <u>programs</u> which <u>enable</u> them to <u>emulate</u> fax <u>terminals</u>."    '034 Patent, 4:28-32;

22  '302 Patent, 4:28-31; *see also* Halpern Decl. ¶¶ 13.    The Summary of the

23  Invention also states that "[i]n recent years, paperless fax techniques allow a

24  computer or a micro-processor equipped with specific software and modem to

25  directly transmit and receive facsimile messages," '034 Patent, 2:42-48, which

26  confirms that the specific software and modem allow the 'paperless fax device' to

27  _____

28  [6] The parties agree that "terminal machine" and "device" are synonymous in the
   patents.    Decl. Exh. 12 (7/24/06 letter between counsel).

CALLWAVE'S OPENING CLAIM
CONSTRUCTION BRIEF          13          Case No. 04-07068-DDP (AJW)

1    emulate a fax machine.

2         That these claim phrases mean "a terminal machine [device] that emulate a

3    fax terminal machine [device] by using facsimile protocol" is confirmed by the fact

4    that the only embodiments in the '034 and '302 patents, also reflected in the Figs.,

5    also require a modem to enable the paperless fax device (or terminal machine) to

6    emulate a fax terminal.   '034 patent, Figs. 8 and 9; '302 patent, Figs. 8 and 9.

7    "Although patent claims need not be limited to the preferred embodiment when the

8    invention is more broadly described, 'neither do the claims enlarge what is patented

9    beyond what the inventor has described as the invention.'"   *Inpro II Licensing*,

10   450 F.3d at 1350 (Fed. Cir. 2006) (citation omitted).

> **3.    "Facsimile protocol" means the standardized procedure that**
> 11       **governs the transmitting and receiving of facsimile**
> 12       **messages, and thus excludes other protocols**

13        The concept of "facsimile protocol" is necessarily present in all of the claim

14   limitations that discuss fax machines or fax messages; it also appears explicitly in

15   claim 69 of the '021 Patent.   As is clear from the patents' claims, specification,

16   and file history, "facsimile protocol" does not include the protocol whereby the

17   substance of a facsimile communication is converted into a different format and

18   then retransmitted using some other protocol – as relevant here, by email protocol.

19   That is the heart of the parties' dispute.

20        In fact, Catch Curve initially proposed that "facsimile protocol" meant the

21   procedure and format that governs the transmitting and receiving of facsimile

22   messages.   Decl. Exh. 12, at p. 3 (7/24/06 letter between counsel).   Catch Curve

23   later reported that it was "satisfied with our definition of 'facsimile protocol,'"

24   Decl. Exh. 13, at p. 1 (7/27/06 letter between counsel), and that "it was not our

25   intent to include e-mailing of image data as transmission according to facsimile

26   protocol," *id*.   CallWave's construction, *see id.,* is consistent with that intent:

27            the standardized procedure that governs the transmitting

28            and receiving of facsimile messages.   The term

CALLWAVE'S OPENING CLAIM
CONSTRUCTION BRIEF          14          Case No. 04-07068-DDP (AJW)

1               "facsimile protocol" does not refer to the procedure of

2               transmitting image data (such as by .pdf, .tif, or .xif, or

3               similar formats) via the internet (such as by email or

4               other Internet protocols).

5      But then Catch Curve changed its position, arguing that "facsimile protocol"

6  means "a procedure that governs the transmission of facsimile messages from an

7  originating facsimile machine to a call handling facility." Decl. Exh. 14 (8/7/06

8  letter between counsel). The patents expose Catch Curve's current litigation effort.

9      As the patents discuss, to send a fax message, there is a "necessary

10  preliminary digital dialogue" in which the sending and receiving fax machines (or,

11  in the method of the invention, their proxy – the SAFF) had to engage.  '926

12  Patent, 8:16–17; '021 Patent, 8:62-64.   Those in the art would have well

13  understood that "facsimile protocol" necessarily meant a standardized procedure

14  that governs the transmitting and receiving of facsimile messages.   Indeed, during

15  prosecution, Catch Curve cited standardized procedures.[7]   Second, the patents cite

16  art that discloses such standards.   Such art has "particular value as a guide to the

17  proper construction of the term, because it may indicate…the meaning of the term

18  to persons skilled in the art."  *Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364,

19  1368 (Fed. Cir. 2003) (citing *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216

20  F.3d 1042, 1045 (Fed. Cir. 2000)).   Catch Curve cited prior art to the PTO that

21  stated that the adoption of standards solved the prior "incompatibility" problem.

22  Decl. Exh. 8 (Audiofax, Inc. Proposal for Bellsouth Advanced Networks—Fax

23  Automation & On-Demand Distribution Methods—Oct. 6, 1998); *see also* '021

24  Patent, Facepage (citing Bellsouth proposal); Decl. Exh. 20 at 4:58-61 (Onose).   A

25  patent owned by j2 Global (which wholly owns Catch Curve) cites such standards.

26  [7] CCITT Standards are the only "Other Publications" cited on the '302 patent face
27  page.   During the second '926 reexamination, Catch Curve cited the CCITT
    standards.   Decl. Exh. 1 at 2nd '926 reexamination certificate p. 2 ('926 patent).
28  During prosecution of the other two patents, Catch Curve also cited CCITT
    standards.   '021 Patent, at p. 3 Col. 1; '034 Patent p. 3. Col. 1.

In U.S. Patent No. 6,625,642, which cites the '926 patent-in-suit, j2 stated that with "fax machines . . ., [r]esolution and encoding are <u>standardized</u> in the Comite Consultatif Internationals de Telegraphie et Telephonie (CCITT) Groups 1-4 recommendations."   Decl. Exh. 15, at 5:7-16 (Naylor).

Consistent with Catch Curve's pre-claim construction correspondence that "it was not our intent to include emailing of image data as transmission according to facsimile protocol," there is nothing in the patents that discusses the conversion of a fax transmission to an email transmission.   To the contrary, as discussed above, the only conversion the patents disclose and claim is a conversion to voicemail. The claims cannot "enlarge what is patented beyond what the inventor has described as the invention.'"   *Inpro II*, 450 F.3d at 1350.

**B.    In '034 Patent, Claim 1, which requires a SAFF accessible through a switched telephone network, a "call" is a request to initiate communication over a switched telephone network**

Claim 1 is drawn to "[a] method for operating a facsimile store and forward facility to facilitate facsimile communications."   The first step is "providing a facsimile store and forward facility accessible through a switched **telephone** network."   The claim uses "call" six times, Decl. Exh. 16 ('034 Patent, Claim 1, with "call" highlighted), and the context makes clear that in <u>every</u> instance a call is made over a switched telephone network.[8]   Catch Curve, however, posits that Claim 1's last usage of "call" is not over a switched telephone network but can be an Internet-based signal.   Decl. Exh. 17, at Exh. 1, page 1 RE: '034 Patent (Interrogatory Response).   Hence, Catch Curve's litigation position:

| Claim Term | CallWave's Construction | Catch Curve's Position |
|---|---|---|
| call | a request to initiate communication over a switched telephone network | a request to initiate communication |

Catch Curve's desired result is **untenable**.

Initially, the asserted claim's language makes clear that the "call" is made

---

[8]  The term appears in other claims, too.   *E.g.*, '021 Patent, Claim 69 ("call" is through a switched <u>telephone</u> network).

1    over a switched telephone network. The disputed limitation itself requires

2    "receiving at the facsimile store and forward facility a call from the paperless

3    facsimile device." Earlier, the claim requires that the "facsimile store and forward

4    facility" be "accessible through a switched **telephone** network." The claim

5    thereby makes clear that the "call" from the paperless facsimile device is over a

6    switched **telephone** network, as the prior six usages of "call" make clear.

7    The specification confirms CallWave's construction. It expressly states that

8    the call at issue (*i.e.*, the "call" from the paperless fax device to the SAFF to request

9    messages) is transmitted over an "ordinary line," '034 Patent, 15:41-47, and

10    explains that the "call" at issue is element 40 in the Figs., '034 Patent, 16:43-45;

11    element 40 is an ordinary telephone line. '034 Patent, Fig. 2. The Summary of

12    the Invention states that the patents' "basic approach is to provide special

13    computer-based fax Store And Forward Facilities (SAFFs) as an integral part of a

14    switched **telephone** network system." '034 Patent, 3:3-6. The Detailed

15    Description notes that the entire system of the claim is "embedded in a switched

16    **telephone** network." '034 Patent, 21:28.

17    The file history points the same way. The PTO rejected initial claims in light

18    of Bishop and other claims. In trying to overcome Bishop, the patentee argued

19    that "[t]he present application and **invention presumes** the existence of a switched

20    **telephone network**, computer based or otherwise." Decl. Exh. 7 at CWI

21    0000152.

22    CallWave's arguments to this Court are like those the Federal Circuit

23    rejected in *Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340 (Fed. Cir.

24    2004). The patented technology there involved "methods and modules for the

25    simultaneous transmission of voice and computer data," *id.* at 1342, and the parties'

26    dispute was whether "sending," "transmitting," and "receiving" limitations "are

27    restricted to communications over a telephone line or whether they may encompass

28    communications over a packet-switched network such as the Internet," *id.* at 1346.

The Federal Circuit concluded that such limitations were "limited to communications over a telephone line and excluding the use of a packet-switched network," *id.*, even though "only claim 7 . . . explicitly states that the transmission of data packets between the local site and the remote site must occur 'over a telephone line,'" *id.* at 1347.   It did so principally because of specification "statements, some of which are found in the 'Summary of the Invention,'" and because "nowhere does [the specification] even suggest the use of a packet-switched network." *Id.* at 1348.   Moreover, like the patentee here, in *Microsoft* the patentee distinguished prior art, stating that "[a]pplicants' invention . . . transmits the packets across a POTS [plain old telephone service] line." *Id.* at 1349.   Like the patent and file history in *Microsoft*, here the claim language, the specification, and the file history point away from the patentee's attempt to broaden the claim.   Here, the "call" in '034 Patent, Claim 1 must be over a switched telephone network.   Accordingly, the Court should confirm that "call" refers to "a request to initiate communication over a switched telephone network."

   **C.    The patentees defined "mailbox" to mean "a   storage file in the mass storage of the Store and Forward Facility," a definition that the claim language confirms**

   As *Phillips* underscored, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.   Here, the inventors defined "mailbox."   In the section headed "Security and Mail," the specification states that "[m]essages which the originator wishes to designate as secure are temporarily directed to *a auxiliary storage file 54, 89 in the . . . SAFF called a 'mail box.'*"   '926 Patent, 12:47-50.   That definition governs.   Nonetheless, Catch Curve disputes it – it seeks a construction that the "mailbox" can be anywhere, including a Hotmail, Gmail, or other email server:

| Claim Term | CallWave's Construction | Catch Curve's Position |
|---|---|---|
| mailbox | a storage file in the mass storage of the Store and Forward Facility | storage area(s) |

   Even leaving the express definition to one side, the '926 Patent, Claim 55 makes clear that the mass storage means are in the Store and Forward Facility

1    ("Store and Forward Facility . . . having mass storage means") and that, in turn, the

2    mailbox is in the mass storage means ("the step of defining mailboxes in the mass

3    storage means associated with particular system subscribers").    *Phillips*, 415 F.3d

4    at 1314 (context of claim term in asserted claim can be highly instructive).

5         The Federal Circuit has also "frequently looked to the abstract to determine

6    the scope of the invention."    *Hill-Rom*, 209 F.3d at 1341 n.1.    The Abstracts of

7    each of the four patents instructs that "[s]ubscriber <u>mailboxes</u> are provided as <u>part</u>

8    <u>of</u> <u>the</u> <u>mass</u> storage."    Likewise, each Summary of the Invention discloses that

9    "[a]ll fax transmissions entered into the network are routed to [a SAFF], . . . where

10   they are temporarily stored or 'spooled' by the computer in a mass storage buffer,

11   such as a magnetic disk."    '926 Patent 2:52-56; *see also id.* Fig. 2 (showing

12   mailboxes (element 54) as part of the SAFF (element 8)).    Such statements are

13   strong evidence that the invention is limited to what is thus described.    *E.g.,*

14   *Terlep*, 418 F.3d at 1383.    Finally, in distinguishing prior art during prosecution,

15   Catch Curve told the PTO that the mailboxes were in the SAFF:    "This is far

16   different than the system mailbox storage provided by the present invention, with

17   fax messages stored in a subscribers mailbox in the central system and accessible

18   from any location for delivery at any desired fax machine."    Decl. Exh. 7, at CWI

19   0000180 ('926 file history excerpts).

20        The Court should confirm that the "mailbox" in the patents is a storage file in

21   the mass storage of the SAFF.

22        **D.    "Together with" means in the same mass storage device**

23        The term "together with" specifies how the messages are stored:    "recording

24   received messages <u>in the</u> <u>mass</u> <u>storage</u> <u>means</u> <u>together</u> <u>with</u> information indicating

25   the transmitting facsimile machine and the intended receiving facsimile machine."

26   '926 Patent, Claim 55 (emphasis supplied); *see also* '302 Patent, Claim 24.

27   Properly construed, "together with" requires that the received messages be stored in

28   the same mass storage device as the information indicating the transmitting

facsimile machine and the intended receiving facsimile machine.   Catch Curve wishes to broaden "together with" to mean "associated with":

| Claim Term | CallWave's Construction | Catch Curve's Position |
| --- | --- | --- |
| together with | in the same mass storage device | storing a facsimile, originating number, and destination number in a way that associates them with each other |

Catch's Curve's litigation position – that "together with" means "associated with" – cannot be reconciled with its patents.

The patents explain that the specified information is stored in a "block of data" in a "mass storage device":   "The originating machine's identification, the destination machine's telephone number, the fax format, and the document image data are all stored on a mass storage device 67 (in FIG. 3), such as a computer magnetic disk unit.   Furthermore, a unique alphameric Message Code is assigned to the block of data to identify it while it is resident in the SAFF system."   '926 Patent, 6:18-27; '302 Patent, Col: 7:4-13.   Moreover, as Fig. 3 confirms, the referenced data are all stored in the same mass storage device:



_Although the "transaction files" and the "stored fax data" files can be in separate places in the particular "mass storage device" or "computer magnetic disk unit," '926 Patent, 7:30-40 & Fig. 3, nowhere does the specification state that the stored fax data files and transaction files can be stored on different mass storage devices.   To the contrary, they are described and disclosed only as being stored together in a mass storage device such as a computer magnetic disk unit.

**E.     "Determining … if the particular call is a mailbox call"**

The method of the '926 patent involves a decision on where to direct the fax message.   The message can either be sent directly to a user's fax machine, or the

message can be sent to a mailbox in the SAFF. This decision – whether to retransmit the message directly or to save it in a mailbox – is the focus of the "determining" limitation.

The existing claim language and the specification support CallWave's construction. The specification explains the decision tree that the system follows to determine whether the call terminates in a mailbox: "The various call and file parameters are linked and stored 138 and the call parameters are passed through 139 to the Local Interface 83, which then decides 141 whether the call is addressed to a 'real' fax number, or a fictitious number terminating in a mail box. If the number is real the Local Interface attempts to contact the destination machine for immediate delivery." '926 Patent, 17:52-59.

Catch Curve's proposed definition, by contrast, does not even mention mailboxes. Catch Curve does not specify what it means for a call to be directed to a user. It offers no guidance on how to interpret "based on an inbound telephone number" (which is unsupported in the specification):

| Claim Term | CallWave's Construction | Catch Curve's Position |
|---|---|---|
| "determining … if the particular call is a mailbox call" | determining whether the call terminates in a mailbox | using a store and forward facility to determine whether an inbound call is directed to a user based on the inbound telephone number |

Because CallWave's definition properly tracks the teachings of the patent, it should be adopted. *Phillips*, supra; *see* n. 7, supra.

### F.    The SAFF terms and § 112(6)

In certain claims, the patentees claimed their invention using the means-plus-function format.   35 U.S.C. § 112, ¶ 6 (allowing claims to means performing a function).   Such claims' scope is restricted to the structures or acts described in the patent's specification for performing those functions, and their equivalents. *E.g.*, *J&M Corp. v. Harley Davidson, Inc.*, 269 F.3d 1360, 1367 (Fed. Cir. 2001).   If the word "means" appears in a claim associated with a function, § 112(6)

1  presumptively applies.   *Micro Chem. Inc. v. Great Plains Chem. Co.*, 194 F.3d

2  1250, 1257 (Fed. Cir. 1999).   If "means" or "step(s) for" are absent, § 112, ¶ 6

3  nonetheless applies if the claim phrase fails to provide sufficient structure or acts

4  for performing its function.   *See, e.g., Mas-Hamilton Group v. LaGard, Inc.*, 156

5  F.3d 1206, 1213-14 (Fed. Cir. 1998).   Interpreting means-plus-function claims

6  requires first identifying the claimed function and then determining the

7  corresponding structures in the specification.   *Omega Engineering, Inc. v. Raytek*

8  *Corporation,* 334 F.3d 1314, 1321 (Fed. Cir. 2003).

9      For claim construction purposes, the Court should identify as corresponding

10  structure only the specific structures actually described in the specification, as

11  opposed to broader, but undisclosed categories of such structures.   *Smiths*

12  *Industries Med. Systs. v. Vital Signs, Inc.*, 183 F.3d 1347, 1357 (Fed. Cir. 1999).

13              **1.    The "mass storage means" limitations**

14      The "mass storage means" is a means for storing fax data.   *See* '926 Patent,

15  Claim 55 & '302 Patent, Claim 24 ("mass storage means for storing facsimile

16  messages").   This claim structure tracks the format for invoking the means-plus-

17  function framework, and thus section 112(6) presumptively applies.   *Micro Chem.*

18  *Inc.*, 194 F.3d at 1257.   Courts have treated the term "storage means" as a means-

19  plus-function limitation.[9]   "[M]ass storage means" is properly a means-plus-

20  function limitation because, while there are endless ways to store information, the

21  claim language provides none of that structure.   (Catch Curve has asserted that §

22  112(6) does not apply, but has not said what it asserts this claim phrase to mean.)

23      Here, the function performed by "mass storage means" is to store facsimile

24  messages.   *See* '926 Patent, Claim 55 & '302 Patent, Claim 24 ("mass storage

25  means for storing facsimile messages").   The corresponding structure disclosed in

26  the specification is a file on a magnetic disk.   *See, e.g.*, '926 Patent, 2:52-56; 6:18-

27

28  [9] *E.g.*, *General Creation LLC v. Leapfrog Enters.*, 232 F. Supp. 2d 661, 674-78 (W.D. Va. 2002).

CALLWAVE'S OPENING CLAIM
CONSTRUCTION BRIEF              22              Case No. 04-07068-DDP (AJW)

23; 7:30-31; Figure 3, Element 67.

### 2. The "computer means" limitation

In the asserted claims, "computer means" is introduced as a means for performing a certain function, *i.e.*, a means for controlling the store and forward facility. *See* '926 Patent, Claim 55 *and* '302 Patent, Claim 24 ("at least one store and forward facility having computer means for controlling its operation"). Section 112(6) thus presumptively applies, and courts have construed "computer means" as a means-plus-function limitation.[10]   Moreover, § 112(6) also applies because the term "computer means" does not provide guidance as to the structure required for the functions of the "computer means."   When a "computer means" is specified, the computer, standing alone, does not provide sufficient structure when the functions include specific tasks.   *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) ("In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.").

The corresponding structures are the disclosed special-purpose computers and algorithms for performing the various functions for receiving, storing, and transmitting facsimile messages, for both mailbox and non-mailbox calls. *See* '926 Patent, Cols. 16:5-20; 16:29-18:49; Figures 1-4, 5a, 5b, 6a, 6b, and 7.

### 3. The "store and forward facility" limitation

The term "store and forward facility" should be construed as a means-plus-function limitation, even though it is not written in standard "means" format (and is thus presumptively not subject to § 112(6)).   Section 112(6) applies because the claim language lacks sufficient structure to carry out the stated purpose of the limitation (*i.e.*, storing and forwarding).   "'The inquiry is not whether a term has a

---

[10] *E.g.*, *TA Instruments, Inc. v. Perkin-Elmer Corp.*, 277 F.Supp.2d 367, 372-75 (D. Del. 2003) (remand after unpublished Federal Circuit opinion concluding that "computer means" was a § 112(6) claim phrase).

as a functional term and has no inherent structure. *See Tech. Licensing Corp.*, 2002 U.S. Dist. LEXIS 26803, at *11-12 (§ 112(6) applies to "circuit," because the claims did not recite, and the specification did not disclose, the necessary circuitry).

The "store and forward facility" has numerous functions in the claims, all related to receiving facsimile messages, storing them, and determining when and where to transmit them. *See* '926 Patent, Claim 55 ("receiving facsimile messages," "storing facsimile messages," and "transmitting facsimile messages"). The corresponding structure is the structure to be used for performing these functions, including both the physical hardware required as well as the software to perform the functions. *See* '926 Patent, Cols. 2:49-56; 3:36-45; 3:67-4:7; 4:21-22; 6:18-23; 7:30-31; 16:5-20; 16:29-18:49; Figures 1-4, 5a, 5b, 6a, 6b, and 7.

## IV. Conclusion

These are fax-to-fax patents, and they cannot be stretched and contorted as Catch Curve now seeks to. For the foregoing reasons, CallWave respectfully asks that the Court issue the Claim Construction Order filed concurrently with this brief.

Dated: October 13, 2006

WEIL, GOTSHAL & MANGES LLP

By: _____

Vernon M. Winters
Attorneys for Defendant and
Counter-Claimant, CallWave,
Inc.

CALLWAVE'S OPENING CLAIM
CONSTRUCTION BRIEF

25

Case No. 04-07068-DDP (AJW)